Westlaw.

286 Fed.Appx. 256                                                    Page 1
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

**H**
This case was not selected for publication in the
Federal Reporter.

Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Melissa AVERY, Plaintiff-Appellant,
v.
JOINT TOWNSHIP DISTRICT MEMORIAL
HOSPITAL, Defendant-Appellee.
**No. 07-3801.**

July 1, 2008.

**Background:** Former hospital employee sued the
hospital, claiming wrongful discharge in violation
of public policy, intentional infliction of emotional
distress, and fraud. The United States District Court
for the Northern District of Ohio granted summary
judgment for the hospital, and the employee ap-
pealed.

**Holdings:** The Court of Appeals, Clay, Circuit
Judge, held that:
(1) Ohio's public policy against the falsification of
records was not put in danger by the dismissal of
the employee, thus defeating her claim of wrongful
discharge;
(2) firing of an employee for what was believed to
be a Health Insurance Portability and Accountabil-
ity Act (HIPAA) violation was not extreme or out-
rageous behavior; and
(3) hospital did not engaged in fraud when it ter-
minated the employee.

Affirmed.

West Headnotes

**[1] Labor and Employment 231H ☞777**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk775 Reporting or Opposing Wrong-
doing; Criticism and "Whistleblowing"
                231Hk777 k. Particular Cases in Gen-
eral. Most Cited Cases
Former hospital employee could not prevail on her
claim that she was terminated in violation of Ohio's
public policy favoring whistleblowers, a policy em-
bodied in Ohio's Whistleblower Act, where she
failed to comply with that statute's procedural re-
quirements for reporting and filing suit. Ohio R.C.
§ 4113.52(A, D).

**[2] Labor and Employment 231H ☞759**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk759 k. Public Policy Considera-
tions in General. Most Cited Cases
Under Ohio law, a former hospital employee's fail-
ure to meet the procedural requirements of the Ohio
Whistleblower Act did not preclude her from bring-
ing a wrongful discharge claim based on a public
policy against the falsification of medical records.
Ohio R.C. §§ 4113.52, 2913.42(A)(1).

**[3] Labor and Employment 231H ☞759**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk759 k. Public Policy Considera-
tions in General. Most Cited Cases
Ohio's public policy against the falsification of re-
cords was not put in danger by the dismissal of a
hospital employee, thus defeating her claim of
wrongful discharge in violation of on a public
policy; a supervisor responded in the negative when
asked by the employee whether she wanted the em-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT
A
tabbies

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

ployee to falsify medical records regarding the delivery of a baby, and the employee's statements regarding the inaccuracy of a midwife's account of the delivery were made while she was defending herself against the midwife's accusations of sloppy charting, not as a report of the violation of a government policy.

**[4] Damages 115 ☞57.58**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)2 Mental Suffering and Emotional Distress
                115k57.50 Labor and Employment
                    115k57.58 k. Other Particular Cases. Most Cited Cases
Hospital officials' firing of an employee for what they believed to be a Health Insurance Portability and Accountability Act (HIPAA) violation was not extreme or outrageous behavior supporting the employee's claim of intentional infliction of emotional distress. Health Insurance Portability and Accountability Act of 1996, § 262(a), 42 U.S.C.A. § 1320d.

**[5] Fraud 184 ☞10**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k10 k. Matters of Fact or of Law. Most Cited Cases

**Fraud 184 ☞13(1)**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(1) k. Falsity of Representations. Most Cited Cases

Under Ohio law, a hospital did not engaged in fraud when it terminated an employee based upon allegations of a blatant Health Insurance Portability and Accountability Act (HIPAA) violation; the hospital's representation that the employee violated HIPAA was a representation of law and not of fact, and there was no evidence of falsity. Health Insurance Portability and Accountability Act of 1996, § 262(a), 42 U.S.C.A. § 1320d.

**\*257** On Appeal from the United States District Court for the Northern District of Ohio.

BEFORE: KEITH, CLAY, and GILMAN, Circuit Judges.

CLAY, Circuit Judge.

**\*\*1** Plaintiff Melissa Avery appeals the district court's order granting summary judgment to Defendant Joint Township District Memorial Hospital on Avery's claims of wrongful discharge in violation of public policy, intentional infliction of emotional distress, and fraud. For the reasons set forth below, we **AFFIRM** the decision of the district court.

**BACKGROUND**

**A. Substantive Facts**

Plaintiff Melissa Avery was hired by Joint Township District Memorial Hospital ("the Hospital") in December 2002 as a part-time registered nurse, an at-will employee, in the Labor and Delivery department. In the first year and a half of Avery's employment, the Hospital had no complaints about Avery's work performance. In the fall of 2004, the Hospital claims that Avery's work began to suffer because of her attention to a spa business she had opened with her husband. In November 2004, Avery's supervisor, Diane Wagner, claims to have received complaints regarding Avery's work performance. According to Wagner's notes, on November 4, 2004,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

Page 3

Wagner talked to a nurse who complained about Avery running her business while she was working at the Hospital. Wagner received complaints about Avery's use of hospital phones to conduct her personal business, her solicitation of patients to become customers of her salon, Avery improperly giving medical advice to patients over the phone, and Avery's sloppy charting of deliveries.

Avery claims that the Hospital's reports of problems with her performance began only after she assisted midwife Bridget Heckler and nurse Maria Kindig with the difficult delivery of a baby girl on November 5, 2004. During the delivery, the vital signs of the baby and mother were being monitored electronically by an Electronic Fetal Heart Monitor that printed a monitor strip, a sheet of paper documenting vital signs, as the information was being recorded. Avery was responsible for noting on the monitor strip when significant events such as the delivery occurred. According to Avery, the delivery proceeded well until the baby's head was visible at 5:29 p.m., but the umbilical cord was wrapped around the baby's neck. Heckler clamped and cut the umbilical cord at 5:30 p.m., resulting in the baby having no oxygen**258** source. A heart rate of sixty beats per minute was recorded by the monitor at this point. According to Avery, because the baby's shoulders were stuck, Heckler needed to turn the mother on her side in order for the baby to be delivered. Avery claims that the baby was not breathing and had no heartbeat when it was delivered and taken to the warmer at 5:34 p.m. Heckler then successfully resuscitated the infant. After the baby was out of danger, Avery recorded the time of delivery as 5:32 p.m. in a handwritten notation on the monitor strip.[FN1] Avery claims that this notation was based on Heckler's or Kindig's recollection of the time of delivery. After the delivery, Avery claims that Heckler wrote "maternal" under the monitor strip's record of a 60 beat per minute heart rate even though the recorded heart rate was the baby's. Heckler also documented that the delivery occurred without complications.

FN1. The monitor strip produced by the Hospital during discovery is missing this handwritten notation.

**\*\*2** On November 10, 2004, Wagner met with Avery to discuss complaints regarding her performance. Wagner told Avery that Heckler was upset because Avery had not accurately noted the time of birth during the November 5, 2004 delivery. Heckler had stated that neither Avery nor the other nurse assisting with the delivery had known exactly when the baby was delivered and that it was Avery's responsibility as the lead nurse to note the time of birth. Heckler believed that the baby had been delivered within seconds of the umbilical cord being cut, much earlier than 5:32 p.m. Focusing on the fact that Heckler believed the time of delivery was earlier than the time Avery noted, Wagner claimed that the way Avery had charted the delivery would look bad in a court of law. While reviewing the monitor strip with Wagner, Avery explained her charting and showed what she claimed was the baby's heart rate continuing for several minutes after the umbilical cord was clamped and cut. Wagner noted that the interpretation of monitor strips was subjective and that the correct interpretation was hard to prove. When Avery claimed that her notation of the time of birth was correct, Wagner suggested that perhaps the clock in the room and the clock in the monitoring device were not synchronized. Avery went to the room and determined that the clocks were synchronized. In the course of their discussion, Avery asked Wagner whether she was being asked to change her charting or to "lose the monitor strip." (J.A. 164.) Wagner responded by describing how, when Wagner was a young nurse, a supervisor had asked her to change her records, and she had refused. Wagner told Avery that she was not being asked to change her charting.

At the same meeting, Wagner confronted Avery about her use of the Hospital's resources and her work time to conduct personal business. Wagner noted complaints regarding Avery's solicitation of business from hospital patients, and Avery agreed

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

Page 4

to stop conducting her spa business during work hours. Wagner also said that Heckler was upset that Avery had given Heckler's patient advice about how to induce labor over the phone.

After meeting with Avery, Wagner received a complaint that Avery had taken a day off work at the Hospital, claiming that she could not find a babysitter, when in fact she was working at her spa. Additionally, the relatives of a patient complained that Avery had obtained confidential information and used it to fire an employee at her spa business. According *259 to Avery, she requested information regarding a patient because one of Avery's employees claimed that she may have been exposed to spinal meningitis and could not be at work for fear of infecting others. Avery called the emergency room and asked if anyone had been admitted with spinal meningitis. When the emergency room staff responded that there was no confirmation of a spinal meningitis case, Avery relayed the information to her employee. Avery fired the employee the next week, although Avery claims that the employee was terminated for unrelated performance issues. Wagner discussed this matter with Art Swain, the Hospital's Vice President of Human Resources and Support Services. Swain concluded that Avery's conduct violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936. According to Swain, the HIPAA violation occurred not solely because Avery called the emergency room about the spinal meningitis patient but also because she shared the information with someone outside the hospital. Swain and Wagner subsequently decided that Avery would be terminated.

**3 On December 8, 2004, Wagner met with Avery and terminated her employment. Wagner claimed that Avery's termination was based in large part on Avery's HIPAA violation. According to Avery, the termination caused her to be depressed, gain thirty pounds, and experience chest pain and an elevated heart rate. Avery was prescribed Toprol by her family doctor for her chest pains.

**B. Procedural History**

On June 27, 2005, Avery brought a wrongful discharge complaint in Ohio state court against the Hospital for her dismissal from her registered nurse position. Avery subsequently entered a voluntary dismissal of the suit without prejudice and filed suit in United States District Court for the Northern District of Ohio claiming that she was wrongfully discharged in violation of public policy, that the Hospital intentionally inflicted emotional distress upon Avery, that the Hospital engaged in negligent misidentification, that the Hospital breached its contract with Avery, and that the Hospital engaged in fraud. The Hospital filed a motion for summary judgment, which was granted by the district court on May 25, 2007.

Avery filed a timely notice of appeal on June 15, 2007. Avery appeals the district court's grant of summary judgment on her claims of wrongful termination in violation of public policy, intentional infliction of emotional distress, and fraud.

### DISCUSSION

#### Standard of Review

This Court reviews a district court's grant of summary judgment *de novo. Blackmore v. Kalamazoo County,* 390 F.3d 890, 894-95 (6th Cir.2004). Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the nonmoving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To support its motion, the moving party may show

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

"that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. While all inferences must be drawn in favor of the nonmoving party, this Court is under *260 no obligation to imagine favorable facts where the nonmoving party has alleged none. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Inasmuch as this is a diversity case, this Court must apply Ohio law "in accordance with the then controlling decision of the highest state court." *Grantham & Mann, Inc. v. American Safety Products, Inc.,* 831 F.2d 596, 608 (6th Cir.1987). If the Ohio Supreme Court has yet to address an issue, this Court must decide the issue using all relevant data. *Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc.,* 249 F.3d 450, 454 (6th Cir.2001). "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [Ohio] Supreme Court would decide otherwise." *Id.* (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995)).

## I. *GREELEY* CLAIM

**\*\*4** Employment in Ohio is generally governed by the common law doctrine of employment at will. *Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 773 N.E.2d 526, 529 (2002). Under this doctrine, both the employer and the employee are free to end the employment relationship for any reason, and as a result, an employee may not bring suit for wrongful discharge. *Id.* However, in *Greeley v. Miami Valley Maintenance Contractors, Inc.,* 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), the Ohio Supreme Court joined the many state courts that recognize an exception to this doctrine when an employee has been

wrongfully discharged in violation of public policy. *Id.* at 986. In *Greeley* an employee was fired because of a court order requiring his wages to be garnished for child support payments. *Id.* at 983. His discharge was in direct contravention of Ohio Revised Code § 3113.213, a statutory provision that prohibits the termination of employees because of wage garnishment orders. *Id.* The *Greeley* court held that although employers are generally permitted to terminate at-will employees for any reason, a termination in violation of an Ohio statute could lead to tort liability for wrongful discharge in violation of public policy. *Id.* at 986.

Although the *Greeley* court recognized this cause of action only for employees who had been discharged in violation of a statute, the Ohio Supreme Court later expanded the wrongful discharge tort's scope to encompass employees who had been discharged in violation of the Ohio and United States Constitutions, administrative rules and regulations, and the common law. *Painter v. Graley,* 70 Ohio St.3d 377, 639 N.E.2d 51, 56 (1994). The *Painter* court specified that "the public policy alleged to have been violated [must be] of equally serious import as the violation of a statute." *Id.* Since first recognizing the tort, often referred to as a "*Greeley* claim," the Ohio Supreme Court has set forth four elements that must be satisfied for a wrongful discharge in violation of public policy action to succeed:

1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

\*261 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4. The employer lacked overriding legitimate busi-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

<div align="right">Page 6</div>

ness justification for the dismissal (the overriding justification element).

*Id.*(quoting Henry H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?,* 58 U. Cin. L.Rev. 397, 398-99 (1989)).

### 1. Clarity

Avery asserts that she was terminated in an effort by the Hospital to cover up the actual facts of the November 5, 2004 delivery. To establish the clarity element of the *Greeley* claim, Avery must demonstrate the existence of an established public policy in violation of which she was discharged. Avery attempts to maintain a *Greeley* claim based on either the Hospital's violation of the public policy embodied in Ohio's Whistleblower Act, Ohio Revised Code § 4113.52, or the public policy against the falsification of medical records. The Hospital contends that Avery cannot maintain a claim based on either of these policies. For the reasons set forth below, we find that Avery's claim does not satisfy the clarity element for the violation of public policy protecting whistleblowers, but it does satisfy the clarity element for the violation of public policy against falsification of medical records.

### a. Whistleblower Act

**\*\*5** [1] The Ohio Whistleblower Act prohibits an employer from retaliating against an employee who reports the employer's wrongdoing. Ohio Rev.Code § 4113.52. Unless the wrongdoing consists of the commission of one of a limited class of criminal offenses (not at issue in this case), in order to be protected by the Whistleblower Act, the employee must notify her supervisor both orally and in writing of the wrongdoing to allow the employer the opportunity to rectify the situation. Ohio Rev.Code § 4113.52(A). The employee must also file suit within 180 days of the employer's retaliatory action in order to recover civil damages. Ohio Rev.Code § 4113.52(D).

Despite the existence of statutory enforcement measures within the act itself, Ohio courts recognize the public policy favoring whistleblowing embodied in Ohio's Whistleblower Act as a basis for a common law wrongful discharge in violation of public policy claim. *Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308, 322 (1997). Ohio courts have interpreted the public policy expressed by the Whistleblower Act narrowly, reasoning that: "[b]y imposing strict and detailed requirements on certain whistleblowers and restricting the statute's applicability to a narrow set of circumstances, the legislature clearly intended to encourage whistleblowing only to the extent that the employee complies with the dictates of R.C. 4113.52." *Id.* at 322-23. As a result, an employee who has not complied with the statute's reporting or procedural requirements may not base a *Greeley* claim upon the policy embodied in the Whistleblower Act. *See Contreras v. Ferro Corp.,* 73 Ohio St.3d 244, 652 N.E.2d 940, 946 (1995).

In the instant case, it is uncontested that Avery did not comply with the Whistleblower Act's requirements for reporting and filing suit. Avery did not file a written report regarding the alleged cover-up of the November 5, 2004 delivery, nor did she bring suit under the Whistleblower Act within 180 days of her discharge from the Hospital. As a result, Avery cannot base her wrongful discharge action upon the Whistleblower Act, and the only viable basis for her *Greeley* claim is the Hospital's**\*262** violation of the public policy against the falsification of medical records.

### b. Falsification of Medical Records

[2] Avery cites a variety of cases, criminal statutes, and administrative regulations to support her contention that Ohio has a public policy against the falsification of medical records. Avery cites Ohio Administrative Code § 4723-4-06(E), requiring nurses to accurately document observations; Ohio Administrative Code § 4723-4-06(G), prohibiting the falsification of patient records; and Ohio Re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
Page 7
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))

vised Code § 2913.42(A)(1), prohibiting the falsification of records.[FN2] Avery also cites *Doyle v. Bethesda Hospital Assn.,* No. CT96-0014, 1996 WL 752547 (Ohio Ct.App. Oct. 23, 1996) (unpublished). In *Doyle,* a nurse alleged that she was fired because she refused to delete from her notes information regarding patient care. The Ohio Court of Appeals held that if the plaintiff's allegations were true, the plaintiff was discharged in violation of Ohio public policy because "[h]ospitals should not be permitted to alter information about patient care to avoid potential liability." *Doyle,* 1996 WL 752547, at *2. Given the abundance of authority prohibiting the falsification of medical records, Avery has demonstrated the existence of a clearly established public policy upon which she may base her *Greeley* claim.

> FN2. Avery also cites Ohio Administrative Code § 4723-4-03(D)(3) as a basis for the public policy against the falsification of records. However, this provision deals with the credentials required of nurses and is unrelated to Avery's argument.

> The relationship between another of Avery's sources of public policy, Ohio Revised Code § 2921.12(A), which prohibits tampering with evidence related to an official proceeding, and the public policy against the falsification of medical records also seems somewhat tenuous since the records in question had no relationship to any pending or likely official proceeding.

**\*\*6** The Hospital argues that Avery cannot maintain a claim based upon the policy against the falsification of medical records because this would essentially be a claim based upon the principles embodied in the Whistleblower statute. In support of its arguments, the Hospital notes that Avery's claim that she was asked to alter medical charts is refuted by her own deposition testimony. The Hospital asserts that excluding this claim, Avery is alleging only that she was fired for reporting Bridget Heck-

ler's alteration of medical records, a quintessential whistleblower claim. Although we agree that Avery's testimony contradicts her assertion that her supervisor asked her to alter medical information, an inquiry into the factual basis for Avery's public policy claim is not helpful in determining whether Avery is alleging the violation of a clearly established policy. This Court's analysis of the first *Greeley* element must focus on the policy Avery has identified and not on the actual circumstances of her termination.

On the other hand, even if the Hospital's argument is well-taken, and the only violation of public policy that Avery could allege arose from the Hospital's discharge of Avery for reporting Heckler's falsification of medical records, Avery's claim would not be precluded by her failure to follow the procedures of the Ohio Whistleblower Act. The Hospital cites a variety of Ohio Court of Appeals cases for the proposition that Ohio law precludes the success of a claim that involves the public policy in favor of whistleblowing (even though cast as involving a different policy that does not specifically prohibit employer retaliation) if the plaintiff has not met the requirements of the Whistleblower Act. The Hospital relies in particular upon **\*263***Evans v. PHTG, Inc.,* No.2001-T-0054, 2002 WL 1401476 (Ohio Ct.App. June 28, 2002). *Evans* involved an employee who brought a claim for wrongful discharge in violation of public policy due to her discharge for reporting her employer's performance of an unlicensed medical procedure in violation of state law. The Court of Appeals found that because the Ohio statute that prohibited the performance of unauthorized medical procedures did not prohibit retaliation against employees for reporting such conduct, Evans' claim was actually based on the Whistleblower Act. *Evans,* 2002 WL 1401476, at *5. Since Evans did not comply with the procedural requirements of the Whistleblower Act, the court held that Evans could not pursue a wrongful discharge in violation of public policy claim. *Id.* at *6. The reasoning in *Evans* is undermined by a series of Ohio Supreme Court cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))

which make clear that despite noncompliance with the Whistleblower Act, a plaintiff can base a *Greeley* claim on her termination in retaliation for reporting conduct that violates Ohio public policy.

In an early case involving the interaction between the Whistleblower Act and other public policies, *Kulch v. Structural Fibers,* 78 Ohio St.3d 134, 677 N.E.2d 308 (1997), the Ohio Supreme Court held that an employee who claimed that his employer retaliated against him for reporting an OSHA violation could bring a wrongful discharge in violation of public policy claim based on Ohio's public policy favoring workplace safety as well as the policy promoting whistleblowing. Despite the possibility that Kulch had complied with the Whistleblower Act, the *Kulch* court specifically held:

**\*\*7** [A]n at-will employee who is discharged or disciplined for filing a complaint with OSHA concerning matters of health and safety in the workplace is entitled to maintain a common-law tort action against the employer for wrongful discharge/discipline in violation of public policy pursuant to *Greeley,* 49 Ohio St.3d 228, 551 N.E.2d 981, and its progeny. Thus, appellant is entitled to maintain a *Greeley* claim against appellees **whether or not he complied with the dictates of R.C. 4113.52** in reporting his employer to OSHA.

*Kulch,* 677 N.E.2d at 328-29 (emphasis added). Because *Kulch* involved federal statutes that specifically prohibit employers from retaliating against employees who report OSHA violations, *Kulch* could be read narrowly to allow plaintiffs to pursue *Greeley* claims for retaliation despite their failure to comply with the Whistleblower Act only when the policy relied upon specifically condemns retaliation. However, later Ohio Supreme Court precedent has made this narrow view of *Kulch* implausible.

The Ohio Supreme Court reaffirmed *Kulch*'s holding in *Pytlinski v. Brocar Products, Inc.,* 94 Ohio St.3d 77, 760 N.E.2d 385 (2002). The *Pytlinski*

court held that the statute of limitations for the Whistleblower Act does not govern a wrongful discharge in violation of public policy claim even if the public policy could be cast as either a whistleblower protection or a workplace safety policy. The Ohio Supreme Court held:

Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted. Therefore, Pytlinski is not bound by the statute of limitations set forth in R.C. 4113.52 because his cause of action is not based upon that statute, but is, instead, based in common law for violation of public policy.

*Pytlinski,* 760 N.E.2d at 388. The *Pytlinski* court found that an independent *Greeley* claim existed for a violation of the Ohio **\*264** policy favoring workplace safety without referencing any statute that prohibited retaliation for reporting workplace safety issues. The court cited a variety of Ohio statutes favoring workplace safety that had been cited in *Kulch. Pytlinski,* 760 N.E.2d at 387 n. 2. Although *Kulch* also discussed the policy embodied in a federal statute that specifically prohibits employers from retaliating against employees who report OSHA violations, this statute was inapplicable to Pytlinski because he had not reported the violations to OSHA. *Id.* at 388. Thus, *Pytlinski*'s holding allows Avery to pursue a wrongful discharge claim based upon the policy against the falsification of medical records even though her whistleblower claim is foreclosed.

In *Krickler v. Brooklyn,* 149 Ohio App.3d 97, 776 N.E.2d 119 (2002), the Eighth District of the Ohio Court of Appeals squarely addressed this issue and reached a conclusion opposite to that of the *Evans* court:

While *Kulch* might have been interpreted to deny a claim based on the workplace alcohol policy by finding it an inappropriate attempt to avoid compliance with the whistleblower statute, this interpretation is no longer viable. Under *Pytlinski,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))

Krickler can maintain her suit based on the work-place alcohol policy, because "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted."

**8 *Krickler,* 776 N.E.2d at 124 (quoting *Pytlinski,* 760 N.E.2d at 388). The *Krickler* court's interpretation of *Pytlinski* is more consistent with the Ohio Supreme Court's holding than that of *Evans. See also Jamison v. American Showa, Inc.,* No. 99CAE-03-014, 2000 WL 1404 (Ohio Ct.App. Dec. 16, 1999) (finding an employee fired in retaliation for reporting environmental concerns could bring *Greeley* claim based on environmental laws and EPA regulations despite noncompliance with Whistleblower Act). Therefore, Ohio Supreme Court precedent allows Avery to bring a *Greeley* claim based on the public policy against the falsification of medical records despite her failure to meet the procedural requirements of the Ohio Whistleblower Act. Nevertheless, Avery's claim ultimately fails due to her inability to satisfy the jeopardy element of her *Greeley* claim, as explained below.

**2. Jeopardy**

[3] The parties also dispute whether Avery has satisfied the jeopardy element of her *Greeley* claim. Ohio courts have been unclear as to the requirements for a plaintiff to prove that her discharge put public policy in jeopardy. This Court has applied a three-part analysis to the jeopardy issue in which the court must:

(1) determine what kind of conduct is necessary to further the public policy at issue; decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Himmel v. Ford Motor Co.,* 342 F.3d 593, 599 (6th

Cir.2003) (quoting *Perritt, supra,* at 408) (internal quotation marks omitted).

The conduct of employees who refuse to falsify records at the request of their superiors is necessary to further the public policy of preventing the falsification of medical records. Avery claims that her conduct was of this nature, yet the evidence she has presented does not support her contention. Avery asked her supervisor whether she wanted Avery to falsify medical records, and Wagner responded in the negative. Contrary to her arguments *265 at the district court and on appeal, Avery herself admitted that Wagner was not trying to coerce her into falsifying medical records.

Avery also claims that she was fired for reporting the falsification of records. Allowing employees to be terminated for reporting such conduct would also undermine Ohio's public policy against the falsification of medical records. The Hospital argues that Avery's claim does not satisfy the jeopardy element based upon her failure to give the Hospital notice that she was vindicating a government policy. For this argument, the Hospital relies upon this Court's decision in *Jermer v. Siemens Energy & Automation, Inc.,* 395 F.3d 655 (6th Cir.2005).

In *Jermer* an employee alleged that he was discharged for his complaints regarding the air quality at Siemens' facility. Employees at Siemens had complained about the air quality, and following air quality testing, changes were made to the facility's air filtration systems. *Id.* at 657. After the changes were made, Jermer requested a special air filter due to his sinus problems and a co-worker's cough. *Id.* He also mentioned to a supervisor that he thought there were still issues with the air. *Id.* Jermer was subsequently terminated during a reduction in force. *Id.* Jermer brought a *Greeley* claim alleging that he was terminated for complaints about air quality in contravention of Ohio's public policy favoring workplace safety. *Jermer,* 395 F.3d at 655. This Court concluded that Jermer had not established the jeopardy element. *Id.* at 660. In reaching

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256                                                                                    Page 10
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))

this conclusion, this Court reasoned that allowing terminations such as Jermer's would not undermine Ohio's public policy of ensuring workplace safety because Siemens was not given notice that Jermer's complaints were connected to this public policy. *Id.*

**\*\*9** The *Jermer* court made clear that a specific statement by an employee describing in detail the government policy being violated is not necessary for an employee to bring a *Greeley* claim. This Court found that Jermer's request for an air filter was insufficient because it merely indicated Jermer's preference, and his off-hand statement that there were still issues with the air was vague. *Jermer,* 395 F.3d at 659. The court likened Jermer's statements "to a request to turn the air conditioner or heat up or down.... It does not assert or in any reasonable way indicate that an employee is acting to protect 'public policy.' " *Id.* at 659-60. However, the *Jermer* court noted that "an employee need not cite a specific statute or law." *Id.* at 659. Instead, the employee's "statements must indicate to a reasonable employer that he is invoking governmental policy in support of, or as the basis for, his complaints." *Id.* at 659.

Avery's discussion of Heckler's falsification of records similarly does not satisfy the jeopardy requirement. Avery made statements regarding the inaccuracy of Heckler's account of the November 5, 2004 delivery while she was defending herself against Heckler's accusations of sloppy charting. Avery claimed that Heckler's recollection of the time of delivery was mistaken and that Heckler's designation of the heart rate on the monitor strip as the maternal heart rate was inaccurate. Avery made no report of Heckler's wrongdoing, and Avery's statements could be seen by the Hospital as a defense of her performance and not as a report of the violation of a government policy. Thus Avery's claim cannot satisfy the jeopardy element.

Ultimately, Avery's *Greeley* claim cannot withstand summary judgment. Avery's claim that she was terminated in violation of Ohio's public policy favoring whistleblowers,**\*266** a policy embodied in

Ohio's Whistleblower Act, fails because Ohio courts have determined that an essential aspect of this public policy is the protection of only those persons who comply with the statute's procedural requirements, requirements that Avery did not follow. In addition, the aspects of Avery's *Greeley* claim that satisfy the clarity element fail the jeopardy element because the policy against the falsification of records was not put in danger by Avery's dismissal.

## II. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

[4] In order to prevail on an intentional infliction of emotional distress claim, Avery must prove that (1) the Hospital intended to cause emotional distress or knew or should have know that its conduct would have resulted in emotional distress; (2) the Hospital's conduct was extreme and outrageous; (3) that the Hospital's conduct was the proximate cause of Avery's injury; and (4) that Avery's mental anguish is serious. *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983)*abrogated on other grounds by Welling v. Weinfeld,* 113 Ohio St.3d 464, 866 N.E.2d 1051 (2007).

**\*\*10** The district court granted the Hospital summary judgment on Avery's intentional infliction of emotional distress claim because there was no evidence that the Hospital's conduct was extreme or outrageous and because Avery did not prove that she suffered from serious mental anguish. Avery claims that the Hospital engaged in extreme and outrageous conduct by falsely citing a blatant HIPAA violation as the reason for her termination and that she suffered serious mental anguish as the result of her termination.

Ohio courts have construed "extreme and outrageous conduct" narrowly, stating:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional dis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256                                                                    Page 11
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

tress, or even that his conduct has been character-
ized by "malice," or a degree of aggravation
which would entitle the plaintiff to punitive dam-
ages for another tort. Liability has been found
only where the conduct has been so outrageous in
character, and so extreme in degree, as to go bey-
ond all possible bounds of decency, and to be re-
garded as atrocious, and utterly intolerable in a
civilized community. Generally, the case is one
in which the recitation of the facts to an average
member of the community would arouse his re-
sentment against the actor, and lead him to ex-
claim, "Outrageous!"

*Yeager,* 453 N.E.2d at 671 (quoting Restatement of
the Law 2d, Torts (1965) 73, Section 46, cmt d).
Avery claims that Hospital's conduct was more dis-
turbing than the conduct involved in many cases in
which courts have determined that a defendant en-
gaged in extreme and outrageous conduct. *Jacobs v.
Gupta,* No. 1-99-85, 2000 WL 567831 (Ohio
Ct.App. May 11, 2000) (finding extreme and out-
rageous conduct where doctor engaged in a pattern
of offensive sexual advances toward a nurse, which
included holding her against her will and trying to
kiss her); *Radcliff v. Steen Electric, Inc., et al.,* 164
Ohio App.3d 161, 841 N.E.2d 794 (2005) (finding
extreme and outrageous conduct where an employer
condoned the behavior of an employee who ex-
posed his penis or simulated a sex act in front of a
co-worker and her son); *Russ v. TRW, Inc.,* 59 Ohio
St.3d 42, 570 N.E.2d 1076 (1991) (finding extreme
and outrageous conduct where an employer termin-
ated an employee and made the employee the target
of a federal investigation for the employee's imple-
mentation of improper accounting practices that he
had *267 been ordered to implement and was told
were legitimate).

Avery's argument is meritless. The Hospital has
shown that there is an absence of evidence that the
termination of Avery's employment rises to the
level of "extreme and outrageous conduct." Avery
alleges that Swain and Wagner intentionally falsely
accused her of violating HIPAA. On the contrary,

the deposition testimony establishes that both Wag-
ner and Swain continue to believe that Avery's con-
duct constituted a HIPAA violation. To support her
argument, Avery points to various points in the de-
position at which Swain and Wagner agree that
simply calling the emergency room to determine
whether a spinal meningitis patient was admitted is
not necessarily a HIPAA violation. However,
Avery fails to mention that Swain and Wagner
viewed the communication of the information
Avery received from the emergency room to
someone outside the hospital as a serious HIPAA
violation. Thus, the evidence before the district
court, viewed in the light most favorable to Avery
does not support any allegation of extreme or out-
rageous behavior on the part of Wagner and Swain
as the result of their firing Avery for a HIPAA viol-
ation. As a result, the district court properly granted
the Hospital summary judgment on Avery's inten-
tional infliction of emotional distress claim.

### III. FRAUD CLAIM

**11 [5] Avery claims that the Hospital engaged in
fraud because she was terminated based upon false
allegations of a blatant HIPAA violation. To prevail
on her fraud claim, Avery must prove:

(a) a representation or, where there is a duty to dis-
close, concealment of a fact, (b) which is material
to the transaction at hand, (c) made falsely, with
knowledge of its falsity, or with such utter dis-
regard and recklessness as to whether it is true or
false that knowledge may be inferred, (d) with
the intent of misleading another into relying upon
it, (e) justifiable reliance upon the representation
or concealment, and (f) a resulting injury proxim-
ately caused by the reliance.

*Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d
1076, 1083 (1991). Avery's claim fails because the
Hospital's representation that Avery violated
HIPAA was a representation of law and not of fact
and because there is no evidence of falsity.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

286 Fed.Appx. 256
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio)))**

Ohio courts have determined that a representation of law amounts to an opinion and therefore cannot form the basis for a fraud claim unless there is a fiduciary relationship between the parties. *Lynch v. Dial Finance Co. of Ohio No. 1, Inc.,* 101 Ohio App.3d 742, 656 N.E.2d 714, 720 (1995). Therefore, Avery's employer's statement that Avery violated HIPAA is not actionable for fraud. In addition, Avery cannot prove the falsity element of her fraud claim. For the reasons discussed above in disposing of Avery's intentional infliction of emotional distress claim, Avery cannot show that the allegation that she had committed a HIPAA violation was "made falsely, with knowledge of its falsity, or with ... utter disregard and recklessness as to whether it is true or false." *Russ,* 570 N.E.2d at 1083. The uncontested evidence shows that after investigating Avery's conduct, Swain and Wagner believed that Avery had violated HIPAA by releasing patient information. As a result, Avery's fraud claim cannot succeed.

For the reasons stated above, this Court **AFFIRMS** the judgment of the district court.

C.A.6 (Ohio),2008.
Avery v. Joint Tp. Dist. Memorial Hosp.
286 Fed.Appx. 256, 2008 WL 2596211 (C.A.6 (Ohio))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
**(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))**

**H**
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio, Ninth District, Summit
County.
Richard J. BENNETT, et al., Appellants,
v.
ROADWAY EXPRESS, INC., et al., Appellees.
No. 20317.

Aug. 1, 2001.

Appeal from Judgment Entered in the Court of
Common Pleas County of Summit, Ohio, Case No.
CV 98 10 3915.
Edward C. Kaminski, and Michael S. Urban, Attor-
neys at Law, Akron, OH, for appellants.

Niki Z. Schwartz and Jennifer E. Schwartz, Attor-
neys at Law, Cleveland, OH, for Roadway Express
and John M. Glenn, appellees.

Donald A. Powell and Robert L. Tucker, Attorneys
at Law, Akron, OH, for Debbie Wears, appellee.

*DECISION AND JOURNAL ENTRY*

BATCHELDER.

**\*1** Appellants, Richard J. Bennett and Rose M.
Merendino, appeal the trial court's decision, grant-
ing summary judgment in favor of appellees, Road-
way Express, Inc., John M. Glenn, and Debbie
Wears. We affirm.

I.

In 1997 and 1998, Richard Bennett was deputy gen-
eral counsel for Roadway Express, Inc.

("Roadway") and worked in Roadway's law depart-
ment. John Glenn was then general counsel, vice
president, and secretary of Roadway. Although he
was not a member of the law department, Glenn
oversaw the daily operations of the law department,
and Bennett reported directly to him. Debbie Wears
was the litigation case manager in the law depart-
ment, but was promoted to compliance administrat-
or for the human resources department in the Fall of
1997. Consequently, Bennett began searching for a
new case manager for the law department. He con-
tacted Rose Merendino, who had served as a tem-
porary legal secretary at Roadway in 1989 and with
whom he had kept in contact, to ascertain whether
she was interested in the position. After interview-
ing Merendino, Bennett offered her the job of case
manager in October 1997. Merendino immediately
accepted.

According to Merendino, before starting work at
Roadway, Merendino was informed by Nancy
Sense, a secretary of Roadway's law department,
that Wears had been spreading rumors that Bennett
and Merendino were having an affair and that was
how Merendino had obtained employment at Road-
way. According to plaintiffs, both Sense and anoth-
er Roadway employee, Joyce Hardman, told them
that Wears had made those statements. Further,
Merendino stated in her deposition that Hardman
told her that Glenn had also recounted the state-
ment. Bennett and Merendino, however, never per-
sonally heard either Wears or Glenn make the al-
legedly defamatory statements. Furthermore, Sense
and Hardman denied that Glenn and Wears had
made those statements, and further, denied ever
telling plaintiffs that Glenn and Wears had said
plaintiffs were having an affair.

Merendino testified that shortly after she began her
job at Roadway, she noticed Glenn looking her up
and down and staring at her legs. She testified that
he treated her like a "bimbo" and completely dis-
regarded her work. She attributed Glenn's lack of
respect to the fact that he thought she was "was just

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

Page 2

some bimbo sleeping with the boss" to get the job.

Merendino complained to Bennett about Glenn's treatment of her and felt that she was being sexually harassed. Accordingly, in January 1998, Bennett allegedly informed Tom Lopienski, vice-president of human resources, and Bob Chess, director of human resources, that Glenn was mistreating Merendino and was looking at her in an inappropriate manner, which made Merendino uncomfortable. Bennett admitted, however, that he did not say that he believed Glenn's behavior violated Roadway's sexual harassment policy. After these meetings, Glenn allegedly engaged in constant adverse treatment of plaintiffs. Glenn allegedly retaliated by having frequent meetings and assigning Merendino excessive work, which she deemed pointless. Again, in March 1998, Bennett reiterated the same complaints to Lopienski and Chess. Both Lopienski and Chess stated that Bennett never informed them that Merendino was being sexually harassed. Having heard nothing from Lopienski and Chess, Bennett went to speak with Michael Wickham, Roadway's chief executive officer, on April 27, 1998. At that meeting, Bennett intended to tell Wickham about the sexual harassment, but was unsuccessful because Wickham kept redirecting the conversation.

*2 After the meeting with Wickham, Glenn summoned Bennett to his office. According to Bennett, Glenn stated that he knew everything Bennett said to Wickham and insinuated that he was going to use his power to get revenge. Glenn also informed Bennett about his plans for restructuring the law department. Bennett stated that he was emotionally devastated by the conversation. The next day, April 28, 1998, Bennett began a medical leave of absence and sought treatment.

After Bennett went on the leave of absence, Merendino reported the alleged sexual harassment to a Roadway executive, other than Bennett, for the first time.

On May 18, 1998, Bennett returned to work. Glenn,

however, prohibited Bennett from working until he obtained the assurance of a physician that he was able to perform the functions of his position. Although Bennett was cleared to return to work by his physician, defendants insisted that he be evaluated by a company-approved psychiatrist before they would allow him to return to work, due to the vagueness of Bennett's physician's letter. Thereafter, Bennett retained counsel, who contacted Glenn and requested time to consult with his client on this issue. Glenn responded by demanding that Bennett inform him by May 27, 1998 at 5:00 p.m. whether he intended to keep the appointment with the psychiatrist. Instead of confirming that Bennett would keep the appointment, Bennett's attorney reiterated his need for time to discuss the matter with his client. Subsequently, Glenn cancelled the appointment that Glenn had made for Bennett to see a psychiatrist. On May 28, 1998, Glenn discharged Merendino, giving the reason of corporate restructuring. On May 29, 1998, Glenn terminated Bennett's employment at Roadway, allegedly due to his performance.

On October 7, 1998, Bennett and Merendino filed a complaint in the Summit County Court of Common Pleas, naming Roadway Express, Inc ., John M. Glenn, and Debbie Wears as defendants. They filed a defamation claim against all three defendants and filed claims for intentional infliction of emotional distress, retaliatory discharge pursuant to R.C. 4112.02, and wrongful discharge in violation of public policy against defendants Roadway and Glenn. Merendino brought claims for sexual harassment and sex discrimination under R.C. 4112.02(A) against Roadway and Glenn. Additionally, Bennett filed claims for handicap discrimination and age discrimination against Roadway and Glenn. Merendino and Bennett also sought punitive damages based on defendants' actions.

On June 9, 2000, Bennett and Merendino moved to compel Nancy Sense, a secretary at Roadway, to disclose the content of her communications with Glenn and Roadway's attorney, which were made in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)

**(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))**

preparation for her deposition. Roadway responded in opposition, claiming that those communications were protected under the corporate attorney-client privilege. On August 16, 2000, the trial court denied the motion to compel, finding that those communications were protected by the corporate attorney-client privilege and the work product doctrine.

**\*3** After extensive discovery, Wears moved for summary judgment on July 11, 2000. The next day, Roadway and Glenn also moved for summary judgment. Subsequently, on July 26, 2000, Merendino and Bennett moved for leave to amend their complaint to include a claim for tortious interference with Bennett's employment contract with Stark County, Ohio, and moved to voluntarily dismiss the age discrimination claim. Plaintiff responded in opposition to defendants' motions for summary judgment on August 2, 2000. In a decision journalized on September 19, 2000, the trial court granted plaintiffs' motion to voluntarily dismiss the age discrimination claim, but denied their motion to amend the complaint to include a tortious interference with an employment contract claim. The trial court also granted summary judgment in favor of all three defendants. This appeal followed.

II.

Merendino and Bennett assert nine assignments of error. We will address each in due course.

SUMMARY JUDGMENT

Pursuant to Civ.R. 56(C), summary judgment is proper if:

(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion

is adverse to that party.

*Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327. Appellate review of a lower court's entry of summary judgment is *de novo,* applying the same standard used by the trial court. *McKay v. Cutlip* (1992), 80 Ohio App.3d 487, 491. The party seeking summary judgment initially bears the burden of informing the trial court of the basis for the motion and identifying portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293. The movant must point to some evidence in the record of the type listed in Civ.R. 56(C) in support of his motion.*Id.* Once this burden is satisfied, the nonmoving party has the burden, as set forth in Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. *Id.* The nonmoving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that shows a genuine dispute over the material facts exists. *Henkle v. Henkle* (1991), 75 Ohio App.3d 732, 735.

A.

First Assignment of Error

The trial court erred in granting summary judgment on all of Plaintiffs-Appellants' claims [i]n finding that Plaintiffs had not established that Defendants Wears and Glenn published defamatory remarks that Plaintiffs were having an affair.

In their first assignment of error, Bennett and Merendino contend that the trial court erred in finding that they had not established that Wears and Glenn published defamatory remarks because the only evidence presented on that issue was inadmissible hearsay. They argue that the evidence was not hearsay. We disagree.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

*4 To prevail in a defamation case, a plaintiff who is a private person must prove five elements: "(1) a false and defamatory statement; (2) about plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of the defendant; and (5) that was either defamatory *per se* or caused special harm to the plaintiff." *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 206.

In the case *sub judice,* the trial court determined that plaintiffs only presented inadmissible hearsay evidence to show publication, and therefore, had failed to establish this element. To support their defamation claim, Bennett and Merendino presented their respective depositions, in which they testified that two Roadway employees, Nancy Sense and Joyce Hardman, informed them that Wears had told them (Sense and Hardman) that plaintiffs were having an affair. Merendino further testified that Hardman told her that Glenn had also told Hardman that plaintiffs were having an affair. Hardman and Sense denied both having heard Wears and Glenn publish the allegedly defamatory statements and having told plaintiffs that Wears and Glenn made those statements.

In *Carriker v. Am. Postal Workers Union* (Sept. 30, 1993), Montgomery App. No. 13900, unreported, 1993 Ohio App. LEXIS 4733, *50-52, appellant claimed that Bondurant had defamed her by telling others that she was having an affair with the Union's president. Attached to her motion for summary judgment, Bondurant submitted an affidavit denying that she had ever made such a statement. *Id.* at *50.In response, appellant submitted her deposition, in which she stated that she had been told by several coworkers that Bondurant had made the defamatory statement. *Id.* Appellant also presented the deposition testimony of John Smith in which he testified that Cliff Woods was told by Karen Barlow that Bondurant made the statement to Barlow. *Id.* at *50-51.In affirming the trial court's entry of summary judgment against appellant, the Second Appellate District found that this evidence was incompetent as hearsay, and therefore, appellant

failed to produce competent evidence creating a genuine issue of material fact as to whether there was publication. *Id.* at *51-52.

This court recently upheld a trial court's grant of summary judgment under similar circumstances in *Lathwell v. Lorain Cty. Jobs for Ohio Graduates* (May 10, 2000), Lorain App. No. 99CA007303, unreported, at 6-8. In *Lathwell,* plaintiff offered as support for his defamation claim the affidavit of Joyce Early. *Id.* at 6-7.Early stated the Rose Minkeiwicz told her that Beasley had made a defamatory remark about plaintiff. *Id.* at 7. This court found that "[t]he pertinent portions of Early's affidavit were not made on personal knowledge of the ultimate fact to be established, that Beasley published these [allegedly defamatory] statements* * *[.] Early's affidavit is based on hearsay and is thus inadmissible as evidence to support Lathwell's defamation claim."*Id.* Accordingly, this court affirmed the trial court's decision. *Id.* at 7-8.

*5 In the present case, plaintiffs argue that their deposition testimony is not hearsay because the statements to which they testified were not offered to prove the truth of the matter asserted, namely that plaintiffs were having an affair; rather, the evidence was offered to show publication of the defamatory statement. See Evid.R. 801(C). Plaintiffs' assertion would be correct if Sense and Hardman had testified that Wears and Glenn had informed them the plaintiffs were having an affair. See *Taylor v. Lenio* (June 20, 1985), Cuyahoga App. No. 49300, unreported, 1985 Ohio App. Lexis 8095, at *7-8. The pertinent portions of Bennett and Merendino's depositions, however, were not made on personal knowledge of the ultimate fact to be established, specifically that Wears and Glenn published the defamatory statements. In fact, plaintiffs admitted that they never heard Wears or Glenn make any defamatory remarks. Thus, those portions of plaintiffs' depositions constitute inadmissible hearsay and cannot be used to defeat summary judgment.[FN1]As plaintiffs did not produce any competent evidence showing publication, we conclude that the trial court properly granted summary judgment in favor

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
**(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))**

of defendants on the defamation claim. Appellants' first assignment of error is overruled.

> FN1. Plaintiffs assert that if their deposition testimony constitutes hearsay, then the only way for a plaintiff to ever prove defamation is if the defendant made the defamatory statement directly to the plaintiff. This is incorrect. A plaintiff must only present the testimony of a person who personally heard the defamatory statement being uttered.

### B.

### Third Assignment of Error

The trial court erred in granting summary judgment on all of Plaintiffs-Appellants' claims [i]n finding that the evidence of hostile work environment was not sufficient to support Merendino's claims of sex discrimination against Glenn and Roadway.

Merendino asserts that the trial court erred in entering summary judgment against her on her sex discrimination claim, as there was a genuine issue of material fact as to whether a hostile work environment existed. We disagree.

R.C. 4112.02(A) prohibits discrimination based on sex, stating:

It shall be an unlawful discriminatory practice [f]or any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

"[A] plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination 'because of * * * sex' by proving * * * 'hostile environment' harassment, *i.e.,* harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." (First omission original.) *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, 176. The Ohio Supreme Court has held that

[i]n order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

**\*6** *Id.* at 176-77. "[H]arassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex." *Id.* at 180. Furthermore, "R.C. 4112.02(A) does not reach disparate treatment on account of personal animosity; no matter how severe or pervasive the conduct, harassment does not constitute a discriminatory practice under R.C. 4112.02(A) unless based on a prohibited classification." *Id.* at 184-85.

In the present case, Merendino claims that defendants treated her adversely based on her sex. In her deposition, Merendino testified that Glenn treated her like a "bimbo," "look[ed] her up and down," and stared at her legs. When asked whether she could recall any other specific instances of sexual harassment by Glenn, Merendino responded:

Same thing of looking me up and down, dismissing me, not giving my work any validity, you know, calling on Debbie [Wears], when I could have answered a question, not having any respect for that position, not giving me any credit, with all of my background in the legal field, that I would have had some semblance of what was going on and the ability to follow through and be responsible. I never got any of that from [Glenn], he just dismissed me from

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

Page 6

the beginning, dismissed.

Merendino also mentioned that during meetings, Glenn would defer to Bennett and that Glenn would override her during telephone calls. She attributed Glenn's lack of respect for her work to the fact that he thought that she "was just some bimbo sleeping with the boss [Bennett]" to get the job. She further testified that a couple of coworkers told her that Glenn accused her of having an affair with Bennett. Additionally, Merendino related that Glenn would assign her time-consuming, pointless (according to Merendino) tasks and that Glenn's hostile treatment of her caused her work to suffer. She stated that after she and Bennett complained about Glenn's behavior, Glenn's hostile treatment increased and her employment with Roadway was terminated.[FN2]

> FN2. Merendino testified that Roadway told her that her position was being eliminated due to corporate restructuring, but she did not believe that was the real reason for her dismissal.

Construing Merendino's testimony most strongly in her favor, the evidence demonstrates that Glenn continually hassled Merendino while she was employed by Roadway and lacked confidence in her work. She also felt harassed by the manner in which Glenn looked her up and down. Merendino, however, has failed to show that Glenn's treatment of her was based on sex. Specifically, the record fails to disclose any disparity in the way Glenn treated male and female employees. See *id.* at 184. In fact, Merendino admitted that Glenn relied on Wears, a female employee at Roadway, and often deferred to her, instead of depending on Merendino's knowledge and expertise. Accordingly, viewing the evidence in a light most favorable to Merendino, we conclude that reasonable minds could not find that Glenn and Roadway's alleged harassment of Merendino was based on sex. Appellants' third assignment of error is overruled.

C.

Fourth Assignment of Error

*7 The trial court erred in granting summary judgment on all of Plaintiffs-Appellants' claims [i]n concluding that as a matter of law Bennett failed to establish a prima facie case of handicap discrimination against Roadway and Glenn.

In his fourth assignment of error, Bennett claims that the trial court erred in granting summary judgment in favor of Roadway and Glenn on his handicap discrimination claim. Specifically, he asserts that a genuine issue of material fact existed as to whether Glenn and Roadway unlawfully discriminated against him because they regarded him as having a physical or mental impairment. We disagree.

R.C. 4112.02(A) prohibits discrimination based on disability.

To establish a prima facie case of handicap discrimination, the person seeking relief must demonstrate (1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question.

*Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 571. R.C. 4112.01(A)(13) defines "handicap" as:
a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or *being regarded as having a physical or mental impairment.*

(Emphasis added.) An emotional or mental illness is one form of "mental impairment." R.C. 4112.01(A)(16)(a)(ii). Under certain circumstances, depression may constitute a handicap for the purposes of R.C. 4112.02(A). See *Shaver v. Wolske & Blue* (2000), 138 Ohio App.3d 653, 666. However,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

Page 7

"[a]bsent indications that one or more major life activities have been substantially limited, [ ] the experience of depression is insufficient to constitute a disability."*Cooke v. SGS Tool Co.* (Apr. 26, 2000), Summit App. No. 19675, unreported, at 11, citing *Beauchamp v. CompuServe, Inc.* (1998), 126 Ohio App.3d 17, 23.

In the present case, Bennett claims that Glenn and Roadway unlawfully discriminated against him because they *regarded* him as having a mental impairment.[FN3] In support of his claim, Bennett pointed to evidence showing that Bennett took a leave of absence for medical reasons beginning on April 28, 1998. In response to Glenn and Roadway's FMLA notice, Bennett provided them with a physician's note, which stated that Bennett was under his care and would be absent until May 18, 1998. On May 13, 1998, defendants sent Bennett a letter indicating that Bennett was required to submit to a fitness-for-duty examination with a Roadway-approved psychiatrist before returning to work. Without obtaining such an examination, Bennett returned to work on May 18, 1998, but was not permitted to work until he submitted to the psychiatric examination. The next day, Bennett furnished Roadway and Glenn with a letter from his physician, stating in its entirety that "Mr. Bennett remains under my care. He is medically cleared to return to full duty at work as of [May 18, 1998]."

> FN3. Bennett does not challenge on appeal the trial court's determination that his depression was not a handicap within the meaning of the statute and that he did not comply with the enforcement requirements of the statute by failing to request accommodation.

**\*8** Glenn acknowledged receiving the letter from Bennett's physician, but emphasized that he needed "an evaluation by the company psychiatrist before determining [Bennett's] fitness to return to duty."Glenn, however, noted that he was restoring Bennett to payroll as of May 18, 1998. On May 22, 1998, Bennett retained counsel, who advised Glenn

that he needed time to discuss the psychiatric evaluation with Bennett and that after their discussion, the attorney would respond to Glenn. Subsequently, on May 27, 1998, Glenn informed Bennett that his "appointment with [the company psychiatrist] remain[ed] scheduled for June 9[, 1998]" and that Bennett had until 5:00 p.m. to inform him whether Bennett intended to keep the scheduled appointment. Glenn reiterated that the purpose of the examination was to determine Bennett's fitness to "perform the essential functions of [his] job."Rather than stating whether Bennett would keep the appointment, Bennett's attorney contacted Glenn by fax and requested time to discuss the matter with his client. The following day, Glenn cancelled the appointment with the psychiatrist, and on May 29, 1998, terminated Bennett's employment at Roadway. Roadway and Glenn substantially agree with these facts.

Construing this evidence most strongly in Bennett's favor, the evidence shows that Glenn and Roadway knew that Bennett had taken a medical leave of absence for emotional or mental reasons and that he was being treated by a physician in that regard. Bennett's physician's letter, clearing him to return to work, did not disclose the precise nature and extent of Bennett's condition or the physician's qualifications to make such a determination. Accordingly, defendants required Bennett to submit to a psychiatric evaluation by a company-approved psychiatrist ostensibly in order to ascertain his ability to perform the functions of his position. Importantly, the Sixth Circuit has found that an employer's requirement that an employee submit to a psychiatric evaluation to determine whether the employee could continue to fulfill the essential functions of the position is not tantamount to a perception by the employer that the employee is disabled. *Sullivan v. River Valley School Dist.* (C.A.6, 1999), 197 F.3d 804, 810-11. For such a requirement to be valid, however, "there must be evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job, and that any examination is limited to determining an employee's ability

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

to perform essential job functions." *Id.* at 813.Here, after a medical leave of absence approximately three weeks in duration, defendants required the examination to ascertain Bennett's ability to perform the essential functions of his job. It is important to note that Bennett's position as corporate counsel involved analyzing and synthesizing complex factual and legal issues into a cogent whole and then providing legal advice to the company and its employees. Thus, the fact that Roadway and Glenn required Bennett to submit to such an examination, without more, does not lead to the conclusion that defendants regarded him as disabled, within the meaning of R.C. 4112.02(A). See *id.* at 811.Consequently, in viewing the evidence most strongly in favor of Bennett, we hold that reasonable minds could not conclude that Roadway and Glenn unlawfully discriminated against Bennett because they regarded him as disabled. Appellants' fourth assignment of error is overruled.

### D.

### Second Assignment of Error

**\*9** The trial court erred in granting summary judgment on all of Plaintiffs-Appellants' claims [i]n finding that the evidence of Roadway's and Glenn's conduct did not rise to [the] level of "extreme and outrageous conduct" necessary to support a claim for intentional infliction of emotional distress.

In his second assignment of error, Bennett asserts that the trial court incorrectly determined that Roadway and Glenn's retaliatory actions did not constitute extreme and outrageous conduct, and therefore, erred in granting summary judgment in favor of defendants on his intentional infliction of emotional distress claim.[FN4]We disagree.

> FN4. In appellants' brief, appellants do not challenge the trial court's entry of summary judgment in favor of defendants as to Merendino's claim for intentional infliction

of distress.

To establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following four elements:

1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community;" 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable [person] could be expected to endure it."

(Citations omitted.) *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34; see, also, *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, syllabus.

Bennett claims that the evidence presented regarding Glenn's conduct toward Bennett when he attempted to return to work after his medical leave of absence was sufficient to withstand summary judgment as to Bennett's intentional infliction of emotional distress claim. We set forth the relevant facts in our discussion of appellants' fourth assignment of error. We find that in viewing the evidence in a light most favorable to Bennett, reasonable minds could not conclude that defendants' actions constituted extreme and outrageous conduct. We, therefore, adduce that the trial court properly entered summary judgment in favor of Roadway and Glenn on Bennett's intentional infliction of emotional distress claim. Appellants' second assignment of error is overruled.

### E.

### Fifth Assignment of Error

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

Page 9

The trial court erred in granting summary judgment on all of Plaintiffs-Appellants' claims [i]n finding that Plaintiffs "failed" to present a "prima-facie showing of retaliation" and "had they done so, the record is replete with evidence to support Roadway had a 'legitimate, non-discriminatory' reason for both terminations."

Bennett and Merendino aver that the trial court improperly granted summary judgment to Roadway and Glenn on their retaliation claim, under R.C. 4112.02(I). They argue that the trial court erred in finding that they failed to present a prima facie showing of retaliation and in finding that, had they made such a prima facie showing, the record was replete with evidence to support a legitimate, nondiscriminatory reason for both terminations. We disagree.

*10 Pursuant to R.C. 4112.02(I), it is an unlawful discriminatory practice

[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

This court has held that a person must prove the following elements to establish a prima facie case of retaliation under R.C. 4112.02(I):(1) plaintiff engaged in a protected activity, (2) plaintiff was the subject of adverse employment action, and (3) a causal link between the protected activity and the adverse action existed. *Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div.* (1994), 99 Ohio App.3d 396, 402. Once a plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant "to articulate a legitimate reason for its action."*Id.* If that burden is met, the burden then shifts back to the plaintiff "to show that the articulated reason was merely a pretext."*Id.*"[A] reason cannot be proved to be 'a

pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks* (1993), 509 U.S. 502, 515, 125 L.Ed. 407, 422.

Assuming *arguendo* that plaintiffs established a prima facie case of retaliation, defendants have articulated legitimate business reasons for terminating Bennett and Merendino's employment at Roadway. Glenn stated that Merendino was terminated due to restructuring the law department, while Bennett was terminated due to performance. According to Glenn, Bennett did not inform him that he was willing to keep the appointment with the company-approved psychiatrist by the time required by Glenn. This failure by Bennett, *inter alia,* apparently precipitated Bennett's termination two days later. Significantly, insubordination is generally a legitimate and nondiscriminatory reason for adverse employment action. See *Hood v. Diamond Products, Inc.* (1996), 74 Ohio St.3d 298, 302. Glenn further testified that once he decided to terminate Bennett, he discharged Merendino because he did not feel that she had the experience or the talent for the new more demanding position, which was created after restructuring the law department. Instead, Glenn awarded Wears the new position because he was impressed by her abilities.

Upon careful review of the record and construing the evidence most strongly in favor of Bennett and Merendino, we conclude that reasonable minds could not find that defendants' justifications for plaintiffs' terminations were merely a pretext. Accordingly, the trial court properly granted summary judgment on the retaliation claims. Appellants' fifth assignment of error is overruled.

F.

Sixth Assignment of Error

*11 The trial court erred in granting summary judg-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
**(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))**

ment on all of Plaintiffs-Appellants' claims [i]n finding that Bennett and Merendino failed to establish their Violation of Public Policy Claim as they failed to comply with the statutory requirements of the "whistle blower" statute.

In their sixth assignment of error, Bennett and Merendino claim that the trial court erred in concluding that they had failed to establish their violation of public policy claims because they had failed to establish their discrimination and retaliation claims under R.C. 4112.02. The gravamen of their argument is that they did, in fact, demonstrate a genuine issue of material fact as to their discrimination and retaliation claims under R.C. 4112.02. We disagree.

To establish a claim for tortious wrongful discharge in violation of public policy, four-elements must be satisfied:

"1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)." (Emphasis *sic.*)

(Bolding added.) *Painter v. Graley* (1994), 70 Ohio St.3d 377, 384, fn. 8, quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-99 (reaffirmed in *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 150-51).

As Bennett and Merendino have failed to establish

their discrimination and retaliation claims, as discussed *infra*, they have not proved that their discharges jeopardize those policies; consequently, the trial court properly granted summary judgment on their wrongful discharge in violation of public policy claims.[FN5]See *Cochran v. Columbia Gas of Ohio, Inc.* (2000), 138 Ohio App.3d 888, 895;*Crosier v. Quikey Mfg. Co., Inc.* (Feb. 28, 2001), Summit App. No. 19863, unreported, at 18. Appellants' sixth assignment of error is overruled.

FN5. In granting summary judgment in favor of Roadway and Glenn on plaintiffs' wrongful termination in violation of public policy claims, the trial court determined that these claims failed because plaintiffs did not succeed in establishing their discrimination and retaliation claims. The trial court went on to find that even if plaintiffs had established their dicrimination and retaliation claims, their public policy claims would still fail because they did not comply with the strict reporting requirements of the Whistleblower Statute. See R.C. 4113.52. On appeal, Bennett and Merendino also challenge the trial court's reliance on the Whistleblower Statute to dismiss their public policy claims. This court, however, need not address this argument as it has been rendered moot by our determination above.

G.

Seventh Assignment of Error

The trial court erred * * * [i]n granting summary judgment as Defendants' reasons for discharging Plaintiffs were pretextual.

In their seventh assignment of error, Bennett and Merendino assert that the trial court erred in determining that defendants' business reasons for discharging them were not a pretext for retaliatory dis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
**(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))**

charge and handicap and sex discrimination.

In order to reach the issue of whether defendants had legitimate business reasons for discharging plaintiffs and whether these business reasons were pretextual, plaintiffs must first establish a prima facie case for each of these claims. See *Hood,* 74 Ohio St.3d at 302 (writing that "[o]nce the plaintiff establishes a prima facie case of handicap discrimination, the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken" and if the employer establishes a nondiscriminatory reason, the employee then "must demonstrate that the employer's stated reason was a pretext for impermissible discrimination"); *Omobien v. Ohio Civ. Rights Comm.* (1993), 89 Ohio App.3d 100, 104 (applying burden shifting to sex discrimination and discrimination cases generally). As previously discussed, both Merendino and Bennett failed to establish a prima facie case for their claims of handicap and sex discrimination. Therefore, regarding these discrimination claims, the issue of whether defendants' alleged legitimate business reasons for discharging plaintiffs were pretextual has been rendered moot. See App.R. 12(A)(1)(c). Furthermore, we discussed these arguments in regard to his retaliatory discharge claim in our disposition of appellants' fifth assignment of error. Appellants' seventh assignment of error is overruled in part and rendered moot in part.

### OTHER ISSUES

### H.

### Eighth Assignment of Error

**\*12** The trial court further erred in [d]enying Plaintiff Bennett's Motion for Leave to Amend the Complaint to include Bennett's claim against Roadway for tortious interference with his employment contract with Stark County.

In his eighth assignment of error, Bennett asserts that the trial court abused its discretion in denying his motion for leave to amend the complaint, pursuant to Civ.R. 15, to include his claim against Roadway for tortious interference with his employment contract with Stark County. This claim is based upon Bennett's allegation that "[c]ounsel for Roadway has provided information to Bennett's current employer, Stark County, Ohio, to support a hearing to discharge Bennett in which Stark County alleges that Bennett falsified his application for employment as the Stark County Labor [*sic* ] Director." He also argues that Civ.R. 18(A) permits him to join his claim for tortious interference with his employment contract. We disagree.

Civ.R. 18(A) provides for the liberal joinder of claims, stating "[a] party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal or equitable, as he has against an opposing party."Civ.R. 18(A), however, does not set forth the appropriate procedure for bringing additional claims after the initial complaint has been filed. For this reason, Mr. Bennett's reliance on *Douglas v. Cincinnati Bd. of Edn.*(1992), 80 Ohio App.3d 173, is misplaced. In *Douglas,* the plaintiff brought multiple claims against the defendant in his original complaint. *Id.* at 178-79.The trial court, however, refused to allow the plaintiff to present evidence on one of his claims (his tort claim), which had been raised in the initial complaint. The First District Court of Appeals determined that "the trial court erred in prohibiting Douglas from going forward on his tort claim" because Civ.R. 18(A) provides for the liberal joinder of claims in original actions and because barring his tort claim would preclude any redress for other injuries the defendant may have caused regarding this matter. *Id.* at 179.

Unlike the plaintiff in *Douglas,* Mr. Bennett sought to assert an additional claim, which was not raised in the initial complaint because the events allegedly giving rise to the claim occurred over a year and a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                    Page 12
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
**(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))**

half after the initial complaint was filed. Civ.R. 15 governs amended and supplemental pleadings. Civ.R. 15(A) provides that, after the period for automatic amendment has expired, a trial court shall freely grant leave to amend the complaint "when justice so requires." On the other hand, Civ.R. 15(E) states, in part, that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."

**\*13** This court has explained that "[a]n amended pleading [pursuant to Civ.R. 15(A) ] is designed to include matters occurring before the filing of the complaint but either overlooked or not known at the time," while "[a] supplemental pleading [pursuant to Civ.R. 15(E) ] * * * is designed to cover matters subsequently occurring but pertaining to the original cause." *Mork v. Waltco Truck Equip. Co.* (1990), 70 Ohio App.3d 458, 461. "Moreover, the staff notes to Civ.R. 15(E) provide that 'fundamentally, a supplemental pleading is a mere addition to, or continuation of, the original complaint.' " *Id.* Therefore, "[u]nder Civ.R. 15, a supplemental pleading must contain only matter[s] in common with the original complaint" and may not raise "[a] new and different cause of action[.]" *Id.*

A trial court's decision whether to grant leave to file a supplemental pleading will not be disturbed on appeal absent an abuse of discretion. See Civ.R. 15(E); *Mork,* 70 Ohio App.3d at 461. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Id.*

In the present case, although Mr. Bennett filed a motion to amend his complaint, we note that the motion was more appropriately termed a supple-

mental pleading under Civ.R. 15(E), as the events giving rise to the tortious interference with employment contract claim occurred subsequent to the matters in the original complaint.[FN6]See *Mork,* 70 Ohio App.3d at 461. Apparently, the events giving rise to the cause of action occurred in July 2000, over a year and a half after the initial complaint was filed, when Roadway provided Bennett's then current employer, Stark County, Ohio, with information regarding Bennett's termination from Roadway to support a hearing to discharge Bennett from his employment with Stark County, Ohio. Bennett moved for leave to add this claim after discovery had been completed and after defendants had filed their motions for summary judgment. Furthermore, Bennett's supplemental pleading is more than a mere addition to, or continuation of, the original complaint and sets forth a new and different cause of action. See *Mork,* 70 Ohio App.3d at 461. Hence, we cannot say that, under these circumstances, the trial court abused its discretion in denying Bennett's motion to file an additional claim for tortious interference with his employment contract with Stark County. In addition, Bennett is not prevented from seeking redress for this cause of action, as he may file this claim in a separate complaint. The eighth assignment of error is overruled.

> FN6. In denying Bennett's motion for leave to file an amended complaint, the trial court ruled that pursuant to Civ.R. 15(E), "the new cause of action clearly is not a 'mere addition to, or continuation of, the original complaint.' "

I.

Ninth Assignment of Error

The trial court further erred in [d]enying Plaintiffs' Motion to Compel Nancy Sense to answer questions on deposition.

**\*14** In their ninth assignment of error, appellants

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

contend that the trial court erred in denying their motion to compel Nancy Sense, a secretary for Roadway, to disclose the content of her communications with Glenn and Roadway's attorney, which were made in preparation for her deposition. Specifically, appellants assert that the trial court incorrectly determined that these communications were covered by the corporate attorney-client privilege. We disagree.

A trial court has broad discretion in ruling on a motion to compel discovery. *State ex rel. The v. Cos. v. Marshall* (1998), 81 Ohio St.3d 467, 469. Therefore, in the absence of an abuse of discretion, an appellate court will not overturn the trial court's ruling on discovery matters. See *id.* An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons,* 66 Ohio St.3d at 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Id.*

Civ.R. 26(B) provides that "[p]arties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action[.]" (Emphasis added.) Generally, communications between an attorney and his or her client are privileged. See R.C. 2317.02(A). The term "client," as used in R.C. 2317.02(A), includes:

a person, firm, partnership, corporation, or other association that, directly or through any representative, consults an attorney for the purpose of retaining the attorney or securing legal service or advice from him in his professional capacity, or consults an attorney employee for legal service or advice, and who communicates, either directly or through an agent, employee, or other representative, with such attorney[.]

R.C. 2317.021.

In *Upjohn Co. v. United States* (1981), 449 U.S. 383, 66 L.Ed.2d 584, the United States Supreme Court addressed the attorney-client privilege as it applies to a corporate client. The court found that the attorney-client privilege extended to communications made by employees of a corporate client to a corporation's counsel under certain circumstances. *Id.* at 390, 66 L.Ed.2d at 591. In determining that the privilege applied in *Upjohn,* the United States Supreme Court focused on the fact that the communications were made by the employees to corporate counsel, who was acting as such, at the direction of corporate supervisors in order to secure legal advice. *Id.* at 394, 66 L.Ed.2d at 594. The court further considered that "[t]he communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." *Id.* While relying on these factors in determining whether the privilege applied in *Upjohn,* the court admonished that the application of the corporate attorney-client privilege must be determined on a " 'case-by-case' " basis. *Id.* at 396, 66 L.Ed.2d at 596.

*15 In addition, *Upjohn* rejected the proposition that the privilege only applied to high level employees or "control group" and found that the attorney-client privilege in the corporate context applied to all employees regardless of "level[.]" *Id.* at 391, 66 L.Ed.2d at 592. Furthermore, it is important to note that "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Id.* at 395, 66 L.Ed.2d at 595.

In the present case, Bennett and Merendino sought to discover the content of Sense's communications with Glenn and Roadway's attorney, which were made in preparation for her deposition. It is undisputed that Sense was an employee (a secretary) with Roadway, both at the time the deposition was taken and when plaintiffs' employment with Roadway was terminated. As previously mentioned, *Upjohn* applied the attorney-client privilege in the corporate context to all employees regardless of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                           Page 14
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)
(Cite as: 2001 WL 866261 (Ohio App. 9 Dist.))

"level[.]" *Id.* at 391, 66 L.Ed.2d at 592. Furthermore, Sense's communications with Roadway and Glenn's attorney were made in preparation for her deposition, which was scheduled for the following day. This pre-deposition meeting was held "[i]n the office." Significantly, Sense did not refuse to answer plaintiffs' questions concerning the underlying facts. See *id.* at 395, 66 L.Ed.2d at 595. In fact, Sense denied that Wears told her that Bennett was having an affair or romantic relationship with Merendino. Accordingly, we cannot conclude that the trial court abused its discretion in finding that the communications were protected under the corporate attorney-client privilege, and therefore, in denying appellants' motion to compel. Appellants' ninth assignment of error is overruled.

### III.

Appellants' first through sixth, eighth, and ninth assignments of error are overruled. Their seventh assignment of error is overruled in part and rendered moot in part. The judgment of the Summit County Court of Common Pleas is affirmed.

*Judgment affirmed.*

The Court finds that there were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).

Costs taxed to Appellants.

Exceptions.

SLABY, and WHITMORE, JJ., concur.
Ohio App. 9 Dist.,2001.
Bennett v. Roadway Express, Inc.
Not Reported in N.E.2d, 2001 WL 866261 (Ohio App. 9 Dist.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

241 Fed.Appx. 271                                                                                    Page 1
241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio)))**

**H**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Lee CAMPBELL, Plaintiff-Appellant,
v.
WASHINGTON COUNTY PUBLIC LIBRARY, et al., Defendants-Appellees.
No. 06-4414.

July 13, 2007.

**Background:** Former employee of public library brought action against county public library and its director, alleging that her discharge violated the Family and Medical Leave Act (FMLA). The United States District Court for the Southern District of Ohio, 2006 WL 2612985, granted summary judgment for library and director. Former employee appealed.

**Holdings:** The Court of Appeals, Rogers, Circuit Judge, held that:
(1) employee established prima facie case that her discharge was discriminatory in violation of FMLA, and
(2) facts that employer was undergoing cost-cutting reorganization and discharged employee was not a valued employee were legitimate, nondiscriminatory reasons for employee's discharge.

Affirmed.

West Headnotes

**[1] Labor and Employment 231H ☞368**

231H Labor and Employment
231HVI Time Off; Leave
231Hk361 Rights of Employee; Violations
231Hk368 k. Discharge or Layoff. Most Cited Cases
County public library employee established prima facie case that her discharge was discriminatory in violation of FMLA; employee faced adverse employment action shortly after taking FMLA leave and filing a complaint to Department of Labor, and there was evidence that library director was upset about employee's complaint. Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**[2] Labor and Employment 231H ☞368**

231H Labor and Employment
231HVI Time Off; Leave
231Hk361 Rights of Employee; Violations
231Hk368 k. Discharge or Layoff. Most Cited Cases
Facts that county public library, as employer, was undergoing cost-cutting reorganization and discharged employee was not a valued employee were legitimate, nondiscriminatory reasons for employee's discharge, and thus, employee could not recover from library or director under the FMLA. Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**[3] Labor and Employment 231H ☞368**

231H Labor and Employment
231HVI Time Off; Leave
231Hk361 Rights of Employee; Violations
231Hk368 k. Discharge or Layoff. Most Cited Cases
Even if supervisor was mistaken as to whether employee was, in fact, insubordinate, that mistaken belief did not amount to a pretext for FMLA discrimination, absent showing that supervisor deliberately used insubordination issue to cover for real reason for discharge. Family and Medical Leave Act of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

241 Fed.Appx. 271
241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio)))**

Page 2

1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**[4] Labor and Employment 231H ⬡368**

231H Labor and Employment
   231HVI Time Off; Leave
      231Hk361 Rights of Employee; Violations
         231Hk368 k. Discharge or Layoff. Most
Cited Cases
Even assuming that employer was mistaken as to
whether employee comments amounted to discrim-
ination against disabled job applicant, mistaken be-
lief did not amount to a pretext for FMLA discrim-
ination, absent showing that employer's reading of
employee's e-mail as being discriminatory was a
pretext to cover for employer's decision to fire em-
ployee because of her FMLA leave. Family and
Medical Leave Act of 1993, § 2 et seq., 29
U.S.C.A. § 2601 et seq.

***272** On Appeal from the United States District
Court for the Southern District of Ohio.

Before: RYAN, DAUGHTREY, ROGERS, Circuit
Judges.

ROGERS, Circuit Judge.

****1** This appeal from a magistrate judge's [FN1] or-
der granting summary judgment concerns Lee
Campbell's claim that the Washington County Pub-
lic Library and its director, Dr. Larry Nash White,
violated the Family and Medical Leave Act of
1993, 29 U.S.C. § 2601, *et seq.,* when the Library
discharged Campbell. Because no jury could find
that the Library acted on impermissible grounds,
we affirm.

> FN1. In a one sentence order, U.S. District
> Court Judge George C. Smith transferred
> this case to Magistrate Judge Terrence P.
> Kemp "[u]pon receipt of written consent of
> all parties" and "pursuant to 28 U.S.C. §
> 636(c)." Order of Jan. 5, 2005.

**BACKGROUND**

On April 28, 2004, Campbell, a former Washington
County Public Library Reference Manager, filed a
complaint in the U.S. District Court for the South-
ern District of Ohio alleging that the Washington
County Public Library Board of Trustees and Larry
Nash White, who was the Library's Director and
Campbell's supervisor at the time of the alleged im-
proper acts, violated the Americans with Disabilit-
ies Act of 1990, 42 U.S.C. § 12101, *et seq.,* the
Family and Medical Leave Act, 29 U.S.C. §
2611(4), and Ohio's wrongful discharge law. On ap-
peal, Campbell challenges the granting of summary
judgment only as to the FMLA claim. (The com-
plaint also included allegations against members
and leaders of the Library Board. Campbell is not
pursuing these allegations.)

In 1995, Campbell began working for the Washing-
ton County Public Library, which promoted her to
reference manager. In that capacity, Campbell su-
pervised five employees in the reference depart-
ment, provided reference service, taught computer
classes to Library patrons, and supervised two em-
ployees in the computer lab.

In 2001, Campbell's mother fell ill from colon can-
cer, and, between July 10, 2001, and April 30,
2003, Campbell took twenty-six days of FMLA-
protected leave to care for her sick mother. In May
2003, Campbell's mother was hospitalized, and
Campbell took an additional nine days of FMLA
leave. That same month, Campbell's sister and sis-
ter-in-law began to care for Campbell's sick mother,
and Campbell was able to return to work without
needing to take more FMLA leave.

Fearing that her job was in danger because she took
FMLA leave, Campbell contacted the Department
of Labor on August 15, 2003, to "protect my rights
under FMLA." (The Library learned of the com-
plaint shortly thereafter.) In her complaint to the
Department of Labor, Campbell alleged that she re-
ceived an adverse performance evaluation and that
the Library***273** reduced her responsibilities be-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

241 Fed.Appx. 271
241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio)))**

Page 3

cause she took FMLA leave.

Campbell claims that her complaint upset White, and she alleges that the Library illegally responded to her taking FMLA leave and to her contacting the Department of Labor. First, according to Campbell's affidavit, she received a negative performance evaluation in 2002. The evaluation included a comment that "[Campbell] is often not even there," and the Library put Campbell on 120 days of probation.

Second, according to Campbell's affidavit, White, Campbell's supervisor, "attempted to remove and/or reduce [Campbell's] responsibilities" by having Susan Wells, from a different department, supervise the computer lab that Campbell previously supervised. White denied that he reduced Campbell's responsibilities because of her FMLA leave and instead suggested that he reassigned the supervision of the computer lab because Campbell was on a different floor. (Campbell notes that Wells, who took over the supervision of the lab, did not work on the same floor as the lab either.)

**\*\*2** Third, according to Campbell's affidavit, on September 29, 2003, White "commenced to treat [her] with contempt and verbally abused [her] in front of [her] staff, contermanding [sic][her] directives to them." She does not offer additional details about the incident.

Fourth, according to Campbell's affidavit, on September 29, 2003, White changed Campbell's job responsibilities by removing her "mezzanine duties." White subsequently reduced her other responsibilities, for example, by removing her from the interviewing process, disbanding the Planning Team, which Campbell coordinated, and preventing her from distributing extra department hours.

Fifth, according to Campbell's affidavit, on November 14, 2003, White recommended to the Board that its Personnel Committee suspend Campbell, and on December 3, 2003, the Library suspended Campbell for 14 days without pay. On December 17, 2003, the Library fired Campbell.

The Library presented evidence that its decisions to suspend and terminate Campbell were not related to her taking FMLA leave. First, it presented evidence that Campbell's suspension was related to her poor performance and her lack of professionalism. For example, there is evidence that Campbell carried an egg timer with her when dealing with patrons to limit the amount of time that she spent with a patron. Some staff members considered the practice "abusive, demeaning, [and] inappropriate," and few, if any, employees in her department had positive impressions of her. Other evidence shows that Campbell was generally disagreeable in meetings, lacked sufficient supervisory skills, and failed to follow instructions.

Second, the Library presented evidence that Campbell exposed the Library to legal liability by commenting on the disabilities of a job applicant. In discussing the merits of a job applicant on October 29, 2003, in an email to White regarding a potential employee, Campbell listed a series of reasons not to hire the applicant. She wrote,"I did not include [the applicant in a list of persons to recommend for the position] because [the applicant's] email mentioned that she would have to quit Kent State a semester before graduating to take the job. Also, I knew [the applicant] as a volunteer in the lab and I don't believe she is the best person for the job." At the end of Campbell's email, she wrote, "You do need to know that [the applicant] would fall under the ADA," a comment that the Library viewed as creating a potential for **\*274** litigation. Campbell denies that she did anything wrong by mentioning the applicant's disability. (In fact, she originally sued the Library arguing that the Library violated the ADA by discharging her in retaliation for her decision to defend the disabled applicant, a claim that she does not pursue on appeal.)

Third, the Library detailed Campbell's poor performance in a December 3, 2003, letter of written reprimand. The letter detailed, for example, how Campbell "lied to the Director regarding the capabilities and previous work history" of an employee,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

241 Fed.Appx. 271                                                                Page 4
241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio)))**

"committed insubordination in not following the Director's written instructions in preparing materials" for interviews, "verbally abused [a reference employee] by aggressively and inappropriately disciplining [the employee]," and caused employees to fear her. The letter noted that Campbell's department had the highest turnover rate and an "apprehensive" staff, and that the Director could no longer trust Campbell in implementing Library policies.

**\*\*3** Fourth, the Library presented evidence that the Library was undergoing reorganization and that this process led to the termination of Campbell's position. At some point in late 2002 or early 2003, the Library began the process of cutting its budget and consolidated departments, moved staff around, conducted surveys, considered closing branches, and limited services in an effort to cut costs. The Library concluded that the reference manager was unnecessary and eliminated the position. The responsibilities of reference manager fell to other employees, and Campbell was the only person who lost her job during the reorganization.

Campbell counters that the reorganization process was part of a complex scheme to hide the Library's decision to discharge her for taking FMLA leave. Specifically, she notes that, two days before Campbell's suspension, the Library hired Justin Mayo to perform many of the reference manager tasks and that the Library did not consider Campbell for the replacement position. In addition, there is some limited evidence that removing Campbell was part of the reorganization process.[FN2] Finally, Campbell notes that the reorganization process did not follow normal Library procedures.

> FN2. White testified as follows:
>
> Q: Isn't it clear that the restructuring is in part to address deficiencies you perceived on the part of the reference manager?
>
> A: In part.... But, again, this was a pro-

cess that started about eight months prior and ... is actually still going on.

> Q: But specifically you reference in this document the suspension of the reference manager; correct?
>
> A: Correct.
>
> Q: Would you agree that the timing of the reorganization or restructuring, which resulted in the elimination of [Campbell's] job, is coincidental, coming two weeks after her suspension?
>
> A: Some would view it that way.

JA 170-71. Campbell stretches this testimony when she argues that "White also admitted that the alleged 'reorganization' was, in fact, meant to address Campbell's purported supervisory problems, and not simply a question of funding." White testified only that Campbell's deficiencies were merely one part of the reorganization and "some would view" the timing as suspicious.

On September 8, 2006, 2006 WL 2612985, Magistrate Judge Kemp granted summary judgment and dismissed Campbell's complaint after making three findings. First, the magistrate judge found that Campbell could establish a *prima facie* case of discrimination because "the library defendants admit that Ms. Campbell exercised the rights afforded to her under FMLA"; there was, at a minimum, a factual dispute whether Campbell suffered an adverse employment action; and the temporal connection between Campbell's taking\*275 FMLA leave and her discharge was sufficient to show causation. Second, the magistrate judge found that the Library satisfied its burden of production by articulating a valid rationale for its actions, because "the record is clear that Ms. Campbell lost job duties ... and ultimately lost her job ... because the library was reorganizing and the reference manager position was

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

241 Fed.Appx. 271
241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio)))**

Page 5

being eliminated[ and] the record indicates that Ms. Campbell was not offered another position at the library because of Ms. Campbell's actions." Third, the magistrate judge rejected Campbell's arguments that the Library's justifications for firing her were pretextual. The magistrate judge granted summary judgment as to all of Campbell's claims. Campbell filed a notice of appeal on September 8, 2006, and the magistrate judge rejected Campbell's motion for reconsideration on October 25, 2006.

### ANALYSIS

#### A. Standard of Review

This court reviews de novo an order granting summary judgment. *Tate v. Boeing Helicopters, Inc.,* 55 F.3d 1150, 1153 (6th Cir.1995). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party, in this case the Library, bears the "burden of showing the absence of a genuine issue as to any material fact," and the evidence submitted "must be viewed in the light most favorable to the opposing party," in this case, Campbell. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

**\*\*4** When a plaintiff argues that an employer illegally retaliated for an FLMA claim, this court applies the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden shifting analysis. *Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 315 (6th Cir.2001). After Campbell shows (1) that she availed herself of a protected FMLA right, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her exercise of her rights and the adverse employment action; the burden shifts to the Library to offer a legit-

imate, nondiscriminatory rationale for the adverse action. Campbell then has an opportunity to show that the Library's articulated reason was really pretext to mask discrimination. *Id.* at 314-15.

#### B. The Magistrate Judge Properly Granted Summary Judgment Against Campbell

[1][2] In this case, Campbell established a *prima facie* case of discrimination,[FN3] because she faced adverse employment action shortly after taking FMLA leave and filing a complaint to the Department of Labor and because there is evidence White was upset about Campbell's complaint. (White's state of mind establishes more than a temporal proximity between Campbell's complaint and her discharge. *See, generally, Campbell v. Univ. of Akron,* 211 Fed.Appx. 333, 351 (6th Cir.2006) (discussing the role of a temporal connection in establishing a *prima facie* case).) The Library offered a legitimate non-discriminatory reason for the adverse **\*276** employment actions: the Library was undergoing a cost-cutting reorganization and Campbell was not a valued employee.

> FN3. The Library argues that Campbell did not establish a *prima facie* case of discrimination because Campbell was not a good employee. These arguments best fit as arguments of a legitimate justification, discussed below.

[3] Campbell's four attempts to show that the Library's justifications were pretext to hide its true motivation are all unsuccessful. Her first argument regarding her interactions with a job applicant does not establish pretext. The Library told Campbell that she was insubordinate when she failed to ask an applicant certain questions. Campbell argued before the magistrate judge and argues on appeal that she was not insubordinate because the questions that she asked were the same questions that White instructed her to ask. She argues, without any direct evidence from the record, that the Library concocted the excuse of Campbell's alleged insubordin-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

241 Fed.Appx. 271
241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio)))

ation as a pretext to hide the Library's desire to retaliate against Campbell for taking FMLA leave. Campbell's argument lacks merit because the issue before the court is not whether Campbell, in fact, was insubordinate (i.e. whether she asked the correct questions (which is unclear from the record)); instead, the issue is whether the Library legitimately perceived Campbell as being insubordinate (an issue that Campbell chooses not to confront directly). *See Sosby v. Miller Brewing Co.,* 211 Fed.Appx. 382, 386-87 (6th Cir.2006); *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir.2001). Campbell's mere assertion that the Library's proffered reason has no basis in fact (i.e. that Campbell did, in fact, ask the right questions) is insufficient to call into question the Library's honest belief (i.e. that Campbell asked the wrong questions). *See Majewski,* 274 F.3d at 1117; *Joostberns v. United Parcel Servs., Inc.,* 166 Fed.Appx. 783, 794-95 (6th Cir.2006). For these reasons, Campbell has not shown that the insubordination issue was pretext because she has not shown that White deliberately used the insubordination issue to cover for the real reason for the adverse employment actions at issue in this case. That is, even if White were mistaken as to whether Campbell was, in fact, insubordinate, such a mistaken belief does not amount to pretext for FMLA discrimination. *See Smith v. Chrysler Corp.,* 155 F.3d 799, 806-08 (6th Cir.1998) (noting that where the employer can demonstrate an honest belief in its proffered reason based on reasonable reliance on particularized facts, the inference of pretext is not warranted). Instead, Campbell must present evidence that the Library's belief was more than just a mistake, *Majewski,* 274 F.3d at 1117, and she does not demonstrate on appeal that such a showing was made.

**5 [4] Campbell's second argument, namely that the magistrate judge misinterpreted her comments about a disabled applicant, fails for similar reasons. Campbell argues that the magistrate judge erred in interpreting Campbell's statement as urging the Library not to hire the applicant, but, according to

Campbell, she did not, in fact, want the Library to pass over a qualified applicant because of the applicant's disabilities. Campbell's argument fails because the court's inquiry is not whether Campbell subjectively sought to discriminate against a disabled applicant. The inquiry here, instead, is whether the Library had reasons to reprimand Campbell for mentioning an applicant's disability in an email that urged the Library not to hire the applicant. Even if Campbell subjectively wanted the Library to overlook the applicant's disability, the Library had reason to read her email as encouraging the Library not to hire an applicant because of a disability. Campbell argues that the Library's reading was wrong; however, she has not tried to show that the Library's reading of the email, assuming it was mistaken, was done as pretext to cover*277 for the Library's decision to fire her because of her FMLA leave. For this reason, Campbell's second effort to show pretext fails.

Third, Campbell argues unconvincingly that the circumstances surrounding her discharge show that the reorganization was not the true motivation for firing her. Campbell did not present this argument before the magistrate judge; had she done so, the magistrate judge should have rejected it. The only evidence to support this claim is (1) that nobody had been fired since April 1999, (2) some people did not know about the reorganization until either February or March 2003, (3) the reorganization plan mentioned the suspension of the reference manager, (4) other employees handled the work of the reference manager, and (5) the Library hired Justin Mayo around the time that it fired Campbell. Such unrelated strands of evidence cannot show that the Library juggled around positions merely to camouflage Campbell's adverse employment action as a reorganization. Indeed, the reorganization had an impact on almost every part of the Library system, took careful planning, and led to the demotion of another employee and a reduction of the Library's hours. No reasonable juror could find, based on this record, that the Library engaged in such an elaborate plot just to hide its decision to take ad-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

241 Fed.Appx. 271
241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio)))**

verse employment action against an employee who contacted the Department of Labor to protect her FMLA rights.

Fourth, Campbell argues that the Library did not follow its own disciplinary procedures. Campbell neither presented this argument to the magistrate judge, nor elaborates on appeal exactly how the Library failed to follow its own policies. She says that the Library did not follow its progressive disciplinary procedures, but, because Campbell is unable to explain how the Library deviated from its normal procedures, her claim fails.[FN4]

> FN4. This fact distinguishes this case from *DeBoer v. Musashi Auto Parts, Inc.,* 124 Fed.Appx. 387, 393 (6th Cir.2005), in which this court found that the plaintiff "offered perhaps the minimal amount of circumstantial evidence of pretext needed to survive summary judgment." In *DeBoer,* the court found that the "combination of the suspicious timing of [plaintiff's] demotion, the suspicious timing of [her employer's] negative reaction to [the plaintiff's] allegedly poor supervisory skills, [the employer's] decision not to counsel [the plaintiff] before demoting her, ... and the incongruity of the request for a morale boost resulting in [the employer's] main justification for [the plaintiff's] demotion sufficiently demonstrates pretext so that summary judgment in [the employer's] favor is precluded." *Id.* at 395. Here, in contrast, Campbell presents the court with no evidence that the Library failed to follow normal procedures.

### CONCLUSION

**\*6** For these reasons, the magistrate judge properly granted summary judgment against Campbell and we affirm.

C.A.6 (Ohio),2007.
Campbell v. Washington County Public Library

241 Fed.Appx. 271, 2007 WL 2050716 (C.A.6 (Ohio))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                                  Page 1
Slip Copy, 2009 WL 928576 (C.A.6 (Ohio)), 186 L.R.R.M. (BNA) 2251
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 928576 (C.A.6 (Ohio)))**

**H**
Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Hector GARCIA, Plaintiff-Appellant,
v.
DAIMLER CHRYSLER CORP., United Auto Workers Local No. 12, and Dan Henneman, Defendants-Appellees.
No. 08-3844.

April 7, 2009.

On Appeal from the United States District Court for the Northern District of Ohio.

Before KEITH, SUTTON, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

**\*1** After allegedly overhearing a harassing comment made by one unionized employee to another, plaintiff Hector Garcia reported the incident by sending letters to his employer and to the home addresses of various union officials. Garcia lied about how he obtained the private home contact information, and defendant Daimler Chrysler suspended him pending an investigation. Plaintiff sued his employer, the union, and the union chairman for retaliation. The district court granted summary judgment in favor of defendants, and we affirm.

I.

Garcia is an hourly employee of defendant Daimler Chrysler Corporation and a member of defendant United Auto Workers Local No. 12 ("UAW" or "Union"). Garcia works in Chrysler's Toledo, Ohio plant as a "floater," meaning that he is assigned to various positions within the plant depending on the company's needs. Floaters are frequently transferred to different departments to cover for permanent employees who are sick or on vacation, or to fill other temporary vacancies. Because of the temporary nature of their work, these employees cannot use their seniority to displace permanent workers who are returning to their permanent positions.

Due to a previous injury, Garcia has a permanent medical restriction that prevents him from performing activities requiring "repetitive gripping" or from doing much lifting with his right hand. As a result of his injury, Garcia was placed within Chrysler's "PQX" system, meaning that he was physically qualified with restrictions and could only be assigned to jobs that he was capable of performing with his restrictions. If an employee within the PQX system was assigned to a job that he believed violated his medical restriction, he could request that the plant doctor make an evaluation. Chrysler, not the Union, was in charge of making PQX assignments.

The controversy leading to the instant case began on August 19, 2004, when Garcia allegedly overheard a conversation between Union secretary/treasurer Mark Epley and employee Connie Ramirez that occurred in the break room. According to plaintiff, Epley told Ramirez that he would send her to a Hispanic conference in Chicago if she would spend a night with him in a hotel and another night with defendant Dan Henneman, chairman of the UAW Jeep unit. Bob Morrissey and Richard Lott, both of whom were Union officials, were also in the break room.

Garcia reported the conversation to Union steward Bill McCullough, who said that he would tell UAW

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                          Page 2
Slip Copy, 2009 WL 928576 (C.A.6 (Ohio)), 186 L.R.R.M. (BNA) 2251
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 928576 (C.A.6 (Ohio)))**

Vice Chairman Daryl Peterson. McCullough asked Ramirez about the conversation. She did not confirm or deny it; she merely "put her head down," a gesture that McCullough assumed meant that it either happened or that she was embarrassed. McCullough told Garcia that there was nothing he could do if Ramirez was not going to complain, and he later told Ramirez that if she had been sexually harassed, or if she were to be sexually harassed in the future, that she should tell the person to stop and then tell an advisor, Union representative, or someone in labor relations.

**\*2** Plaintiff alleges that he told Bruce Baumhower, the UAW President, about the incident and Baumhower believed him. Baumhower disputes this and testified that he called Epley about the Ramirez conversation, Epley denied it, and Baumhower reported this denial to Garcia. Garcia also claims to have contacted Dan Twiss, UAW's International Representative, although Twiss denies that he was contacted.

Garcia mailed a letter to Thomas Maxon, the Senior Manager of Human Resources at the Chrysler plant, and to the home addresses of a number of Union representatives. Garcia obtained the addresses from Fred Muir, his union steward. The letter stated:

Labor Relations, and UAW Union Local 12

I would like to file charges against Union Brother Mark Epley, for using his job as a tool for sexual harrassment [sic]. Mark Epley needs to be removed from his Union job, and discipline [sic].

On August 19, 2004 I went on my break because I knew Connie Ramirez was working in the committee room. She was at the coffee pot, and did not see me walk in. Mark Epley was sitting in his office with the door open. I heard Mark Epley discussing a trip to Chicago for the Hispanic conference with her. He said I'll pay your room for 3 days, and I'll pay your expenses, but he said you have to spend one night in a room with me because I'm sending you to Chicago.

She walked back to her desk and sat down. I looked at her and she shook her head. I rolled my chair over to her and whispered that Mark Epley had no right talking to her like that. She said, Hector, I just came back to work and I'm only part time, I might loose [sic] my job. I said it doesn't matter if you are full time or part time, you are not a whore and he can not use his job for sex. By that time my break was over and I went back to work.

On October 1, 2004 I approached Union Rep. Dan Twiss about the matter, and he said why are you telling me there is nothing I can do? I stopped and thought to myself, he doesn't want to help a minority because anoter [sic] Union Brother Rep. was involved. At this point I wiil [sic] file charges with labor relations at work and with the Hispanic Council.

Mark Epley should be removed from his Union job for trying to use his power to have sex.

Local 12 Member, Hispanic Member

Hector Garcia [FN1]

> FN1. The original letter was written entirely in capital letters. For the sake of readability, we have changed the case.

Garcia did not mention anything about Henneman in the letter because, unlike Epley, he believed that Henneman "wasn't a person like that," meaning a person who would take advantage of Ramirez.

Garcia's letter was the first time that he notified Chrysler management about Epley's comments. A number of Union representatives were concerned that Garcia mailed his letter to their home addresses because, in many cases, their home addresses were not public information. Both Chrysler and the UAW kept these addresses confidential to prevent the representatives from being harassed at home and to protect their privacy. Disclosure of such information violates company policy; abuse of private information had recently resulted in epis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                        Page 3
Slip Copy, 2009 WL 928576 (C.A.6 (Ohio)), 186 L.R.R.M. (BNA) 2251
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 928576 (C.A.6 (Ohio)))**

odes of identity theft. Chrysler policy allows it to discipline employees "up to and including discharge" for failure to provide information or for providing false information.

**\*3** Chrysler formed an investigative team comprised of Maxon, labor relations supervisor Jean Hathaway, and Henneman. The investigation team interviewed Ramirez, who denied that she had been sexually harassed and provided a written statement to that effect. The team also interviewed Lott and Morrissey, both of whom denied that Epley had harassed Ramirez. The team questioned Garcia about how he obtained the addresses. At Garcia's request, his union representative, Raul Ledesma, was present. Garcia gave conflicting explanations regarding how he obtained the addresses. His answers ranged from finding them on the internet, to driving to the individuals' houses, to claiming that his wife found them. Eventually Garcia admitted that he obtained the addresses from Muir. Maxon described his confusion following this discussion with Garcia: "I still to this day don't know where they came from."The team then questioned Muir about the addresses, to which he repeatedly responded, "I plead the Fifth."

Chrysler suspended Garcia without pay pending its investigation into how he obtained the addresses. Maxon later explained that he believed the suspension was necessary because of Garcia's conflicting explanations:

[W]e had such a difficult time-and I'll be very candid with you, I don't have any clue, didn't at the time as to what was true and what wasn't. So it had taken an inordinate amount of time and there was more that was going to have to take place, so his suspension was necessary in my opinion so that we could continue with the investigation.

Henneman confronted Garcia about the Epley incident and called him a liar. Plaintiff alleges that Henneman also swore at him.

Garcia filed a grievance with the UAW, and

Chrysler reinstated him with backpay. Nevertheless, he filed a discrimination complaint with the EEOC, alleging that Chrysler and the UAW retaliated against him for reporting Epley's conversation with Ramirez.

Two weeks later, Chrysler Area Manager Brian Tringali transferred Garcia from the material handling department back to his home department because the material handling department "was over roll," meaning that it had more employees than it needed. He was sent home on several occasions because there was no work for him. He returned to work but was assigned to a position that violated his medical restrictions, so Chrysler transferred him back to his previous job as a forklift operator.

The EEOC issued a determination letter stating that it found sufficient evidence to support a retaliation claim. Garcia then brought the present action in the United States District Court for the Northern District of Ohio, claiming retaliation in violation of Title VII and OHIO REV.CODE § 4112. The district court ultimately granted summary judgment in favor of defendants, and Garcia appealed.

II.

We review a district court's grant of a motion for summary judgment de novo. *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 374 (6th Cir.2007). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."FED.R.CIV.P. 56(c). The moving party has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317. 323 (1986). When determining whether the movant has met this burden, we must view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir.2007).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                    Page 4
Slip Copy, 2009 WL 928576 (C.A.6 (Ohio)), 186 L.R.R.M. (BNA) 2251
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 928576 (C.A.6 (Ohio)))**

### III.

**\*4** Garcia argues that defendants retaliated against him for reporting Epley's conversation with Ramirez. To establish a prima facie claim of retaliation under Title VII and Ohio law,[FN2] Garcia must show that: (1) he engaged in protected activity; (2) defendants knew that he engaged in the protected activity; (3) defendants subjected him to an adverse employment action; and (4) the adverse employment action was causally connected to the protected activity. *Ladd v. Grand Trunk Western R.R., Inc.,* 552 F.3d 495, 502 (6th Cir.2009). If plaintiff can establish a prima facie case, the burden shifts to defendants to articulate a "legitimate, nondiscriminatory reason" for their actions. *McDonnell Douglas Corp. v. Green,,* 411 U.S. 792, 802 (1973); *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir.2008). If defendants make this showing, the burden shifts back to plaintiff to show that defendants' proffered reason is merely "a pretext to hide unlawful discrimination." *Russell,* 537 F.3d at 604.

> FN2. Ohio courts apply Title VII jurisprudence to the interpretation of OHIO REV.CODE § 4112. *Ohio Civ. Rights Comm'n v. David Richard Ingram, D.C., Inc.,* 630 N.E.2d 669, 674 (Ohio 1994).

### A.

Plaintiff argues that Chrysler retaliated against him by suspending him pending an investigation into how he obtained the addresses and by transferring him to a job that violated his medical restrictions.

### 1.

Garcia asserts that he met the prima facie elements of a retaliation claim regarding Chrysler's suspension of him pending its investigation. Chrysler argues that plaintiff has failed to establish a causal connection between the protected act and the suspension pending investigation. However, we need not resolve this matter because, even assuming that plaintiff met his prima facie case, he cannot show that Chrysler's suspension of him was a pretext for retaliation. Thus, he has failed to carry his ultimate burden of persuasion in a manner that would allow for a reasonable juror to find in his favor. *See Ladd,* 552 F.3d at 502 (concluding that it was unnecessary to analyze a prima facie case when a plaintiff cannot establish pretext).

Assuming arguendo that plaintiff could establish a prima facie case, the burden of production shifts to Chrysler to offer a non-retaliatory reason for the adverse employment action. *Id.* Chrysler asserts that its non-retaliatory purpose for suspending Garcia was his dishonesty and evasion in answering questions regarding how he obtained the addresses. In order to prevail, Garcia must show that this proffered reason either: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action."*Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994)). Plaintiff cannot make this showing.

Garcia concedes that Chrysler's proffered reason for suspending him had a basis in fact; he admits that he was not truthful in responding to questions about how he obtained the addresses. Plaintiff offers no admissible evidence that his evasiveness did not motivate his suspension or that it was insufficient to warrant a suspension. Plaintiff argues further that Chrysler retaliated against him, not only by suspending him during its investigation, but by the mere act of conducting an investigation. We disagree. Garcia cannot create the need for an investigation by his own evasive conduct and then claim that the investigation itself was retaliatory. *See Driggers v. City of Owensboro, Ky.,* 110 F. App'x 499, 508 (6th Cir.2004) (holding that an investigation into the facts surrounding plaintiff's complaints did not constitute improper conduct). The district court properly granted summary judgment in favor of Chrysler on this issue.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2009 WL 928576 (C.A.6 (Ohio)), 186 L.R.R.M. (BNA) 2251
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 928576 (C.A.6 (Ohio)))**

2.

*5 Garcia's claim that Chrysler retaliated against him by transferring him to a different department fails for similar reasons. Chrysler asserts that it transferred Garcia, a floater, because the department he was working in "was over roll, meaning that it had more employees than necessary to fill the available positions."Plaintiff has failed to present any *admissible* evidence to show that Chrysler's explanation lacked a basis in fact, did not actually motivate the transfer, or was insufficient to warrant the transfer. Garcia proffers two reasons-Ledesma's statement and the EEOC letter-but neither is admissible for purposes of opposing a motion for summary judgment.

Ledesma, whom plaintiff describes as "a tried and true union official," stated that he "can't think of any other reason" for Chrysler's action other than retaliation. Garcia argues that "Ledesma's testimony was based on personal knowledge. He knew from experience how people are normally reassigned."The district court rejected the testimony because Ledesma admitted that his testimony was based on his "impression" of the events, rather than on specific information. We agree with the district court. Rule 56 requires "personal knowledge," and a statement that one cannot "think of any other reason" is not the same as a statement that one actually knew of the reason. Even if Ledesma knew "how people are normally reassigned," Garcia has not shown that Ledesma knew anything about this particular reassignment. Garcia argues further that Ledesma's statement is admissible as a statement by a party opponent. However, even if Ledesma's statement could be imputed to the Union, Garcia has not shown how it could be imputed to Chrysler. The district court properly excluded this statement.

Regarding the admissibility of the EEOC letter, Garcia relies upon the Ninth Circuit case of *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.,* 685 F.2d 1149 (9th Cir.1982). In *Gifford,* the Ninth Circuit held that an EEOC investigation into whether the plaintiff had been treated differently than her male

coworkers was sufficient to create an issue of fact in that case. *Id.* at 1156.However, Garcia has not identified any cases where the Sixth Circuit has made a similar determination. *See Williams v. Nashville Network,* 132 F.3d 1123, 1129 (6th Cir.1997) (ruling that a district court did not abuse its discretion in refusing to admit an EEOC probable cause determination letter). Garcia argues that the trial court has broader discretion to exclude an EEOC letter at trial than at the summary judgment stage, but offers no legal support for this proposition.

Garcia has not shown that Chrysler's reason for transferring him was a pretext for illegal retaliation.

B.

Garcia alleges that the Union retaliated against him by encouraging Chrysler's suspension of him and concurring in his transfer. The Union argues that it could not have retaliated against plaintiff by suspending him because it was Chrysler, not the Union, that issued the suspension. In fact, it was Henneman, on behalf of the Union, who persuaded Chrysler to reimburse Garcia for the time that he was suspended. Even if, for the sake of argument, the Union was responsible for suspending plaintiff, Garcia's claim of retaliatory suspension fails when applied to the Union for the same reason that it fails as applied to Chrysler. Garcia's evasiveness when questioned about how he obtained the addresses prevents him from being able to show that the suspension was pretextual.

*6 Plaintiff has also failed to show that the Union, as opposed to Chrysler, was responsible for his transfer, other than by proffering Ledesma's statement, which we have already determined to be inadmissible. However, even if the Union's role in the transfer was coterminous with Chrysler's role, Garcia is still unable to show that the reason given for the transfer-his department being "over roll"-was pretextual.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The district court ruled that plaintiff's claim against the Union for retaliatory transfer failed, but it based its conclusion on Garcia's inability to make his prima facie case, rather than on his inability to establish pretext. Specifically, the district court determined that Garcia could not show that his transfer "was causally connected to his report as opposed to overstaffing in the stock department."Holding that Garcia's claim fails because he cannot show that his transfer was connected to his report, or holding that it fails because he cannot show that being "over roll" was a pretext for retaliation, are simply two ways of saying the same thing: Garcia cannot succeed on his claim against the Union because he cannot show that it retaliated against him. Whether we hold that Garcia cannot demonstrate the elements for his prima facie case, or show that the proffered nondiscriminatory reason was pretextual, the result is the same. Thus, we affirm the district court's grant of summary judgment in favor of the Union.

### C.

Garcia argued in his complaint and in his opposition to summary judgment below that defendants engaged in retaliatory harassment against him. However, he did not raise this issue in his opening brief on appeal. In his reply brief, he argued that the various incidents about which he complained in his opening brief amounted to retaliatory harassment in their totality. He also argued, apparently for the first time, that "the legal review for retaliation and retaliatory harassment are nearly the same."

We have held that "[a]n argument raised for the first time in a reply brief will not be considered by this Court." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 578 (6th Cir.2002) (citing *Wright v. Holbrook,* 794 F.2d 1152, 1156 (6th Cir.1986)); *Wu v. Tyson Foods, Inc.,* 189 F. App'x 375, 381 (6th Cir.2006) (refusing to consider an issue not raised in appellant's opening brief even though the issue was preemptively raised in appellee's brief). Garcia did not raise this issue in his

opening brief and has cited no authority that would excuse this waiver merely because the issue is "nearly the same" as one that he did raise.

### D.

Garcia asserts, without citation to authority, that the district court violated his Seventh Amendment right to a trial by jury. He argues that "[i]n this case, where various witnesses disagreed with each other about key facts and where affidavits were submitted at summary judgment specifically to challenge facts set forth by Garcia, the lower court should not have ignored the constitutional mandate to allow a jury to try Garcia's claims."This is nothing more than an attempt to recycle Garcia's summary judgment arguments as somehow being Seventh Amendment arguments. Garcia does not cite any authority supporting his Seventh Amendment argument, and the perfunctory manner with which he has addressed this issue amounts to a waiver. *See United States v. Villareal,* 491 F.3d 605, 611 (6th Cir.2007) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

### IV.

*7 Finally, Garcia sued Henneman under both Title VII and OHIO REV. CODE § 4112.02(I). The district court cited *Wathen v. Gen. Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997), for the proposition that a plaintiff "cannot hold an individual liable for illegal retaliation under Title VII."Accordingly, the district court dismissed the claims against Henneman. On appeal, Garcia does not challenge the dismissal of the Title VII claim against Henneman but argues that the district court erred in dismissing the state law claim against him. Plaintiff cites *Genaro v. Cent. Transp., Inc.,* 703 N.E.2d 782 (Ohio 1999) for the proposition that Ohio law allows liability to attach to individuals.

In *Genaro,* the Ohio Supreme Court held that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Page 7

Slip Copy, 2009 WL 928576 (C.A.6 (Ohio)), 186 L.R.R.M. (BNA) 2251
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 928576 (C.A.6 (Ohio)))**

"individual supervisors and managers are accountable for their own discriminatory conduct occurring in the workplace environment." 703 N.E.2d at 787. The court based its decision on the language of OHIO REV.CODE § 4112.01(A)(2), which defines the term "employer" as: "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer."Thus, in order for liability to attach to Henneman, the local UAW leader, Garcia would have to show that Henneman met the statutory definition of "employer."

Even if plaintiff could make this showing, *Genaro* does not create a separate liability standard; it merely states that "for purposes of [§ 4112], a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct...." 703 N.E.2d at 787-88. Under *Genaro*, a supervisor's liability is joint and several with his employer. Therefore, because neither Chrysler nor the Union are liable for the reasons explained above, there is no liability to attach jointly or severally to Henneman.

<div align="center">V.</div>

For these reasons, we affirm the judgment of the district court.

C.A.6 (Ohio),2009.
Garcia v. Daimler Chrysler Corp.
Slip Copy, 2009 WL 928576 (C.A.6 (Ohio)), 186 L.R.R.M. (BNA) 2251

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

167 Fed.Appx. 448                                                                                          Page 1
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))**

**C**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Patricia HILL, Plaintiff-Appellant,
v.
FORUM HEALTH, Sonya Clawson-Gregg and
Elizabeth Maiorana, Defendants-Appellees.
No. 04-4160.

Jan. 20, 2006.

**Background:** Former employee sued former employer, alleging race discrimination in violation of Title VII, § 1981 and state law. The United States District Court for the Northern District of Ohio granted summary judgment for the employer, and the employee appealed.

**Holding:** The Court of Appeals, McKeague, Circuit Judge, held that the employee failed to prove that employer's legitimate, non-discriminatory explanation for an alleged failure to promote the employee was a pretext for race discrimination.
Affirmed.

Karen Nelson Moore, Circuit Judge, filed an opinion concurring in part.

West Headnotes

Civil Rights 78 ⚖1137

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases

African-American employee failed to prove that employer's legitimate, non-discriminatory explanation for an alleged failure to promote the employee, that the subject appointment arose from a reorganization and that the worker appointed had already been performing the duties of the position for several months under a different title, was a pretext for race discrimination in violation of Title VII; that the employee was arguably better qualified by virtue of her experience did not justify an inference that the proffered reason for appointing the other worker was false, and the employee's attempt to expose the employer's explanation as false or unworthy of credence was premised on no more than a scintilla of evidence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

*449 On Appeal from the United States District Court for the Northern District of Ohio.Gilbert W.R. Rucker, III, Warren, OH, for Plaintiff-Appellant.

Domenic A. Bellisario, Law Office, Pittsburgh, PA, for Defendants-Appellees.

Before MOORE, ROGERS and McKEAGUE, Circuit Judges.

**OPINION**

McKEAGUE, Circuit Judge.

**\*\*1** In this action, appellant, who is African-American and a long-time employee of the appellee employer, alleges that she was denied the opportunity, due to discriminatory animus, to compete for promotion to a position for which she was better qualified than the Caucasian employee who was promoted. The employer defended its actions by explaining that the subject appointment arose from a reorganization, that the appointment did not involve a vacant position that needed to be posted for pro-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))**

motion or hiring, and that the employee appointed had already been performing the duties of the position for several months under a different title. The district court concluded appellant had failed to show that the employer's legitimate nondiscriminatory reason was a pretext for discrimination and awarded summary judgment to the employer. On appeal, appellant has failed to identify any error in the district court's analysis and we therefore affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACK-GROUND

Plaintiff Patricia Hill was hired by the Youngstown Hospital Association, a hospital in Youngstown, Ohio now known as Western Reserve Care System ("WRCS"), as a practical nurse in 1968. Defendant Forum Health is the parent corporation of WRCS.[FN1] Upon obtaining her Associate's Degree in Nursing at Youngstown State University, plaintiff Hill was hired by WRCS as a registered nurse in 1974. *450 From 1970 to 1983, Hill worked in the hospital's Coronary Intensive Care Unit. From 1983 to 1994, she worked in the WRCS Department of Internal Medicine as a clinical assistant. Beginning in 1994, she assisted Jeffrey Rubin, M.D., in opening and operating the Peripheral Vascular Diagnostic Center ("PVDC"), a department at WRCS. In April 1998, she was designated Technical Director of the PVDC. It was in this capacity that Hill continued to work until her employment was terminated on October 25, 2002, purportedly for performance deficiencies.

> FN1. For purposes of this appeal, however, both Forum Health and WRCS have been treated as one and the same entity, *i.e.,* as plaintiff's employer.

The difficulties that eventually led to plaintiff's termination after some 34 years of employment appear to have been precipitated by the "promotion" of one of plaintiff Hill's colleagues, defendant Sonya Clawson-Gregg. Effective April 1, 2001, Clawson-Gregg was given the title, or appointed to the newly created position, "Corporate Director of Non-Invasive Cardiology Services." The appointment was prompted by the recommendation of defendant Elizabeth Maiorana, who was Cardiovascular Administrator for both WRCS and Trumbull Memorial Hospital ("Trumbull"), another hospital in Youngstown managed by Forum Health. As Corporate Director, Clawson-Gregg was given responsibility for supervision of the PVDC, among other departments. Upon learning of Clawson-Gregg's appointment, Hill voiced objection. She believed that she was better qualified for the position than Clawson-Gregg. She resented the fact that the position was not posted and that she was afforded no opportunity to compete for it. Hill, who is African-American, attributed the preferential treatment received by Clawson-Gregg to racial favoritism. Following Clawson-Gregg's appointment, Hill's employment relationship with Forum Health gradually deteriorated until she was discharged on October 25, 2002.

**\*\*2** In this action, plaintiff alleges that Forum Health's failure to promote her was the product of race discrimination and violative of her civil rights under both federal law (Title VII, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981) and state law (Ohio Revised Code § 4112.02). Plaintiff's first amended complaint also contains allegations that she was subjected to a racially hostile work environment and was ultimately discharged because of her race. On August 18, 2004, the district court awarded summary judgment to defendants on all three theories. On appeal, Hill asserts no claim of error with respect to the district court's ruling on her hostile work environment claim.

In connection with the discriminatory discharge theory, Hill contends only that the district court erred by failing to evaluate the claim as a retaliatory discharge claim. The district court expressly refused to recognize a retaliation claim because it correctly found that plaintiff had failed to allege such a claim in her complaint. In challenging this conclusion, appellant Hill does not even argue that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448                                                                                    Page 3
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))**

her complaint should be liberally construed as stating a retaliation claim. It plainly does not. Rather, plaintiff contends she asserted a retaliation claim in her opposition to defendants' motion for summary judgment.

Granted, a claim that was not formally pleaded but was otherwise fairly presented to and addressed by the district court *may* be preserved for review on appeal. *See Strouss v. Michigan Dep't of Corrections,* 250 F.3d 336, 345 (6th Cir.2001). Here, however, no retaliation claim was ever presented to the district court. Plaintiff's isolated references to "retaliation" in her brief opposing defendants' motion for summary judgment in no way represent an attempt to state a distinct retaliation *claim.* Rather, the term "retaliation" was used only in support of her other actually *451 pleaded claims, as plaintiff argued that the proffered reasons for defendants' adverse actions were pretextual and that their actions were actually motivated by discriminatory animus. A separate and distinct retaliation claim was never asserted against defendants and never fairly presented to the district court. Here, as in *Yatvin v. Madison Metropolitan School Dist.,* 840 F.2d 412, 420-21 (7th Cir.1988), the case distinguished by *Strouss,* plaintiff clearly failed to tell the district court she was making a retaliation claim. The district court did not err, therefore, in failing to recognize such a claim.

Further, plaintiff's attempt to raise the claim for the first time on appeal comes too late. It is well-settled that this court will not consider arguments raised for the first time on appeal unless necessary to avoid a miscarriage of justice. *Barner v. Pilkington North America, Inc.,* 399 F.3d 745, 749 (6th Cir.2005) ("Our function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order."); *Lepard v. NBD Bank,* 384 F.3d 232, 236 (6th Cir.2004). Plaintiff has offered no explanation for her failure to timely assert a retaliation claim below and we remain unpersuaded that a miscarriage of justice will result if the claim is not ad-

dressed in this appeal.

**3 Accordingly, this appeal focuses on the district court's evaluation of plaintiff's failure to promote claim. In this regard, the district court determined that plaintiff Hill had established a *prima facie* case of discrimination; that defendants had presented a legitimate nondiscriminatory reason for their actions; and that plaintiff had failed to adduce evidence upon which a reasonable jury could find that defendants' reason was pretextual. The district court awarded summary judgment to defendants. On appeal, Hill contends that the district court failed to evaluate the record in the light most favorable to her, and that the judgment should therefore be vacated and the case remanded for trial.

**II. ANALYSIS**

**A. Governing Legal Standards**

The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes,* 398 F.3d 868, 873 (6th Cir.2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley,* 385 F.3d 683, 689-90 (6th Cir.2004). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir.2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing sub-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448                                                                                      Page 4
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))**

stantive law. *Id.*

In summarizing the governing substantive law, the district court correctly observed that plaintiff's failure to promote claims, under Title VII, 42 U.S.C. § 1981, and Ohio law, are all evaluated under the same standards, those applicable to Title VII claims. *See Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 n. 2 (6th Cir.2000). Because plaintiff presented no direct evidence*452 of discrimination, her circumstantial evidence was evaluated by the district court under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253-06, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), concisely summarized as follows:

> To establish a *prima facie* claim of racial discrimination based on a failure to promote under Title VII of the Civil Rights Act of 1964, a plaintiff generally must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. After a plaintiff creates a presumption of discrimination by establishing a *prima facie* case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision. The plaintiff then bears the burden of showing that the defendant's proffered reason is pretextual.

> **4 A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times.

*Dews,* 231 F.3d at 1020-21 (footnote, citations omitted).

**B. Plaintiff's *Prima Facie* Case**

The district court noted that the circumstances of this case do not fit neatly within the standard elements of a *prima facie* failure to promote case. Specifically, the court observed that although plaintiff is clearly a member of a protected class, there was little or no evidence that she applied for, was qualified for, or was considered for the position to which Sonya Clawson-Gregg was appointed. The court cited *Dews,* however, in concluding that because Forum Health had not given employees notice and a formal mechanism for expressing interest in the available promotion, it had "a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known." *Id.* at 1022. For purposes of evaluating plaintiff's *prima facie* case, the district court rejected defendants' argument that Clawson-Gregg's appointment as Corporate Director of Non-Invasive Cardiology Services was not a promotion, but simply a job title change to reflect the duties she was actually performing. With the new job title, the court observed, Clawson-Gregg also received a raise, rendering the new position sufficiently analogous to a promotion that Forum Health ought to have given potentially interested employees an opportunity to apply. Because Forum Health had not given plaintiff this opportunity, the district court concluded, consistent with *Dews,* that plaintiff did not have to meet the "applied for" and "considered for" elements to make out a *prima facie* case.

The court also recognized that plaintiff Hill did not meet all requirements of the Corporate Director job description. She had not earned a Bachelor's Degree and had had no prior job responsibilities at Trumbull Memorial Hospital. In contrast, Clawson-Gregg did have prior experience at Trumbull. Yet, she was appointed even though she, too, lacked a Bachelor's Degree.*453 [FN2] Hence, the court surmised that the job qualifications were not so rigidly

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448                                                                                    Page 5
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
(Not Selected for publication in the Federal Reporter)
(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))

enforced as to necessarily exclude Hill from eligibility. In view of other evidence of Hill's prior experience and qualifications, the court concluded that there was at least a question of fact as to whether Hill was qualified for the position.

> FN2. It appears that Clawson-Gregg was in an educational program to complete her Bachelor's Degree when she was appointed and earned the degree shortly after her appointment.

Finally, the court noted, in connection with the fourth element of the *prima facie* case, that there was some question as to whether Clawson-Gregg is Native-American and is therefore also a member of a protected class. On this point, too, the court concluded there was at least a question of fact concerning Clawson-Gregg's racial or ethnic background. This discrepancy is immaterial. Whether Clawson-Gregg is Caucasian or of Native-American descent, the fact remains she is not a member of the same protected class as Hill. In other words, the fact that Clawson-Gregg is undisputedly not African-American is a factor contributing to an inference of discriminatory motive.

**5 Based on the foregoing analysis, the district court concluded that plaintiff had presented sufficient evidence in support of a *prima facie* case of race discrimination. Meeting the elements of a *prima facie* case was deemed to create a rebuttable presumption that the employer unlawfully discriminated against the employee. Appellant Hill has not, of course, challenged the district court's finding that she made out a *prima facie* case. Nor have defendants challenged the determination. Therefore, we need not pass on the correctness of the district court's opinion in this regard. We note, however, that for the reasons stated by the district court, Hill's *prima facie* showing of discrimination is, under any construction, a weak one. The district court recognized that plaintiff had adduced evidence in support of only two or three of the normally required four elements-evidence deemed sufficient to create a genuine issue of material fact. The weak-

ness of the discrimination presumption arising from such a weak *prima facie* showing is relevant, as seen below, in evaluating plaintiff's showing that Forum Health's legitimate nondiscriminatory reason for its actions was pretextual.

**C. Legitimate Nondiscriminatory Reason**

To rebut plaintiff's *prima facie* case, defendants were obliged to produce evidence of a legitimate nondiscriminatory reason for the decision to appoint Clawson-Gregg and not Hill to the Corporate Director position. The district court determined that defendants satisfied their burden of production in this regard.

Defendants' explanation rested largely on the testimony of Cardiovascular Administrator Elizabeth Maiorana. She explained that Forum Health began restructuring the management of the Cardiovascular Department at both WRCS and Trumbull in 1998 or 1999. As a consequence, the Director of Cardiology position, occupied by Cathy Valinsky, was to be supplanted by two new positions, Manager of Invasive Cardiology Services and Manager of Non-Invasive Cardiology Services, to enhance accountability for operations in both departments. Initially, Valinsky became the Manager of Non-Invasive Cardiology Services and, while a Manager of Invasive Cardiology Services was being recruited,*454 she handled those responsibilities as well.

When Valinsky died suddenly in the Summer of 1999, Clinical Nurse Manager Myrna Ruggles assumed responsibility in the interim for managing both invasive and non-invasive services. Both positions were posted and both internal and outside candidates were considered. Patricia Hill did not apply for either position. Ruggles ended up accepting the Manager of Invasive Cardiology Services position. Meanwhile, Clawson-Gregg had been hired as a Lead Echo Sonographer in September 1999. She demonstrated managerial skills and began assisting Ruggles with her duties. Clawson-Gregg applied for the Manager of Non-Invasive Cardiology Ser-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448                                                                                                  Page 6
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
(Not Selected for publication in the Federal Reporter)
(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))

vices position at WRCS and it was awarded to her in June 2000.

**6 Early in 2001, Kevin Walro, Manager of Non-Invasive Cardiology Services at Trumbull, announced his resignation. He had been performing essentially the same duties at Trumbull that Clawson-Gregg had been performing at WRCS. Clawson-Gregg then began to assist with management of non-invasive services at Trumbull as well as WRCS. In the Summer of 2001, Maiorana recommended to the Forum Health Human Resources Department that Clawson-Gregg's job description be expanded to reflect the increased duties she had assumed. This recommendation led that Summer to a change in Clawson-Gregg's title to Corporate Director of Non-Invasive Cardiovascular Services, a title that had not previously existed, a title that reflected her responsibilities for management of "Echocardiography, EKG, Pacer Clinic, Stress Testing, and Vascular at the Trumbull Campus and Cardiac Rehab, Echocardiography, EKG, Stress Testing, Nuclear Cardiology and the Peripheral Vascular Diagnostic Center at the Northside [WRCS] campus." Maiorana memo. 8/23/01, J.A. 378.

Thus, Forum Health explained that there had not been an open Corporate Director position for which qualified candidates were recruited for promotion or hire. Rather, Sonya Clawson-Gregg was-in the midst of this restructuring process, complicated by vacancies due to a death and a resignation-present, willing and able to help as needed. She had voluntarily assumed extra duties to meet the needs presented, had demonstrated competence in handling those responsibilities, and had been rewarded with a new title and raise commensurate with her expanded responsibilities.

Maiorana explained that where, as in this case, the Corporate Director title was essentially created by Human Resources to match the responsibilities actually being performed by an employee who had originally been hired in a different capacity, there was no requirement for posting a position vacancy

and receiving applications. This understanding was corroborated by the testimony of Chief Operating Officer Michael Cicchillo. There was no vacancy to fill through promotion or hiring; Clawson-Gregg was already doing the job. Therefore, she was granted the "appointment." Maiorana cited the example of another Forum Health employee, David Hollis, who had months earlier, pursuant to similar restructuring, been given the newly created title Corporate Director of Respiratory Services at both WRCS and Trumbull, without any posting of the position. Thus, defendants maintain, race discrimination played no role in the process whereby plaintiff Hill and other potentially interested employees were not afforded the opportunity to apply for the Corporate Director appointment.

Appellant Hill does not challenge the district court's determination that defendants'*455 explanation represents a legitimate nondiscriminatory reason for their actions. Still, she insists it is a pretext for race discrimination.

**D. Pretext**

To bear her burden of showing pretext, Hill was required to adduce evidence upon which a reasonable trier of fact could find either (1) that there was no factual basis for defendants' proffered reason for their actions, or (2) that their proffered reason did not actually motivate their actions, or (3) that their proffered reason was not sufficient to justify their actions. Hill appears to be relying on the second or third of these three ways. She identifies six circumstances as creating a triable fact issue on the question of pretext.

**7 First, Hill contends that she was better qualified than Clawson-Gregg for the Corporate Director position, considering her greater experience and education. She cites the deposition testimony of Chief Operating Officer Michael Cicchillo to the effect that *if*, hypothetically, there had been a vacancy and if the position had been posted, Hill would not have been disqualified from applying

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
(Not Selected for publication in the Federal Reporter)
(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))

and "could have been on the job." Cicchillo dep. pp. 85-86, J.A. 540-41. The significance of this testimony is undercut by the fact that, as Cicchillo recognized, there was no vacancy.[FN3] Hill did not have a chance to compete with Clawson-Gregg for the position because, under the circumstances described above, Clawson-Gregg was already performing the duties entailed in the Corporate Director position before the position existed as such. Thus, even though Hill was *arguably* better qualified by virtue of her experience, this hardly justifies an inference that defendants' proffered reason for appointing Clawson-Gregg is false.[FN4]

> FN3. Maiorana, too, testified that Hill could have applied and been considered for the position *if* there had been a vacancy, but there was no vacancy. Maiorana dep. pp. 121-22, J.A. 484-85.

> FN4. Apart from Hill's subjective belief and argument, there is no evidence that her extensive prior experience at WRCS would necessarily have rendered her better qualified for the Corporate Director position. Unlike Clawson-Gregg, Hill appears not have been actively pursuing her Bachelor's Degree, had no prior experience at Trumbull, and had not demonstrated managerial skills and competence.

Second, Hill contends defendants violated the WRCS job posting policy by appointing Clawson-Gregg without first posting the position and giving other current employees a chance to apply for it. The cited policy reflects hospital management's preference for filling position vacancies by promoting from within and provides that *"vacancies may be* announced on the bulletin board for a period of five (5) working days with the specific qualifications for each position clearly described in the job posting notice." WRCS Standard Policy & Procedure Instructions, J.A. 491 (emphasis added). The policy cited by Hill is couched in precatory, not mandatory, language.[FN5] Moreover, its applicability is dubious inasmuch as Clawson-Gregg's

"appointment" appears not to have represented the filling of a "vacancy." Again, the asserted policy violation does not impugn the truthfulness of defendants' given reason for appointing Clawson-Gregg.

> FN5. The discretionary nature of the policy is corroborated by the testimony of Maiorana, who understood the posting policy to be optional for managerial positions. Maiorana dep. pp. 32-33, J.A. 358-59.

Third, Hill contends preferential treatment was evident in Clawson-Gregg's earlier promotion to Manager of Non-Invasive Cardiology Services in June 2000, which set the stage for her appointment to *456 Corporate Director in the summer of 2001. Yet, it is undisputed that the Non-Invasive Manager position had been posted; that Clawson-Gregg had been performing some of the duties of the position while applications were sought; and that Clawson-Gregg applied for the position, whereas Hill did not. Clawson-Gregg's earlier promotion does not therefore evidence race discrimination.

Fourth, Hill points out that when she was appointed to the position of Technical Director of the PVDC in 1998, which entailed the added responsibility of assisting in obtaining and maintaining accreditation of the lab, she did not receive a raise, whereas Clawson-Gregg did receive a raise upon her appointment to Corporate Director. She contends this disparate treatment is evidence of race discrimination. Yet, when the description of Hill's added duties is compared with the duties included within Clawson-Gregg's responsibilities as Corporate Director, summarized above at p.10, it becomes obvious that the two positions are not comparable in all relevant respects. The asserted disparity does not, therefore justify an inference of race discrimination. *See Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (to justify inference of discrimination, disparate treatment received by comparable non-minority employee must be shown to have involved employee similarly situated in all relevant respects).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448                                                                                                    Page 8
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
(Not Selected for publication in the Federal Reporter)
(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))

**\*8** Fifth, Hill cites Cicchillo's recognition of the need for minority hiring and advancement opportunities. Defendants contend that recognition of this need prompted the hospital to offer educational assistance to deserving minority candidates. In fact, they contend Patricia Hill had herself received such affirmative assistance when Forum Health's predecessor, Youngstown Hospital Association, paid for her education as she obtained her Associate's Degree in Nursing at Youngstown State University in the early 1970's. Defendants contend this refutes the charge that Hill is the victim of race discrimination. Obviously, neither circumstance has much if any relevance to the question whether race discrimination played a role in Clawson-Gregg's appointment to Corporate Director.

Hill maintains, however, that there is a continuing need for advancement of minority employees at the Forum Health hospitals. She contends this need is substantiated by a March 7, 2000 petition purportedly signed by over 100 minority employees of Forum Health. The text of the petition is as follows:

We the minority employees of Forum Health have decided to bring our concerns to the forefront. For the past several months there have been noticeable changes in the administrative staff. The ratio of minority administrators to the number of minority employees is abysmal at best. The representation of the minority patient population is appalling. We the minority employees of Forum Health want to begin an ongoing open and forthright dialogue with current management to rectify this situation immediately. There must be higher representation of minority administrators within the Forum Health system.

J.A. 496-501.

At the outset, we note that the petition represents hearsay, *i.e.*, an unsworn, out-of-court statement offered for the truth of the matter asserted. Fed.R.Evid. 801(c). Hill has not even argued that the petition is admissible pursuant to a recognized hearsay exception. As hearsay, the petition is inadmissible to create a factual dispute to defeat a motion for summary judgment. **\*457** *Sperle v. Michigan Department of Corrections,* 297 F.3d 483, 495 (6th Cir.2002).

Moreover, the circumstances surrounding the preparation and presentation of the petition to the administration are not disclosed in the record. Neither is the petition accompanied by any statistical information regarding the ratio of minority administrators to minority employees or the number of minority applicants for administrative positions or the relative qualifications of those applicants. Further, the petition predated Clawson-Gregg's appointment as Corporate Director by over a year. Hence, the informal petition is both inadmissible and utterly devoid of legitimate probative value to show pretext in this case.

Sixth, Hill contends defendants' reliance on restructuring of management as justification for their actions is unworthy of belief because Forum Health's discriminatory promotion practices preceded the reorganization. This bald statement is not supported by citation to anything in the record. It represents no evidence that defendants' legitimate nondiscriminatory reason is false and no evidence that Clawson-Gregg's appointment was the product of race discrimination.

**\*9** In response to defendants' explanation, plaintiff was obliged to come forward with evidence showing that the explanation is not true and that race discrimination was the real reason that she was not considered for the Corporate Director position. In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143-49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court defined this burden specifically. The court confirmed first that the plaintiff always retains the burden of proving intentional discrimination. *Id.* at 143, 120 S.Ct. 2097. Yet, the court recognized that evidence of the falsity of the employer's explanation, coupled with the elements of the plaintiff's *prima facie* case, could possibly, even without additional evidence of discrimination, justify an inference of discrimination. *Id.* at 147-48,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448                                                                                       Page 9
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))**

120 S.Ct. 2097. Whether the inference could be justified under such circumstances depends on a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that may properly be considered on a motion for judgment as a matter of law." *Id.* at 148-49, 120 S.Ct. 2097.

Applying this teaching in this case, it is obvious that plaintiff failed to carry her burden of showing pretext. First, as explained above, her *prima facie* case, even if barely adequate, is manifestly weak. Second, defendants' legitimate nondiscriminatory explanation is well-supported and reasonable. Third, Hill's attempt to expose defendants' explanation as false or unworthy of credence is premised on no more than a scintilla of evidence and is totally unavailing. Having failed to adduce evidence on which a reasonable trier of fact could conclude that defendants' explanation is false, there is no plausible evidentiary basis for an inference that race discriminatory animus was the true motivation for Clawson-Gregg's appointment. Accordingly, the district court did not err in concluding that plaintiff failed to show pretext. There is no genuine issue of material fact and defendants were properly awarded summary judgment on plaintiff's failure to promote claim.

### III. CONCLUSION

For the foregoing reasons, we conclude that the judgment of the district court, awarding summary judgment to defendants, must be and is hereby **AFFIRMED.**
**\*458** KAREN NELSON MOORE, Circuit Judge, concurring in the judgment and in part II of the majority opinion.
I concur in the judgment, but I do not agree with the majority's conclusion that a retaliation claim was never presented to the district court. Clearly, if a claim is raised in a motion or brief opposing summary judgment, we should consider it. *Strouss v.*

*Mich. Dep't of Corr.*, 250 F.3d 336, 345 (6th Cir.2001). The majority states that Hill's "isolated references" to retaliation "in no way represent an attempt to state a distinct retaliation *claim.*" However, Hill's several references to retaliation in her brief in opposition do present a claim of retaliation. *See* J.A. at 434-35 (Opp'n to Defs. Mot. for Summ. J.) ("The discharge of Hill was only a pretext to the retaliation for her filing a discrimination charge with the Equal Employment Opportunity Commission and her vocalization of the discriminatory conduct of the Defendants."); J.A. at 443 (Opp'n to Defs. Mot. for Summ. J.) ("The discipline of Hill was only a pretext to the retaliation for her filing a discrimination charge ..."); J.A. at 443 (Opp'n to Defs. Mot. for Summ. J.) (describing alleged hostility towards Hill as a result of the fact that she filed a discrimination charge); J.A. at 448 (Opp'n to Defs. Mot. for Summ. J.) (discussing the alleged "retaliatory discharge"). Hill may not have presented her claim of retaliation in the most precise manner, but these statements present it nonetheless.

**\*\*10** We should address the merits of Hill's retaliation claim in spite of the fact that the district court did not review this issue. *See Kennedy v. Superior Printing Co.*, 215 F.3d 650, 655 (6th Cir.2000) ("[B]ecause a grant of summary judgment is reviewed *de novo,* this court may affirm the judgment of the district court on any grounds supported by the record, even if they are different from those relied upon by the district court."). Hill must demonstrate the following in order to establish a prima facie case of retaliation pursuant to Title VII:

1) [she] engaged in activity that Title VII protects; 2) defendant knew that [she] engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists.

*Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir.2003). Forum Health asserts that Hill has failed

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)))**

to demonstrate a causal connection between her termination and the fact that she filed a discrimination complaint. Br. Appellee at 53. "To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott,* 348 F.3d at 543. The record demonstrates that Forum Health would have terminated Hill's employment even if she had not filed a complaint with the EEOC or spoken to her superiors regarding her concerns. *See, e.g.,* J.A. at 279 (Incident Report) (noting Hill's failure to clock in and out as required on September 13 and 14, 2001); J.A. at 280 (Incident Report) (noting that Hill hung up on Clawson-Gregg on October 1, 2001, and that this had happened before); J.A. at 399 (Incident Report) (describing an incident in which Hill failed to call for overtime approval on November 20, 2001, and hung up on Clawson-Gregg on November 21, 2001); J.A. at 285 (Incident Report) (explaining that Hill changed her schedule without approval on October 4, 5, and 6, 2002, that she had failed to renew the accreditation of the Peripheral Vascular Lab on which she had previously claimed to have been working, *459 and that there were numerous errors in her reports); J.A. at 284 (Letter dated October 25, 2002 from Sonya R. Clawson-Gregg to Patricia A. Hill) (stating that Hill had missed two meetings and that her employment with Forum Health was terminated). Hill did not provide sufficient evidence to the contrary, and summary judgment for Forum Health on the retaliation claim is proper. Therefore, I concur in the judgment and in part II of the majority opinion affirming the grant of summary judgment on the failure-to-promote claim.

C.A.6 (Ohio),2006.
Hill v. Forum Health
167 Fed.Appx. 448, 2006 WL 162967 (C.A.6 (Ohio)), 2006 Fed.App. 0057N

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.E.2d                                                              Page 1
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547
**(Cite as: 2003 WL 22887954 (Ohio App. 12 Dist.))**

**H**

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio,
Twelfth District, Butler County.
Edgar J. HOWARD, Plaintiff-Appellant,
v.
CONTECH CONSTRUCTION PRODUCTS, INC., Defendant-Appellee.
**No. CA2003-01-018.**

Decided Dec. 8, 2003.

**Background:** Former employee brought age and race discrimination claims against former employer, and argued that his termination was against public policy. The Court of Common Pleas, Butler County, No. CV2001-07-1721, granted employer's motion for summary judgment. Employee appealed.

**Holdings:** The Court of Appeals, Powell, J., held that:
(1) employee failed to establish that his discharge permitted the retention of a person who did not belong to protected class, as required to establish prima facie case of age discrimination;
(2) assuming that employee established a prima facie case of age discrimination, he failed to show that employer's asserted reason for terminating employee, that employee's position was eliminated as part of a work force reduction, was merely a pretext;
(3) employee who was the only minority employee in his department when he was terminated established that he was treated worse than non-protected similarly-situated employees, as required to establish prima facie case of race discrimination;
(4) employee failed to show that employer's asserted reason for terminating employee, that employee's position was eliminated as part of a work force reduction, was merely a pretext, precluding em-

ployee's recovery for race discrimination; and
(5) employee's public policy claim failed as a result of failure of underlying discrimination claims.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ☞1204**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most Cited Cases
Former employee failed to establish that his discharge permitted the retention of a person who did not belong to protected class, as required to establish prima facie case of age discrimination, where younger employees in department who were not terminated did not have same job classification as former employee, and employee in department who had same job classification as former employee was over the age of 50 and was not terminated. R.C. § 4112.02(A).

**[2] Civil Rights 78 ☞1209**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1209 k. Motive or Intent; Pretext. Most Cited Cases
Assuming that former employee established a prima facie case of age discrimination, he failed to show that employer's asserted reason for terminating employee, that employee's position was eliminated as part of a work force reduction, was merely a pretext, precluding recovery, even though company was profitable when it instituted reduction in force, employees were still hired, and severance packages were given to some individuals who were terminated, where employees were hired on an as needed basis with prior approval necessary, and severance costs were not calculated in net income of employ-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547
**(Cite as: 2003 WL 22887954 (Ohio App. 12 Dist.))**

Page 2

er. R.C. § 4112.02(A).

**[3] Civil Rights 78 ☜1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited
Cases
Former employee who was the only minority employee in his department when he was terminated established that he was treated worse than non-protected similarly-situated employees, as required to establish prima facie case of race discrimination. R.C. § 4112.02(A).

**[4] Civil Rights 78 ☜1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
Former employee failed to show that employer's asserted reason for terminating employee, that employee's position was eliminated as part of a work force reduction, was merely a pretext, precluding employee's recovery for race discrimination, even though company was profitable when it instituted reduction in force, employees were still hired, and severance packages were given to some individuals who were terminated, where employees were hired on an as needed basis with prior approval necessary, and severance costs were not calculated in net income of employer. R.C. § 4112.02(A).

**[5] Civil Rights 78 ☜1720**

78 Civil Rights
    78V State and Local Remedies
        78k1718 Right of Action; Nature and Grounds
            78k1720 k. Employment Practices. Most
Cited Cases
A claim for wrongful discharge in violation of public policy embodied in statute prohibiting discriminatory practices will fail if the underlying discrimination claim fails. R.C. § 4112.02(A).

Civil Appeal from Butler County Court of Common Pleas Case No. CV2001-07-1721.Freking & Betz, Randolph H. Freking, Mark W. Napier, Cincinnati, OH, for plaintiff-appellant.

Thompson Hine LLP, Stephen J. Butler, Deborah S. Brenneman, Cincinnati, OH, for defendant-ap- pellee.

POWELL, J.

**\*1 {¶ 1}** Plaintiff-appellant, Edgar Howard, appeals a decision of the Butler County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Contech Construction Products, Inc. ("Contech").

{¶ 2} Contech is a privately held company that manufactures and sells corrugated metal drainage pipe, plastic pipe, and other products used in site development work. It is based in Middletown, Ohio, but has manufacturing and sales offices throughout the United States.

{¶ 3} In March 1999, Patrick Harlow was hired as Contech's President and CEO. During his interview with the Board of Directors, Harlow was told that the company's financial performance had been sluggish. The Board further indicated that they wanted to improve profitability.

{¶ 4} Within a few months of starting his new position, Harlow began to explore the possibility of reducing the payroll by instituting a voluntary separation program ("VSP"). However, after further consideration, Harlow decided not to pursue a VSP at that time.

{¶ 5} In early and mid-2000, Contech's expenses grew and there were signs that the economy was softening. At the August 2000 Board of Directors meeting, Contech's executive management team submitted a preliminary budget for the fiscal year ending June 30, 2001. The Board rejected the budget and instructed Harlow to revise it to improve profitability. Harlow saw the only way of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547
(Cite as: 2003 WL 22887954 (Ohio App. 12 Dist.))

meeting the Board's demands was by significantly reducing Contech's operating expenses.

{¶ 6} A new budget was presented and approved by the Board in September 2000. Contech's Chief Financial Officer, James Moyle, told Harlow that he believed Contech had little chance of meeting the new budget. Indeed, Contech did not meet the approved budget and Moyle lost his job as a result.

{¶ 7} After the Board approved the new budget, Harlow and his executive team expedited a series of actions to reduce costs and improve profitability. Harlow directed that cuts be made in sales, manufacturing and at headquarters.

{¶ 8} Frank Miller, the Vice-President of Sales, was directed by Harlow to cut approximately $2 million of costs from his department without losing any sales. Miller attempted to cut costs by reorganizing the sales force and eliminating approximately 20 positions. The positions were eliminated through a combination of not rehiring for open positions and terminating some existing employees. The majority of the terminated sales employees were under the age of 40.

{¶ 9} Contech's Vice-President of Manufacturing, Bill McClane, proposed to reduce costs by closing facilities, and consolidating their functions with other plants. He also increased the seasonal, voluntary layoff program at the manufacturing facilities and conducted involuntary layoffs. McClane's efforts were considered insufficient by the Board, and his employment was terminated.

{¶ 10} Harlow directed the Vice-President of Human Resources, Chuck Fortener, to develop a VSP for headquarters employees with a payroll savings goal of $1 million. Fortener proposed a VSP open to employees who were at least 50 years old and whose age and years of service at Contech totaled at least 70. The eligibility requirements opened up the VSP to approximately half of Contech's employees at headquarters. Some individuals were excluded from eligibility, including Contech's execut-

ive management and three other employees whom they felt would be difficult to replace.

*2 {¶ 11} If electing to participate in the VSP, the employees would receive a lump sum payment reflecting the length of their service at Contech. Contech would also pay their COBRA premiums for a period of time proportionate with their length of service. Finally, the employee could elect to use outplacement services or receive an additional $500 payment. The VSP was unveiled in October 2000 with an ending date of December 4, 2000. Only six employees elected to participate.

{¶ 12} Fortener did not believe that Contech would achieve its $1 million cost cutting goal solely through the VSP. Therefore, in November 2000, before the election ended, Fortener directed managers and supervisors to identify the tasks performed in their department and assess their relative importance. The managers and supervisors were to determine which jobs could be absorbed by other employees or eliminated all together. Ultimately, in January 2001, Contech decided to eliminate six positions through an involuntary separation program ("ISP"). One of the employees, Justin Holweger, who was 54 at the time, was transferred to an open position in the credit department. The other five employees, including appellant, were terminated. All five employees were over the age of 50.

{¶ 13} Appellant filed an age and race discrimination claim against Contech, arguing that his termination violated R.C. Chapter 4112. He also argued that his termination was against Ohio public policy.[FN1] Contech moved for summary judgment as to all of appellant's claims. The trial court granted Contech's motion. Appellant appeals the trial court's decision raising three assignments of error.

> FN1. Appellant originally also filed a worker's compensation retaliation claim and disability discrimination claim. However, appellant did not oppose Contech's motion for summary judgment as to these claims.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547
(Cite as: 2003 WL 22887954 (Ohio App. 12 Dist.))

Page 4

{¶ 14} Assignment of Error No. 1:

{¶ 15}"THE TRIAL COURT ERRED IN GRANT-ING SUMMARY JUDGMENT AS TO COUNT II-AGE DISCRIMINATION."

{¶ 16} Appellant maintains that the trial court erred in not finding that Contech violated the R.C. Chapter 4112 prohibition against age discrimination when it determined to terminate his position. He maintains that the trial court did not properly consider the evidence. He also argues that genuine issues of material fact exist as to his claim.

{¶ 17} An appellate court's review of a summary judgment decision is de novo. *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, *1996-Ohio-336.* Under a Civ.R. 56(C) motion for summary judgment, the movant must demonstrate that: "(1) [there is] no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party."Civ.R. 56(C); *Welco Industries, Inc., v. Applied Cos.,* 67 Ohio St.3d 344, 346, *1993-Ohio-191.*

{¶ 18} The nonmoving party may not rest upon the allegations or denials in the pleadings, but must affirmatively demonstrate the existence of a genuine issue of material fact to prevent the granting of a motion for summary judgment.Civ.R. 56(C); *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798. In deciding whether there is a genuine issue of material fact, the evidence must be construed in the nonmoving party's favor. *Angel v.. The Kroger Co.,* Warren App. No. CA2001-07-073, *2002-Ohio-1607.*

*3 {¶ 19}R.C. 4112.02(A) provides in pertinent part, "It shall be an unlawful discriminatory practice for any employer, because of the race, * * * age * * * of any person, to discharge without just cause, to refuse to hire, or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."A party may bring an action pursuant to R.C. 4112.02(A) by presenting direct, circumstantial or statistical evidence of discrimination. *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 505, 575 N.E.2d 439.

{¶ 20} Absent direct evidence, a prima facie case may be established by an employee demonstrating that (1) he was a member of the protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by, or his discharge permitted the retention of, a person who did not belong to the protected class. *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Kohmescher* at 505-506, 575 N.E.2d 439. A prima facie case raises an inference of discrimination only because we presume the acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *Mauzy v. Kelly Services, Inc.,* 75 Ohio St.3d 578, 584, *1996-Ohio-265.*

{¶ 21} Upon presentation of a prima facie case, the employer may submit a "legitimate, nondiscriminatory reason" as to why the employee was discharged. *Kohmescher* at 503, 575 N.E.2d 439. The employee is then permitted to show that the reasons for the employer's adverse action were merely a pretext for unlawful discrimination. *Id.* at 503-503, 575 N.E.2d 439. If the employee is unable to establish a prima facie case of age discrimination or to present evidence that the employer's asserted reasons for the adverse action are false, the employee's age discrimination case will fail. *Stair v. Phoenix Presentations, Inc.* (1996), 116 Ohio App.3d 500, 509, 688 N.E.2d 582, citing to *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 148, 451 N.E.2d 807.

[1]{¶ 22} Neither party disputes that appellant has established the first three elements of a prima facie case necessary to support an age discrimination

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                                                        Page 5
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547
**(Cite as: 2003 WL 22887954 (Ohio App. 12 Dist.))**

claim. Appellant alleges that he has presented evidence to satisfy the fourth element as well. In his brief, he presents many items as evidence to support his contention that he has met his burden in showing a prima facie case of discriminatory intent.

{¶ 23} In support of his prima facie case, appellant first points to the VSP as evidence that Contech intended to terminate its aged 50 and older employees because only those over the age of 50 could take advantage of it. However, Contech placed both an age and a years-of-service requirement on its VSP eligibility. Only employees with at least 20 years of service and at least the age of 50 were eligible to participate. A voluntary separation plan that uses both of these factors does not indicate a policy of age discrimination. See *Wilson v. Firestone Tire and Rubber Co.* (C.A.6, 1991), 932 F.2d 510, 514.

*4 {¶ 24} Appellant next argues that Harlow, from the inception of his employment as Contech's CEO, intended to eliminate those over age 50. Appellant points to the fact that Harlow testified that he looked into offering a VSP during his first year as CEO similar to what he later offered. Again, a VSP that utilizes age with other factors does not show discriminatory intent.*Id.*

{¶ 25} Appellant also points to the fact that Harlow used a document that listed the employees' ages when determining who to offer the VSP to. He maintains that because it was used in the creation of the VSP, it shows that Harlow used the listed ages for the ISP as well. Appellant's mere assertion offers no proof that Harlow discriminated against appellant on account of his age. *Id.*

{¶ 26} Appellant maintains that only those who were eligible for the VSP were considered for the ISP. He points to the testimony of Kristen Shepard, Supervisor of Employee Benefits. He also points to the testimony of Robert Hall, Manager of the IT department, who stated that it did not surprise him that an employee who was eligible for the VSP was terminated pursuant to the implementation of the ISP. Also, David Senften, Manager of Transporta-

tion and Distribution, stated when asked that he believed that the ISP and VSP were related.

{¶ 27} However, Shepard, Hall and Senften admitted in their depositions that they were not involved in the decision making process concerning which positions to eliminate. Stray remarks do not substantiate a finding of discrimination when they "cannot be linked to the decisionmaker bringing forth the adverse action." *Samadder v. DMF of Ohio, Inc.,* 154 Ohio App.3d 770, *2003-Ohio-5340,* ¶ 47.

{¶ 28} He also asserts that "Contech took active steps to push the employees to accept the VSP." He argues that he was threatened that "if an insufficient number of employees elect to resign under the VSP, involuntary separations would be necessary and any later package would not be as 'generous.' " He also maintains that during a meeting with Fortenor he was encouraged to accept the VSP.

{¶ 29} In the initial letter the employees received concerning the VSP, the above language was included. However, the letter also stated that, "We wish to stress that your termination of employment under the Program must be strictly voluntary. If anyone tells you that you must participate in the Program because you are going to be terminated, they are misinforming you. Please report any such communication * * *." Further, appellant testified in his deposition that he understood the VSP to be "more or less, you had the option to take it or not to take it."The evidence presented by appellant has little to no weight in showing that Contech acted with a discriminatory animus in selecting his position for termination.

{¶ 30} Appellant also provided the trial court a statistical analysis report completed by Sharon Kelly that was prepared for Contech.[FN2]Kelly's report found that the difference between the actual and predicted number of terminations of the aged 50 and older employees could have occurred by chance. Appellant notes in a footnote that Kelly's analysis is flawed because it utilizes the wrong

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

number of employees. Appellant argues that only those employees who were considered for the ISP and those who did not take advantage of the VSP should be counted. He then provided a printout from a web site, which purportedly computed the same statistical calculation as Kelly, only concluding that the number of those terminated was statistically significant and probably did not occur by chance.

FN2. Contech withdrew her report prior to the summary judgment proceeding. However, appellant submitted her report in the summary judgment proceeding.

***5** {¶ 31} However, in order for statistics to be valid and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination. *Goad v. Sterling Commerce, Inc.* (June 13, 2000), Franklin App. No. 99AP-321, citing to *Stair,* 116 Ohio App.3d at 510, 688 N.E.2d 582. Here, as the trial court found, the statistics represent only one factor, the age of the employees. They do not account for the skills of those employees or the business needs of the company. As such, they offer little to no support on their own as to an inference of age discrimination.

{¶ 32} Appellant argues that Holweger, Ruscher and Kiefer were permitted to transfer to open positions within Contech, but he was not offered the option. Holweger, one of the employees who lost his position, is also over the age of 50. He was selected to transfer because of his skills. Ruscher was not hired until several months after the end of the ISP, and Kiefer had a business degree. Again, appellant's assertion offers little to no support as to an inference of age discrimination.

{¶ 33} Finally, appellant maintains that Taylor, Grant and Voegele, whom appellant worked with in the cost accounting department were similarly situated to him and permitted to remain in the department. Although younger than appellant, at 35, 43 and 48 years of age respectively, Taylor, Grant and Voegele did not have the same job classification as appellant. Further, Jeannie Stine, who did have the same job classification as appellant, was in his department, and was also over the age of 50, was not terminated. As such, appellant's discharge did not permit "the retention of a person who did not belong to the protected class." *Kohmescher,* 61 Ohio St.3d at 505-506, 575 N.E.2d 439.

[2]{¶ 34} Considering the evidence presented by appellant, we find that appellant did not meet the burden of establishing a prima facie case. Even assuming that appellant had established a prima facie case, appellant did not adequately rebut Contech's non-discriminatory reason as being a pretext to his release.

{¶ 35} Assuming appellant proved his prima facie burden allowing a presumption of discriminatory intent, the burden would shift to Contech to give a legitimate nondiscriminatory reason for terminating appellant's position. Contech maintains that the cost accounting department, where appellant worked, was reorganized due to a reduction in force. According to Harlow, the reduction in force was necessitated by a soft economy and a desire to improve the profitability of the company. Headquarters, where appellant worked, was ordered to lower its costs by $1 million.

{¶ 36}"A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the [employee's] duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp Inc.* (C.A.6, 1990), 896 F.2d 1457, 1465.

***6** {¶ 37} In Contech's reduction in force, Wilson

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                                                Page 7
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547
**(Cite as: 2003 WL 22887954 (Ohio App. 12 Dist.))**

was directed to reorganize the cost accounting department and eliminate two positions. After the re-organization, the amount of work that each person in the department was responsible for was going to increase, therefore each employee's productivity in the department was a consideration. According to his managers' deposition testimony, appellant was the least productive in the department. Two positions were terminated, one of which was appellant's. The work was absorbed amongst those remaining in the department. No single person now completes all of appellant's work.

{¶ 38} Appellant's department was not the only one that had terminations and was reorganized. Within headquarters, five individuals lost their positions due to reorganization. The evidence presented shows that Contech terminated some of its contractors. The record also indicates that Contech implemented a hiring freeze in that any request to hire or replace an employee had to have approval of the vice-president of the department and Harlow or Fortener. Further, the record indicates that two vice-presidents were terminated for not meeting expectations with the cost reductions.

{¶ 39} Some of the plants were closed and reorganized to improve distribution and positions were terminated. Further, according to the evidence, the sales force cut costs and lost approximately 20 positions due to the reorganization of its area. A majority of those individuals terminated from sales were not within the protected age class.

{¶ 40} In arguing that Contech's reason for eliminating appellant's position is pretext, appellant points to the fact that Contech was still profitable. A company does not have to be unprofitable in order to institute a reduction in force. See *Lehere v. Gould Defense Systems, Ocean Systems Div.* (June 11, 1987), Cuyahoga App. No. 52294.He also argues that employees were still hired. As stated above, employees were hired on an as needed basis with prior approval necessary. He also maintains that severance packages were given to some individuals who were terminated. However, as Moyle testified, these severance costs were not calculated in the net income of the corporation.

{¶ 41} After a thorough examination of the record, we agree with the trial court's assessment that appellant lost his position as a result of Contech's nondiscriminatory reason of a reduction in force. Appellant has not presented evidence showing that the reduction in force was pretext. As such, we find no error in the trial court's decision granting summary judgment in favor of Contech. Moreover, no genuine issue of material fact exists. Accordingly, appellant's first assignment of error is overruled.

{¶ 42} Assignment of Error No. 2:

{¶ 43}"THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO COUNTS IV AND V-RACE DISCRIMINATION."

{¶ 44} The same analysis used in determining age discrimination claims is also utilized in race discrimination claims. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 197, 421 N.E.2d 128. Therefore, the same elements of a prima facie case for race discrimination claim and the burden shifting analysis which were discussed in the previous section apply here as well.

*7 {¶ 45} Appellant testified in his deposition that he was not treated the same as non-minority employees. He argues that children of non-minority employees, but not those of minority employees, were hired over the summer. He also argues that similarly situated co-workers made more money than he did for the same job. He alleges that two nonminority employees routinely were given raises, but he was not. He also argues that he was not permitted to come in on the weekends to catch up on work, unlike others.

{¶ 46} Appellant's contentions are without merit. Appellant was the only minority whose position was terminated through the ISP. His children were hired to work for Contech over the summer. Only

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547
**(Cite as: 2003 WL 22887954 (Ohio App. 12 Dist.))**

one other employee in the cost accounting department was of the same job classification as appellant, Stine. Stine made $300 more a year than appellant, however Stine had more responsibilities than appellant. Appellant presented no evidence that two other nonminorities routinely received raises. Finally, appellant's supervisor testified that appellant did not finish his work in a timely manner during the work week, and therefore he was not permitted to work overtime on the weekends to complete his tasks.

[3]{¶ 47} However, the fourth element in the prima facie analysis states that a prima facie case can be shown if the adverse action allowed the retention of an employee who is not a member of the protected class. *Kohmescher,* 61 Ohio St.3d at 505-506, 575 N.E.2d 439. Howard was the only minority employee in his department. Because his position was terminated, he was treated worse than non-protected similarly situated employees. Therefore, he has established a prima facie case of discrimination.

[4]{¶ 48} Nevertheless, Contech is still entitled to summary judgment because it had a legitimate nondiscriminatory reason for its actions, i.e., the reduction in force. See *Barnes,* 896 F.2d at 1465. As stated above, appellant has not sufficiently rebutted the nondiscriminatory reason as pretext for discriminatory intent. Accordingly, appellant cannot establish that the termination was a result of discriminatory intent. Appellant has presented no genuine issue of material fact. As such, his second assignment of error is overruled.

{¶ 49} Assignment of Error No. 3:

{¶ 50}"THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO COUNT VI-WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY."

[5]{¶ 51} Appellant maintains that his discharge was in violation of Ohio public policy. See *Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, *1997-Ohio-219.* A public policy claim will fail if the underlying discrimination claim fails. *Godfredson v. Hess & Clark, Inc.* (C.A.6, 1999), 173 F.3d 365, 375;*Robinson v. Nationwide Ins. Companies* (Dec. 21, 2001), Lake App. No.2000-L-119. We have found that both appellant's race and age discrimination claims have failed. As such, appellant's public policy claim likewise fails. Appellant's third assignment of error is overruled.

*8 {¶ 52} Judgment affirmed.

YOUNG, P.J., and WALSH, J., concur.
Ohio App. 12 Dist.,2003.
Howard v. Contech Const. Products, Inc.
Not Reported in N.E.2d, 2003 WL 22887954 (Ohio App. 12 Dist.), 2003 -Ohio- 6547

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1514423 (N.D.Ohio)
**(Cite as: 2007 WL 1514423 (N.D.Ohio))**

Page 1

**H**

Only the Westlaw citation is currently available.Not for Publication

United States District Court,
N.D. Ohio,
Eastern Division.
Frances A. McNEAL-PAGE, Plaintiff,
v.
DEGUSSA ADMIXTURES, INC., Defendant.
**No. 1:05CV894.**

May 22, 2007.

James Alexander, Jr., Pittman & Alexander, Cleveland Heights, OH, for Plaintiff.

Patricia Ann Poole, Kelly M. King, Baker & Hostetler, Cleveland, OH, for Defendant.

### *MEMORANDUM AND OPINION*

CHRISTOPHER A. BOYKO, J.

**\*1** This matter is before the Court on Defendant Degussa Admixtures. Inc.'s ("Degussa") Motion for Summary Judgment (ECF # 32). For the following reasons, the Court grants Defendant's Motion.

Plaintiff is an African-American female over the age of fifty, employed by Defendant as a Government Approvals Manager. Plaintiff was employed by Defendant and its predecessor company for over thirty years, the greater portion of her employment in Cleveland, Ohio. In 2002, Plaintiff was placed on assignment to Defendant's office in Texas at Plaintiff's request. She remained in Texas until July 16, 2004, when her position with Defendant was terminated. Plaintiff alleges her position was subsequently divided between two white males. Plaintiff's Amended Complaint alleges improper discrimination based on race, sex and age in violation of federal and Ohio law.

Defendant contends Plaintiff's employment was terminated due to a reduction in force recommended by a third-party consulting firm. Defendant denies any discriminatory intent claiming the reduction in force was necessary to sustain profitability.

### *STANDARD OF REVIEW*

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings. depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323. A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505. 91 L.Ed.2d 202 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as oth-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1514423 (N.D.Ohio)
**(Cite as: 2007 WL 1514423 (N.D.Ohio))**

Page 2

erwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 150 (6th Cir.1995); *United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir.1985). However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir.1995) (citing *Celotex,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265). Furthermore, this Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Betkerur v. Aultman Hospital Ass'n.,* 78 F.3d 1079, 1087 (6th Circ.1996)."Rather, the burden falls on the non-moving party to designate specific facts or evidence in dispute." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Discrimination based on Race and Sex

**\*2** Title VII of the United States Code makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."42 U.S.C.2000e-2(a)(1).Title VII claims are analyzed similarly to claims brought under Ohio Revised Code section 4112. *See Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1020 (6th Cir.2000).

"A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by providing circumstantial evidence which creates an inference of discrimination." *DiCarlo v. Potter,* 358 F.3d 408, 414 (6th Cir.2004)."Mere personal belief,

conjecture and speculation are insufficient to support an inference of ... discrimination." *Woythal v. Tex-Tenn Corp.,* 112 F.3d 243, 247 (6th Cir.1997).

Direct evidence is evidence "which, if believed, proves the existence of improper discrimination animus without inference or presumption." *Williams v. United Dairy Farmers,* 20 F.Supp.2d 1193, 1198 (S.D.Ohio 1998). In *Talley v. Bravo Pitino Rest.,* 61 F.3d 1241, 1248-49, (6th Cir.1995), the Sixth Circuit provided examples of direct evidence of racial animus. These included racial slurs by a manager, a principal stating a "white presence" needed to be maintained in a recently integrated school to prevent white flight, and employee testimony that managers made derogatory racial remarks about blacks. Discriminatory remarks by a manager may be evidence of discrimination even if the manager was not the ultimate decision maker. *Ercegovich v. Goodyear Tire and Rubber Co.,* 154 F.3d 344, 354-55 (6th Cir.1998). However, in *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 380 (6th Cir.1993), the Sixth Circuit stated "[c]ase precedent clearly reflects that isolated and ambiguous statements ... are too abstract, in addition to being irrelevant and prejudicial" to support a discrimination claim. "Direct evidence generally requires unmistakable verbal assertions that the plaintiff was treated adversely because of his race." *Paasewe v. Ohio Arts Council,* 74 Fed.Appx. 505, 507 (6th Cir.2003) citing *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir.1998).

It is undisputed there is no direct evidence of discrimination. Plaintiff admitted in deposition no one at Degussa discriminated against her on the basis of her race, sex or age, prior to her termination. (McNeal-Page pp. 67-68). Rather, Plaintiff's claim is based solely on her allegations her position was divided between two white males and she was treated differently than similarly situated non-protected class employees.

### McDonnell Douglas/Burdine Analysis

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1514423 (N.D.Ohio)
**(Cite as: 2007 WL 1514423 (N.D.Ohio))**

In the absence of direct evidence of discrimination, the Court will apply the *McDonnell Douglas/ Burdine* burden shifting analysis. It is plaintiff's burden to prove a prima facie case of discrimination by his or her employer. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. (1973). *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207, (1981). Upon plaintiff making a prima facie showing of discrimination, the burden "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253, (quoting *McDonnell,* 411 U.S. at 802)."[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."*Id.*"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."*Id.*"To establish a prima facie case of discrimination based upon circumstantial evidence, Plaintiff must show that he (1) "is a member of a protected group," (2) "was subject to an adverse employment decision," (3) "was qualified for the position, and (4) "was replaced by a person outside of the protected class." *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 349 (6th Cir.1997). In addition, under section (4) Plaintiff may meet her burden by showing she was treated differently than similarly situated nonprotected employees. See *Wade v. Knoxville Utils. Bd.,* 259 F.3d 452, 461 (6th Cir.2001). The burden of establishing a prima facie case under *McDonnell Douglas* is not onerous. *Burdine,* at 251."A prima facie case of discrimination in a reduction in force case requires proof that the plaintiff was part of a protected class, that she was qualified to perform the job and that she was discharged; in addition, the plaintiff must produce 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.' " *Gragg v. Somerset Technical College,* 373 F.3d 763, 767 (6th Cir.2004). quoting *Barnes v. Gencorp, Inc.,* 896 F.2d 1457, 1465 (6th Cir.1990). " 'The guiding principle [in a reduction in force case] is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age' or gender.' *Gragg* at 767-68 quoting *Barnes* at 1466.

### *Analysis of Title VII Claims*

**\*3** Defendant has submitted the Declaration of Lisa Shuld, Director of Human Resources for Degussa. Her declaration attests Plaintiff's termination was the result of an inability of Degussa to sustain profitability. (Shuld dec. pg. 2). Furthermore, the deposition of Charles Nmai, a supervisor with Degussa, reveals Plaintiff was not replaced by a person outside the protected class. Rather, her duties were divided between two current Degussa employees who were degreed engineers, whereas Plaintiff lacks a college degree.

Plaintiff has offered no evidence in support of her allegations. She did not supply a timely affidavit, she does not cite to relevant deposition testimony or attach any documentary evidence to support her claims. She names individuals she alleges were similarly situated to her and were not terminated, yet she fails to offer any evidence to support this contention or contradict the evidence supplied by Defendant. Furthermore, Defendant has provided evidence Plaintiff's duties were divided between two current Degussa employees. This circuit has held, "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Barnes v. Gencorp, Inc.,* 896 F.2d 1457, 1465 (6th Cir.1990). Without evidence to create a genuine issue that Plaintiff was, in fact, replaced by a non-protected class employee, Plaintiff has failed to make a prima facie case of race or gender discrimination and her Title VII claims fail as a matter of law. Furthermore, as this

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

is a reduction in force case, Plaintiff has failed to provided the merest scintilla of evidence that would allow the factfinder to infer she was singled out for termination due to improper motives.

### Age Discrimination

The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.,* prohibits employment discrimination based on age. "Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)."Claims under the ADEA are typically analyzed within the framework set forth in *McDonnell Douglas." Bush v. Dictaphone Corp.,* 161 F.3d 363, 368 (6th Cir.1998). Plaintiff must establish a prima facie case of age discrimination when she has failed to offer evidence of direct discrimination. Plaintiff must show: "(1) he was at least 40 years old at the time of the alleged discrimination, (2) he was qualified for the job, (3) he suffered an adverse employment action, and (4) he was replaced by someone substantially younger." *Browning v. Dep't of the Army,* 436 F.3d 692, 695 (6th Cir.2006)."However, in 'reduction in force' cases like this one. the fourth prong is modified so that the plaintiffs must provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Rowan v. Lockheed Martin Energy Systems, Inc.,* 360 F.3d 544, 547 (6th Cir.2004) quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 350 (6th Cir.1998).

### ANALYSIS

**\*4** Plaintiff offers no evidence to contradict the evidence presented by Defendants. Therefore, Plaintiff has not created a genuine issue of fact she was either replaced by a person outside the protec-

ted class, was treated differently than similarly situated employees or singled out for impermissible reasons. Nor has Plaintiff met the heightened evidentiary requirement in reduction in force cases sufficient to make a prima facie age discrimination claim under the ADEA. She has offered no direct, circumstantial or statistical evidence supporting her disparate treatment claims. Without such evidence, Plaintiff has failed to make a prima facie case of unlawful discrimination based on race, sex, or age under Title VII. "Speculation and hunches" are insufficient means of creating a genuine issue of fact. See *Hartsel v. Keys,* 87 F.3d 795, 802 (6th Cir.1996). In the absence of any acceptable means of proof in support of her Brief in Opposition to Defendant's Motion for Summary Judgment, the Court finds Plaintiff has failed to create any genuine issue of material fact upon which a jury could find for Plaintiff. Therefore, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's discrimination claims under Title VII and the ADEA.

### Plaintiff's § 1981 and State Law Claims

42 U.S.C. § 1981 states in pertinent part: "[a]ll persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."The Sixth Circuit has held "[t]he elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and 1981." *Aquino v. Honda of America, Inc.,* 158 Fed. Appx. 667, 674 (6th Cir.2005). Since Plaintiff's claims of discrimination under 42 U.S.C. § 1981 are analyzed using the same criteria and burdens of proof as discrimination claims under Title VII, this Court finds Plaintiff's § 1981 claims suffer the same shortcomings and fail for the same reasons described in this Court's analysis of Plaintiff's Title VII claims. See *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 868 (6th Cir.2001).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1514423 (N.D.Ohio)
**(Cite as: 2007 WL 1514423 (N.D.Ohio))**

Page 5

Finally, Plaintiff's state law race and sex. discrimin-
ation claims are likewise analyzed under the same
standards as Title VII claims and fail for the same
reasons.

Therefore, the Court grants summary judgment for
Defendant on all Plaintiff's claims and the case is
removed from the Court's active docket.

IT IS SO ORDERED.

N.D.Ohio,2007.
McNeal-Page v. Degussa Admixtures, Inc.
Not Reported in F.Supp.2d, 2007 WL 1514423
(N.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
**(Cite as: 2006 WL 212069 (S.D.Ohio))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio, Western Division.
James F. REYNOLDS, Plaintiff
v.
GEORGIA-PACIFIC CORP., Defendant.
**No. C-1-03-459.**

Jan. 25, 2006.

Randolph Harry Freking, Freking & Betz, Cincinnati, OH, for Plaintiff.

ORDER GRANTING SUMMARY JUDGMENT
TO DEFENDANT

DLOTT, J.

**\*1** This matter comes before the Court on Defendant Georgia-Pacific Pacific's Motion for Summary Judgment (doc. # 22). For the reasons that follow, the Court GRANTS Georgia-Pacific's motion (doc. # 22) and also sua sponte GRANTS summary judgment to Georgia-Pacific on Reynolds' public policy claims.

I. BACKGROUND

This case arises from the termination of Plaintiff James F. Reynolds ("Reynolds")'s employment with Defendant Georgia-Pacific Corp. ("Georgia-Pacific"). Reynolds worked for Georgia-Pacific and/or its predecessor corporations as a sales representative ("sales rep") from 1976 until October of 2000, when he was promoted to District Sales Manager for the Detroit District. (Reynolds dep. at 25-26, 32.) In mid-2002, Georgia-Pacific began restructuring its sales force, in part to be able to work more efficiently and effectively with its customers. (*See* Shelton dep. at 50; Hawkins dep. at 19-28.) As part of the reorganization, Georgia-Pa-

cific consolidated several sales districts, including the Detroit and Indianapolis Districts. (Reynolds dep. at 89-90.)

In May of 2002, Joe Horvath, then Georgia-Pacific's Central Region Division Manager, held a conference call, in which he informed Reynolds and the other District Managers that Georgia-Pacific was going to reorganize. (*Id.* at 83-84.) In June of 2002, Horvath told Reynolds that the Detroit and Indianapolis Districts were going to be consolidated. (*Id.* at 99.) On July 10, 2002, Horvath and Gerry Hawkins interviewed Reynolds in person in Chicago for the new Detroit-Indianapolis consolidated District Manager position, and later the same day B.J. Shelton conducted a phone interview with Reynolds. (*Id.* at 94, 130.) Jim Schwartz, the Indianapolis District Manager, was also being considered for the position.

A few weeks later, Horvath told Reynolds that Schwartz had been chosen to be the consolidated District Manager. (Reynolds dep. at 110.) Horvath and Shelton also told Reynolds to look on the Georgia-Pacific intranet and apply for any job listed there. (*Id.* at 111, 135.) In late September, there was a posting on the intranet for an opening as the Houston District Manager. (*Id.* at 136.) Reynolds applied for that position, but Glenn Lyons, the hiring manager for Houston, decided not to interview Reynolds for that position. (*Id.* at 138-39.)

Georgia-Pacific terminated Reynolds' employment at the end of September of 2002. Reynolds was 57 at the time. (*Id.* at 6.) Reynolds filed his complaint on June 23, 2003, alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; age discrimination in violation of Ohio Revised Code ("O.R.C.") § 4112; breach of Ohio public policy against age discrimination; age discrimination in violation of Michigan Compiled Laws ("M.C.L.") § 37.2202; and breach of Michigan public policy. (*See* doc. # 1.) On February 28, 2005, Georgia-Pacific moved

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
**(Cite as: 2006 WL 212069 (S.D.Ohio))**

for summary judgment on Reynolds' age discrimination claims.

## II. JURISDICTION AND LEGAL STANDARD

**\*2** This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Reynolds' ADEA claim, and supplemental jurisdiction under 28 U.S.C. § 1367 over Reynolds' state law claims. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See*Fed.R.Civ.P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."Fed.R.Civ.P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## III. ANALYSIS

Georgia-Pacific moves for summary judgment on Reynolds' age discrimination claims. Reynolds argues that two of Georgia-Pacific's employment decisions were motivated by age discrimination: 1) Georgia-Pacific's choice of Schwartz instead of Reynolds as the consolidated District Manager, and 2) Georgia-Pacific's choice of Brent Berquist for the Houston District Manager Position and denial of an interview to Reynolds for that position. Reynolds indicts Georgia-Pacific for the mere fact that Georgia-Pacific did not assist Reynolds in finding

another position within the company. It is important to emphasize, however, that "an employer owes no duty to an employee to transfer him to another position when the employer reduces its workforce for economic reasons."*See Ridenour v. Lawson Co.,* 791 F.2d 52, 57 (6ᵗʰ Cir.1986). The crucial question the Court must examine is whether Georgia-Pacific's decision not to transfer Reynolds was made impermissibly on the basis of his age.

### A. ADEA Claim

In Count I, Reynolds brings a claim under the ADEA, 29 U.S.C. § 623. Reynolds has no direct evidence of age discrimination, but he maintains that he can prove his case through circumstantial evidence. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court laid out the burden shifting analysis for private claims alleging employment discrimination. To prove discrimination by circumstantial evidence, Reynolds must first establish a prima facie case. *See id.* at 802."Where an employer can demonstrate that a plaintiff was terminated as part of a [reduction in force], the elements of a prima facie case are modified to require a heightened proffer of evidence."*See Norbuta v. Loctite Corp.,* 1 Fed. Appx. 305, 312 (6ᵗʰ Cir.2001). However, Georgia-Pacific conceded for the purposes of its motion for summary judgment that Reynolds could make a prima facie case. (*See* doc. # 22 at 11.) As such, the burden of production shifts back to Georgia-Pacific to articulate a legitimate, nondiscriminatory reason for terminating Reynolds. *See McDonnell Douglas,* 411 U.S. at 802-03. If Georgia-Pacific meets this burden, then Reynolds must show that Georgia-Pacific's articulated reason is merely a pretext for illegal discrimination. *Id.* at 804.Thus, although the burden of production shifts in this analysis, the burden of persuasion remains with Reynolds at all times. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
(Cite as: 2006 WL 212069 (S.D.Ohio))

1. Georgia-Pacific's Decision to Hire Schwartz Over Reynolds for the Consolidated District Manager Position

**\*3** First, the Court will consider Reynolds' claim that Georgia-Pacific committed age discrimination in choosing Schwartz over him for the consolidated District Manager position. Georgia-Pacific has put forward a legitimate, nondiscriminatory reason for its employment action: 1) the company terminated Reynolds pursuant to a reorganization and reduction in force,[FN1] and 2) the managers in charge of hiring a manager for the new consolidated district concluded that Schwartz was a better candidate. The burden thus returns to Reynolds to show that Georgia-Pacific's articulated reason is merely a pretext for illegal discrimination.

> FN1. Although Reynolds described Georgia-Pacific's reorganization as a "restructuring and reduction in force" in his complaint, he argues in his Memorandum in Opposition to Defendant's Motion for Summary Judgment that the reorganization was not, in fact, a reduction in force. (Compare doc. # 1, ¶¶ 17,24, with doc. # 25 at 5.) Reynolds' argument is without merit. There is some evidence suggesting that overall, the reorganization was not intended to be a reduction in force, in the sense that reducing numbers was not Georgia-Pacific's primary goal. However, a reduction in force includes situations like this one where "business considerations cause an employer to eliminate one or more positions within the company."See Norbuta, 1 Fed. Appx. at 313 (emphasis added). The evidence is undisputed that Georgia-Pacific consolidated several districts, including the Detroit and Indianapolis Districts, and that some District Manager positions were eliminated as a result. (Reynolds dep. at 89-90.) While "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced

after his or her discharge ... a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties." Norbuta, 1 Fed. Appx. at 313. Here, because the districts were consolidated, Schwartz assumed some of Reynolds' duties in addition to his own. As such, Georgia-Pacific's restructuring qualifies as a reduction in force under the law.

To prove that Georgia-Pacific's explanation for failing to reassign him is mere pretext, Reynolds "is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge."See Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994) (citations and internal quotations omitted). Reynolds attempts to show pretext by the first two methods only.

The first method of showing pretext requires "evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false.' " Id. (citation omitted). Georgia-Pacific has offered a legitimate reason for its decision to select Schwartz instead of Reynolds, including the undisputed facts that Schwartz had been a District Manager for four years to Reynolds' one and a half years, and that Reynolds received a substandard performance evaluation shortly before the challenged employment decisions were made.[FN2]Reynolds argues that Georgia-Pacific's reason is factually false because Schwartz was seventeen years younger than Reynolds, had twelve fewer years of experience in the industry, and was not performing as well as Reynolds.

> FN2. Though Reynolds disagreed with his evaluation, it is undisputed that he received a 2 on a scale of 1 to 5 in his 2001 performance evaluation, which put him in the "improvement needed" category. (Reynolds dep. at 63, 68.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
**(Cite as: 2006 WL 212069 (S.D.Ohio))**

Page 4

First, "[t]he isolated fact that a younger person eventually replaces an older employee is not enough to permit a rebuttal inference that the replacement was motivated by age discrimination."*See Hedrick v. Western Reserve Care System,* 355 F.3d 444, 462 (6th Cir.2004) (citing *Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 267 (6th Cir.1986)). Thus, the fact that Schwartz was younger than Reynolds is not sufficient to show pretext. Second, with these allegations, Reynolds does not prove false either the facts on which Georgia-Pacific based its decision, nor the reason itself (*i.e.,* that Schwartz was a better candidate). Rather, he challenges Georgia-Pacific's subjective conclusion that Schwartz was a better candidate. Reynolds' "subjective view of [his] qualifications in relation to those of the other applicants, without more, cannot sustain a claim of discrimination."*See Hedrick,* 355 F.3d at 462.

The Sixth Circuit has repeatedly emphasized that "it is inappropriate for the judiciary to substitute its judgment for that of management," and that a court's appropriate inquiry is limited to "whether the employer gave an honest explanation of its behavior ."*Id.* However, a Court may consider whether an employer's decision was reasonably informed and considered "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Wexler v. White's Fine Furniture, Inc.* 317 F.3d 564, 576 (6th Cir.2003); *see also Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir.1998). The Court notes that in coming to its decision to hire Schwartz instead of Reynolds, Georgia-Pacific interviewed Reynolds and considered his performance record. In light of these facts, this Court will not second guess Georgia-Pacific's decision. The Court thus finds that Reynolds has offered no evidence to suggest that Georgia-Pacific's proffered reasons have no basis in fact. Reynolds has thus failed to prove pretext by the first method.

*4 To show pretext by the second method, Reynolds must show that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup."*See Manzer,* 29 F.3d at 1084. In the Sixth Circuit, "in order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of age discrimination."*Id.* Reynolds alleges that Horvath made two remarks that are circumstantial evidence of discrimination.[FN3]Reynolds alleges that in September 2001, Horvath said to a marketing person that he had the oldest group of District Managers in the country, (*see* doc. # 25, citing Reynolds dep. at 145-46), and that in early 2002, Horvath described Gary Stelow, one of Reynolds' subordinates, as an "old guy" who had "outlived his usefulness." (*Seeid.,* citing Reynolds dep. at 147.)

> FN3. As there is no other apparent evidence of discrimination, the Court presumes that Reynolds would have relied upon these two comments to make out his prima facie case. If that were true, Reynolds would need additional evidence to establish pretext. *See Manzer,* 29 F.3d at 1084. However, because Georgia-Pacific conceded without argument that Reynolds could make out a prima facie case, the Court is not certain of what arguments Reynolds would have made. For the sake of fairness, the Court will consider these alleged comments as part of Reynolds' pretext argument.

The Sixth Circuit has laid out several rules for analyzing the relevance of age-related comments. *See Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 354-57 (6th Cir.1998). The first consideration is who made the alleged statement. *Id.* at 354.Next, the Court must "examine the substance of the discriminatory remarks in determining their relevancy." *Id.* at 355.Last, the Court must consider the nexus, or "temporal connection between the statement and the challenged employment action." *Id.* at 357 (citing *Ryder v. Westinghouse Elec.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
(Cite as: 2006 WL 212069 (S.D.Ohio))

*Corp.,* 128 F.3d 128, 133 (3d Cir.1997)); *seealso Bigelow v. ANR Pipeline Co.,* No. 96-1642, 1997 WL 428964, at ----5(6th Cir. July 29, 1997).

Here, the person who made both of the allegedly discriminary statements was also one of the people who made the decision to hire Schwartz instead of Reynolds as the new consolidated District Manager. The statements thus are significant and need to be further analyzed. "[A]n employer's comments referring directly to a *plaintiff's age* may support an inference of discriminatory animus.... Isolated and ambiguous comments," however, "are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination."*Id.* (emphasis in original). Horvath's comment did not refer directly to Reynolds or his age. Moreover, while Reynolds alleges that Horvath's comment about having the oldest group of managers in the country was critical, at least one other person who heard it thought the comment was a compliment about his managers' collective experience. (*See* Goodman dep. at 46-48.) The Court finds the comment to be neutral and ambiguous.

Horvath's other alleged comment, while more suspect, was also not about Reynolds or his age. Moreover, Horvath's second comment is similar to some-and not as inflammatory as other-comments which the Sixth Circuit has found insufficient to require a finding of pretext. *See Sherman v. American Cyanamid Co.,* No. 98-4035, 1999 WL 701911, at ----5(6th Cir. Sept.1, 1999); *Bigelow,* 1997 WL 428964, at ----5. For instance, in *Sherman,* the plaintiff's supervisor said of another employee, "you cannot teach an old dog new tricks."*See Sherman,* 1999 WL 701911, at ----4. And in *Bigelow,* the plaintiff's supervisor remarked that the company fired one employee because of a " 'combination of age and wage," and that the company needed to fire its "old fart" employees. *Bigelow,* 1997 WL 428964, at ----2. In both these cases, the Sixth Circuit held that the remarks were not sufficient to permit the conclusion that the sheer weight of the circumstantial evidence made it more likely than not

that the employer's justification was pretext. *See Sherman,* 1999 WL 701911, at ----5; *Bigelow,* 1997 WL 428964, at ----5.

**\*5** The Court comes to the same conclusion here. Not only are Horvath's allegedly discriminatory statements insufficient to make it more likely than not that Georgia-Pacific's explanation is pretextual, but also other circumstantial evidence fails to support Reynolds' argument. As Georgia-Pacific notes, the Sixth Circuit has considered the fact that a company retained other older employees in a reduction in force as evidence that the employer's employment decisions were not motivated by age discrimination. *Ferrette,* 105 Fed. Appx. at 726 (three of four employees retained were over 50, and one was over 70).[FN4] In this case, during the reduction in force, Horvath selected another older employee, Howard Goodman, then age 57, for another manager position.[FN5](Reynolds dep. at 178; Horvath dep. at 153.) Moreover, there is no temporal nexus here between the alleged comments and Reynolds' not being chosen as the consolidated District Manager; one of these statements was made almost a year before and the other approximately six months before Georgia-Pacific chose Schwartz over Reynolds for the post. *See Bigelow,* 1997 WL 428964, at ----5 (abstract, alleged discriminatory statements made months before plaintiff's termination do not support finding of discrimination). Even taking Reynolds' allegations about Horvath's statements as true, the Court finds that Reynolds has not offered sufficient evidence from which a reasonable jury could conclude it is more likely than not that Georgia-Pacific's proffered reasons did not actually motivate Georgia-Pacific's choice of Schwartz over Reynolds and Reynolds' subsequent termination. Reynolds has thus failed to prove pretext by either of the first two *Manzer* methods. [FN6]

> FN4. Reynolds cites *Ercegovich,* 154 F.3d at 356-57, for the related proposition that "evidence of discrimination against other older workers ... may serve to support other evidence of pretext and as circumstan-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
(Cite as: 2006 WL 212069 (S.D.Ohio))

tial evidence of discrimination against the plaintiff."(*See* doc. # 25 at 17.) In *Ercegovich,* the Sixth Circuit held only that discriminatory *remarks* by management regarding other employees may, in certain circumstances, indicate a corporate culture of discrimination that supports the inference of discrimination against a plaintiff. The *Ercegovich* court explained how such remarks should be analyzed, a process that the Court has undertaken above regarding Horvath's alleged remarks about his District Managers in general and about Gary Stelow.*Ercegovich* specifically concerned such statements, and does not support this Court's consideration of the other "evidence" that Reynolds puts forth about alleged age discrimination against other older employees. Regardless, even if *Ercegovich* permitted this Court to consider such evidence, the Court finds, below, that the evidence is not probative of age discrimination.

For instance, Reynolds argues that a jury should be allowed to consider evidence that Georgia-Pacific's Consumer Products Sales Division "as a whole targeted older District Managers for removal."(*See* doc. # 25 at 17.) The pattern and practice *method* of proving discrimination is not available to individual plaintiffs, so the Court may not consider such an argument. *See Bacon v. Honda of America Mfg., Inc.,* 370 F.3d 565, 575 (6th Cir.2004) (race discrimination context). Nevertheless, pattern and practice *evidence* may be relevant to proving an individual claim for disparate treatment. *Seeid.*The Court may thus consider the specific evidence Reynolds cites. First, Reynolds notes that Horvath removed Goodman and replaced him with a younger District Manager. As discussed above, Horvath in fact retained Good-

man as a Redistribution Manager, which is evidence that is contrary to a finding of discrimination. Next, Reynolds argues that Horvath also discriminated against Gary Stelow because of his age. Reynolds notes that Stelow attested that: 1) Horvath repeatedly asked him when he was going to retire, 2) Schwartz gave him an ultimatum to quit or be fired; and 3) Stelow believed these actions were motivated by his age. (*Id.* at Ex. 2., Stelow Aff.) The Court notes that, under the *Ercegovich* analysis, such questions and comments are not discriminatory on their face, are temporally removed from the decisions at issue, and, in the case of Schwartz's alleged ultimatum, were made by someone who had no influence over the employment decisions at issue. They therefore are not circumstantial evidence of discrimination.

Reynolds also notes that the average age of the seven District Managers who were removed from their jobs in 2002 was 50.14 years. In reduction of force cases involving a brief period of time, the Sixth Circuit has considered whether a change in the average age of employees is indicative or contraindicative of discrimination. *See, e.g., Almond v. ABB Industrial Systems, Inc.,* 56 Fed. Appx. 672, 677 (6th Cir.2003) (collecting cases). Reynolds' statistic, however, is not probative because it is not presented in the context of comparative figures.

FN5. Goodman was a District Manager of another district that was consolidated. He was moved to the position of Redistribution Manager, which he considered a lateral move. (Goodman dep. at 28-29.)

FN6. The final way for Reynolds to establish pretext is to show that Georgia-Pacific's proffered reasons for Reynolds' ter-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
(Cite as: 2006 WL 212069 (S.D.Ohio))

mination are insufficient to motivate discharge. *See Manzer,* 29 F.3d at 1084. Reynolds does not appear to make this argument, but the Court will consider it briefly enough to note that the combination of Georgia-Pacific's reorganization and Reynolds' performance evaluation gave sufficient reason for his discharge and Georgia-Pacific's choice of Schwartz over him for the consolidated district manager position.

## 2. Georgia-Pacific's Decision Not to Hire or Consider Reynolds for the Houston District Manager Position

Next the Court will consider Reynolds' claim that Georgia-Pacific discriminated against him by failing to transfer him to an open District Manager position in Houston. Again, Georgia-Pacific conceded for the purpose of its motion for summary judgment that Reynolds could make out a prima facie case of age discrimination. (*See* doc. # 22 at 11.) The Court thus must follow the same inquiry as that above. Georgia-Pacific has put forward a legitimate, nondiscriminatory reason for its employment action: 1) the reduction in force; and 2) Georgia-Pacific's conclusion that Reynolds was not a good candidate for the position because of Reynolds' substandard performance evaluation. The burden again falls to Reynolds to prove that Georgia-Pacific's articulated reason is merely a pretext for illegal discrimination.

Again, to prove that Georgia-Pacific's explanation for failing to reassign him is mere pretext, Reynolds must show by a preponderance of the evidence either "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer,* 29 F.3d at 1084 (citations and internal quotations omitted). Reynolds again attempts to show pretext only by the first two methods.

*6 First, Reynolds argues that Lyons' decision not to select Reynolds for the Houston District Manager position had no basis in fact because Lyons was not sufficiently informed to make such a decision and because Reynolds was the more qualified candidate. Reynolds argues that Lyons was not so informed because he did not interview Reynolds, and he could not give any reason why he hired Berquist. Lyons, however, did cite an undisputed reason on why he chose not to interview or select Reynolds for the position: his knowledge of "issues surrounding [Reynolds'] performance as a district manager," as exemplified by Reynolds' performance evaluation of a 2 on a scale of 5. (Lyons dep. at 99.) The Court finds that Lyons' concerns and explanation were reasonable, and as explained above, will not substitute its judgment for that of management. *See Hedrick,* 355 F.3d at 462. Reynolds has thus failed to show pretext by the first method.

To show pretext by the second method, Reynolds must present evidence that undermines the credibility of Georgia-Pacific's explanation for the challenged employment action through circumstantial evidence of discrimination. *See Manzer,* 29 F.3d at 1084. Reynolds' evidence here is even more attenuated that his evidence on the discrimination claim addressed above. Reynolds has presented no evidence of discriminatory remarks that Lyons made, nor any other evidence suggesting that Lyons had an age bias or that age discrimination affected Georgia-Pacific's decision not to consider Reynolds for the Houston District Manager position. In fact, he admits that he has no additional information other than Horvath's comments to support his assumption that his age influenced the decision. (Reynolds dep. at 149-50.) Instead, Reynolds points again to Horvath's alleged discriminatory remarks as circumstantial evidence that Georgia-Pacific's proffered explanation did not actually motivate its decision. Although Lyons made the decision not to hire or interview Reynolds, Reynolds alleges that because Lyons spoke with Horvath about him, Lyons' decision was tainted by Horvath's discriminatory animus. (*See* doc. # 25 at 18.) "[D]iscriminatory

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
**(Cite as: 2006 WL 212069 (S.D.Ohio))**

statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination." *Ercegovich,* 154 F.3d at 356. However, "discriminatory remarks of those who may have influenced the decision not to reassign the plaintiff to other positions in the company may be relevant when the plaintiff challenges the motive behind that decision." *Id.* at 355.As Horvath's remarks may have influenced Lyons' decision, Horvath's alleged remarks are relevant.

Nevertheless, the Court has already found, above, that Horvath's alleged remarks do not compel a finding of pretext under the law. And, those remarks are even further removed from the decision at issue here, that is, Georgia-Pacific's decision not to interview Reynolds for the Houston District Manager position, than they were from Georgia-Pacific's decision not to hire Reynolds as the consolidated District Manager. Consequently, the Court holds that Reynolds has failed to show that a reasonable jury could conclude that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext."Reynolds has thus again failed to prove pretext by either *Manzer* method.

*7 The Court concludes that, even when the evidence is taken in the light most favorable to Reynolds, Reynolds has failed to show by such evidence that a reasonable jury could conclude that either of the challenged employment decisions were more likely than not motivated by age discrimination. The Court thus GRANTS summary judgment to Georgia-Pacific on Reynolds' ADEA claim.

**B. State Law Claims** [FN7]

> FN7. The Court notes that Reynolds has brought claims under both Michigan and Ohio law, but the parties have not presented a choice-of-law analysis. The Court declines to do so either, as summary judgment should be granted on all of Reynolds' state law claims regardless of which state's law applies.

**1. Statutory Claims**

In Counts II and IV, Reynolds brings claims under O.R.C. § 4112 and M.C.L. § 37.2102, respectively. Ohio courts apply the same standards to age discrimination claims under O.R.C. 4112 as those applicable to age discrimination claims under the ADEA. *See Ferrette v. Cuyahoga Cty. Bd. of Elections,* 105 Fed. Appx. 722, 725 n. 2 (6th Cir.2004); *Owen v. Penton Pub., Inc.,* No. 91-3744, 1992 WL 92739, at ----7 n. 1(6th Cir. Date 1992) (citing *Plumbers v. Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (Ohio 1981)). Therefore, the Court's ADEA analysis, above, also governs Reynolds' Ohio law age discrimination claim.

Under M.C.L. § 37.2202, a plaintiff has three possible approaches to stating a prima facie age discrimination case. First, he may use the *McDonnell Douglas* framework applied to claims under the ADEA. *See McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1159 (6th Cir.1990); *Matras v. Amoco Oil Co.,* 424 Mich. 675, 385 N.W.2d 586, 589 (Mich.1986) (applying *McDonnell Douglas* analysis to claim under Michigan law). Second, he may use an approach developed by Michigan courts, where the court examines whether age was a determinative factor in the plaintiff's discharge. *Id.* Third, he may show through circumstantial, statistical or direct evidence that he was discriminated against. *Id.* Once a plaintiff proves a prima facie case by one of these methods, however, Michigan courts apply the same analysis and evidentiary burdens to claims under M.C.L. § 37.2202 as those that federal courts apply to claims under the ADEA.[FN8]*See Union Camp Corp.,* 898 F.2d at 1162 (citing *Simpson v. Midland-Ross Corp.* 823 F.2d 937, 940 (6th Cir.1987)). Reynolds' age discrimination claim under Michigan law thus also stands or falls with his claim of age discrimination under the ADEA.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
**(Cite as: 2006 WL 212069 (S.D.Ohio))**

Page 9

> FN8. Again, Georgia-Pacific has conceded for the purposes of this motion that Reynolds can state a prima facie case of age discrimination. The Court thus need not analyze whether Reynolds has stated a prima facie case under Michigan law.

Thus, for the reasons stated above, summary judgment is also GRANTED on Reynolds' state age discrimination claims.

2. Public Policy Claims

In Counts II and V, Reynolds brings claims for breach of Ohio public policy and breach of Michigan public policy, respectively. It is clear under Michigan law that M.C.L. § 37.2102 provides the exclusive statutory cause of action for an age discrimination in employment claim, and that there is no separate cause of action for breach of Michigan public policy against age discrimination. *Fair v. Prime Sec. Distributors, Inc.,* No. 96-1989, 1997 WL 810005, at ----4 (6th Cir. Dec.29, 1997). Ohio courts, however, are divided on whether a plaintiff may simultaneously pursue a statutory age discrimination claim under O.R.C. § 4112 and a common law claim for violation of Ohio public policy against age discrimination. *See Gessner v. City of Union,* 159 Ohio App.3d 43, 48-49, 823 N.E.2d 1, 4-5 (Ohio Ct.App.2004).

**\*8** The Ohio Supreme Court's decision in *Wiles v. Medina Auto. Parts,* 96 Ohio St.3d 240, 773 N.E.2d 526, 535 (Ohio 2002), is instructive here. In *Wiles,* the Court considered whether a terminated plaintiff could maintain both a claim under the Family Medical Leave Act and a claim for violation of Ohio public policy against wrongful discharge. *Wiles,* 96 Ohio St.3d at 249, 773 N.E.2d at 535. In holding that such a public policy claim was not viable, the Court stated that "statutory remedies provide an effective vehicle for vindicating the statute's policy, obviating recognition of a wrongful discharge claim."*Id.* Several of this court's sister courts have since applied *Wiles* in holding that, because the

Ohio Civil Rights Act ("OCRA") provides sufficient remedies, a plaintiff may not maintain a separate cause of action for breach of Ohio public policy against discrimination where the plaintiff has also brought a claim under the OCRA. *See, e.g., Gray v. Allstate Ins. Co.,* No. 1:03-CV-910, 2005 WL 2372845, at \*7-\*8 (S.D.Ohio Sept.26, 2005) (age discrimination case) (gathering cases); *butsee Mercurio v. Honeywell,* No. C-1-02-275, 2003 WL 966287, at \*3 (S.D.Ohio March 5, 2003) (public policy claim viable despite claim under OCRA).

This Court agrees. Under the FMLA, a plaintiff may recover compensatory damages, back pay, and front pay, and some equitable remedies such as reinstatement, as well as liquidated damages, but not punitive damages. A plaintiff bringing a claim under O.R.C. § 4112 is entitled to comprehensive remedies, including " 'damages, injunctive relief, or any other appropriate relief.'The statute authorizes awards of back pay, front pay, and compensatory and punitive damages. It also permits a trial court to order reinstatement in lieu of front pay."*See Gray,* 2005 WL 2372845, at \*8. This Court finds that the remedial scheme of O.R.C. § 4112 is substantially similar to that of the FMLA, and that *Wiles* thus applies to bar public policy claims based on age discrimination where the plaintiff has also brought a claim under O.R.C. § 4112. As such, Reynolds cannot maintain his breach of public policy claims under Ohio law, either. The Court therefore sua sponte GRANTS summary judgment to Georgia-Pacific on Counts III and V of Reynolds' complaint.

IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Georgia-Pacific Pacific's Motion for Summary Judgment (doc. # 22) and also GRANTS summary judgment to Georgia-Pacific on Reynolds' Ohio and Michigan public policy claims.

IT IS SO ORDERED.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                              Page 10
Not Reported in F.Supp.2d, 2006 WL 212069 (S.D.Ohio)
**(Cite as: 2006 WL 212069 (S.D.Ohio))**


S.D.Ohio,2006.
Reynolds v. Georgia-Pacific Corp.
Not Reported in F.Supp.2d, 2006 WL 212069
(S.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.