

**BELINDA C. ALLEN-CUFFEE, Plaintiff, vs. FRANKLIN COUNTY JUVENILE DETENTION CENTER, Defendant.**

**Case No. 99CV00344**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2001 U.S. Dist. LEXIS 4754*

**February 6, 2001, Decided**
**February 7, 2001, Filed**

**DISPOSITION:** [*1] Defendants' Motion for Summary Judgment GRANTED.

**COUNSEL:** For BELINDA C ALLEN-CUFFEE, plaintiff: Nicholas E Kennedy, McGuire Law Office, Dennis M McGuire, Columbus, OH.

For FRANKLIN COUNTY JUVENILE DETENTION CENTER, defendant: Robert E Williams, Franklin County Prosecutor's Office, Columbus, OH.

**JUDGES:** ALGENON L. MARBLEY, UNITED STATES DISTRICT COURT.

**OPINION BY:** ALGENON L. MARBLEY

**OPINION**

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter is before the Court on the Defendants' Motion for Summary Judgment filed on October 6, 2000. The Plaintiff, Belinda Allen-Cuffee, was employed by the Franklin County Court of Common Pleas, Domestic Division and Juvenile Branch, the Defendant in this matter. The Plaintiff claims that she was discriminated against on the basis of her race when she was terminated on December 22, 1998. The Plaintiff brought suit, following her termination, under Title VII, *42 U.S.C. § 2000e, 42 U.S.C. § 1981*, Ohio Revised Code Chapter 4112, and also brought a state law claim for violation of

Ohio public policy. For the following reasons, the Defendants' Motion for Summary Judgment is **GRANTED.**

**II. FACTS**

The facts, presented [*2] in the light most favorable to the non-movant Plaintiff are as follows. The Plaintiff, is an African-American woman who was employed by the Defendant as a Unit Leader in the Franklin County Juvenile Detention Center. As a Unit Leader, the Plaintiff was responsible for the care of youths detained at the Juvenile Detention Center ("JDC"). Mr. Ed Kise, the Director of Unit Life, was the Plaintiff's direct supervisor, and was the individual who recommended that the Plaintiff be terminated. [1] Ms. Allen-Cuffee was terminated on December 22, 1998, because she allegedly engaged in a pattern of conduct that degraded and humiliated detained juveniles, and because she had displayed work-related conduct toward the juveniles that impugned the dignity of the Domestic Court. Ms. Roseanne Davis is the Superintendent of JDC.

> 1 The affidavit of Kerri Griffin, Human Resource Administrator for the Domestic Division and Juvenile Branch of the Common Pleas Court, stated that Unit Coordinators reported to the Director of Unit Life and Unit Leaders reported to Unit Coordinators.

[*3] The Plaintiff was given a pre-disciplinary hearing on November 16, 1998, before hearing officer Assistant Court Director Eric Fenner. Four of the Plaintiff's co-workers provided testimony at the hearing. Julie Johnson testified that she heard Ms. Allen-Cuffee say: "these black bitches can beat these white bitches any day," and that she had heard the Plaintiff call Ms. Adler,

a co-worker, a "racist bitch." Ms. Johnson also stated that Ms. Allen-Cuffee's referred to a juvenile, "NC," as "fish sticks." Apparently, NC had a sexually transmitted disease, and as a result, there was an unpleasant odor in her room. At one point, Ms. Johnson testified that she heard Ms. Allen-Cuffee scream at NC: "if you didn't want me to tell everyone you were raped, you shouldn't have told me; I have a right to tell anyone about it; you deserved to be raped."

Linda Boyd was the second witness to testify at the pre-disciplinary hearing. Ms. Boyd testified that she heard Ms. Allen-Cuffee refer to white female residents as "damn white bitches," and referred to white co-workers as "white bitches." Ms. Boyd further testified that she heard the Plaintiff state that "she could make their lives hell, those white [*4] bitches will be pulling their hair out before dinner." This statement was made by Ms. Allen-Cuffee after she indicated that she would instigate one of the youths to harass and cause problems for the white staff.

The third witness was Lora Zigan. Ms. Zigan heard Ms. Allen-Cuffee tell another staff member that "these black girls could beat these white bitches asses." Ms. Zigan further testified that the Plaintiff had stated that she would like to "beat the New York out of Ms. Hajdukovic," and confirmed that the Plaintiff had called NC "fish sticks."

Ms. Hajdukovic, who is now known as Ms. Boling, was the fourth witness at the hearing. Mr. Boling testified that she walked into the employee's locker room at the JDC, and heard the Plaintiff having a conversation with a co-worker. In the conversation, she heard the Plaintiff state: "she thinks she's 'bout it with the kids; let's see if she's 'bout it on the street." Ms. Boling stated that she did not know what Ms. Allen-Cuffee was talking about at the time. When she left the locker room a few minutes later, Ms. Boling stated that the co-worker told her that the Plaintiff had been talking about her, Ms. Boling, and that the Plaintiff had [*5] said that she would kick the New York right out of her.

Ms. Boling also testified that Ms. Allen-Cuffee had entered a pod and agitated a youth who had been confined for disciplinary reasons. The youth, as a result, engaged in disruptive behavior. Ms. Allen-Cuffee left Ms. Boling to deal with the situation. Mr. Boling also confirmed that Ms. Allen-Cuffee called NC "fish sticks."

Chaplain Mike Taylor submitted a written statement in which he disclosed NC's statements to him. Chaplain Taylor had a conversation with NC on September 16, 1998. During that conversation, NC indicated that "Ms. Allen had spread a rumor about her that was sexual in nature and had openly harassed her in this regard in front of the other girls on her pod." The Chaplain also stated

that Ms. Allen-Cuffee had told other youths that NC had a sexually transmitted disease.

Ms. Allen-Cuffee denied all of the allegations at the hearing. Based on the evidence presented, Mr. Fenner recommended that the Plaintiff be terminated from her position as Unit Leader. Mr. Fenner forwarded the memorandum and his recommendation to Court Director Harold Weller on November 19, 1998. Based on his review of Ms. Allen-Cuffee's case, [*6] Mr. Weller concluded that termination was appropriate. Mr. Weller initialed the hearing officer's report and forwarded it to the Judges.

On December 22, 1998, three of the five Judges of the Domestic Court signed a General Journal Entry terminating Ms. Allen-Cuffee's employment with the Domestic Court.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*. The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388-89 (6th Cir. 1993)*. The non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as [*7] to the material facts." *Moore v. Philip Morris Cos., 8 F.3d 335, 340 (6th Cir. 1993)* (citation omitted). "Summary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (finding summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)*. In responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." *FED. R. CIV.*

P. 56(e); see also Celotex, 477 U.S. at 324; [*8] Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. Anderson, 477 U.S. at 251; see also Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir. 1995).

## IV. ANALYSIS

### A. Section 1981 - Title VII - Ohio Revised Code Chapter 4112

#### 1. Indirect Evidence

Without direct evidence of discrimination, a plaintiff may demonstrate a prima facie case of race discrimination under Title VII, 42 U.S.C. § 2000e, 42 U.S.C. § 1981 and Chapter 4112 of the Ohio Revised Code, by establishing: (1) she was a member of a protected class, (2) she suffered an adverse action, (3) that she was qualified for the position, and (4) that she was replaced by someone outside the protected class, or that she was treated differently than similarly-situated non-minority employees. Warfield v. Lebanon Corr. Inst., 181 F.3d 723, 728-29 (6th Cir. 1999); Thurman v. Yellow Freight Sys., 90 F.3d 1160, 1166 (6th Cir. 1996); [*9] Harrison v. Metropolitan Gov't of Nashville & Davidson Cty., 80 F.3d 1107, 1115 (6th Cir. 1996).[2]

> 2    With few exceptions, Ohio courts have adopted Title VII's prima facie elements and analysis in evaluating claims brought under Chapter 4112. Little Forest Med. Ctr. v. Ohio Civ. Rights Comm'n, 61 Ohio St. 3d 607, 575 N.E.2d 1164 (Ohio 1991).

Likewise, the elements of a prima facie case under Title VII are the same for those brought under § 1981. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); Jackson v. Quanex Corp., 191 F.3d 647 (6th Cir. 1999). Section 1981, however, differs from Title VII in several respects. First, a plaintiff must demonstrate purposeful discrimination in a § 1981 claim. General Bldg. Contractors Assoc., Inc. v. Pennsylvania, 458 U.S. 375, 390, 73 L. Ed. 2d 835, 102 S. Ct. 3141 (1982). The burden of demonstrating purposeful discrimination is present throughout the prima facie case and, if applicable, in the pretextual analysis. Second, the doctrine of respondeat superior does not apply in § 1981 actions. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 105 L. Ed. 2d 598, 109 S. Ct.

2702 (1989); Kolb v. State of Ohio, 721 F. Supp. 885, 892 (N.D. Ohio 1989).

Third, in contrast to Title VII, defendants can be held individually liable for discrimination. Jones v. Continental Corp., 789 F.2d 1225, 1231 (6th Cir. 1986); Taylor v. Jones, 653 F.2d 1193, 1200 (8th Cir. 1981). To establish individual liability, the defendant must have been personally involved in the discriminatory action. Allen v. Denver Public Sch. Bd., 928 F.2d 978 (10th Cir. 1991); Grimes v. Superior Home Health Care of Middle Tenn., Inc., 929 F. Supp. 1088, 1096 (M.D. Tenn. 1996).

[*10] Under the fourth element, the exemplar comparable employee must be "similarly-situated in all respects." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (citing Stotts v. Memphis Fire Dep't, 858 F.2d 289 (6th Cir. 1988)). In Pierce v. Commonwealth Life Insurance Co., 40 F.3d 796 (6th Cir. 1994), the Sixth Circuit elaborated on this standard:

> In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the . . . employees whom he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.

Id. at 802 (quoting Ruth v. Children's Med. Ctr., 1991 U.S. App. LEXIS 19062, No. 90-4069, 1991 WL 151158, at *6 (6th Cir. Aug. 8, 1991) (quotation omitted). The Sixth Circuit further advanced the evolution of the similarly-situated criterion in Perry v. McGinnis, 209 F.3d 597 (6th Cir. 2000), [*11] when it shifted its focus from formalism to functionality in ruling that "in applying the [similarly-situated] standard courts should not demand exact correlation, but should instead seek relevant similarity." Id. at 601 (citing Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)). Thus, for another employee to be "comparable" to a plaintiff, she must be similarly-situated in all relevant respects.

If the plaintiff establishes a prima facie case, the defendant must come forward with a legitimate non-discriminatory reason for the adverse action. Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253, 67

*L. Ed. 2d 207, 101 S. Ct. 1089 (1981); Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121, 1126 (6th Cir. 1998); Thurman, 90 F.3d at 1166; Mitchell, 964 F.2d at 582.* The defendant need not show that the decision was motivated by the proffered reason, only that the non-discriminatory reason is legally sufficient to justify judgment for the defendant. *Burdine, 450 U.S. at 254-55.* If the defendant proffers a sufficient non-discriminatory [*12] reason, then the presumption created by the *prima facie* case is rebutted. *Id. at 255.* Once the defendant provides a legitimate non-discriminatory reason for the adverse employment action, the plaintiff must demonstrate that the employer's proffered reasons were but a pretext for unlawful discrimination. *Scott, 160 F.3d at 1126; Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1082 (6th Cir. 1994).*

There are three ways in which a plaintiff-employee may demonstrate pretext. First, the employee may offer evidence that the employer's reason had no basis in fact. Second, the employee may argue that the reason was insufficient to discharge the employee. Third, the employee may offer evidence that the reason did not actually motivate the employer's decision. *Smith v. Chrysler Corp., 155 F.3d 799, 805-06 (6th Cir. 1998); Manzer, 29 F.3d at 1084.* Under the first two methods of demonstrating pretext, a court may infer discrimination. *Manzer, 29 F.3d at 1084.*

In the third method of proving pretext, presenting the argument that the defendant's reasons did not motivate the adverse employment [*13] action, the plaintiff must come forward with additional evidence of discrimination. If the plaintiff does not come forward with additional evidence, "the plaintiff has failed to prove pretext and judgment for the defendant is warranted. . . ." *Kline v. Tennessee Valley Authority, 128 F.3d 337, 346-47.* The third type of case arises "when the plaintiff has failed to introduce evidence that the reasons offered by the defendant are 'factually false.'" *Manzer, 29 F.3d at 1084.*

In 2000, the Supreme Court examined the plaintiff's burden. The Court found that "[a] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000).* Since *Reeves*, the Sixth Circuit has abided by its earlier decisions, which adopted three methods for demonstrating pretext. *See, e.g., Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th Cir. 2000); Kahn v. Dean & Fulkerson, 2000 U.S. App. LEXIS 29386,* [*14] *at *28-*29, No. 99-1015 (6th Cir. Nov. 13, 2000).*

In this case, under the *McDonnell Douglas* burden-shifting analysis, as just described, the Defendant argues that Ms. Allen-Cuffee cannot demonstrate a *prima facie* case because she was not replaced, and none of the similarly-situated employees was treated more favorably than the Plaintiff. The Plaintiff responds that several similarly-situated white employees received better treatment than she did. And, at oral argument, for the first time, Ms. Allen-Cuffee argued that she was replaced by an employee outside her protected class.

Both parties agree that for the purposes of this Motion, the Plaintiff has met the first three criteria of *McDonnell Douglas*. The Court therefore will focus its analysis on the fourth element: whether Ms. Allen-Cuffee was replaced, or, in the alternative, whether similarly-situated non-minority employees were treated more favorably. If Ms. Allen-Cuffee demonstrates either, then she has established a *prima facie* case, and the burden shifts to the Defendant to present a legitimate non-discriminatory reason for her termination.

**1. Was the Plaintiff Replaced?**

The first issue the Court must consider is [*15] whether the Plaintiff can meet the fourth element of her *prima facie* burden by demonstrating that she was replaced by an individual outside of her protected class. The Plaintiff was terminated on December 22, 1998 from her position as Unit Leader. From November 30, 1998 through December 7, 1998, JDC had posted for three Unit Leader positions. This posting was updated to reflect the need for six Unit Leaders. The second posting was from November 30, 1998 until December 14, 1998. Following the posting on December 21, 1998, JDC's first offer of employment was to a black woman. This applicant turned down the job offer. The second offer went to a white woman, Ms. McCray, on February 16, 1999. Ms. McCray accepted the job offer.

Based on this evidence, the Court finds that there is no genuine issue of material fact as to whether the Plaintiff was replaced. She was not. The fact that six Unit Leader positions were open *before* Ms. Allen-Cuffee was terminated, and that no additional postings occurred as a result of the Plaintiff's termination, is the first factor that leads this Court to believe that Ms. Allen-Cuffee was not replaced.

Although one Unit Leader position was filled following [*16] the Plaintiff's termination, there is no evidence that the Plaintiff's actual position was filled. Absent evidence that Ms. McCray assumed Ms. Allen-Cuffee's job, and not the job of another Unit Leader, the Court cannot conclude that Ms. Allen-Cuffee was, in fact, replaced. The Plaintiff failed to provide evidence demonstrating, for example, that either Ms. McCray

worked the same shift as she did, or that Ms. McCray worked in the same pod.

The Court also notes that the Plaintiff did not present any evidence that she was replaced. [3] It is the Plaintiff's burden to demonstrate all of the elements of her *prima facie* case, and she cannot use unsubstantiated inferences to support her burden. During discovery, the Plaintiff could have ferreted out whether Ms. McCray replaced her.

> 3    The Plaintiff instead relied upon the affidavit of Kerri Griffin, which was provided by the Defendant.

The Court concludes that the Plaintiff cannot meet the fourth element of her *prima facie* case by showing that she had been [*17] replaced by an individual outside of her protected class.

**2. Were Comparable Employees Treated Differently?**

Ms. Allen-Cuffee argues that Unit Leaders, who reported to the same supervisor, were treated more favorably than she was for similar transgressions. [4] The Plaintiff presents six comparable white employees whom she believes were not terminated by JDC for similar conduct. The Defendant provides two responses: (1) that the conduct was not comparable, and (2) that the evidence is inadmissable. And that it must be borne in mind that "hearsay evidence may not be considered on a motion for summary judgment." *Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996); see also North Am. Specialty Ins. Co. v. Myers, 111 F.3d 1273, 1283 (6th Cir. 1997).* Because of the large number of comparables provided by the Plaintiff, the Court will examine each in turn.

> 4    According to the Plaintiff, Mr. Kise was her direct supervisor. The affidavit of Kerri Griffin states that Mr. Kise was the Director of Unit Life, and that Unit Coordinators reported to the Director of Unit Life. Unit Leaders, such as Ms. Allen-Cuffee, reported to Unit Coordinators. For purposes of this Opinion, the Court will assume that Mr. Kise was the Plaintiff's supervisor. The Judges, however, were the ones who made the final decision to terminate the Plaintiff.
>
> Ms. Davis was the Ms. Davis, Superintendent of the Detention Center, whom the Plaintiff described as the "ultimate supervisor."

**[*18] a. Unit Leader Kuntz**

According to the Plaintiff, Unit Leader Pamela Kuntz, a white woman, was accused of referring to black youths as "nasty hoes" and referring to their hair as "nappy." Ms. Kuntz said to black youths: "Don't be hat-

ing on me because my hair is beautiful, blond and flowing and your hair is short and nappy." The Plaintiff states that Ms. Kuntz was neither terminated, nor sent to a predisciplinary hearing, but was given a "conference." Nothing was placed in Ms. Kuntz's personnel file.

In reviewing the Plaintiff's deposition testimony, the Court finds that the Plaintiff has not provided admissible evidence either that Unit Leader Kuntz made all of the comments as described, or that she was given a "conference for her discipline." The Plaintiff testified that Unit Leader Kuntz made "fun of black youth's hair" as "nappy." The Plaintiff did not, in fact, testify that it was Ms. Kuntz who made the "nasty hoes" comment. (Allen-Cuffee Dep. at 56, 133). Ms. Allen-Cuffee further stated that she "knew" that Ms. Kuntz had a disciplinary conference because Ms. Umoh told her. The Court finds that this is inadmissible hearsay.

The Court finds, however, that the Plaintiff [*19] has established the following admissible comparable evidence regarding Ms. Kuntz. Marcia White, a former Unit Leader employed by JDC in 1998 or 1999 was also deposed in this case. (White Dep. at 7). Ms. White testified about the comments allegedly made by Unit Leader Kuntz. Ms. White stated that a woman, who was referred to as "Ms. K," said "'don't be hating on me because my hair is beautiful, blond and flowing and your hair is short and nappy.'" (White Dep. at 13).

**b. Unit Leader Clark**

The Plaintiff next presents the conduct of Unit Leader Clark, a white woman, who called two co-workers "black bitches." Mr. Kise held a conference with Ms. Clark, but nothing was placed in her personnel file. The Plaintiff states that Ms. Clark also referred to black youth's hair as "nappy." According to the Plaintiff, Ms. Clark received a meeting with Ms. Davis for her behavior. Ms. Clark also placed her hands on another staff member, Ms. Turbach. Ultimately, Ms. Clark received a one-day suspension for "discourteous treatment of other staff," despite the fact that she had a previous disciplinary record.

The Defendant responds that all Ms. Allen-Cuffee can establish is that Ms. Clark referred [*20] to co-workers as "black bitches," and on three to five occasions made statements to the effect of: "I don't care about her hair being nappy. We're not providing hair grease for them," or "it's not my fault that they have to have that on their skin, we're not providing that."

To support the "black bitches" comment made by Ms. Clark, the Plaintiff provides the affidavit of Deborah Meadows, who worked at JDC from March 1992 through August 1998. (Meadows Aff. P 1). Ms. Meadows stated that Ms. Clark called her and other youths "black

bitches." (Meadows Aff. P 6). [5] Ms. Meadows further testified that Mr. Kise addressed this behavior. *Id.*

> 5  Ms. White testified that Ms. Clark had made "nappy hair" statements. (White Dep. at 22).

The Plaintiff stated that Unit Leader Clark met with Ms. Davis. The Plaintiff, however, was not able to show documentary evidence of the conference Ms. Clark allegedly had with either Mr. Kise or Ms. Davis. In contrast, the Defendant provided the affidavit of Brian Jones, a Unit Coordinator [*21] at JDC, who testified that Ms. Clark was disciplined for making the comment "f--king bitches." (Jones Aff. P 3). Ms. Clark was given a written reprimand for the comment on January 10, 1997, which was also provided. *Id.*

The Plaintiff testified that Ms. Clark told her that Ms. Clark placed her hands on her (Ms. Turbach). This is both unsubstantiated hearsay and is not comparable conduct--a physical touching cannot be compared to a verbal comment.

At most, the Court concludes that Unit Leader Clark made a "black bitches," and a "nappy hair" comment, and that she was disciplined for using the language "f--king bitches."

**c. Unit Leader Adler**

The Plaintiff presents as the next comparable, Unit Leader Adler, who allegedly had made racial statements to Ms. Allen-Cuffee including how black people commit all of the crimes, and other racial comments such as "that's so ghetto." The Plaintiff testified that Ms. Adler was only given a conference. According to the Plaintiff, other staff members, such as Ms. Geddes, brought the fact that Ms. Adler had made radical comments to the Defendant's attention.

As for the derogatory comments that Ms. Adler made about blacks being the ones [*22] who commit all of the crimes, in her deposition, Ms. Allen-Cuffee merely was relating what Ms. Geddes told her. (Allen-Cuffee Dep. at 110-11). The Plaintiff, however, provided the affidavit of Ms. Geddes, who was employed by JDC from June of 1993 to January of 1998. (Geddes Aff. P 1). Ms. Geddes stated that Ms. Adler made comments about how "she couldn't believe how many 'blacks' were in the detention center." (Geddes Aff. P 3). Ms. Geddes also related Ms. Adler's statement that: "there was a lot of 'black' staff as well. [Ms. Adler] informed me that about 90% of the criminal justice system was full of 'blacks.' She pointed out that there were few 'white' staff people and that there were more 'black' staff members." (Geddes Aff. P 4). Ms. Allen-Cuffee reported these comments to Mr. Scott, an administrator. (Geddes Aff. P 7). As a re-

sult, Ms. Geddes met with Ms. Adler and Mr. Kise. (Geddes Aff. PP 9-13).

The Court concludes that Ms. Allen-Cuffee has established that Ms. Adler made racial comments.

**d. Unit Leader Bays** [6]

> 6  In Ms. Allen-Cuffee's deposition, Ms. Bays is referred to as Ms. Biaz. The spelling, however, was determined to be B-a-y-s during the deposition. (Allen-Cuffee Dep. at 102).

[*23] According to Ms. Allen-Cuffee, Unit Leader Bays, (formerly Stephens), a white woman, was also accused of threatening other staff members and calling them "bitches." Ms. Bays met with Ms. Davis for her discipline; no hearing was conducted. Nothing was placed in Ms. Bays's employment file.

Ms. Allen-Cuffee's deposition testimony with regard to this incident was as follows: "She's had situations where some of the other staff have said that she had threatened them, and she had a -- well, really not a hearing, but she said she had talked to Ms. Davis about the situation, and then some -- I guess it was supposed to have been staff members that came over here and talked to Kerri Griffin about it." (Allen-Cuffee Dep. at 101-02). The Plaintiff testified that Ms. Bays told Ms. Allen-Cuffee, that Ms. Boyd had told Ms. Bays that Ms. Bays was threatening Ms. Boyd. (*Id.* at 102). When asked: "And so Ms. Boyd -- has Ms. [Bays] told you that Ms. Boyd met with Roseanne Davis about that?" Ms. Allen-Cuffee responded: "She said that Ms. [Bays] said that Ms. Davis had talked to her about it." (Allen-Cuffee Dep. at 103).

This "evidence" is clearly inadmissible hearsay, as hearsay within hearsay, [*24] and cannot support a defense to summary judgment. The Court finds that the Plaintiff has not provided documentary evidence that Ms. Bays actually met with Ms. Davis about the alleged incident.

**e. Unit Leaders Johnson and Tamosovich**

Unit Leader Johnson called youths "nasty hoes." Unit Leader Tamosovich, a white woman, made comments such as that she did not "have to provide for the little monkey girls." Ms. Tamosovich also stated that the black youths looked like "apes." Neither Ms. Johnson, nor Tamosovich was terminated. [7] The Defendant responds that Ms. Tamosovich was not identified by the Plaintiff as a similarly-situated individual in her interrogatory responses.

> 7  The Plaintiff also presents as a comparable Mr. Kreig. Mr. Kreig, however, is not compara-

ble to the Plaintiff as he held a different position with JDC. Mr. Kreig was a supervisor.

These individuals, at most, made racially derogatory comments about youths at JDC. Ms. White testified that the comments about "little monkey girls" and "they [*25] look like apes" were made by Ms. Tamosovich. (White Dep. at 15). Ms. White, however, did not report the comments to the Defendant. (White Dep. at 63-64).

### f. Is the Conduct Comparable?

The Court finds that the conduct of the Unit Leaders was comparable to that of the Plaintiffs. Here, Ms. Allen-Cuffee allegedly stated: "these black bitches can beat these white bitches any day" and called Ms. Adler a "racist bitch." Ms. Allen-Cuffee, also referred to a juvenile, NC, as "fish sticks" because of the youth's personal smell that resulted from a sexually transmitted disease. Ms. Allen-Cuffee screamed at NC: "if you didn't want me to tell everyone you were raped, you shouldn't have told me; I have a right to tell anyone about it; you deserved to be raped."

Viewing the facts in the light most favorable to the Plaintiff, Ms. Allen-Cuffee held the same position as Unit Leaders Kuntz, Clark, Adler, Bys, Johnson and Tamosovich, who have been identified as comparables. [8] The Court can assume for purposes of this Motion that all of the Unit Leaders reported to the same supervisor, Mr. Kise, and that they ultimately reported to the Superintendent of JDC, Ms. Davis. The Court believes that [*26] all of the women engaged in inappropriate conduct.

> 8  The Defendant contends that Ms. Tamosovich was not identified as a comparable by the Plaintiff in her interrogatory responses. The Court, however, will consider Ms. Tamosovich's conduct as she was a Unit Leader during the relevant period.

Placing the incidents in juxtaposition, the Plaintiff's racist and "white bitch" comments parallel the other racist comments made by the Unit Leaders, including comments such as: "nasty hoes," "nappy hair," "black bitches," "that's so ghetto" and "little monkey girls." From the evidence provided, it appears that this type of language was commonplace at JDC, but that only Ms. Clark was given a written reprimand for her "f--king bitches" comment. Accepting Ms. Allen-Cuffee's testimony as true, the use of inappropriate and/or racist language, would only result in a "conference," which was not made part of the employee's personnel record.

The Court finds that viewing the facts in a light most favorable to the Plaintiff, both [*27] sets of individual's comments were derogatory and racist, and concludes that

the Plaintiff has demonstrated the fourth element of her *prima facie* case.

### 3. Legitimate Non-Discriminatory Reason and Pretext

Assuming that Ms. Allen-Cuffee was able to meet the four elements needed to establish a *prima facie* case of race discrimination, the Defendant offers the following legitimate non-discriminatory reason: the Plaintiff allegedly engaging in a pattern of conduct that degraded and humiliated detained juveniles, and for displaying work-related conduct toward the juveniles that impugned the dignity of the Domestic Court. The burden therefore shifts to the Defendants to demonstrate pretext. In response, Ms. Allen-Cuffee offers anecdotal and statistical evidence and chooses to follow the third method of showing pretext as outlined by *Manzer*.

In *McDonnell Douglas v. Green*, the Court found that a plaintiff may demonstrate pretext though "petitioner's general policy and practice with respect to minority employment. . . . Statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case [*28] conformed to a general pattern of discrimination against blacks." *411 U.S. 792, 805, 93 S. Ct. 1817, 36 L. Ed. 2d 668.*

Through her own testimony, Ms. Allen-Cuffee provided the following anecdotes, which she argues is additional evidence of discrimination. Mr. Beer, a white male, fell asleep but was not terminated while Mr. Greene, a black male, was terminated for falling asleep on the job. Mr. Bowens, a black male, received a ten-day suspension for excessive tardiness and absenteeism. Ms. Kuntz, a white female, and Mr. McMahon, a white male, were chronically late, but were not given a ten-day suspension. Mr. Burton, a black male, was suspended and written up for absenteeism, while white employees such as Kuntz, Stephens, Johnson and Ross were given sick days.

Ms. Allen-Cuffee continues that Mr. Brockinton, a black male, reported off-work without an excuse and was found to be in gross neglect of duty. Ms. Kuntz was a no show and was not found to be in gross neglect of duty. Ms. Kidd, a white female, did not bring in the proper documentation when she called off and was not disciplined as harshly.

Mr. Robert Currie, a black man, refused to work a double shift, because he was diabetic, and was asked to resign. [*29] Ms. Boyd, a white diabetic female, could not work a double shift and was allowed to remain in her single shift capacity. Ms. Biaz, a white female, could not work a double shift for medical reasons and was allowed to continue working. Mr. Childs, a black male, refused to

work overtime and was given a-one-day suspension. Ms. Kuntz refused to work overtime and was not disciplined.

Unit Leader Gatewood received discipline for using too much force with a youth. When Ms. Adler and Ms. Johnson hurt a youth by restraining her, they did not receive discipline. Unit Leader Kirkbride, a white employee, was involved with a use of force, but was not investigated until after the media found out about what he did. Mr. McMahon, a white employee, would throw youths into their rooms, but received no discipline. Unit Leaders Williams and Evans, both white males, regularly "bounced the kids around," including hitting a youth with a basketball several times, calling youths names and verbally threatening them. Williams and Evans were not disciplined.

Mr. France, a black male, and Mr. Heckathorn, a white male, were involved in an improper shift exchange on or about September 10, 1998. Mr. France received [*30] a one-day suspension, while Mr. Heckathorn, a white male, received a written reprimand.

Ms. Kiss, a white female, had her charges of excessive absenteeism dismissed. Mr. Bowens, a black male, received a one-day suspension for excessive tardiness. Ms. Kuntz, a white female, received a written reprimand for allowing a youth to have a deadly weapons. Mr. Johnson, a white female, had her discipline postponed for improper shift exchange, with no record of such charges being reopened. Black employees Gatewood, Graham, Holloway, Birdsall, Ferguson and Smith were given up to a four-day suspension and nothing less than a one-day suspension.

Ms. Kidd, who had been previously disciplined, was given a written reprimand for failure to work overtime and for insubordination. Mr. Prince, a black male, was given a one-day suspension for failure to work overtime. Mr. Childs, a black male, was given a one-day suspension for failure to report for overtime. Mr. Green, a black male, was recommended for termination for refusal to work overtime.

The Plaintiff also offers the following "statistical" evidence. In 1998, approximately forty-two disciplinary hearings were held. Twenty-eight out of the forty-two [*31] were black employees. Out of the fourteen white employees who were sent to a disciplinary hearing, only five were in the Unit Life Department under Mr. Kise. The disciplines for the white employees were: written reprimand, postponed charges and a one-day suspension. Of the twenty-eight blacks sent to disciplinary hearings, twenty were from Mr. Kise's Unit Life and the disciplines included four terminations.

From November 1, 1997 to late 1998, Mr. Kise was the recommending supervisor for twenty-four disci-

plines. Out of the twenty-four recommended disciplines, only five of those employees were white. None of those white employees were recommended for termination, nor were they terminated.

The Defendant contends that anecdotal evidence fails and that the Plaintiff has not presented competent statistical evidence. The Court agrees and finds that the Plaintiff has not demonstrated pretext. As for the anecdotal evidence, the Plaintiff has failed to place it in context. For example, the discipline that the employees received cannot be compared absent evidence of other factors including: the employee's disciplinary history, whether the employee was permanent or probationary, and whether [*32] the employee had been given a warning for similar conduct in the past. The Sixth Circuit has found that "numerous charges of disparate treatment and hostile work environment that are made in general, conclusory terms, but [in which] names times and occasions are missing" did not demonstrate pretext. *Wixson v. Dowagiac Nursing Home, 87 F.3d 164, 171 (6th Cir. 1996).* And, just because other employees were discriminated against, does not mean that the reason for Ms.-Allen-Cuffee's termination was a pretext for unlawful discrimination.

In addition, most, if not all of the Plaintiff's anecdotal evidence is based on inadmissible hearsay which cannot form the basis for a showing of pretext. The bulk of the Plaintiff's anecdotal evidence is based on Ms. Allen-Cuffee's own recollection of events and office gossip. For example, the Plaintiff related many conversations and incidents that she was not privy to, and did not provide either affidavits or deposition testimony from the individuals who either actually heard the comments being made or were the "victims" of the discriminatory discipline. The Court cannot rely upon this evidence in determining whether the Plaintiff [*33] has shown pretext or in deciding upon the present Motion for Summary Judgment.

The "statistics" presented by the Plaintiff are also lacking. The Sixth Circuit has found that the "'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Tinker v. Sears, Roebuck & Co., 127 F.3d 519, 524 (6th Cir. 1997)* (citations omitted). Statistics have failed when they have, for example, offered too small a sample size, when information on the methodology is missing and when the source of the data is absent. *Id.; see also Martinez v. State of Wyoming, 218 F.3d 1133 (10th Cir. 2000)* (concluding that the statistics provided did not raise a genuine issue of material fact because, for one, they did not "eliminate nondiscriminatory explanations for the disparate treatment"); *Raskin v. The Wyatt Co., 125 F.3d 55, 67-68 (2d Cir. 1997)* (finding that a statistical report lacked probative value as it did

not "account for other possible causes," and did not "account for the presence of a comparison groups."); *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 848-49 (1st Cir. 1993) [*34] (reaching the conclusion that the statistics were of "questionable import" for several reasons including that they did not "connect the statistics to the [defendant's] specific decision to dismiss [the plaintiff;]" "did not provide important information regarding the pool of applicants;" and did not "eliminate nondiscriminatory explanations for disparate treatment").

The Court finds that the Plaintiff's statistics in this case present similar problems. The Plaintiff fatally omits the total number of, and the percentage of, African-Americans employed by JDC. And, although Mr. Kise's management record has been scrutinized by the Plaintiff, the Defendant in this case is JDC, not Mr. Kise. The statistics relating to Mr. Kise's disciplinary practices, therefore, are not probative. The Court also finds that the sample size is too small. The Plaintiff only presents statistics for the year of 1998. This single year could represent a skewed sample--the disparity in 1997 and 1999 could have been in the opposite direction. And, as in *LeBlanc* and *Raskin,* the statistics here were not tied to the Defendant's decision to dismiss Ms. Allen-Cuffee and did "eliminate nondiscriminatory explanations" [*35] for the allegedly disparate discipline. Likewise, as in *Tinker* and *Martinez,* the statistics presented by Ms. Allen-Cuffee are not truly statistics, but are a small sample of raw data, absent statistical analysis and therefore without any type of methodology.

Based on these deficiencies, the Court concludes that although the Plaintiff made a *prima facie* case, she has not demonstrated that the Defendant's reason for terminating her was merely a pretext for unlawful discrimination. For these reasons, the Defendant's Motion for Summary Judgment is **GRANTED.**

**B. Public Policy**

The remaining issue in this case is a state law claim for violation of public policy. Ms. Allen-Cuffee claims a violation of Ohio public policy for retaliating against her for seeking counsel. In order "to state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a 'clear public policy.'" *Painter v. Graley,* 70 Ohio St. 3d 377, 639 N.E.2d 51 (Ohio 1994) (syllabus). The "clear public policy" can be based on statutes, the Constitution of Ohio and the

United States, administrative [*36] rules and regulations and the common law. *Painter, 639 N.E.2d at 51* (syllabus); *see also Collins v. Rizkana,* 73 Ohio St. 3d 65, 652 N.E.2d 653, 657-60 (Ohio 1995) (holding that a cause of action may be brought for wrongful termination in violation of public policy based on sexual harassment and discrimination).

According to the Plaintiff, on August 6, 1998, Unit Leader Adler "came after" the Plaintiff and threatened her. Initially, nothing was done and Ms. Allen-Cuffee's written incident report was ignored. Ms. Allen-Cuffee retained counsel on September 14, 1998. The Plaintiff's attorney sent a letter to Mr. Terry Brex, Director of Human Resources, and informed him of the situation. An investigation was conducted, which the Plaintiff argues led to her termination. The Defendant responds that summary judgment must be entered unless the Plaintiff can show that they lacked an overriding business justification for their decision.

District courts may decline to exercise supplemental jurisdiction over state claims if "the district court has dismissed all claims over which it has original jurisdiction." *28 U.S.C. § 1367(c)(3).* As [*37] there is no remaining federal question left, this Court, in the interests of comity and federalism, declines to exercise jurisdiction over a case which is constituted exclusively of state law claims. Ms. Allen-Cuffee's claim of violation of public policy is therefore dismissed without prejudice.

**IV. CONCLUSION**

The Defendants' Motion for Summary Judgment is **GRANTED.**

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**

**UNITED STATES DISTRICT COURT**

**Dated: February 6, 2001**

JUDGMENT IN A CIVIL CASE - Date: **February 7, 2001**

**Decision by Court.** This action was decided by the Court without a trial or hearing.

IT IS ORDERED AND ADJUDGED that the defendants' motion for summary judgment is GRANTED.

Date: **February 7, 2001**



LEXSEE 2008 U.S. DIST. LEXIS 7967

**TERESA BATUYONG, Plaintiff, vs. SECRETARY OF DEPARTMENT OF DEFENSE, ET AL., Defendants.**

**CASE NO. 1:07-CV-944**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO**

*2008 U.S. Dist. LEXIS 7967*

**February 4, 2008, Decided**
**February 4, 2008, Filed**

**COUNSEL:** [*1] For Teresa Batuyong, Plaintiff: Ronald E. Falconi, LEAD ATTORNEY, Parma, OH; Rodger A. Pelagalli, Parma Heights, OH.

For Secretary of Department of Defense, Defense Finance and Accounting Service, Secretary, Robert Gates, Defendants: Lisa Hammond Johnson, Office of the U.S. Attorney - Cleveland, Cleveland, OH.

**JUDGES:** JAMES S. GWIN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JAMES S. GWIN

**OPINION**

OPINION & ORDER

[Resolving Doc. No. 24]

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Before this Court is a motion for summary judgment filed by Defendants Defense Finance and Accounting Service ("DFAS") and Robert Gates, Secretary of the Department of Defense. [Doc. 24.] Plaintiff Teresa Batuyong ("Batuyong") opposes the motion. [Doc. 25.] For the following reasons, the Court **GRANTS** the Defendants' motion for summary judgment.

**I. Background**

Plaintiff Teresa Batuyong was born in the Philippines on May 29, 1948. [Doc. 25-1.] She became a citizen of the United States in 1989. *Id.* In 1995, the Plaintiff began work as a secretary for the Defendant Defense Finance and Accounting Service in their Technical Services Organization ("TSO") in Cleveland, Ohio. *Id.*

In the spring of 2004, the Plaintiff's first- and second-level supervisors [*2] were Jeffrey King ("King") and Jay Griesser ("Griesser"). [Doc. 25 at 1.] Griesser was replaced by Jane Cironi ("Cironi") sometime before June 2004. *Id.* Although Plaintiff Batuyong generally received strong performance evaluations throughout her career, on at least two occasions, Cironi and King publicly criticized the Plaintiff. [Docs. 25-1 at 2; Doc. 25-2 at 2-3.] On May 26, 2004, King chastised the Plaintiff for spending "too much time" working on the Asian/Pacific American Heritage Program, for which she served as a Special Emphasis Program Manager. [Doc. 25-1 at 4; Doc. 25-4 at 3.] This was not the first time that King and the Plaintiff had discussed her EEO activities. [1]

> 1   The Plaintiff states that, in early 2004, King denied her request to attend the National Congressional Training Conference for Federal Asian/Pacific employees and, on another date, denied the Plaintiff's paid attendance at the U.S.D. National Conference on Civil Rights. [Doc. 25-1 at 4.]

Plaintiff Batuyong sustained a non-work related knee injury and sought medical treatment in April 2004. [Doc. 25-1 at 3.] She underwent an MRI and scheduled surgery for June 4, 2004. *Id.* On May 27, 2004, the same day as the Asian/Pacific [*3] American Heritage Program was held at DFAS, the Plaintiff presented King with a request for 240 hours of advanced sick leave ("ASL") with respect to her knee surgery. [Doc. 25-1 at 3.] The request was accompanied by patient's notes. The

Plaintiff knew these notes were not sufficient to obtain approval for her ASL request, so she informed King that she would submit appropriate medical documentation within the time allowed by the Code of Federal Regulations. [2] On June 4, 2004, the Plaintiff underwent surgery. On June 11, 2004, King recommended that the Plaintiff's request for advanced sick leave be approved, despite the fact that she lacked appropriate medical documentation. [Doc. 24-1 at 2; Doc. 25-7 at 6.] In compliance with DFAS policy, King forwarded the Plaintiff's request for ASL to the approving official, Jane Cironi. Cironi had never decided a request for ASL before, so she contacted DFAS's human resources department located in Indianapolis for advice. [Doc. 24-13 at 1-2.] HR specialist Jennifer Willis ("Willis") informed Cironi that the Plaintiff's ASL request could not be granted without "administratively acceptable medical documentation." [Doc. 24-1 at 3.]

    2   The Plaintiff had [*4] accumulated sufficient leave time to cover her absence from work until June 17, 2004, but would need to use advanced sick leave thereafter.

On June 18, 2004, the Plaintiff received a note from her doctor, Dr. James Walker, and submitted this document to King. [Doc. 25-1 at 5.] Dr. Walker's note stated that the Plaintiff had undergone knee surgery on June 4, 2004 and that she could tentatively return to work on July 19, 2004. [Doc. 24-4.] That same day, King faxed a Department of Labor FMLA form to Plaintiff. Id.

On June 24, 2004, Cironi received this note and contacted Willis for help in deciding whether the information was acceptable. [Doc. 24-14 at 3-4.] Willis advised Cironi that the documentation was unacceptable because it did not include information explaining why the Plaintiff's knee surgery would long prevent her from performing her job, which consisted largely of sedentary and clerical activities, for six weeks. Id. Willis also consulted the "Medical Disability Advisor," a reference book that indicated that the recovery time for knee surgery was less than six weeks. Id.

On July 1, 2004, Cironi wrote a memorandum, pursuant to the advice received from Willis, denying the Plaintiff's [*5] request for ASL. [Doc. 24-5.] Cironi asked the Plaintiff to submit additional information regarding the dates and times of her physical therapy and a medical certificate detailing how her post-surgery condition rendered her unable to work even with reasonable accommodation. Id. The memo informed the Plaintiff that she was to be provisionally granted Leave Without Pay ("LWOP") status, but that if DFAS did not receive appropriate medical evidence for her ASL request by July 9, 2004, then the absence might be classified as Absent Without Leave ("AWOL") and the Plaintiff could be subject to other disciplinary actions. Id.

On July 7, 2004, the Plaintiff received and submitted to the Defendants another note from Dr. Walker stating that she could return to work around July 19, 2004. [Doc. 24-6.] The note also included physical restrictions for the Plaintiff including instructions not to drive, bend, or lift. Id. Willis informed Cironi that this note was still unacceptable to verify Plaintiff Batuyong's ASL request because it did not include information regarding her physical therapy or affected job duties, as required by the July 1, 2004 memo. [Doc. 24-14 at 5.] Cironi notified the Plaintiff [*6] of this decision on July 12, 2004, and also told the Plaintiff that her absent hours had been converted into LWOP and AWOL pursuant to the earlier memorandum. Id.

On July 16, 2004, the Plaintiff received a third note from Dr. Walker in which he briefly stated that she was unable to perform her work duties. [Doc. 24-8.] She also received a note from Dr. Faiman, her doctor for purposes of high blood pressure health problems, who stated that the Plaintiff's health was suffering due to stress from the work-related absence conflict. [Doc. 24-9 at 2.] After reviewing these materials, Willis told Cironi that the documentation was still administratively insufficient. [Doc. 24-14 at 5.] In late July 2004, the Plaintiff's union informed Cironi that they intended to file disparate treatment charges against the Defendants. [Doc. 25 at 5.]

Apparently exhausted from the conflict over the leave, and despite the advice she received from Willis that Plaintiff Batuyong's ASL request still lacked proper medical documentation, Cironi decided to approve the Plaintiff's request on August 4, 2004. [Doc. 24-11.] Plaintiff Batuyong was paid for all of the leave she had taken since June 4, 2004; the AWOL and [*7] LWOP classifications were removed from the Plaintiff's time records; and the Plaintiff returned to work on August 9, 2004. [Doc. 24-14 at 5-6; Doc. 24-16 at 22.]

Three days after she returned to work, Cironi and King gave Plaintiff Batuyong her performance evaluation for the May 1, 2003 through April 30, 2004 evaluation period. [Doc. 24-12.] The evaluation, dated June 14, 2004, gave Plaintiff Batuyong a "Fully Successful" rating, the same rating that she had been given by her supervisors in the prior evaluation period. Id.

On March 30, 2007, the Plaintiff filed the present case against the Defendants. [Doc. 1.] The Defendants filed a summary judgment motion on December 19, 2007. [Doc. 24.] On January 3, 2008, the Plaintiff opposed this motion. [Doc. 25.] The Defendants replied in support of their motion on January 10, 2008. [Doc. 28.]

**II. Legal Standard**

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c).* The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element [*8] of the non-moving party's case. *Waters v. City of Morristown, 242 F.3d 353, 358 (6th Cir. 2001).* A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin, 150 F.3d 594, 597 (6th Cir. 1998)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).*

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (quoting *Fed. R. Civ. P. 56(c)).* However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* It is not sufficient for the nonmoving party merely to show that there is some existence of doubt [*9] as to the material facts. *Id. at 586.* Nor can the nonmoving party "rest upon the mere allegations or denials of the adverse party's pleading." *FED. R. CIV. P. 56(e).*

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *National Enters., Inc. v. Smith, 114 F.3d 561, 563 (6th Cir. 1997).* "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987)* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)); see also Celotex, 477 U.S. at 322.* Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 178 (6th Cir. 1996)* (internal quotations omitted).

### III. Discussion

In her complaint, Plaintiff Batuyong raises [*10] four causes of action: (1) a hostile work environment claim, (2) a race discrimination claim, (3) a retaliation claim, and (4) an intentional infliction of emotional distress claim. Counts One through Three are all brought pursuant to Title VII of the Civil Rights Act of 1964, while Count Four arises either under Ohio tort law or the Federal Torts Claims Act ("FTCA"). [Doc. 1.] The Defendants seek summary judgment in their favor on all four claims. [Doc. 24.] The Court will address each claim in turn.

### A. Race Discrimination Claim Under Title VII of the Civil Rights Act of 1964

A plaintiff can establish a prima facie disparate treatment case for race discrimination under Title VII by introducing direct evidence of discrimination or by using the *McDonnell-Douglas* paradigm. *McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See also Kline v. Tennessee Valley Authority, 128 F.3d 337, 348-49 (6th Cir. 1997).* The *McDonnell-Douglas* paradigm requires a plaintiff to show circumstantial evidence that a jury to could use to draw an inference of discrimination. Specifically, the plaintiff bears the burden of establishing that she: (1) is a member of a protected group, (2) was subject to [*11] an adverse employment action, (3) was qualified for the position, and (4) she was treated differently than employees outside the protected class for the same or similar conduct. *Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995)* (citing *Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)).*

Once the plaintiff establishes a prima facie case, a presumption arises that the defendant unlawfully discriminated against the plaintiff. The burden then shifts to the defendant to establish legitimate non-discriminatory reasons for its actions. *Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 254-56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).* If the defendant can articulate legitimate non-discriminatory reasons, then the burden shifts back to the employer to prove the stated reasons are pretext for discrimination. *McDonnell-Douglas, 411 U.S. at 804-5.* The ultimate burden of persuasion rests with the plaintiff. *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).*

In this case, the parties do not dispute that the Plaintiff has satisfied the first three elements of the prima facie race discrimination case. First, Plaintiff Batuyong is a member of a protected class under Title VII because she [*12] is Filipino-American. Second, the Plaintiff was qualified for her job and has received positive job evaluations since she began working for DFAS in 1995.

2008 U.S. Dist. LEXIS 7967, *

Third, the Plaintiff suffered an adverse employment action when she was initially denied advanced sick leave and placed on Leave Without Pay (LWOP) and Absent Without Leave (AWOL) status, resulting in a temporary reduction in pay, benefits, and health insurance. The Defendants claim that Plaintiff Batuyong has failed to prove the fourth element of her prima facie case, however, because she has not shown that any DFAS employees outside of the protected class were treated more favorably with regard to advanced sick leave requests by supervisors King or Cironi. [Doc. 24-1 at 9.] In response, the Plaintiff argues that she was "treated differently than *any* other employee, similarly situated or not, who had requested ASL" and that no other employee "was required to jump the hurdles created specifically for Teresa by King/Cironi." [3] [Doc. 25 at 8-9.]

> 3   The Plaintiff alleges that she alone was required to: "complete a Department of Labor FMLA (Family Medical Leave Act) form; sign a waiver to allow a supervisor and/or a supervisor's chosen [*13] medical representative to speak directly with the employee's treating physician; and to make employee's treating physician review a position description of the employee in order to evaluate it and compare it with the employee's work restrictions." [Doc. 25 at 9.]

A similarly situated employee is one who has the same supervisor, was subject to the same standards of conduct, and engaged in "nearly identical" conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's response. *Mallory v. Noble Corr. Inst., 45 Fed. Appx. 463, 471-72 (6th Cir. 2002); Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994).* The Sixth Circuit has instructed that courts "should not demand exact correlation, but should instead seek relevant similarity." *Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir. 2000)* (holding that employees were similarly situated when charged with the same duties and had the same supervisor). When a plaintiff is accused of violating company policies, such as the claim here that the Plaintiff failed to submit proper documentation for her ASL request, the question is whether the employer has a rational reason for treating [*14] the plaintiff differently. When employees engage in different conduct, they are not similarly situated because the employer would be rational in disciplining them differently. *See, e.g., Palmer v. Potter, 97 Fed. Appx. 522, 524-25 (6th Cir. 2004); Hardy v. Eastman Chem. Co., 50 Fed. Appx. 739, 743 (6th Cir. 2002).*

This Court finds that the Plaintiff has failed to prove that she was treated differently than similarly situated members outside of the protected class. An individual similarly situated to Plaintiff Batuyong would be a DFAS employee who was applied for ASL in the same relevant time period and failed to submit the proper medical documentation, yet whose request was still granted by Cironi or King. The record indicates that no such person exists.

In support of her position, Plaintiff Batuyong relies on the affidavit of Theresa Gill, a computer analyst who has been employed at DFAS since 1985, in which she attests that she made an ASL request on August 14, 2007, her request was initially denied by her direct supervisor King, and then the request was officially granted on August 20, 2007. [Doc. 25-2 at 1-2.] Gill also says that, despite the initial rejection of her ASL request, [*15] she was never placed on AWOL status. *Id.*

This Court concludes, however, that Gill is not an employee similarly situated to the Plaintiff. First, the record does not indicate Gill's race and thus it is unclear whether she is a member of the protected class. Assuming that Gill is not a member of the protected class, however, she does not provide sufficient comparison evidence for this case. While Gill and Batuyong were both supervised by King, the Court notes that King actually recommended approving the Plaintiff's ASL request. [Doc. 24-2 at 2.] King, therefore, is not the DFAS supervisor responsible for the adverse employment action taken in this case. [4] In fact, King actually denied Gill's requests for ASL "several times," which cuts directly against Plaintiff's argument that the handling of her own ASL request was racially motivated. Gill's initial ASL request was written and made in 2007, while Plaintiff's request was oral and made in 2004. Gill's request was denied because of a concern that she would not be able to pay back the leave, while the Plaintiff's request was denied because she allegedly submitted improper documentation. Gill and Batuyong displayed different conduct and [*16] applied for ASL leave in materially different situations; thus, they are not similarly situated employees.

> 4   Cironi, the approving official in this case, had apparently never dealt with an ASL request before Batuyong's application, which renders the existence of similarly situated employees under her supervision more difficult to find. The Plaintiff, however, has not presented any evidence showing that Cironi has granted ASL leave to an employee with improper medical documentation since her interactions with Batuyong either.

Plaintiff Batuyong also alleges that Pat Kinsella, a white male employee at DFAS, was granted ASL leave for knee surgery in 2002. The only evidence supporting this allegation, however, comes from Plaintiff Batuyong herself. Gregory Harmon mentions the incident in his

affidavit, but he lacks personal knowledge of the incident and relies solely on information provided to him by the Plaintiff. [Doc. 25-3 at 2.] Such evidence is inherently unreliable and, even if true, is too ill-defined to establish an adequate comparison for purposes of summary judgment.

Even when viewed in the light most favorable to the Plaintiff, her vague references to Kinsella and assorted other [*17] DFAS employees who received ASL are not sufficient to show that those individuals are similarly situated in all relevant respects because there is no information, for example, as to the length of time between their ASL requests and actual start of leave period, whether they included appropriate medical documentation with their applications for ASL, whether their requests were initially denied or provisionally granted, or as to the identity of their supervisors. *See Frazier v. USF Holland, Inc.*, 250 *Fed. Appx.* 142, 2007 *U.S. App. LEXIS* 23797, 2007 *WL* 2913880, at *4 (6th Cir. 2007) (finding that the plaintiff's "generalized and vague allegations that other non-minority casual employees were treated better than he was is not enough to make out a prima facie showing" for purposes of summary judgment).

Plaintiff Batuyong thus fails to present a prima facie case of race discrimination because she cannot satisfy the fourth element of the *McDonnell-Douglas* test. The Court nevertheless goes on to consider whether, if the Plaintiff had satisfied the prima facie case, she could show that the Defendants' explanation is a pretext for discrimination. Here, the Defendants claim that they had legitimate and nondiscriminatory business reasons for [*18] denying the Plaintiff's ASL request due to insufficient medical documentation under 5 *C.F.R.* § 630.403(a). Specifically, the Defendants say that the Plaintiff failed to provide any medical paperwork prior to June 18, 2004, and submitted insufficient documentation thereafter until her request was approved on August 4, 2004.

The burden then shifts back to Plaintiff Batuyong to demonstrate that the Defendants' proffered explanation for their delay and initial denial of her ASL request was pretext for discrimination. The Supreme Court says that plaintiffs can show pretext by demonstrating the employer's proffered reasons are unworthy of belief, or by showing that a discriminatory motive more likely motivated the employer's action. *Texas Dep't Comm. Affairs*, 450 *U.S.* at 256.

The Plaintiff claims that King and Cironi could have provisionally granted her ASL request pending appropriate medical documentation, but failed to do so out of a personal dislike for her. The Plaintiff points to a few isolated incidents in which King criticized her for being

away from her desk when she was organizing EEO events, refused to pay for her travel to EEO conferences, or was aware of previous grievances she [*19] had filed. These incidents, according to the Plaintiff, establish a racially discriminatory animus that motivated the Defendants' behavior.

This evidence fails to establish that the Defendants's proffered reasons for initially denying the Plaintiffs' ASL request are pretextual. Even if this Court were to assume that the Defendants failed to follow their own internal procedures for evaluating advanced sick leave requests, this fact alone is insufficient to establish pretext for race discrimination. *See White v. Columbus Metropolitan Housing Authority*, 429 *F.3d* 232, 246 (6th Cir. 2005) (noting that "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext"). Further, the Plaintiff may not show pretext merely by pointing out that the Defendants made an unwise business decision. *See Bahl v. Royal Indem. Co.*, 115 *F.3d* 1283, 1291 (7th Cir. 1997) (stating that "the inquiry is not whether the reason for the firing was a correct business judgment but whether the decisionmakers honestly acted on that reason"). Even if this Court assumes that the Defendants required Plaintiff Batuyong to submit more medical documentation for [*20] her ASL request than they typically required of other employees, the Plaintiff must do more than show that this conduct was potentially unfair; she must show that it was illegally motivated by race.

The record shows that Jeff King, the supervisor that Plaintiff Batuyong alleges was critical of her EEO activities, actually recommended that her ASL request be granted. Jane Cironi, King's supervisor who had never handled an ASL request before, reasonably relied on the advice of HR specialist Willis. The record contains no evidence that Cironi acted on the basis of race in any of her employment decisions or possessed any racially motivated animus. In fact, Cironi ultimately recommended granting Plaintiff Batuyong's ASL request even though she was advised not to do so by Willis due to Plaintiff's lack of medical documentation. Further, the record does not contain any evidence that Willis even *knew* the Plaintiff's race because Willis worked in Indianapolis and only corresponded about the Plaintiff's ASL request via telephone and email. [Doc. 24-14 at 3; Doc. 24-13 at 2.] The Plaintiff bears the burden of showing pretext, and she has failed to do so in this case.

The Court therefore grants [*21] summary judgment in favor of the Defendants on the Plaintiff's Title VII disparate treatment race discrimination claim.

**B. Hostile Work Environment Claim**

2008 U.S. Dist. LEXIS 7967, *

The Defendants also allege that they are entitled to summary judgment on the Plaintiff's hostile work environment claim. To establish a hostile work environment claim, a plaintiff must show that (1) she is a member of a protected class, (2) she was subjected to unwanted harassment, (3) the harassment was based on her membership in the protected class, (4) the harassment unreasonably interfered with her work performance, creating a hostile work environment, and (5) the employer is liable. *See Clay v. UPS, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

A hostile work environment claim will lie only where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys.* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). The plaintiff must show both that a reasonable person would find the environment objectively hostile and that the plaintiff personally found the conduct severe or pervasive. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566-68 (6th Cir. 1999). [*22] Offhand comments and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the "terms and conditions of employment." *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir.1999).

The Defendants claim that they are entitled to summary judgment on Plaintiff Batuyong's hostile work environment claim because, even assuming the facts as alleged by the Plaintiff to be true, the harassment experienced by the Plaintiff is not sufficiently severe or pervasive. This Court agrees. Plaintiff Batuyong complains of various incidents in which she was criticized by her supervisors, resulting in feelings of depression and humiliation. While potentially upsetting, this conduct occurred in isolated incidents, thus failing to be pervasive, and was not so objectively severe that it actually changed the terms and condition of her employment. *Harris*, 510 U.S. at 21.

Further, the Plaintiff complains that the way in which her ASL requests were handled created a hostile work environment, resulting in physical and emotional injury during the period in which she was recovering from work. [Doc. 25-1 at 6-7 (noting that by the time she returned to work, "the damage was done")]. During [*23] that time, however, the Plaintiff was away from work and thus her work performance was not affected. Further, she received a high performance evaluation only days after returning. [Doc. 24-12.] Plaintiff Batuyong makes some claim as to residual harassment that she experienced upon return to the workplace in August 2004, but the allegations are vague and, even if believed, do not amount to objectively severe or pervasive conduct in violation of Title VII. [5]

5 Plaintiff, for example, says that "[a]fter my return to work, I received harassing treatment from Mr. King and Ms. Cironi. Mr. King also tried to get me to sign an FMLA form for 'future illnesses.'" [Doc. 1.] Requiring an employee to fill out a medical form, even if not of the type usually required of employees, is not "sufficiently severe or pervasive" conduct to constitute a hostile work environment.

*C. Retaliation Claim*

Title VII prohibits retaliatory employment actions against employees who oppose or report workplace practices that violate Title VII. *See 42 U.S.C. § 2000e-3(a)*. A plaintiff must show that (1) she engaged in a protected activity, (2) the employer knew about the protected activity, (3) the employer took an adverse [*24] employment action, and (4) there was a causal connection between the protected activity and the adverse action. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004). The Supreme Court has noted that Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2414-15, 165 L. Ed. 2d 345 (2006) (internal citations omitted). This anti-retaliation provision does not protect against "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415.

Plaintiff Batuyong seems to allege that the adverse employment action taken with regard to her ASL requests was in retaliation for previous labor grievances that she had filed. The Plaintiff fails, however, to establish that those grievances were protected activity under Title VII. The Plaintiff's only other labor grievance relating to race discrimination, [*25] or any other protected activity under Title VII, was dismissed as untimely when it was filed back in 1999 and involved two former supervisors. [Doc. 25-14 at 1-2.] The record does not indicate that any of the supervisors involved in the instant case were even aware of that specific EEO grievance, let alone retaliated on that basis in 2004.

Even assuming that the Plaintiff's prior labor grievances were protected activity of which the Defendants knew, the Plaintiff has failed to show sufficient injury. Plaintiff Batuyong certainly was not dissuaded from filing the instant race discrimination lawsuit, and the evidence does not show that a reasonable person would have considered the Defendants' delay in approving her ASL request more egregious than any other bureaucratic

annoyance that occurs all the time in the workplace. Indeed, it appears that the Defendants actually acquiesced to the Plaintiff's ASL demands, rather than retaliating, upon learning that she intended to file a race discrimination suit and provided her with a "Fully Satisfactory" evaluation just three days after she returned to work. [Doc. 24-12.]

### D. Intentional Infliction of Emotional Distress Claim

The Defendants also say **[*26]** that they are entitled to summary judgment on the Plaintiff's intentional infliction of emotional distress claim because the claim is preempted by the Federal Employees Compensation Act ("FECA"), found at *5 U.S.C. § 8101, et seq.* The Plaintiff argues that claims alleging employment discrimination and harassment are not covered by FECA.

The Federal Employees Compensation Act ("FECA") addresses work-related injuries of federal employees. *5 U.S.C. § 8102(a)*. FECA covers claims "for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty." *Id.* Generally, an injury occurs "in the performance of duty" if it arises out of and in the course of employment. *Tarver v. United States, 25 F.3d 900, 902 (10th Cir. 1994)* (internal citation omitted). The FECA is the exclusive remedy against the United States for an injury within its coverage. *5 U.S.C. § 8116(c). See also Lockheed Aircraft Corp. v. United States, 460 U.S. 190, 103 S. Ct. 1033, 74 L. Ed. 2d 911 (1983).*

Intentional infliction of emotional distress claims raised by federal employees, regardless of whether they are brought under state tort law or the FTCA, fall within the purview of FECA and therefore are preempted **[*27]** by the statute. *See Saltsman v. United States, 104 F.3d 787, 790 (6th Cir. 1997); Lockett v. Potter, 2007 U.S. Dist. LEXIS 9867, 2007 WL 496361, at *1-2 (N.D. Ohio 2007).* The fact that the Plaintiff's emotional distress claim arises in an employment discrimination context does not render the claim beyond FECA's coverage. *See Figueroa v. U.S. Postal Service, 422 F. Supp. 2d 866, 878 (N.D. Ohio 2006)* (noting that the "Sixth Circuit has made clear that FECA provides the *only* remedy for an employee disabled by work-related stress. . . Accordingly, mental distress FTCA claims predicated on a supervisor's workplace conduct are preempted by FECA") (internal citations omitted).

The Court therefore lacks subject matter jurisdiction to consider the Plaintiff's intentional infliction of emotional distress claim because FECA provides the exclusive remedy for her claim.

### IV. Conclusion

For the reasons stated above, the Court **GRANTS** the Defendants' motion for summary judgment as to all claims.

IT IS SO ORDERED.

Dated: February 4, 2008

*s/ James S. Gwin*

JAMES S. GWIN

UNITED STATES DISTRICT JUDGE



LEXSEE 2007 U.S. DIST. LEXIS 17837

**Dorothy Diaz, Plaintiff, vs. Westin Hotel, Defendant.**

**Case No. 1:06-cv-018**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*2007 U.S. Dist. LEXIS 17837*

**March 9, 2007, Decided**
**March 9, 2007, Filed**

**COUNSEL:** **[*1]** For Dorothy Diaz, Plaintiff: Randolph Harry Freking, LEAD ATTORNEY, Heather M Schisler, Freking & Betz, Cincinnati, OH.

For Westin Hotel, Defendant: Mark Joseph Stepaniak, LEAD ATTORNEY, Paula J Dehan, Taft Stettinius & Hollister, Cincinnati, OH.

**JUDGES:** Sandra S. Beckwith, Chief Judge.

**OPINION BY:** Sandra S. Beckwith

**OPINION**

*ORDER*

This matter is before the Court on Defendants' motion for summary judgment. Doc. no. 18. For the reasons that follow, Defendants' motion for summary judgment is **GRANTED.**

I. *Introduction*

Plaintiff, a female citizen of the State of Ohio, brings this action against Defendant Westin Hotel, an Ohio corporation doing business in the State of Ohio. [1] Plaintiff brings claims for gender discrimination under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-2, et seq.*, and *Ohio Revised Code Ch. 4112* (Counts I and II); violation of the Family and Medical Leave Act (FMLA), *29 U.S.C. § 2601, et seq.* (Count III); pregnancy discrimination in violation of the Pregnancy Discrimination Act of 1978, *42 U.S.C. § 2000e(k)* (Count IV); and breach of Ohio public policy (Count V). Plaintiff **[*2]** claims that Defendant discriminated against her by treating her differently than male and non-pregnant employees and terminating her employment.

Plaintiff also claims that Defendant terminated her in retaliation for exercising her rights under the FMLA. Plaintiff claims that Defendant's actions constitute a breach of public policy. The Court has subject matter jurisdiction over Plaintiff's claims brought under federal law pursuant to *28 U.S.C. § 1331.* Plaintiff invokes the Court's supplemental jurisdiction over her state law claims pursuant to *28 U.S.C. § 1367.*

> 1 Defendant states that its proper name is Starwood Hotels and Resorts Worldwide, Inc., dba Westin Hotel.

II. *Background*

Plaintiff began her employment with Defendant in 1993 as a part-time employee. She eventually became a full-time Banquet Server. Plaintiff was a member of the Hotel Employees and Restaurant Employees Union, Local 12 ("Union"), and was subject to the collective bargaining agreement **[*3]** between Defendant and the Union. As a Banquet Server, Plaintiff was responsible for serving guests at breakfast, lunch and dinner events and receptions. Her duties included setting up buffets, serving food to guests at tables, passing food by tray to standing guests, and serving beverages. From 1999 until her termination, Plaintiff reported to Banquet Manager Kim Roberts. Roberts in turn reported to John Wedig, Food and Beverage Director.

The collective bargaining agreement sets forth Defendant's right to make and enforce work rules. Defendant has established standards of conduct, performance and attendance, which are enforced through a progressive discipline system. Pursuant to this system, when an employee commits a rule infraction or is deficient in his or her work performance, the employee's supervisor or

manager documents the details surrounding the incident on a disciplinary form. The form is then submitted to the Human Resources Department, which determines whether discipline is appropriate and, if so, indicates the level of discipline warranted by the infraction. An employee generally receives coaching prior to being issued formal discipline. Formal discipline includes two [*4] verbal warnings and three written warnings. The second written warning is considered the "last and final warning" before discharge and is marked accordingly. Upon receipt of a third written warning, an employee is suspended pending investigation and possible discharge. Discipline is cumulative for all performance deficiencies and infractions.

In 2000, Roberts rated Plaintiff's performance as "unsatisfactory." Over the following three years, Plaintiff received an overall rating of "satisfactory."

In the autumn of 2003, Plaintiff informed Defendant that she was pregnant and due at the end of the year. In late October, Defendant honored Plaintiff's physician's recommendation that she not work more than two consecutive shifts in a day. In late November, after Plaintiff's physician determined she could not continue working, Plaintiff obtained family and medical leave from December 1, 2003, until eight weeks post-partum. Plaintiff exhausted her twelve weeks of FMLA leave. On February 26, 2004, she requested five additional weeks of leave to have cataract surgery on both eyes. Defendant approved leave through the requested date of April 5, 2004.

Plaintiff returned to her full-time server [*5] position without restrictions on April 5, 2004. She received her annual review for the 2003-04 review year. Roberts rated Plaintiff as meeting expectations in all categories.

On May 6, 2004, Defendant received a complaint from a customer about a "coffee break" group running out of coffee, which occurred while Plaintiff and a co-worker, Miguel Alcalde, were providing coffee service. [2] Defendant wrote off the customer's charges in response to the complaint. Plaintiff received a verbal warning while Alcalde received a documented coaching. Plaintiff contested the discipline and the Union filed a grievance on her behalf. Plaintiff admitted that she had been left in charge of training Alcalde, who she described as a "new employee who hadn't worked banquets before;" she had assigned him to handle a function on his own while she took a larger function; and she had used her judgment and instructed him to use two small coffee urns and one hot water urn for the coffee service when he had wanted to use a three-gallon coffee urn. Plaintiff's depo., pp. 70-72, 148, 151-52; depo. exh. 26. Defendant denied the grievance, and the Union did not pursue arbitration. Hakes Decl., P 9.

2   The disciplinary form lists the date of the incident on the first page as April 6, 2004, which is an apparent mistake.

[*6]   One week later, Plaintiff received a second verbal warning for taking an unauthorized break during a guest function. Forty-five minutes into the event, Plaintiff was discovered three floors away from the event on the receiving dock with her friend and co-worker who was also assigned to the event, Francesco Ferrari. Defendant alleges that she was taking a break when she should have been passing hors d'oeuvres at the function. Hakes Decl., P 10; Plaintiff's depo., exh. 29. Plaintiff admittedly had not asked Roberts' permission to take a break. Plaintiff's depo, p. 164.

Four months later, in September 2004, Plaintiff received her first written warning, which was for taking food from the hotel without permission in violation of company policy. Plaintiff received the warning from Wedig, who prepared a discipline form and submitted it to Human Resources. Plaintiff's depo., pp. 85, 89; depo. exh. 32.

On October 7, 2004, Plaintiff received her "last and final" warning for not completing a work assignment before clocking out. Plaintiff received the warning from Assistant Banquet Manager Marcel Riddle for leaving a banquet cart full of dirty banquet service items unloaded for employees on [*7] the following shift to clean up and put away. Plaintiff's depo., exh. 33; Hakes Decl., P 11.

Two days later, on October 9, 2004, Plaintiff was scheduled to work a double shift beginning at 5:00 a.m. Plaintiff called Roberts at 7:30 a.m. as the breakfast shift was concluding and told her that her alarm clock had not gone off. Roberts instructed Plaintiff to report for the lunch shift. Roberts subsequently documented Plaintiff's missed shift and submitted it to the Human Resources Department for review. Hakes concluded that suspension pending investigation and discharge was appropriate. On October 13, 2004, Roberts met with Plaintiff and informed her that she was suspended pending investigation and possible discharge. After reviewing Plaintiff's progressive discipline, Hakes concluded that discharge was warranted. She informed Plaintiff on October 15, 2004, that her employment was terminated. Plaintiff contested her discharge, the Union filed a grievance on her behalf, the Westin denied the grievance at each stage of the grievance process, and the Union did not pursue arbitration. Hakes Decl., PP 13, 14; Plaintiff's depo., exh. 7.

At some point during her employment, Plaintiff had [*8] complained to Hakes that the rules were being applied inconsistently and about Roberts' supervision. Hakes depo., pp. 71-72; Roberts depo., pp. 45-47. Ac-

cording to Plaintiff and Ferrari, Roberts had told them that they were troublemakers because they spoke up about the unfair treatment. Plaintiff's depo., pp. 57-58; Ferrari Aff., P 10, doc. 22, attachment. Roberts found fault with Plaintiff because she "wanted to know what everybody else was doing" and she considered her a "busybody." Roberts depo., pp. 74-77. On June 14, 2004, Plaintiff wrote a letter to General Manager Bodington and told him the rules were not being enforced equally in the Banquet Department, there was favoritism, and there were unclear rules. Plaintiff's depo., pp. 167-68; *see* Hakes depo, p. 74. Bodington never received the letter. Bodington depo., pp. 18-19.

Plaintiff was the only female employee who became pregnant while reporting to Roberts. According to Ferrari, Roberts spoke negatively about Plaintiff to other employees after Plaintiff returned from maternity leave. Ferrari Aff., P 12. Roberts did not notice a difference in Plaintiff after her return from maternity leave and did not notice that having [*9] a newborn affected Plaintiff's work. Roberts depo., pp. 70, 78.

### III. *Summary judgment standard*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)*. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (emphasis in original). The court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are [*10] any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson, 477 U.S. at 250*. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id*

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, *Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979)*, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

### IV. *Opinion*

#### A. *Gender discrimination claim*

##### 1. *Applicable law*

Under the law of the Sixth Circuit, the same evidentiary framework applies to discrimination claims brought under Title VII and Ohio law. *Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992))*. A plaintiff claiming discrimination may establish [*11] a prima facie case by introducing either direct or circumstantial evidence. *Rowan v. Lockheed Martin Energy Systems, Inc., 360 F.3d 544, 547-48 (6th Cir. 2004)*. Direct evidence is evidence that "proves the existence of a fact without requiring any inferences." *Id. at 548* (citations omitted).

Plaintiff may establish a prima facie case of discrimination through circumstantial evidence by showing that: 1) she is a member of the protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position lost; and 4) her position was filled by someone outside of the protected class. *Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1081 (6th Cir. 1994)* (citing *McDonnell Douglas Corp v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*; *Gagne v. Northwestern Nat. Ins. Co., 881 F.2d 309, 313 (6th Cir. 1989))*.

Plaintiff may also establish the fourth prong of a prima facie case by showing that she was treated less favorably than a similarly-situated employee outside of her protected class. *Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002)*. In such a case, plaintiff must [*12] prove that all relevant aspects of her employment situation were similar to those of the employee with whom she seeks to compare herself. *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)*. Although the Sixth Circuit has held that "to be deemed 'similarly-situated,' the individuals with whom [the plaintiff] seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," *Mitchell, 964 F.2d at 583*, the Sixth Circuit has subsequently noted that "*Mitchell* itself only relied on those factors relevant to the factual context in which the *Mitchell* case arose-an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment." *McMillan v. Castro, 405 F.3d 405, 413 (6th Cir. 2005)* (citing *Er-*

cegovich, 154 F.3d at 352). The McMillan court clarified that the specific factors addressed in Mitchell "generally are all relevant [*13] in cases alleging differential disciplinary action," but courts should not assume that the specific factors discussed in Mitchell are relevant in cases arising under different circumstances. Id. Rather, in such cases, courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Id. at 413-14; see also Seay v. TVA, 339 F.3d 454, 479-80 (6th Cir. 2003) (noting that Mitchell's "same supervisor" language has never been read as imposing an inflexible requirement and this particular factor was not relevant to the Seay plaintiff's claim where the record indicated that the decision to suspend the plaintiff "was not made in a vacuum," several discussions and a meeting took place involving all of the people involved in the decision-making process, including the plaintiff's immediate supervisor and the department manager, and all of those individuals were well-aware of the discipline meted out to past violators).

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case. If the plaintiff [*14] establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the employer carries its burden, the plaintiff must prove by a preponderance of the legal evidence that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. Id. at 804.

The United States Court of Appeals for the Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the adverse employment decision; or 3) the reasons were insufficient to warrant the decision made. Manzer, 29 F.3d at 1084; McDonnell Douglas, 411 U.S. at 802. The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, that is, the reason is factually false. Id. It consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, so that the proffered reason [*15] is pretextual. Manzer, 29 F.3d at 1084. An inference of pretext is not warranted where the employer can demonstrate an honest belief in its proffered reason, i.e., where the employer can establish that it "reasonabl[y] reli[ed] on particularized facts that were before it at the time the decision was made." Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)). The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially iden-

tical to that which purportedly motivated the plaintiff's discharge. Manzer, 29 F.3d at 1084.

Although the court should refrain from probing an employer's business judgment, business judgment is not an absolute defense to unlawful discrimination. Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003). "[T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Id. (citing Smith, 155 F.3d at 807). [*16] The plaintiff may establish pretext by showing that the "asserted business judgment was so ridden with error that defendant could not honestly have relied upon it." Id. (quoting In re Lewis, 845 F.2d 624, 633 (6th Cir. 1988)).

2. Analysis

Plaintiff alleges that she and male employees who were similarly-situated in all relevant respects engaged in acts of "comparable seriousness," but the male employees were treated better than Plaintiff. Plaintiff alleges that she and the male employees were similarly-situated in all relevant respects because (1) they worked in the Banquet Department, (2) they were subject to disciplinary actions by the same managers, and (3) they were subject to the same disciplinary policies and system of progressive discipline. Plaintiff specifically alleges that she was treated less favorably than similarly-situated male employees in the following instances:

. While Alcalde was responsible for failing to make sure there was coffee for an event and both he and Plaintiff were "essentially at the same step in terms of progressive discipline," Plaintiff received discipline progressive toward termination while Alcalde received only [*17] coaching and Alcalde was not disciplined "for failing to help Plaintiff or for being late."

. Plaintiff, a non-smoker, was disciplined for taking a bathroom break for which she did not need advance permission because she cut through the smoking dock whereas Larry Gray and Melvin Carpenter, both smokers, regularly took smoke breaks on the dock but received no discipline.

. Plaintiff was disciplined for taking home leftover food while male "and other employees" did so without consequence.

. Plaintiff was disciplined for failing to break down a cart she did not use while a male employee (and a female employee) "failed to attend to [their] cart" and were not disciplined.

. When Plaintiff overslept, she was given a written warning subjecting her to suspension and, ultimately, termination. Male employees who were late were either

not disciplined or were not subjected to similar discipline; when they failed to show up for work, managers would call them at home; and discipline was not cumulative and did not result in termination.

After carefully reviewing the evidence Plaintiff has offered in support of her allegations of dissimilar treatment, the Court finds that Plaintiff [*18] has not come forward with sufficient evidence to establish a prima facie case of gender discrimination. First, Plaintiff complains that the discipline for the incident involving the coffee break was unfair because it was Alcalde's failure that caused the customer complaint, Alcalde was supposed to "share responsibility for all breaks," Alcalde was not disciplined for failing to help Plaintiff or for being late to work that morning, and instead of starting with a clean disciplinary slate like Alcalde, which should have occurred since Plaintiff's last discipline had been more than 12 months earlier on April 28, 2003, Plaintiff was given a second verbal warning. Plaintiff has not shown, however, that she was similarly-situated to Alcalde. To the contrary, Plaintiff was an experienced banquet server, while Plaintiff herself describes Alcalde as a newer and inexperienced employee who had been placed under her direction that day and who she had been "essentially left to train" while attending to her own job. Plaintiff states that she gave Alcalde a smaller room to work (despite Roberts having told the two employees not to split the events as they had (Roberts depo., p. 60)) and exercised [*19] her judgment in directing him to use smaller coffee urns. Doc. 22, pp. 4-5, exh. A; Plaintiff's depo., pp. 70-75. Given these circumstances, Defendant had a rational basis for holding Plaintiff to a higher degree of accountability and meting out more severe discipline to her than it did to Alcalde. Its decision is not subject to second-guessing by the Court and the jury.

Similarly, Plaintiff has not shown that she was treated differently than similarly-situated employees when she was disciplined for taking a break on the receiving dock. Plaintiff contends in her opposing memorandum that the discipline for the unauthorized break was unfair because she had to use the restroom on the service level downstairs since servers were not allowed to use the restrooms near the event, she did not need Roberts' permission to take a bathroom break, she cut through the dock area afterwards where the smokers take breaks just as Roberts was walking through, she does not smoke but was written up for taking a break on the smoking dock, and Larry Gray and Melvin Carpenter, both males and both smokers, often went down for smoke breaks without permission but were never written up. See Plaintiff's depo. [*20] , pp. 78, 83, 159-164; Hakes depo., p. 127; Carnevale Aff., P 6. Plaintiff's suggestion that she was simply cutting through the receiving dock on her way back from the bathroom when Roberts

encountered her is inconsistent, however, with the statements she made in the affidavit she prepared on March 8, 2005. See Plaintiff's depo., exh. 7. In her affidavit, Plaintiff concedes that she was taking a break when Roberts came across her, stating that she had stopped in the smoking area to see Ferrari, she had not even been there three minutes when Roberts saw her, and when Roberts asked what they were doing there, Plaintiff replied, "we were taking a break." Id. Thus, Roberts was clearly justified in concluding that Plaintiff was taking a break when Roberts encountered her. Although Plaintiff alleges that other individuals were not disciplined when they took unauthorized breaks, she makes only a conclusory allegation to this effect and provides no specific details to support a finding that the individuals took breaks under similar circumstances, i.e., early after an event had begun when they were expected to be working the event, or to show that Roberts was aware that these individuals [*21] were taking unauthorized breaks. Absent any specific evidence to support her conclusory allegation, there is no basis for finding that Plaintiff was treated less favorably than similarly-situated males for taking an unauthorized break.

Plaintiff claims that she was treated less favorably than a male employee with regard to the dirty cart incident because just days later, on October 9, she notified Riddle that Alcalde had left a cart out, but Alcalde was not disciplined. [3] Plaintiff's depo., p. 206; Doc. 22, exh. F; Carnevale Aff., P 7. Plaintiff, however, provides no specifics regarding the October 9 incident, such as whether the cart was full of dirty items and whether someone else was required to break down the cart. Her allegations are much too vague to permit a finding that the infractions were similar and warranted comparable discipline.

    3    Plaintiff omits to mention in her opposing memorandum that she reported to Riddle that both Alcalde and a female employee had left the cart out. Plaintiff instead seeks to compare her treatment only to that afforded Alcalde.

[*22] Plaintiff likewise cannot establish that she was treated less favorably than a similarly-situated male for taking food home without authorization. Plaintiff contends that employees took leftover food home all of the time and had done so with Defendant's knowledge. She states that the day after she committed this infraction, a male employee, Ruben Pilot, took food home without permission, Plaintiff reported the infraction to Supervisor Marciel Riddle, Riddle told Plaintiff he had talked to Pilot and told him not to do it again, but Pilot did not receive any discipline. Plaintiff's depo., pp. 90-92, 206; Hakes depo., p. 67. Plaintiff has not shown, however, that she was similarly-situated to Pilot because

Plaintiff was disciplined by Wedig for this incident and she is not aware that Wedig saw others take food home, whereas Plaintiff reported the incident involving Pilot to a different supervisor, Riddle. Accordingly, the discipline Plaintiff received for this infraction cannot satisfy the fourth element of her prima facie case.

Finally, Plaintiff seeks to compare herself to male employees who she claims were disciplined less harshly for violating Defendant's Time and Attendance Policy [*23] than Plaintiff was. Plaintiff claims that employee Melvin Carpenter violated the call-off policy and did not report to work three times in one week but received coaching and verbal warnings instead of written warnings as required by the policy (see doc. 22, exh. H, documenting that Carpenter called off less than two hours before the start of his shift the first day and called off two additional days in the same week); Calvin Booker failed to show up for work on two occasions and both times a supervisor called him at home and he received no discipline for being approximately two and four hours late, respectively (Carnevale Aff., P 8; Plaintiff's depo., pp. 138, 211-12); Larry Gray purportedly received no discipline, coaching or verbal warnings for the multiple times he was late, and Roberts would call him at home if he did not report to work (Plaintiff's depo., pp. 132, 138); and when Alcalde came in late, he received coaching instead of a second written warning (Doc. 22, exh. J, documenting Alcalde's arrival to work 12 minutes late). Plaintiff claims that Roberts admits in her declaration that she approved different arrival times for other employees by stating, "I did not consult [*24] Diaz when I approved a subordinate's arrival at a time later than that marked on the schedule." See Roberts Decl., P 4, Doc. 18, attachment.

Plaintiff has not come forward with sufficient, competent evidence to create a genuine issue of material fact as to whether she was treated less favorably than similarly-situated males who committed comparable infractions of the Time and Attendance Policy. First, Plaintiff has not explained how the coaching and two verbal warnings Carpenter received violated the policy. In any event, there is no indication that Carpenter failed to report his absence prior to the start of his shift on any day, so that his infractions are not of comparable seriousness to the infraction committed by Plaintiff, who did not report her absence until the conclusion of her breakfast shift. Second, Alcalde's being twelve minutes late for his shift as documented at doc. 22, exh. J, is not as egregious as Plaintiff's missing an entire shift. In addition, the only evidence Plaintiff offers of other infractions by Alcalde and of infractions by Booker and Gray are her handwritten notes and handwritten notes she has identified only as "Wilson notes" (doc. 22, exh. I) [4], [*25] which list dates these individuals were allegedly late and some brief de-

scriptions of the circumstances. The notes, however, are hearsay evidence under Fed. R. Ev. 802, which may not be considered on summary judgment. See Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 927 (6th Cir. 1999) (citing Wiley v. United States, 20 F.3d 222, 226 (6th Cir.1994)).

    4   Plaintiff does not identify the author of the "Wilson notes."

Even if the Court were to consider Plaintiff's notes, they do not reflect that Plaintiff has any personal knowledge as to why the male employees were late on the listed dates, whether they discussed the circumstances with a supervisor, and whether their tardiness was excused for any reason. In addition, Plaintiff testified at her deposition that she has no personal knowledge as to whether Gray or Alcalde were disciplined for coming to work late. See Plaintiff's depo., pp. 138-140, 198, 202. Carnevale's affidavit which Plaintiff has submitted [*26] indicates that Gray was in fact disciplined since Carnevale states that the records produced by Defendant as disciplinary records for Gray show that the discipline applied to him was not always progressive and he received either coaching or verbal warnings when he was disciplined for being late. See Carnevale Aff., P 9. Finally, Plaintiff's cryptic notes do not show that Gray committed infractions under the policy that warranted more serious discipline than he actually received on her notes reflect only that Gray was 20 minutes late on June 5, 2004. See doc. 22, exh. F. This evidence does not suffice to show that Plaintiff was treated less favorably than male employees for infractions of comparable seriousness.

Looking at the individual incidents giving rise to disciplinary action against Plaintiff cumulatively and viewing her disciplinary record as a whole, a reasonable trier of fact could not conclude that she was treated more harshly than a similarly-situated male employee with a comparable disciplinary record. Plaintiff has not produced competent evidence that a male employee committed a series of infractions warranting progressive discipline culminating in termination. [*27] Accordingly, Plaintiff has failed to carry her burden to produce evidence to establish a prima facie case of discrimination.

Even if Plaintiff had come forward with sufficient evidence to establish a prima facie case of gender discrimination, she has not produced sufficient evidence to create a genuine issue of material fact regarding pretext. Plaintiff claims that the reasons offered for Defendant's decisions are pretextual because Defendant has offered inconsistent explanations for its decisions. Plaintiff contends that Defendant was aware of disparate treatment of female employees and of harassment of Plaintiff upon her return from leave but did nothing about it and did not

keep a record of such complaints. *See* Hakes depo., pp. 70-72, 74; Roberts depo., pp. 44-48; Diaz depo., pp. 167-168; Bodington depo., p 19. Plaintiff claims that Hake's review of discipline was therefore limited to the written record of managers who had discretion to decide whether or not to enforce the rules, such as Roberts' claimed discretion to approve late arrival for some employees but not others. Plaintiff concludes that because a jury could find Defendant's reasons for terminating Plaintiff's employment [*28] to be false or insufficient to justify termination, or that the alleged investigation pending termination was so ridden with error that Defendant could not honestly have relied upon it, she has established a genuine issue of material fact regarding pretext.

First, for the reasons stated above, Plaintiff has not produced competent evidence to show that the reasons offered for her termination were insufficient to motivate her termination. Second, Plaintiff has not shown that any of the other reasons offered by Defendant for disciplining her are factually false. With regard to the dirty cart incident, Plaintiff claims that she reported the cart in question was not hers because she did not have bottled juices on her cart that day, and although Roberts later claimed that Plaintiff was the only person on coffee break during that time, there were multiple coffee breaks that day. *See* doc. 22, exh. 7; Plaintiff depo., p. 174. Plaintiff states in her affidavit, however, that she could not honestly say if she had broken her cart down and that everyone else had been using her cart, so she could not tell whether or not the dirty cart was actually hers. Doc. 22, exh. 7. Roberts testified at [*29] her deposition that she determined that the cart was Plaintiff's because she had been the only coffee break person scheduled on the preceding night. Roberts depo., pp. 65-66. Accordingly, the record demonstrates that Defendant had a reasonable basis for concluding the cart in question was Plaintiff's, and if it in fact was not, Plaintiff has not shown Defendant's conclusion to the contrary to be anything other than an honest mistake. Plaintiff has not demonstrated that any of the other reasons offered by Defendant for disciplining her are factually false.

In addition, Plaintiff has not shown how Defendant's reasons for the decision to terminate her are inconsistent. Nor has Plaintiff shown that Defendant was aware of Plaintiff's complaints of disparate treatment of female employees and harassment of Plaintiff but failed to address the inequities. There is evidence that Plaintiff complained about unfair treatment and about particular incidents involving Larry Gray and others in the department, but there is no evidence that she framed her complaints in terms of gender discrimination and disparate treatment of male and female employees. *See* Hakes depo., pp. 71-72; Plaintiff's depo. [*30] , pp. 167-169; Roberts depo., pp. 44-49. Thus, Defendant's alleged failure to respond to Plaintiff's complaints of unfair treatment is not competent evidence of pretext for gender discrimination.

Finally, Plaintiff has not produced evidence to show that Defendant's investigation pending her termination was so ridden with error that Defendant could not honestly have relied upon it. Plaintiff argues that Hakes' review of the discipline Plaintiff had received was limited to the written record presented by managers who had discretion whether or not to enforce the rules. Plaintiff alleges by way of example that Roberts now justifies her failure to discipline the males appropriately by claiming unfettered discretion to approve late arrival for some employees but not others. *See* doc. 22, p.22 (citing Roberts Decl., P 4). Plaintiff also asserts that Roberts "admits that she approved different arrival times for other employees," thereby enabling her to excuse the late male employees "as she pleased" while instead choosing to discipline Plaintiff for similar conduct. Plaintiff's allegations are a misrepresentation of the record. Roberts indicated in her declaration only that she could "approve[] [*31] a subordinate's arrival at a time later than that marked on the schedule" and that she did not consult with Diaz when she did so. This statement by Roberts and the fact that she had discretion to approve later arrival times for employees simply is not probative of pretext. Plaintiff has produced no other evidence of errors occurring in the course of Defendant's investigation into her disciplinary record. Having failed to produce competent evidence of pretext, Defendant is entitled to summary judgment on Plaintiff's gender discrimination claim.

B. *Pregnancy Discrimination Act claim*

A claim of discrimination based on pregnancy under Title VII is analyzed in the same manner as any other claim of discrimination based on sex. *Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 658 (6th Cir. 2000)*. This evidentiary framework requires that the plaintiff first establish a prima facie case of unlawful discrimination or introduce direct evidence of discrimination. *Manzer, 29 F.3d at 1081*.

A prima facie case of pregnancy discrimination is established when the plaintiff demonstrates "1) she was pregnant, 2) she was qualified for her job, 3) she was subjected [*32] to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision." *Cline, 206 F.3d at 658*.

In support of her pregnancy discrimination claim, Plaintiff alleges that she was the only employee who became pregnant while reporting to Roberts; after Plaintiff returned from maternity leave, Roberts spoke negatively about Plaintiff to other employees; although Roberts admittedly did not notice a difference in Plaintiff upon her return to work, Plaintiff was subjected to unfair

progressive discipline leading to the termination of her employment following her return to work; and Plaintiff had been disciplined only approximately once per year prior to her pregnancy.

Defendant is entitled to summary judgment on Plaintiff's pregnancy discrimination claim. Plaintiff does not allege that Defendant subjected her to unfair discipline or otherwise discriminated against her during her pregnancy, which ended when she gave birth in the latter part of December of 2003. Rather, Plaintiff alleges that Defendant first subjected her to unfair discipline several months following her pregnancy, after she had returned from post-partum FMLA [*33] leave and additional time off for eye surgery, and then terminated her approximately nine months after she gave birth. Plaintiff has not cited any authority for the proposition that a pregnancy discrimination claim may lie when the adverse employment action occurs many months after the pregnancy has ended and the plaintiff has returned from maternity leave. Nor is the Court aware of any such authority. Even if Plaintiff could establish a pregnancy discrimination claim when the adverse employment action occurs remote in time from the pregnancy, she cannot prevail on her claim in this case because she has not produced any evidence to demonstrate a causal connection between her pregnancy, any discipline she received, and her termination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's pregnancy discrimination claim.

### C. *FMLA retaliation claim*

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *29 U.S.C. § 2612(a)(1)(D)*. An employer [*34] is prohibited from retaliating or discriminating against an employee who has exercised the right to take FMLA authorized leave. *Id.; 29 C.F.R. § 825.220(c)*.

In FMLA cases that rely upon indirect evidence, the Sixth Circuit has applied that three-step *McDonnell Douglas* paradigm. *See Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 315 (6th Cir. 2001)*. A plaintiff may establish a prima facie case of retaliatory discharge under the FMLA, *29 U.S.C. § 2615(a)(2)*, by showing that (1) she availed herself of a protected right under the FMLA, (2) she was subjected to an adverse employment action, and (3) there is a causal connection between her exercise of a right under the FMLA and the adverse employment decision. *Id. at 314* (citing *Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir.1990)*). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

adverse employment action. *Id. at 315*. If the defendant articulates such a reason, then the plaintiff has the burden of showing that the articulated reason is a pretext for discrimination. *Id.* [*35] In order to establish a causal link, the plaintiff must "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Zanders v. Nat'l R.R. Passenger Corp., 898 F.2d 1127, 1135 (6th Cir.1990)* (quoting *Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982)*). The Sixth Circuit has stated in the context of a claim of retaliation for filing an EEOC charge that although temporal proximity alone is insufficient to establish a causal connection, a causal connection may be established by demonstrating both that the adverse action was taken shortly after the plaintiff filed the complaint and that the plaintiff was treated differently from other employees. *Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 321 (6th Cir. 2007)* (citing *Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999)*).

In support of her FMLA claim, Plaintiff alleges that prior to taking leave, she "reported her concerns that she would be subjected to retaliation if she told her supervisor about her pregnancy;" her FMLA leave fell at the busiest time of the year and Defendant [*36] had to fill her position with part-time workers; Plaintiff's manager spoke negatively about her following her return; Plaintiff had been subjected to discipline approximately once a year prior to her leave but was subjected to unfair progressive discipline leading to her termination soon after her return; notes written by the Human Resources Director Hakes recount Plaintiff's entire history of discipline with "one glaring non-discipline entry - Plaintiff's FMLA leave"; and other non-pregnant workers were not subjected to unfair discipline and were not terminated.

Upon a careful review of the evidence of record, the Court finds that Plaintiff has failed to come forward with sufficient evidence to go forward on her FMLA claim. For the reasons set forth above, Plaintiff has not shown that the discipline to which she was subjected was unwarranted or that other similarly-situated employees committed infractions of comparable seriousness and were not terminated. The other evidence cited by Plaintiff is not probative of a retaliatory motive, particularly when considered in view of the fact that the separate disciplinary actions leading up to Plaintiff's termination were handed out to Plaintiff [*37] by at least three different supervisors, only one of whom is alleged to have harbored any animus toward Plaintiff. Moreover, contrary to Plaintiff's representation, there is no notation of FMLA leave on the chronology of discipline compiled by Hakes. Instead, there is an entry of "LOA," which presumably is an abbreviation for "Leave of Absence," next to the dates "Nov. 30, 2003 - Apr. 5, 2004," which

would encompass the period of Plaintiff's FMLA leave and her additional time off for eye surgery. Doc. 22, exh. K. The inclusion of this notation in the chronological listing of Plaintiff's disciplinary actions does not support an inference that Defendant terminated Plaintiff in October 2004 in retaliation for taking FMLA leave ending in February 2004.

### D. *Breach of Ohio public policy*

Defendant contends that Plaintiff cannot bring a claim for breach of Ohio public policy based on her discharge because she was not an at-will employee but was instead a union member whose employment was covered by a collective bargaining agreement. Plaintiff has not responded to Defendant's argument in her opposing memorandum. Accordingly, Defendant is entitled to summary judgment on the public policy **[*38]** claim.

### E. *Title VII retaliation*

Defendant argues that Plaintiff's Title VII retaliation claim fails as a matter of law. Plaintiff did not present a claim for retaliation in violation of Title VII in the complaint. Accordingly, the Court need not address Defendant's argument.

### V. *Conclusion*

The record does not support a reasonable inference that Defendant discriminated against Plaintiff because of her sex or pregnancy or that Defendant retaliated against Plaintiff for exercising her rights under the FMLA. Accordingly, Defendant's motion for summary judgment is well-taken and is **GRANTED** as to all claims. Plaintiff's claims are **DISMISSED WITH PREJUDICE. THIS CASE IS CLOSED.**

**IT IS SO ORDERED.**

Date: *March 9, 2007*

s/ Sandra S. Beckwith

Chief Judge

United States District Court



LEXSEE 1994 US APP LEXIS 6557

**VIRGINIA KAUFFMAN, Plaintiff-Appellant, v. KENT STATE UNIVERSITY, et al., Defendants-Appellees.**

**NO. 93-3302**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*1994 U.S. App. LEXIS 6557*

**April 1, 1994, Filed**

**NOTICE:**      [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**   Reported in Table Case Format at: *21 F.3d 428, 1994 U.S. App. LEXIS 15962.*

**PRIOR HISTORY:**      ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO. District No. 91-00938. Bell, District Judge.

**DISPOSITION:**   AFFIRMED

**JUDGES:** BEFORE: MARTIN, RYAN, and SUHR-HEINRICH, Circuit Judges.

**OPINION BY:** PER CURIAM

**OPINION**

   **PER CURIAM.** Plaintiff Virginia Kauffman appeals an award of summary judgment to defendant Kent State University in this employment discrimination action. Plaintiff alleges two actions taken by defendant violated the Age Discrimination in Employment Act, *29 U.S.C. §§ 621-634* ("ADEA"): the University's failure to promote her to the position of office manager; and its decision to transfer her from the Central Office to another department. For the reasons stated below, we AF-FIRM the district court's grant of summary judgment in favor of defendant. [1]

   1   The court also granted summary judgment to defendants Chester Williams and Ann Metham, holding that they were not employers under the ADEA. Plaintiff does not appeal this holding.

[*2] I.

   Defendant Kent State University hired Kauffman in 1979, to fill the position of Clerk I in the Department of Physical Plant Services. At the time she was hired, Kauffman was fifty years old. In 1982, Kauffman, at age fifty-four, was promoted to Clerk II. Kauffman's supervisor and the officer manager, Virginia Eustice, retired in 1989, and it is the defendant's conduct during the replacement process that is at issue regarding the first claim.

   Plaintiff claims that she was qualified for the position and that she would have applied for the position had it been posted and advertised. The defendant maintains that Chester Williams, Department Head of Physical Plant Services, hired Ann Metham, plaintiff's coworker in the Physical Plant Central Office, to fill the position of office manager after he requested and received approval from the Office of Affirmative Action for a waiver. [2] At the time Metham was promoted, she was under the age of 40. After Metham's promotion, Kauffman continued in her position of Clerk II at the Central Office.

   2   Raymond Borom, Director of the Office of Affirmative Action at the University, granted Williams a waiver so he did not have to post the position.

[*3]  The facts relevant to plaintiff's second claim occurred in May of 1990, when Kauffman was assigned to a different location, the Heating Plant. Plaintiff contends that she was transferred because of her age but admits that she retained her job classification as Clerk II and her same rate of pay. Kauffman nevertheless contends that the lateral transfer was to a less desirable position.

Plaintiff appeals the award of summary judgment on two grounds: (1) that the district court erred in finding that the plaintiff failed to rebut the defendant's legitimate nondiscriminatory reason for failing to promote the plaintiff to the position of office manager; and (2) that the district court erred, as a matter of law, in holding plaintiff's lateral transfer was not an adverse employment action.

## II.

We uphold the grant of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).* [*4]

To establish a prima facie case under the ADEA, Kauffman must establish: (1) that she belonged to the protected class, in this case that she was between the ages of 40 and 65; (2) that her employer subjected her to an adverse employment decision, in this case the failure to promote her and the decision to transfer her; (3) that her qualifications did not disqualify her from the position she was seeking; and (4) that she was replaced by a person not a member of the protected class. *Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 313 (6th Cir. 1989).*

The plaintiff bears the burden of proving a prima facie case of employment discrimination. Once the plaintiff meets his burden, the defendant may "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)* (quoting *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* The plaintiff then has the opportunity to rebut [*5] any legitimate reason offered by the defendant. *Id., at 804.*

### A. Failure to Promote

The district court determined that Kauffman established a prima facie case of age discrimination with regard to the defendant's failure to promote her to the office manager position. Plaintiff contends, however, that

the district court erred in ruling that she failed to rebut defendant's legitimate nondiscriminatory reason for promoting Metham, and not her, to the position of office manager.

Although Williams testified in deposition that Metham was promoted because she alone had the qualifications for the position, the district court found and the record supports that Kauffman met the minimum qualifications for the position of office manager. Plaintiff had filled in as office manager on two occasions. Nevertheless, defendant's contention that Metham's qualifications were superior to Kauffman's is also supported by the record. Borom stated that at the time he granted William's request for a waiver, he reviewed the qualifications of the existing employees in the Central Office at the Department of Physical Plant Services. Borom testified [*6] that Kauffman had not passed the typist test but Metham had; that Kauffman was a clerk whereas Metham was a clerical specialist; [3] and that he concluded that the person with the higher level of skill had to be the office manager. Borom decided that Metham's skills were better suited to the position of office manager. Accordingly, he granted Williams the requested waiver.

> 3  Williams testified at deposition that Metham was classified as a Typist II at the time she was promoted. The actual classification is not material because classification indicates a higher skill level than a clerk classification.

The district court found that this evidence constituted a legitimate business reason for not promoting Kauffman. [4] We agree. Therefore, we address the evidence offered by plaintiff to rebut defendant's legitimate reason.

> 4  Additionally, the district court noted that at the time Kauffman was hired, Williams stated a preference for older employees, and that Kauffman received a promotion at the age of 54.

[*7]  In rebuttal, plaintiff did not protest the assessment of Metham's qualifications but attempted to establish the existence of a discriminatory reason for defendant's failure to promote her through the affidavits of two coworkers. Janice Burke, a coworker hired after Metham was promoted, stated that Williams and Metham told her that "the older lady in the Department was resistive to change" and that Burke should not associate with her. Because Burke became employed after Metham had already become office manager, the district court found that the statement lacked probative value as to William's motivation at the time of the promotion. We agree and additionally note that the age remark goes to identification, not discrimination. This isolated and innocuous mention of age does not support a finding of pretext. *See*

*Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986), cert. denied, 480 U.S. 919, 94 L. Ed. 2d 690, 107 S. Ct. 1375 (1987).

The second coworker, Darla Spellman, stated that Williams and Metham told her not to train Kauffman on the computer. From this remark, Spellman surmised [*8] that Williams and Metham believed that plaintiff was too old to learn to use a computer. Spellman also stated that Metham was openly rude to plaintiff. Plaintiff's argument that the statements attributed to Williams and Metham regarding computer training create an inference of age discrimination requires the court to go beyond the parameters of inference-drawing into the realm of speculation and imagination. This comment does not support the conclusion drawn by Spellman that Williams believed Kauffman was too old to learn. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 584 (6th Cir. 1992) (affidavits containing conclusory allegations and subjective beliefs are insufficient evidence to establish a claim of discrimination as a matter of law). Nor will we equate rudeness with age discrimination. Accordingly, we find that Kauffman presented insufficient evidence to rebut defendant's legitimate reason for promoting Metham rather than Kauffman and affirm the district court's grant of summary judgment on this claim.

## B. Lateral Transfer

As to her second claim, plaintiff contends that the district court erred in holding she did not meet her burden of establishing [*9] a prima facie case of age discrimination because she suffered no adverse employment decision. She argues that her intradepartmental transfer to the Heating Plant constituted an adverse employment action because her responsibilities were decreased, and because her promotional opportunities were curtailed in that there is no office manager position at the Heating Plant. According to plaintiff, the absence of an officer manager position is disadvantageous in that she can no longer earn extra income by filling in as office manager, as was possible in the Central Office. On two occasions during Kauffman's approximately ten-year tenure in the Central Office, she filled in for the office manager.

The district court evaluated the transfer under a constructive discharge standard. Under this standard, a lateral transfer is actionable as an adverse employment action provided the conditions are objectively intolerable to a reasonable person. *Darnell v. Campbell County Fiscal Court*, 731 F. Supp. 1309 (ED. Ky. 1990), aff'd, 924 F.2d 1057 (6th Cir. 1991) (table). To apply the standard, the court examines the transfer Position to determine [*10] whether it is so intolerable to a reasonable person that it amounted to a constructive discharge. *Id.* Among those factors relevant to the assessment are: decrease in salary, grade level or benefits, and change in job duties or responsibilities. *Id.*

In *Darnell*, the plaintiff refused the lateral transfer, a transfer offered by defendant because the plaintiff's position was being terminated. Consequently, she lost her job. Here, Kauffman did not refuse the transfer or lose her job. Although her claim is more aptly characterized as a constructive "demotion" rather than a constructive "discharge," [5] we find the same factors considered by the *Darnell* court are applicable in the assessment of this claim. The factual distinction between the plaintiff's refusal to accept the transfer in *Darnell*, and Kauffman's acceptance of the transfer is irrelevant to the assessment of liability.

> 5    Although Kauffman now claims she was forced to transfer, she wrote a letter which reads, "I wish to be transferred to the Heating Plant as you previously requested and feel the sooner the better." There is much made that the transfer was a punishment, and that Kauffman and her supervisor did not get along, however, this evidence is not indicative of age discrimination so much as a personality conflict. There is no evidence that the transfer was motivated by a discriminatory animus.

[*11]    Here, the district court correctly determined that the conditions of transfer did not constitute an adverse employment action. Not only were these conditions objectively tolerable, they were tolerable to Kauffman.

Kauffman offers the deposition of Janice L. Burke as support for her contention that the transfer to the Heating Plant resulted in conditions that were intolerable to a reasonable person. Burke states that there are fewer promotional opportunities but offers no basis for her opinion. Nor is there any evidence in the record to show that Kauffman could not be promoted in the Heating Plant or that a worker from the Heating Plant could not be promoted to office manager in the Central Office. Even if Burke is correct, the district court correctly held that the reduction in promotional opportunities is insufficient as a matter of law to overcome the cumulative weight of the other factors. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989).

Kauffman's second complaint is that there is not enough work to keep her busy; however changes in responsibilities or job site that do not materially disadvantage an older employee [*12] are not actionable. *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883 (7th Cir. 1989). Kauffman is not disadvantaged by a lightened work load.

Finally, plaintiff admitted in her deposition that she enjoyed working at the Heating Plant. Accordingly, we

1994 U.S. App. LEXIS 6557, *

agree with the district court that Kauffman's lateral transfer does not constitute an adverse employment decision.

In sum, we find the district court's award of summary judgment to the defendant was proper and is **AFFIRMED.**



LEXSEE 2007 US DIST LEXIS 20828

**TABITHA MUELLER, Plaintiff v. J.P. MORGAN CHASE & CO., et al., Defendants**

**Case No.: 1:05 CV 560**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 20828*

**March 23, 2007, Decided**
**March 23, 2007, Filed**

**COUNSEL:** [*1] For Tabitha Mueller, Plaintiff: Melanie V. Miguel-Courtad, LEAD ATTORNEY, Cleveland, OH.

For J.P. Morgan Chase & Company, Bank One Corporation, Defendants: Joseph N. Gross, LEAD ATTORNEY, William J. Shin, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH.

**JUDGES:** SOLOMON OLIVER, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SOLOMON OLIVER, JR.

**OPINION**

ORDER

On February 11, 2005, Plaintiff Tabitha Mueller ("Plaintiff" or "Mueller") filed the within case, alleging that Defendants J.P. Morgan Chase & Co., Bank One Corporation, and Marcelo Torres ¹ (collectively, "Defendants") interfered with Plaintiff's rights under the Family and Medical Leave Act ("FMLA" or the "Act") and retaliated against, and ultimately terminated, her for exercising her FMLA rights. Now pending before the court is Defendants' Motion for Summary Judgment. (ECF No. 67.) For the reasons that follow, Defendants' Motion is hereby granted in part and denied in part.

> 1    Defendants state that, due to a corporate merger, the correct Defendants are JPMorgan Chase Bank, N.A., the successor-interest to Bank One Corporation, and Marcelo Torres. (*See* Defs.' Answer to Pl.'s First Am. Compl. 1; ECF No. 30;

Defs.' Mot. for Summ. J. 1, 2, ECF No. 67; *see also* Defs.' Ex. A, ECF No. 67-2.)

**[*2] I. FACTS AND PROCEDURAL HISTORY**

In or about February, 2002, Plaintiff began working as a relationship banker at Bank One, NA's Gordon Square Branch in Cleveland, Ohio. (Dep. of Tabitha Mueller 19:15-16, ECF No. 69) ("Mueller Dep."); Not. of Placement, Defs.' Ex. B., ECF No. 70-2.) Her original duties included opening savings accounts, checking accounts, certificates of deposits, and providing loans to customers, and she later also began working with annuities, estate planning, mutual funds, and investments. (Mueller Dep. at 15:24-25, 17:5-8, 22-25.) In addition to her salary, Plaintiff was eligible for monthly bonuses, which were calculated by how many accounts she opened and the dollar amount that she brought into the bank. (*Id.* at 16:4-15.) Plaintiff was hired by Clare Brilla ("Brilla"), the District Manager at the time. (*Id.* at 15:13-16.) In February or March, 2003, Marcelo Torres ("Torres") was hired as the Branch Manager of the Gordon Square location. (First Dep. of Marcelo Torres 17:7-9, 22:18, ECF No. 79) ("Torres First Dep.") Torres was Plaintiff's direct supervisor throughout the relevant time period. (First Aff. of Marcelo Torres P 4, Defs.' Ex. C, ECF No. [*3] 67-4) ("Torres First Aff.") Plaintiff received annual performance reviews; Brilla conducted Plaintiff's 2002 review, and Torres conducted her 2003 review. (Mueller Dep. at 22:2-4.)

**A. Plaintiff's First FMLA Leave**

One of Plaintiff's sons has juvenile diabetes, and Plaintiff often missed work to take him to the doctor or to care for him. (*Id.* at 38:24-17; 44:9-12, 55:20-56:5.)

Torres repeatedly complained to Diane Houghton ("Houghton"), the Assistant Branch Manager, about Plaintiff missing work for family emergencies. (Dep. of Diane Houghton 33:11-36:14, ECF No. 81) ("Houghton Dep.") Torres also complained to Brilla, the District Manager at the time. (Dep. of Clare Brilla 26:12-20, ECF No. 84-15, at 3) ("Brilla Dep.") Plaintiff contends that in or around October, 2003, Torres began complaining to her that she was missing time from work to care for her son. (Aff. of Tabitha Mueller P 6, ECF No. 84-2) ("Mueller Aff.") Plaintiff's son's doctor advised Plaintiff to apply for FMLA leave. (Mueller Dep. at 56:1-8.) Plaintiff maintains that she asked Torres at least twice to provide her with the necessary paperwork to file for intermittent leave under the FMLA. (Mueller Aff. P 7-8; [*4] Mueller Dep. at 56:25-57:16.) Human Resources ("H.R.") told Plaintiff that only her manager, Torres, could make the initial request for FMLA leave. (Mueller Aff. P 8; Mueller Dep. at 120:12-20.) In addition, Brilla stated that it was the manager's responsibility to make the initial call to H.R. (Brilla Dep. at 25:24-26:1.) Plaintiff complained to her co-workers "every day" that Torres was not timely processing her FMLA request. [2] (Houghton Dep. at 42:13-14; see id. at 41:21-43:14.) Houghton asked Torres about it twice, and he replied that he had called H.R. (Id. at 41:24-42:1; 42:7-9, 18-21.) While Plaintiff was waiting for Torres to initiate her FMLA leave, she was allowed to take time off, although Torres advised her that "it would not be good for [her] to take the time off but to do what [she] had to do." (Mueller Dep. at 59:4-7.)

2  As background, Plaintiff also states that "[t]his was not the first time that Torres failed to provide [her] with paperwork to process a claim." (Mueller Aff. P 11.) Torres had previously delayed processing her unrelated workers' compensation claim for an injury that occurred on December 2, 2003. (Id.) Her co-worker, Amy Pendleton, testified that Plaintiff repeatedly complained to her that Torres was not submitting the necessary paperwork. (Pendleton Dep. at 46:7-48:12.)

[*5]  Plaintiff maintains that, in or around December, 2003, [3] Torres provided her with the necessary paperwork for her to apply for FMLA leave. (Mueller Aff. PP 9-10; Pl.'s First Am. Compl. P 10; Pl.'s Compl. P 10.) H.R. sent the paperwork to Torres, who then gave it to Plaintiff. (Mueller Dep. at 58:4-6.) Plaintiff and her doctor then completed the paperwork and turned it in directly to H.R. (Id. at 58:24-25, 58:7-12.) A computer printout entitled, "FMLA Program For Mueller, Tabitha R." indicates: "DATE REQUEST RECEIVED 01/02/2004." (FMLA Program For Mueller, Tabitha R. 1, Pl.'s Ex. 2, ECF No. 84-3.) The printout also states that H.R. received the "medical leave application and docu-

mentation" on January 13, 2004, and approved the request on January 15, 2004. (Id. at 2.) In addition, Plaintiff submitted a letter from Bank One to Plaintiff, dated January 15, 2004, which stated that her intermittent leave was approved for the period from January 2, 2004, through July 2, 2004. (Pl.'s Ex. 10, ECF No. 84-11.)

3  At Plaintiff's deposition on October 10, 2005, she stated that she "finally got the paperwork in October." (Mueller Dep. at 57:22-58:6.) Plaintiff did not make any corrections to her deposition transcript during the thirty-day correction period provided for by Fed. R. Civ. P. 30(e). On June 27, 2006, over two months after Defendants filed for summary judgment, Plaintiff filed an affidavit stating that her deposition transcript contained a "typographical error," and that she actually received the FMLA paperwork from Torres "at the end of December 2003 or early 2004." (Mueller Aff. PP 9-10.) Defendants argue that this affidavit should be disregarded. Defendants cite Lanier v. Bryant, 332 F.3d 999, 1004 (6th Cir. 2003), for the rule that after a summary judgment motion has been filed, a party may not create a factual issue by filing an affidavit that contradicts her earlier deposition testimony. The court finds that Plaintiff's affidavit does not squarely contradict her deposition testimony. Elsewhere in her deposition, Plaintiff states that October, 2003, is when she "applied" for FMLA leave (Mueller Dep. at 55:20-23) and when she "started trying to get the forms." (Id. at 120:6-8.) In addition, in both her original and amended Complaint, Plaintiff alleges that "[f]inally, in or around December 2003 Defendant Torres provided Plaintiff with the FMLA application and information." (Pl.'s First Am. Compl. P 10, ECF No. 28; Pl.'s Compl. P 10, ECF No. 1.) Consequently, although the court notes that Plaintiff should have discovered and corrected the transcript error earlier, the inconsistency appears to be an honest mistake, not an intentional factual contradiction. See Mich. Pork Producers v. Campaign for Family Farms, 229 F. Supp. 2d 772, 779 (W.D. Mich. 2002), vacated on other grounds ("While it is true that it is improper for a witness to contradict deposition testimony by an affidavit or declaration for the purpose of avoiding summary judgment, this rule does not apply to a witness who is simply clarifying or expanding upon previous testimony.") (internal citation omitted). Therefore, the court finds that while Plaintiff is not allowed to change her deposition testimony pursuant to Rule 30(e), her affidavit should not be stricken.

[*6] Plaintiff alleges that even after her FMLA leave was approved, Torres repeatedly insisted that she provide him with a doctor's excuse for every absence so that he could put it in her personnel file. (Mueller Aff. P 12; Mueller Dep. at 65:18-67:13; Dep. of Amelia Pendleton 24:7-25; 49:1-3, ECF No. 82) ("Pendleton Dep.") Torres kept his own list and file of Plaintiff's absences, which he had Houghton sign, yet he did not keep a list or file for any other employee. (Houghton Dep. 55:13-56:17.) Plaintiff told Torres that her doctor had informed her that doctor's notes were not required for FMLA absences, and Torres replied that company policy was to obtain a note when an employee missed a certain number of days. (Mueller Dep. at 70:15-71:19.) Whenever Torres asked, Plaintiff would provide him with a note from her doctor. (Mueller Dep. at 67:14-68:5.) In late January or early February, 2004, Plaintiff spoke to H.R., who instructed Plaintiff to tell Torres that he did not need medical certification for FMLA-approved absences. (Mueller Dep. at 68:8-21; 120:1-5; 121:23-122:1; 122:10-11.)

According to Plaintiff, in either January or February, 2004, Torres asked her and her co-worker Amelia, [*7] known as Amy, Pendleton ("Pendleton") to notarize a document or documents outside the presence of the signatory. (Id. at 69:10-13; 115:21-119:1.) Plaintiff states that Torres became upset when they refused to do so. (Mueller Aff. P 13; Mueller Dep. at 69:5-69:13; 115:21-119:1). Pendleton corroborates this account. (Pendleton Dep. at 49:20-54:3.) Torres contends that he merely asked Plaintiff whether a certain document required notarization. (Torres First Aff. P 5.) In her deposition, Plaintiff testified that notarizing a document improperly was both illegal and against company policy, and that two employees had recently been fired for doing so. (Mueller Dep. at 70:12-14; 117:17-19; see Brilla Dep. at 48:3-14.)

Sometime in February, 2004, Plaintiff reported Torres' conduct regarding the doctor's notes and the notary incident to Brilla. (Mueller Aff. PP 14-15; Mueller Dep. at 69:5-18.) Later that month, Plaintiff met with Brilla, Torres, and Houghton to discuss these issues. (Mueller Dep. at 68:22-69:13, 70:4.) According to Plaintiff, Brilla told Torres at the meeting that anything he obtained or requested from Plaintiff, or any files he kept regarding Plaintiff, had to be sent [*8] to H.R., who would then ask Plaintiff directly for documentation if they wanted it. (Id. at 69:7-69:11, 70:1-4.) Plaintiff maintains that Brilla told Torres that nothing could be notarized unless the signatory was present. (Id. at 69:25-70:1.) After the meeting, Plaintiff says that Torres no longer asked her to bring doctor's notes for her absences, and that no disciplinary action was taken against Torres. (Id. at 70:5-7; Mueller Aff. P 16.) Brilla testified that she did not discipline Torres about the notary incident because she believed his explanation. (Brilla Dep. at 45:19-48:20.)

Torres admitted that he was not trained in FMLA policies (Torres First Dep., 29:3-6, 32:4-20, ECF No. 79; Second Dep. of Marcelo Torres 136:6-10, ECF No. 80) ("Torres Second Dep.") and stated that Mueller was the only one of his employees who took FMLA leave (Torres Second Dep. at 197:3-197:16).

In March, 2004, Sean Barrett ("Barrett") replaced Brilla as District Manager. (Aff. of Sean Barrett P 4, ECF No. 67-5) ("Barrett Aff.")

**B. Plaintiff's Performance Review**

Torres testified that in March, 2004, he asked Jane Black ("Black"), [4] who was the temporary Senior H.R. Business Rep. [*9] (Dep. of Jane Black 11:25, 17:1-10, ECF No. 78) ("Black Dep."), to look over and approve Plaintiff's 2003 performance review because he wanted to discuss his concerns about giving her a negative rating. (Torres Second Dep. at 140:8-16.) Torres testified that Black agreed with the review (id.), although Black testified that she had no recollection of being involved with Plaintiff's review (Black Dep. at 20:20-22:14). At the end of March, 2004, Torres and Houghton presented and discussed the 2003 performance review with Plaintiff. (Mueller Dep. at 22:25-23:9.) Plaintiff received a rating of "needs improvement" in six out of twenty-two categories and a rating of "meets expectations" in fourteen out of twenty-two categories. [5] (Retail Banking Performance Review, Pl.'s Ex. 4, ECF No. 84-5.) The review gave Plaintiff an overall rating of "needs improvement," which meant that she was not eligible to receive a pay raise. (Id. at 2; see Mueller Aff. P 17; Mueller Dep. at 22:20-29:4.) According to Plaintiff, prior to this review, Torres had never advised Plaintiff of any problems regarding her job performance. (Mueller Aff. P 17.) At his deposition, Torres explained that, although [*10] Plaintiff had met her work performance goals (called Product Value Codes or "PVCs"), he had other issues with Plaintiff that resulted in her poor rating:

> [S]he had a lot of issues that were not PVC related that caused a lot a [sic] trouble in the office that really affected the way the branch could be run . . . . Her overall attitude; her attendance when it was not pertaining to FMLA or her son, either being out for problems with her husband, problems with her mother, problems with her sister; she was unreliable.

(Torres Second Dep. at 139:13-16; 140:10-12, 21-24.)

4 Black's deposition transcript reveals that she did not recall much about Mueller's employment

or her FMLA leave in general. (Black Dep. at 18:13-21:14; 23:9-26:20; 27:6-28:20; 28:10-14; 29:24-30:4; 30:21-32:7; 33:20-22; 35:16-36:7; 36:19-37:1; 37:21-38:3; 40:22-25.)

5 One category was rated "not applicable." (See Torres First Dep. at 65:17-66:5.)

To contest her unfavorable evaluation, Plaintiff sent a memorandum [*11] to Black, dated April 1, 2004, detailing Plaintiff's concerns about the review. (Pl.'s Internal Mem., Pl.'s Ex. 3, ECF No. 84-4.) In the memorandum, Plaintiff stated that she agreed with some of the unfavorable ratings and disagreed with others. She also stated:

> My overall review worked out to be a needs improvement and I do not feel this is fair or accurate.
>
> . . .
>
> I know that [Torres] was not happy that I called HR about my FEMLA [sic] because he kept putting it off . . . . And I also feel that . . . our conversation with the D[istrict] M[anager] . . . has also affected his attitude towards me because he had wanted myself or my assistant to notarize documents after the fact so my [various supervisors] and myself sat down and discussed any problems I had and problems he had . . . but during this conversation the things he is marking me for now were not brought up and if I was doing so poorly from last year['s] review time to this year['s] review time should I not have had some sort of indication as to what [areas] he felt I needed to work on to prevent a poor review.

(Id.) (all caps omitted.) Plaintiff maintains that Black responded to [*12] her by saying that there was nothing Black could do and that Torres' supervisors were upholding the review. (Mueller Aff. P 19.) However, Black had no independent recollection of receiving this memorandum or making this statement. (Black Dep. at 22:19-24:8.) Plaintiff filed a grievance with H.R. regarding the review, but she did not follow up on it because she went on a medical leave of absence 6 soon after. (Mueller Dep. at 29:5-30:12.)

6 In her deposition, Plaintiff testified that, during the relevant time period, she took other absences in addition to the FMLA leaves involved in this lawsuit. (See Mueller Dep. at 38:7-41:10.)

## C. Plaintiff's Fee Reversal

On February 25, 2002, when Plaintiff was first hired, she signed the bank's Account and System Access Acknowledgment for New Employees, which includes the following rule:

> The following actions may result in disciplinary action up to and including termination of your employment:
>
> . . .
>
> 2. Making any adjustments or changes to the financial [*13] information on your own account, or that of a friend, relative, acquaintance, or coworker. Examples of adjustments or changes include, but are not limited to, processing deposits, processing withdrawals, processing credits or debits, and modifying or waiving fees.

(Defs.' Redacted Ex. F, ECF No. 70-3) (bold omitted.) Similarly, Plaintiff signed the bank's Retail Employee Standards on March 11, 2003. (Defs.' Ex. E, ECF No. 67-6.) One rule states:

> An employee may not process any transaction or perform maintenance (such as address, name or ownership changes) on his/her personal account, or the account of a close personal friend or relative. Violations by employees such as, but not limited to, the following may result in corrective action up to and including termination:
>
> . . .
>
> Processing fee reversals or waivers for themselves or family members' accounts

(Id. at 3) (bold omitted.) During the relevant time period, the bank's policy allowed employees to perform automatic fee reversals when a holder of a premier client account was charged an overdraft fee. (Houghton Dep. at 73:2-74:17; Mueller Aff. P 26.) A premier client account is defined as "someone that [*14] has a relationship with Bank One of $ 35,000 in checking, savings, CDs, investments, loans, credit cards." (Houghton Dep. at 72:21-23; see Mueller Dep. at 76:13-15.) Plaintiff states that she had "had supervisor authority" to do fee reversals for premier clients herself without obtaining manager approval. (Mueller Dep. at 77:5-10.)

In March, 2004, Dominic Rodriguez ("Rodriguez"), a premier account holder, contacted Plaintiff and asked her to reverse an overdraft fee of $ 112. (Mueller Aff. P 20; Mueller Dep. at 75:18-76:22.) At the time, Plaintiff's sister, Faith, also known as Nikki, King ("King"), was the caregiver for Rodriguez's child; they began dating sometime after the fee reversal. (Mueller Aff. P 21; Mueller Dep. at 75:5-17; 77:18-23.) Rodriguez and King held a joint account at the bank as well as each holding separate accounts. (Mueller Aff. P 22.) Plaintiff avers that the bank had previously permitted Plaintiff to open the joint checking account for Rodriguez and King without repercussion. [7] (Mueller Aff. P 27.) Pendleton states that she is "pretty sure" that Plaintiff opened the joint account. (Pendleton Dep. at 58:23-24.) Pendleton further stated that she did not [*15] known whether Torres was aware of what Plaintiff had done, and that Plaintiff was never disciplined for this transaction even though it was against bank policy. (Id. at 58:20-61:14.) Although Defendants do not state whether or not Plaintiff opened the joint account with the bank's knowledge or permission, they do submit the Consumer Signature Card dated November 25, 2002, which indicates that Plaintiff opened the joint account. (Consumer Signature Card, Defs.' Ex. B, ECF No. 86-3.) Torres testified that this card was in the bank's possession during the time he supervised Plaintiff and that it was kept in the normal course of business. (Second Aff. of Marcelo Torres PP 5-6, Defs.' Ex. C, ECF No. 86-4) ("Torres Second Aff.") Pendleton stated that Plaintiff was listed as the personal banker for Rodriguez and King. (Pendleton Dep. at 38:19.)

7 Plaintiff states in her deposition that Pendleton opened the joint account in Plaintiff's presence because Plaintiff was not allowed to open it. (Mueller Dep. at 125:12-127:4.)

[*16] Plaintiff says that when she accessed Rodriguez's account to perform the fee reversal, her computer screen did not indicate that this was the joint account on which her sister was also listed, and that Plaintiff was not aware that her sister was listed on this account. (Mueller Aff. PP 23-24; Mueller Dep. at 75:22-24.) Plaintiff also states that no other managers were in the bank at the time. (Mueller Aff. P 25; see Houghton Dep. at 87:15-17.) Plaintiff reversed the $ 112 overdraft fee on the joint Rodriguez-King account. (Mueller Aff. PP 25-26; see Banking Center P&L, Defs.' Ex. G, ECF No. 67-8.)

During this time period, Barrett told Torres to review the appropriateness of fee reversals as a way of making the branch more profitable. (Barrett Aff. P 5.) Torres asked Houghton to review the March, 2004, "P & L Report," which listed all the fee reversals. (Torres First Aff. P 6.) Houghton testified that she brought Plaintiff's fee reversal to Torres' attention because it was one of the

larger amounts. (Houghton Aff. PP 5-6; Houghton Dep. at 77:9-78:13; 79:7-17; 81:22-86:18.) Houghton said that she was not aware of which employee had processed the transaction when she first brought [*17] it to Torres' attention, and that "after clicking through several computer screens," Torres and Houghton discovered that Plaintiff had processed the transaction. (Houghton Aff. P 6.) Houghton said that she knew King was Plaintiff's sister. (Id.) Houghton also testified that if she had been in the office on the day that Plaintiff reversed Rodriguez's fee, Houghton would have completed the fee reversal if Plaintiff had asked her. (Houghton Dep. at 87:7-88:1.)

Plaintiff maintains that in early April, 2004, Torres, and possibly Houghton, [8] verbally reprimanded her for the fee reversal. [9] (Mueller Aff. P 30; Mueller Dep. at 93:3-96:14.) Plaintiff responded by stating that at the time she did not remember or realize that her sister was on the account. (Mueller Aff. P 29.) Plaintiff states that Torres told her that she "could no longer perform any functions on the account," to which she agreed. (Id. P 30.) Houghton heard Torres state that "this might come back and harm you." (Houghton Dep. at 89:23-90:7.) Torres stated that he confronted Plaintiff about the fee reversal incident, but simply expressed to her that he did not know what discipline the bank would impose. (Torres First [*18] Aff. P 8.) At the bank, there is a policy that managers must document verbal reprimands. (Id. P 9; see Barrett Aff. P 10.) Torres denied that he verbally reprimanded Plaintiff at this confrontation, and pointed out that there is no evidence of a verbal reprimand in Plaintiff's personnel file. (Torres First Aff. P 9.) Torres stated that he informed Black of the fee reversal in early May, 2004. (Id. P 8.) Black testified that she could not recall how or when she found out about the fee reversal, but that she thought it was not until Plaintiff was out on her second FMLA leave, which began on May 31, 2004. (Black Dep. at 30:21-32:21; 36:3-15; 42:18-43:3.)

8 In her deposition, Plaintiff stated that only Torres was present (Mueller Dep. at 93:6-7, 94:1-8), while her affidavit states that both Houghton and Torres were present during the reprimand (Mueller Aff. P 28). Torres stated that he confronted Mueller alone. (Torres First Aff. P 8.) Houghton first stated that she was unsure whether she was present. (Houghton Dep. at 89:4-5; 90:4-6.) She later stated that Torres called Plaintiff into Houghton's office and Houghton began the confrontation. (Id. at 89:1-3; 89:10-90:16.)

[*19]

9 Torres stated that he discovered the fee reversal in late April or early May, 2004, when Houghton brought it to his attention. (Torres First Aff. P 6; Torres First Dep. at 86:20-25; 87:7-10; 87:24-88:13.) Houghton stated that she con-

fronted Plaintiff the same day, or the day after, that she discovered the fee reversal (Houghton Dep. at 88:2-8), but that she did not know when this took place. (*Id.* at 88:16-25.)

The fee reversal was not mentioned to Plaintiff again until September 7, 2004, two days prior to Plaintiff's termination. (Mueller Aff. P 31.)

**D. Plaintiff's Second FMLA Leave**

On May 27, 2004, Plaintiff separately informed Torres and Black that her husband was missing and that she was having a mental breakdown. (*Id.* PP 32-33.) Either that day or the next, Plaintiff's husband was admitted to the hospital for a drug overdose. (Mueller Dep. at 41:11-42:15.) According to Plaintiff, when she told Torres about her need to take FMLA leave, Torres "responded by telling me that I should just quit and collect welfare." (*Id.* P 35; *see* Mueller Dep. at 113:5-115:6.) Plaintiff [*20] reported this to H.R. (Pl.'s Ex. 11, ECF No. 84-12.) The H.R. entry for June 8, 2004, at 2:38 p.m. states that Plaintiff "INDICATES . . . THAT MGR INITIALLY RECOMMENDED SHE QUIT HER JOB LAST WK WHEN SHE WAS GOING ON LEAVE." (*Id.*) Plaintiff also testified that Torres suggested that she call the bank's Employee Assistance Program ("EAP"), which she did. (Mueller Dep. at 42:41:17-42:18.) EAP suggested that Plaintiff apply for a medical leave. (*Id.* at 42:19-23.)

According to Plaintiff, Black told her that Black would process the paperwork for Plaintiff to take leave (Mueller Aff. P 34), although Black testified that she had no memory of speaking to Plaintiff (Black Dep. at 26:9-20). Plaintiff called H.R., and was told that Torres would have to get the paperwork for her. (Mueller Dep. at 61:6-7.) Plaintiff applied for and was able to take leave immediately beginning May 31, 2004. (*Id.* at 61:18-62:8.) Once the paperwork was approved, it "related back" to her first absence. (*Id.*)

**E. Plaintiff's Termination**

There is some conflicting testimony regarding when the fee reversal incident was reported to H.R. and Corporate Security. Defendants' process for reporting an employee [*21] ethics issue was to either contact Corporate Security directly, or to contact H.R., who would then contact Corporate Security. (Black Dep. at 28:25:29:7.) Although Torres alleges that he reported the incident to Black in early May, 2004, and left a message for Andrew Sekula ("Sekula"), a Corporate Security investigator, the same day (Torres First Dep. at 87:18-89:18), the testimony of both Black and Sekula contradict this account. Black testified that it was her practice to call Corporate Security immediately upon being informed of an allega-

tion of employee misconduct. (Black Dep. at 28:15-20; 29:8-16; 42:18-43:3.) Black said that she usually left a voice mail message for Sekula, and that he would call her back within a few days. (Black Dep. at 29:17-30:20.) Black also testified that she believes that she learned about Plaintiff's fee reversal incident while Plaintiff was already on leave, and that she called Sekula immediately. (*Id.* at 35:19-36:15.)

Plaintiff submitted what she maintains are Sekula's notes. Plaintiff's notes state: "On May 28, 2004 HR Jane Black informed RI of a possible Code of Conduct issue involving RB Tabitha Mueller . . . . RI contacted the BCM Marcelo Torres on [*22] Tuesday June 1, 2004." (Management Memo, Pl.'s Ex. 12, ECF No. 84-13.) At his deposition, Sekula testified that the first time he learned of the fee reversal was when Torres contacted him on May 28, 2004 (Dep. of Andrew Sekula 13:9-15, 15:1-11, ECF No. 77) ("Sekula Dep.") and that Sekula investigated the incident and called Torres "in very early June" to schedule an interview with Plaintiff (*id.* at 18:16-19:20). At that point, Torres informed Sekula that Plaintiff was either on leave or that she was about to go on leave, so they decided that Sekula would interview her upon her return to work. (*Id.* at 20:5-25.)

Plaintiff returned from FMLA leave on September 7, 2004. (Mueller Dep. at 84:1-21.) Around 10:15 a.m., Plaintiff was called in to Torres' office, where Sekula was also present. (*Id.* at 86:8-19.) Sekula asked Plaintiff to explain her account of what happened regarding the fee reversal. (*Id.* at 86:21-22.) He wrote out her narrative, which he then read to her, and she signed. (*Id.* at 86:22-89:9.) Plaintiff's statement, as read by Sekula at his deposition, is as follows:

> This morning I discussed and reviewed transaction documents which relate to the DDA [*23] account of Dominic E. Rodriguez. In late March 2004, I recall that I processed an overdraft fee reversal in the amount of $ 112. As I further recall, Mr. Rodriguez is a premier client and would have qualified for the fee reversal. I did not discuss the reversal with either my BCM or ABCM. At the time of the reversal, I failed to recall or realize that my sister, Faith N. King, was a cosigner on the account as well as Dominic Rodriguez. In that I failed to realize that consideration, I never intended to violate the code of conduct.

(Defs.' Redacted Ex. J, ECF No. 70-4; Sekula Dep. at 27:23-29:14.) Plaintiff then asked why she was being

asked about the fee reversal at that point when it had been addressed previously in April, and Sekula told her that he had only learned of the incident at the end of May. (Mueller Dep. at 86:23-87:7.) Later that morning, Plaintiff was told that she was suspended with pay pending further investigation. (*Id.* at 89:10-91:4.) On September 8, 2004, Sekula reported the results of his interview with Plaintiff and his investigation to Barrett, the District Manager. (Aff. of Andrew Sekula P 10, Defs.' Ex. I, ECF No. 67-10) ("Sekula Aff.") Barrett, [*24] possibly in conjunction with Black, made the decision to terminate Plaintiff. [10] (Barrett Aff. P 8; Black Dep. at 33:22-34:22.) Torres testified that he did not take part in that decision. (Torres Second Dep. at 192:15-193:14.) Barrett said that, prior to his decision to terminate Plaintiff, Barrett "was unaware that Plaintiff had complained to Brilla or Torres about anything" in February, 2004. (Barrett Aff. P 9.) On September 9, 2004, Torres called Plaintiff to inform her that she had been terminated due to the fee reversal incident. (Mueller Aff. P 45; Mueller Dep. at 91:7-10.)

> 10    Barrett's affidavit does not mention that Black participated in the decision. He stated, "I decided to terminate Plaintiff's employment. I based my decision to terminate Plaintiff's employment solely on Plaintiff's fee reversal on her sister's account and nothing else." (Barrett Aff. P 8.) Black states that she participated in the decision by recommending that Plaintiff be terminated. (Black Dep. at 32:22-33:22.)

Sekula and [*25] Black each testified that the bank terminated an employee who had improperly reversed a fee for a relative, and Black testified that she did not believe that terminating the employee was discretionary. (Sekula Dep. at 36:21-23; Black Dep. at 34:19-35:1.) Sekula stated that approximately 50 to 100 employees in his district have been terminated for such incidents in the past ten years, and that he did not recall any employee who had received a lesser discipline. (Sekula Dep. at 36:17-20; 36:24-37:18.) Black also stated that any employee's improper fee reversal that she dealt with always resulted in termination, and that she did not recall any employee who had not been terminated for such conduct. (Black Dep. at 33:5-7; 33:23-34:6.) In addition, Barrett stated that:

> [a]t Chase, verbal reprimands are documented in writing. I am not aware of any documented verbal reprimands with respect to Plaintiff's fee reversal on her sister's account. As Chase's District Manager, I would not have known Torres, or any of Plaintiff's superiors, to merely give Plaintiff a verbal reprimand for her fee reversal on her sister's account. At the

time I terminated Plaintiff's employment in September [*26] 2004, I believed that Chase terminated the employment of any employee who reversed fees for a relative, and I had terminated the employment of other employees for this reason before and since Plaintiff's termination. I have always terminated employees in my chain of command for reversing fees for a relative.

(Barrett Aff. P 10.) Brilla, the former district manager, also stated that the bank's "policy and practice" was "to terminate employees who process fee reversals on the account of a family member." (Aff. of Clare Brilla P 7, Defs.' Ex. K, ECF No. 67-12.)

On February 11, 2005, Plaintiff filed a Complaint, alleging violations of the FMLA. (Pl.'s Compl.) She alleges that Defendants interfered and/or restrained her from taking FMLA leave and that Defendants retaliated against her for taking leave by improperly terminating her upon her return from an FMLA-approved absence. (Pl.'s First Am. Compl. P 24.) On April 17, 2006, Defendants filed the pending Motion for Summary Judgment. (ECF No. 67.)

## II. SUMMARY JUDGMENT STANDARD

*Federal Rule of Civil Procedure 56(c)* governs summary judgment motions and provides:

> The judgment [*27] sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 153, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); White v. Turfway Park Racing Ass'n, Inc., 909 F.2d 941, 943-44 (6th Cir. 1990).* A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors

could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id. at 252.* However, "[c]redibility judgments and weighing of the evidence [*28] are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Schebil, 188 F.3d 365, 369 (6th Cir. 1999).*

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing Frito-Lay, Inc. v. Willoughby, 274 U.S. App. D.C. 340, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).* The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus, 801 F. Supp. 1, 4 (S.D. Ohio 1992).* The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id.*

When [*29] a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

*Fed. R. Civ. P. 56(e).*

## III. LAW AND ANALYSIS

### A. Theories of Recovery Available Under the FMLA

The FMLA entitles an employee to take up to twelve weeks of unpaid leave each year because of the employee's serious health condition or that of a close relative. *29 U.S.C. § 2612(a)(1).* FMLA leave may be taken in blocks of time (e.g., for the birth of a child or to recover from surgery) or intermittently (e.g., for a recurring health condition). *Id. § 2612(b).* Upon return from FMLA leave, the employee is entitled to be restored either to her original position or to an equivalent position. *Id. § 2614(a)(1).*

Two distinct theories of recovery arise under the FMLA: interference (also called "entitlement") and re-

taliation (also called "discrimination"). See [*30] *Arban v. West Publ'g Co., 345 F.3d 390, 400-401 (6th Cir. 2003)* (explaining both theories of recovery).

According to the statute, an employer is prohibited from *interfering* with an employee's FMLA rights:

(a) Interference with rights.

(1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title.

*29 U.S.C. § 2615(a)(1).* In addition, an employer is prohibited from *retaliating* against an employee who complains of an employer's violation:

[a](2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title.

(b) Interference with proceedings or inquiries. It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual --

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this title;

(2) has given, or is about to give, any information in connection with any [*31] inquiry or proceeding relating to any right provided under this title; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this title.

*Id. § 2615(a)(2) & (b).* Section 2617(a) imposes liability on "[a]ny employer who violates [*29 U.S.C. § 2615*]," and provides an individual right of action to sue in state or federal court. *29 U.S.C. § 2617(a)(1), (a)(2).*

The implementing regulation outlines interference violations (*29 C.F.R. § 825.220(a)(1)*) and retaliation violations (*Id. § 825.220(a)(2)*) and provides examples of prohibited employer conduct. For example, conduct constituting employer interference with employee's rights includes "not only refusing to authorize FMLA leave, but *discouraging an employee from using such leave.*" *§ 825.220(b)* (emphasis added). Likewise, retaliation or discrimination against employees who have taken FMLA

leave takes many forms. The regulation states, in perti-
nent part:

> [I]f an employee on leave without pay
> would otherwise be entitled to full bene-
> fits (other than health benefits), the same
> [*32] benefits would be required to be
> provided to an employee on unpaid
> FMLA leave. By the same token, *employ-*
> *ers cannot use the taking of FMLA leave*
> *as a negative factor in employment ac-*
> *tions, such as hiring, promotions or disci-*
> *plinary actions;* nor can FMLA leave be
> counted under "no fault" attendance poli-
> cies.

*29 C.F.R. § 825.220(c)* (emphasis added). The regulation
also emphasizes that an employer violates the FMLA
when it violates either the FMLA statute itself or the
implementing regulations. *29 C.F.R. § 825.220(b).* Fi-
nally, even where an employer violates the FMLA, an
employee is not entitled to relief unless she can show
that she "has been prejudiced by the violation." *Ragsdale
v. Wolverine World Wide, Inc., 535 U.S. 81, 89, 122 S.
Ct. 1155, 152 L. Ed. 2d 167 (2002); Cavin v. Honda of
Am. Mfg., 346 F.3d 713, 726 (6th Cir. 2003)* (quoting
*Ragsdale*); see *29 U.S.C. § 2617(a)(1)(A)(i)(I).*

## B. Plaintiff's Claims

At the outset, the court must determine whether
Plaintiff is pursuing her claims under the theory of inter-
ference, retaliation, or both. Plaintiff's Complaint cites *29
U.S.C. § 2615(a)(1)* [*33] , which covers interference,
but she does not cite the statutory provisions that cover
retaliation. (Pl.'s First Am. Compl. P 25.) However, the
Complaint also refers to "Defendants' discriminatory
acts" and "retaliatory conduct." (*Id.* PP 24, 26.) In their
Motion for Summary Judgment, Defendants assume that
Plaintiff had pled a retaliation claim by splitting the al-
leged violations into both retaliation and interference
claims. (Defs.' Mot. for Summ. J. at 10-14, 18-19 (re-
taliation), 15-16 (interference).) In her Opposition Brief,
Plaintiff cites both interference and retaliation regula-
tions and contends that Defendants have violated both.
(Pl.'s Opp'n Br. at 22-24.) Yet Plaintiff challenges the
burden of proof that Defendants employ for the retalia-
tion claim, contending that all of the alleged violations
(or, alternatively, all of the violations that occurred prior
to Plaintiff's termination) are subject to the standard used
for interference claims. (*Id.* at 25-26.) Nevertheless,
Plaintiff continues to use the term "retaliation" through-
out her brief. (*See, e.g., id.* at 9) ("Despite the over-
whelming evidence that Plaintiff was *retaliated* against
and ultimately terminated [*34] for taking [FMLA]

leave . . . all Defendants have moved for summary judg-
ment contending that they have no legal responsibility
over the *retaliation* and termination against Plaintiff.")
(emphasis added). Therefore, the court finds that Plain-
tiff's claims are as follows:

. Plaintiff's allegation that Torres did not timely ini-
tiate Plaintiff's FMLA paperwork upon request (for
which Plaintiff cites *29 C.F.R. § 825.220[a](1) & (b)*) is
an interference claim;

. Plaintiff's allegation that Torres harassed Plaintiff
when she tried to take her approved FMLA leave (for
which Plaintiff cites *§ 825.220(b) & (c)*) is both an inter-
ference and a retaliation claim;

. Plaintiff's allegation that Torres gave Plaintiff a
poor performance review that took into account her ab-
sences in the fall of 2003 when she was waiting for
FMLA approval (for which Plaintiff cites *825.220(c)* as
well as cases that involve only interference claims) is a
retaliation claim; [11]

. Plaintiff's allegation that Defendants retaliated
against Plaintiff for complaining to H.R. and her co-
workers about Torres' behavior in regard to the notary
incident and requesting doctor's excuses for [*35] ap-
proved absences (for which Plaintiff cites *§
825.220[a](2)*) is a retaliation claim; and

. Plaintiff's allegation that Defendants wrongly ter-
minated Plaintiff after she returned from FMLA leave
(for which Plaintiff does not cite any statute or regula-
tion) is a retaliation claim.

(*See* Pl.'s Opp'n Br. at 22-25.) Therefore, two viola-
tions will be analyzed under the interference theory and
four violations will be analyzed under the retaliation the-
ory.

> 11 Defendants correctly point out that Plaintiff
> discussed this allegation for the first time in her
> Opposition Brief, without including it her Com-
> plaint. (Defs.' Reply Br. at 4.) However, a Com-
> plaint need only contain "a short and plain state-
> ment of the claim showing that the pleader is en-
> titled to relief . . . ." *Fed. R. Civ. P. 8(a).* As the
> court finds that the Complaint alleges both inter-
> ference and retaliation claims, and as Defendants
> argue both types of claims in their Motion for
> Summary Judgment, Defendants had adequate
> notice about both claims. The fact that Plaintiff
> lists some facts in her Complaint does not pre-
> clude her from including other facts in her brief
> to support each claim. The Sixth Circuit has held
> that a "[c]omplaint need not set down in detail all
> the particularities of a plaintiff's complaint
> against a defendant . . ." *Carrasco v. NOAMTC*

*Inc.*, 124 Fed. Appx. 297, 301 (6th Cir. 2004). Indeed, the purpose of discovery is to determine all the underlying facts. In the instant case, various depositions demonstrate that the issue of Plaintiff's performance review was fully explored. (*See, e.g.*, Mueller Dep. at 22:25-23:9; Torres Second Dep. at 140:8-16.) Therefore, the court may properly address the performance review issue at the summary judgment stage.

**[*36] C. Interference**

1. Establishing an Interference Claim

In an interference inquiry, an employer's intent is irrelevant. *Arban, 345 F.3d at 401* ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.") (quotation omitted).

To prevail on an FMLA interference claim, a plaintiff must prove by a preponderance of the evidence [12] that (1) she is an eligible employee as defined in the Act; (2) the defendant is an employer as defined in the Act; (3) she was entitled to FMLA leave; (4) she gave proper notice of her intention to take leave; and (5) the defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights. *Hoge v. Honda of Am. Mfg., 384 F.3d 238, 244 (6th Cir. 2004); Cavin, 346 F.3d at 719*. As stated above, the plaintiff must also prove that she has been prejudiced by the violation. *Ragsdale, Inc., 535 U.S. at 89; Cavin, 346 F.3d at 726*.

12

Plaintiff correctly states that the burden of proof for an interference claim is preponderance of the evidence. (Pl.'s Opp'n Br. at 26) (citing *Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112 (9th Cir. 2001)*. Although the Sixth Circuit has not explicitly stated that the McDonnell Douglas framework does not apply to interference claims, *see* discussion, *infra* at Part III.D, it recently applied McDonnell Douglas to a retaliation claim and not to the accompanying interference claim, while also pointing out that the employer's intent is relevant only to a retaliation claim, not to an interference claim. *Edgar v. JAC Prods., 443 F.3d 501, 507-508 (6th Cir. 2006)* (using the term entitlement rather than interference). In addition, district courts in the Sixth Circuit have also held that McDonnell Douglas does not apply to interference claims. *See, e.g., Schmauch v. Honda of Am. Mfg., Inc., 295 F. Supp. 2d 823, 831 (S.D. Ohio Dec. 11, 2003); Collins v. United States Playing Card Co., 466 F. Supp. 2d 954, 2006 U.S. Dist.*

*LEXIS 80927, *15 (S.D. Ohio Nov. 6, 2006). But see Petsche v. Home Fed. Sav. Bank, 952 F. Supp. 536, 538 (N.D. Ohio 1997)*. Because much of *Petsche*'s progeny actually involves retaliation claims, and because the reasoning in *Batchelder* and *Edgar* is persuasive, this court finds that *McDonnell Douglas* is not appropriate for Plaintiff's interference claim.

**[*37] 2. Alleged Interference Violations**

The court finds that Plaintiff alleges that Defendants interfered with her FMLA leave in two ways: (1) Torres did not timely initiate Plaintiff's FMLA paperwork upon request; and (2) Torres harassed Plaintiff when she tried to take her approved FMLA leave. (Pl.'s Opp'n Br. at 22-23.) In the instant case, the parties' dispute centers on the fifth element [13] -- whether Defendants interfered with Plaintiff's FMLA benefits.

13    *See* discussion, *infra* at Part III.C, finding that Torres is an employer under the Act. Defendants do not contest that the bank is an employer under the Act. All other elements are undisputed.

*a. Timeliness of Torres' Processing of Plaintiff's First FMLA Request*

Plaintiff alleges that, in regard to her first FMLA leave to care for her son, Torres did not timely initiate Plaintiff's FMLA paperwork upon request, thereby restraining her from exercising her FMLA rights in violation of *29 C.F.R. § 825.220(b)*. (Pl. **[*38]** 's Opp'n Br. at 22-23.) Viewing the facts in the light most favorable to Plaintiff, beginning in October, 2003, Plaintiff repeatedly asked Torres to provide her with the necessary forms to request leave, which he did not provide until December, 2003. A computer printout from H.R. indicates that the FMLA request was received on January 2, 2004, and that H.R. received Plaintiff's application on January 13, 2004, and approved it on January 15, 2004. (Pl.'s Ex. 2, ECF No. 84-3.) In addition, a letter from Bank One to Plaintiff, dated January 15, 2004, states that her intermittent leave was approved for the period of January 2, 2004, through July 2, 2004. (Pl.'s Ex. 10, ECF No. 84-11.) This evidence suggests that Torres did not initiate Plaintiff's FMLA paperwork until January 2, 2004; that Plaintiff turned in the completed paperwork on January 13, 2004; that her leave was approved on January 15, 2004; and that the effective date related back to the date on which the request had been made.

Defendants argue that they did not interfere with Plaintiff's use of FMLA leave because her leave was ultimately approved. *See Bila v. Radioshack Corp., 2004 U.S. Dist. LEXIS 24649, *23 (E.D. Mich. Nov. 22, 2004)* **[*39]** ("[A] plaintiff suffers no FMLA injury when []he receives all the leave []he requests.") (quoting *Graham v.*

*State Farm Mut. Ins. Co., 193 F.3d 1274, 1275 (11th Cir. 1999)).* In addition, Defendants point out that Plaintiff admitted that she was not denied any time off between the time she requested FMLA leave and the time the leave was approved. Consequently, Defendants argue that Plaintiff was not denied any benefits, and that she therefore cannot show that she was prejudiced by any alleged delay in processing her FMLA request.

The court disagrees. Even where an employee's FMLA leave is eventually approved, an employer's delay in effectuating the leave constitutes a violation. *See Saroli v. Automation & Modular Components, Inc., 405 F.3d 446, 454 (6th Cir. 2005)* (finding violation where employer delayed responding to employee's request for maternity leave, and remanding to district court for determination of whether prejudice existed). Although Plaintiff was allowed to take leave while she waited for the FMLA leave to be approved, she was discouraged from doing so. In addition, a genuine issue of material fact exists [*40] as to whether the poor performance rating she received due to her non-FMLA absences was based on the absences she took while waiting for FMLA paperwork. (*See* Pl.'s Opp'n Br. at 23-24); *see* discussion, *infra*, at Parts III.D.3(b)(i) & 4(a) & 5(a). If so, then the three months that Plaintiff had to wait for Torres to provide the paperwork prejudiced Plaintiff by causing her to take additional absences, which then resulted in a poor performance review, thereby precluding her from earning a pay raise. *See Schmauch v. Honda of Am. Mfg., Inc., 295 F. Supp. 2d 823, 829 (S.D. Ohio 2003)* (finding that employee's FMLA leave caused employer to extend employee's "attendance improvement program," which limited the number of absences he could take and thus led to his termination).

Moreover, the fact that Plaintiff's second FMLA leave, in May, 2004, was timely approved (*see* Mueller Aff. PP 33-36; Mueller Dep. at 61:1-62:8; Defs.' Mot. for Summ. J. at 4) shows how quickly FMLA leave is approved once requested. Likewise, the fact that FMLA leave relates back to the date requested strongly suggests that the first FMLA paperwork was *not* initiated in October, 2003, [*41] as Defendants contend, because if it had been, her leave would have related back to October, 2003 (as opposed to January 2, 2004). Consequently, a question of fact exists as to whether Plaintiff could have taken FMLA leave as early as October, 2004, if her paperwork had been initiated earlier. As such, a genuine issue of material fact exists as to whether Torres interfered with Plaintiff's right to take FMLA leave by failing to timely process her request and whether she was prejudiced thereby. Therefore, Defendants' Motion for Summary Judgment is denied as to Plaintiff's interference claim based on allegations that Torres delayed processing Plaintiff's FMLA request.

### b. Harassment of Plaintiff Regarding Her FMLA Leave

After receiving approval for intermittent FMLA leave in January, 2004, Plaintiff alleges that Torres discouraged her from taking her approved FMLA leave by repeatedly asking for a doctor's note each time she took leave, making inappropriate comments to her, and asking her to improperly notarize a document. Plaintiff also contends that Torres' requests for doctor's certificates were sometimes more frequent than permitted by the regulations, which allow an employer [*42] to ask for recertification of an employee's medical condition no more than every thirty days. 29 C.F.R. § 825.308.

Even construing all facts in favor of Plaintiff, the court finds that Plaintiff has not shown that she was prejudiced by Torres' behavior (*see* Defs.' Reply Br. at 4) because Plaintiff continued to take FMLA leave and her second request for FMLA leave was approved. Plaintiff also concedes that Torres' behavior ceased after Plaintiff confronted Brilla, who spoke to Torres. For these reasons, the court grants summary judgment for Defendants on Plaintiff's interference claim based on Torres' alleged harassment. As Plaintiff also alleges that these facts constituted retaliation, the court will analyze them again under that standard.

### D. Retaliation

#### 1. Establishing a Retaliation Claim

Unlike an interference claim, an employer's intent or motive is "an integral part" of a retaliation inquiry. *Edgar v. JAC Prods., 443 F.3d 501, 508 (6th Cir. 2006).* Contrary to Plaintiff's contention that the McDonnell Douglas framework cannot be used "for the actions that occurred prior to [Plaintiff's] termination" (Pl.'s Opp'n Br. [*43] at 26), Defendants correctly state that the Sixth Circuit uses the *McDonnell Douglas* framework to analyze all retaliation claims that are based on indirect evidence. (Defs.' Mot. for Summ. J. at 10); *see Edgar, 443 F.3d at 508* (citing *Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 313-16 (6th Cir. 2001)); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* Defendants correctly argue that a mixed-motive analysis is also applicable (Defs.' Mot. for Summ. J. at 14), despite Plaintiff's arguments to the contrary [14] (Pl.'s Opp'n Br. at 29-30).

14  Plaintiff cites *Cavin, 346 F.3d 713*, for the proposition that "mixed-motive analysis is inappropriate under the FMLA." (*See* Pl.'s Opp'n Br. at 29-30.) Yet *Cavin* does not discuss the mixed-motive analysis at all -- nor does it even involve a retaliation claim.

2007 U.S. Dist. LEXIS 20828, *

The McDonnell Douglas framework is a three-part analysis. First, an employee must prove, by a preponderance of the evidence, [*44] a prima facie case that she was retaliated against because she used FMLA leave. *Skrjanc, 272 F.3d at 315; see Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. Next, if the plaintiff makes out a prima facie case, then the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the discharge. *Skrjanc, 272 F.3d at 315*. Finally, if the defendant has met its burden of production, then "the McDonnell Douglas framework -- with its presumptions and burdens -- is no longer relevant." *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. At that point, the plaintiff must persuade the fact-finder, by a preponderance of the evidence, that "unlawful discrimination was the real reason for the adverse employment action." *Gibson v. City of Louisville, 336 F.3d 511, 514 (6th Cir. 2003); see Skrjanc, 272 F.3d at 315*. The court notes that the reference to McDonnell Douglas as "burden shifting" is a misnomer because, although the defendant bears the *burden of production* at the second step, the plaintiff bears the ultimate *burden* [*45] *of persuasion* throughout the analysis. *See Gibson, 336 F.3d at 513-514; St. Mary's Honor Ctr., 509 U.S. at 507*.

The plaintiff need not prove that discrimination was the *sole* reason for her termination to prevail. *Gibson, 336 F.3d at 513*. For example, if the defendant proffers a non-discriminatory reason for the adverse employment action, then the plaintiff must show that the employer's non-discriminatory reason is just a pretext to mask discrimination. *Skrjanc, 272 F.3d at 315*. If, instead, the defendant proffers both discriminatory and non-discriminatory reasons, then the mixed-motive analysis applies. *Gibson, 336 F.3d at 513* (citing *Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003)); Maxwell v. GTE Wireless Serv. Corp., 121 F. Supp. 2d 649, 658 (N.D. Ohio 2000)* (citing district courts in the Sixth Circuit that have applied the mixed-motive analysis to FMLA claims). Under the mixed-motive framework, the plaintiff must prove by a preponderance of the evidence that discrimination was "a motivating factor" in the adverse employment decision. *See Gibson, 336 F.3d at 513-514* [*46] (citing *Desert Palace, 539 U.S. at 93*). A defendant can then avoid liability by setting forth an affirmative defense that it would have taken the same action even without the discriminatory factor. *Lampkin v. Ernie Green Indus., 2005 U.S. Dist. LEXIS 5451, *4 (N.D. Ohio Mar. 30, 2005); Richardson v. Monitronics Int'l, Inc., 434 F.3d 327, 333 (5th Cir. 2005)*. Whether a discriminatory reason for the adverse action exists (thereby triggering the mixed-motive analysis) or whether a plaintiff must simply argue against a defendant's proffered non-discriminatory reason, the inquiry at the fact-finding stage remains the same: to determine whether the defendant's *real* reason was unlawfully discriminatory. *Gibson, 336 F.3d at 514* ("Regardless of the framework used for presenting the proof, the underlying substantive law is the same.").

Thus, in the instant case, Plaintiff can prevail on her retaliation claim by proving either that: (1) Defendants' non-discriminatory reasons for the adverse employment actions are pretextual; or (2) under the mixed-motive framework, despite any valid non-discriminatory reasons, the FMLA leave [*47] was a motivating factor in the adverse employment actions. Conversely, Defendants can prevail by showing either: (1) a valid non-discriminatory reason for the adverse employment action; or (2) under the mixed-motive framework, even in the absence of a discriminatory reason, they would have made the adverse actions anyway.

### 2. Alleged Retaliation Violations

Defendants contend that Plaintiff's termination is the only adverse employment action that Plaintiff alleges in her Complaint. (Defs.' Mot. for Summ. J. at 11.) However, as stated previously, Plaintiff did not have to list every fact in her Complaint. (See discussion, *supra* at note 9.) Although Plaintiff does not clearly state which actions she alleges under her interference claim and which under her retaliation claim, and does not apply the proper legal analysis to each claim, the court finds Plaintiff's retaliation claim to include the following allegations: (1) Torres gave Plaintiff a poor performance review that took into account her absences in the fall of 2003, during the time that she was waiting for FMLA approval; (2) Defendants wrongly terminated Plaintiff after she returned from FMLA leave; (3) Torres harassed [*48] Plaintiff by requiring her to provide medical excuses for every FMLA-approved absence; [15] and (4) Defendants retaliated against Plaintiff for complaining to H.R. and her co-workers about Torres' behavior by not disciplining him. (Pl.'s Opp'n Br. at 22-25.)

> 15   For example, Plaintiff asserts that Torres' requests for recertification constitute "retaliatory" action. (See Pl.'s Opp'n Br. at 23.)

### 3. Plaintiff's Prima Facie Case of Discrimination

A plaintiff's burden in establishing a prima facie case of discrimination is not intended to be "onerous." *Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 870 (6th Cir. 2001)* (quoting *Burdine, 450 U.S. at 253*). To establish a prima facie case, a plaintiff must prove by a preponderance of the evidence that: (1) she availed herself of a protected FMLA right by notifying her employer of her intent to take leave; (2) she suffered an adverse employment action; and (3) there was a causal connection between the exercise of her FMLA [*49]

rights and the adverse employment action. *Edgar, 443 F.3d at 508; Skrjanc, 272 F.3d at 314; St. Mary's Honor Ctr., 509 U.S. at 506.* The parties dispute both the second and third elements.

### a. Adverse Employment Action

An adverse employment action is one that causes a "materially adverse change in the terms and conditions of [plaintiff['s]] employment." *McMillian v. Potter, 130 Fed. Appx. 793, 796 (6th Cir. 2005)* (quotation omitted and inside brackets added). An adverse employment action can "include demotions, reductions in salary or job responsibilities, offers of early retirement or continued employment on terms less favorable than the employee's former status, and harassment by the employer calculated to encourage the employee's resignation." *Weigold v. ABC Appliance Co., 105 Fed. Appx. 702, 708 (6th Cir. 2004)* (citation omitted).

### i. Performance Review

In their Reply Brief, Defendants argue that Plaintiff's poor performance review does not constitute an adverse employment action. However, the case on which Defendants rely for this proposition is distinguishable. In *Primes v. Reno,* [*50] the Sixth Circuit held that the plaintiff's "mid-range performance evaluation of 'fully successful' . . . is not the type of adverse employment action contemplated by Title VII." *190 F.3d 765, 767 (6th Cir. 1999).* Yet the instant Plaintiff received a "needs improvement" rating, not a satisfactory mid-range rating as in *Primes.* In addition, the prima facie case in *Primes,* which involved Title VII rather than the FMLA, required the plaintiff to "show[] that the Department of Justice treated differently a member of a non-protected group similarly situated in an analogous situation." *Id. at 766.* As stated above, a prima facie case of discrimination under the FMLA has no such requirement. Furthermore, another Title VII case specifically distinguished *Primes* by holding that a plaintiff's negative performance review *did* constitute an adverse employment action because, unlike *Primes,* the plaintiff showed the possibility that the review caused him to suffer "material change" in his employment. *Byrd v. Stone, 2000 U.S. App. LEXIS 441, *9 (6th Cir. Jan 6, 2000).* In the instant case, it is undisputed that Plaintiff did not receive [*51] a salary increase due to the poor performance review. Accordingly, the court holds that Plaintiff's performance review constitutes an adverse employment action.

### ii. Termination

Defendants do not contest the fact that Plaintiff's termination is an adverse employment action.

### iii. Torres' Harassment

Plaintiff maintains that Torres harassed Plaintiff when she tried to take her approved FMLA leave by repeatedly asking for unnecessary medical excuses. However, there is no evidence before the court showing that the harassment rises to the level of causing a material harm in Plaintiff's employment terms or conditions. As such, Plaintiff has not shown an adverse employment action, and therefore fails to make her prima facie case. Therefore, the court hereby grants summary judgment for Defendants as to Plaintiff's retaliation claim based on Torres' harassment and Defendants' failure to discipline Torres.

### iv. Plaintiff's Complaints About Torres

Plaintiff appears to allege that Defendants retaliated against Plaintiff by not disciplining Torres for retaliating against her for complaining to H.R. and her co-workers about Torres' behavior regarding the medical excuses and the notary incident. [*52] However, Defendants' purported failure to discipline Torres does not constitute an adverse employment action against Plaintiff. Accordingly, the court hereby grants summary judgment for Defendants as to Plaintiff's retaliation claim based on Defendants' failure to discipline Torres. Therefore, the only remaining allegations in support of her retaliation claim are her negative performance review and her termination.

### b. Causal Connection

To establish a causal connection between the exercise of her FMLA rights and the adverse employment action, a plaintiff "must show that an employee's use of FMLA leave was a 'significant factor' motivating the retaliatory action." *Dage v. Time Warner Cable, 395 F. Supp. 2d 668, 675 (S.D. Ohio 2005)* (citation omitted). A plaintiff's burden to demonstrate a causal connection "between an employee's FMLA leave and termination is 'minimal,' and courts are expected to 'draw reasonable inferences' from any credible evidence" that the plaintiff puts forth. *Id. at 676* (citing *Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000)).* The parties disagree on whether the temporal proximity between an [*53] employee's exercise of FMLA rights and the adverse employment action is sufficient, by itself, to constitute a causal connection. (*See* Defs.' Mot. for Summ. J. at 11-12; Pl.'s Opp'n Br. at 27-28; Defs.' Reply Br. at 7-8.) The *Dage* court summarized the state of Sixth Circuit law:

> The Sixth Circuit has, in some recent cases, suggested that temporal proximity must be coupled with some evidence of retaliatory conduct before any connection may be inferred. However, the Sixth Circuit has declined to specify precisely how much additional evidence is required.

Moreover, there are other recent employment retaliation cases, including FMLA cases, indicating that temporal proximity alone may support an inference of causal connection.

*Dage, 395 F. Supp. 2d at 676* (cases cited for each proposition omitted). As Plaintiff relies not only on temporal proximity, but also on evidence of other retaliatory conduct, the court need not determine whether temporal proximity alone is sufficient to constitute a causal connection.

i. Performance Review

Plaintiff contends that Torres retaliated against her by giving her a negative performance review for the 2003 calendar [*54] year in violation of *29 C.F.R. § 825.220(c)*, which states that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ." *See Cavin v. Honda of Am. Mfg., 346 F.3d 713, 726 (6th Cir. 2003)* ("[A] termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA.") (quotation omitted). Torres testified that although Plaintiff met her work performance goals, he had other issues with Plaintiff related to her absences. Of course, an employer may take into account an employee's non-FMLA absences without violating *§ 825.220(c)*. However, Plaintiff alleges that Torres improperly took into account her absences from October, 2003, to December, 2003, which occurred after she had asked Torres to initiate the FMLA paperwork and before her leave was approved in January, 2004. (*See* Pl.'s Opp'n Br. at 23-24.) If Torres did consider Plaintiff's absences during this period, then Plaintiff's poor review could be causally connected to the amount of time it took for her FMLA leave to be initiated [*55] and approved. Put simply, if the FMLA leave had been approved in October when Plaintiff first requested the paperwork, then Plaintiff's absences from October, 2003, through December, 2003, would have been covered under the FMLA, which raises the possibility that she would have received a more positive performance review, thereby making her eligible for a pay raise.

Plaintiff submits the list of her absences from November 23, 2002, through March 24, 2004. (*See* Pl.'s Exs. 5-6, ECF Nos. 84-6, 84-7.) Only the absences in 2003 are relevant to the performance review at issue. The absences in this time frame are labeled with the following five categories: "approved paid", "approved unpaid", "illness paid", "vacation", and "personal hol." (*See id.*) Although neither party analyzes these absences or explains the meaning of the various categories, the record shows that Plaintiff was absent from work for a total of forty-nine days in 2003 and that seventeen of those absences occurred in the last three months of the year. In other words, 35% of her absences took place in the last 25% of the year. Also, Plaintiff had ten "approved unpaid" absences in the last three months of the year compared [*56] to only nine "approved unpaid" absences throughout the other nine months of the year. Consequently, some evidence suggests that Torres took Plaintiff's absences from October to December into account in the performance review. In addition, at Plaintiff's meeting with management regarding Torres' requests for medical notes for her FMLA leave as well as the notary incident in February, 2004, Torres did not mention any of the factors that he listed on the performance review one month later. Consequently, it is possible that Torres retaliated against Plaintiff for having reported his behavior to their supervisors by giving Plaintiff a poor performance review. (*See* Pl.'s Internal Mem. at 2.)

Therefore, the court finds that a jury could reasonably conclude that Torres retaliated against Plaintiff for her complaints about him by giving her a negative performance review that unlawfully took into account absences that could have been covered by FMLA if her leave had been approved earlier. Therefore, Plaintiff has shown a causal connection and has made out her prima facie case.

ii. Termination

Plaintiff points out two instances of temporal proximity: (1) her termination occurred two days [*57] after she returned from FMLA leave; and (2) Torres reported the fee reversal on the same day that Plaintiff requested her second FMLA leave. (*Id.* at 32.) The court is not persuaded that the first instance of temporal proximity is significant because it is clear that Sekula could not interview Plaintiff while she was out on leave. As Sekula testified that he was not informed of the fee reversal until Plaintiff had begun her second FMLA leave, he was unable to contact her until her first day back at work. Consequently, the court finds that the fact that Plaintiff was terminated two days after her return from FMLA leave does not create a causal connection.

Plaintiff focuses her argument on the second instance of temporal proximity, and argues that the reason *why* Sekula did not learn of the fee reversal until just before Plaintiff took FMLA leave is significant because, viewing all facts in Plaintiff's favor, Torres knew about the fee reversal two months prior to reporting it to Sekula, and it is undisputed that the fee reversal led directly to Plaintiff's termination. In addition, Torres commented that Plaintiff should quit her job rather than take more FMLA leave and he warned [*58] her that the fee reversal "might come back to harm" her. The court finds that

Plaintiff's emphasis on Torres is misplaced because he did not participate in the decision to terminate Plaintiff; only Barrett and Black were involved. Plaintiff argues that the fact that Torres reported the fee reversal the same day that she filed her second FMLA leave suggests that his decision to report the incident was made in retaliation for her leave request. However, Plaintiff has not shown any evidence that Torres would have been justified in *not* reporting the fee reversal to his superiors. Even assuming that Torres had verbally reprimanded her, Barrett testified that he never would have accepted a verbal reprimand as the ultimate discipline for a fee reversal for an employee's relative. Barrett also testified that he believed that all such violators were terminated, and that he had "always terminated employees in [his] chain of command for reversing fees for a relative." (Barrett Aff. P 10.) Likewise, Black testified that any employees she dealt with who had reversed fees for a relative "always resulted in terminations, so I always recommended termination." (Black Dep. at 33:1-7.) Defendants [*59] further argue that Plaintiff knew that her sister was on the account on which she reversed the fee. Plaintiff has not presented any evidence to contradict the fact that employees who reversed fees for a relative were always terminated. Thus, at most, Torres' delay in reporting the fee reversal simply delayed the termination; it did not change the outcome.

Barrett testified that he based his decision to terminate Plaintiff solely on the fee reversal and that, at the time he made the decision, he was not aware of any of Plaintiff's complaints to Brilla or Torres. (Barrett Aff. P 9.) Plaintiff has produced no evidence that Black discussed any of Plaintiff's complaints or FMLA issues with Barrett when she recommended termination. Plaintiff has not presented any evidence to contradict Defendants' sworn testimony that the decision to terminate Plaintiff was based solely on her fee reversal and not on any issues surrounding her FMLA leave or complaints about Torres.

In response, Plaintiff argues that the bank had not been enforcing its other policies, thereby undermining Defendants' argument that they consistently enforce the fee reversal policy. Specifically, Plaintiff argues that the [*60] bank had not been enforcing its policy (and the law) regarding notarization as evidenced by Torres receiving no discipline for his attempt to have Plaintiff improperly notarize a document. (*See* Pl.'s Opp'n Br. at 29.) However, even construing all evidence in the light most favorable to Plaintiff, the fact that Defendants did not discipline Torres for attempting to violate a notary rule does not demonstrate that Defendants would not discipline Plaintiff for violating the fee reversal rule. Nor does the fact that Plaintiff was not disciplined for opening the joint account for Rodriguez and King mean that

Defendants would not discipline Plaintiff for violating the fee reversal rule. Such speculations, absent admissible supportive evidence, are insufficient to warrant a denial of summary judgment.

Accordingly, Plaintiff has not shown that her termination was causally connected to her FMLA leave, and therefore she has failed to make her prima facie case. As such, the court hereby grants summary judgment for Defendants on Plaintiff's retaliation claim based on Plaintiff's termination.

### 4. Defendants' Non-Discriminatory Reasons

As Plaintiff has made a prima facie showing of FMLA [*61] retaliation based on her performance review, Defendants must now rebut the prima facie case by "articulat[ing] a legitimate, non-discriminatory reason" for the performance review. See, e.g., *Skrjanc, 272 F.3d at 315*. Defendants argue that Plaintiff's negative performance review was fair, and that Plaintiff has not pointed to any evidence to the contrary. (Defs.' Reply Br. at 5-6.) The review indicates that Plaintiff received a "needs improvement" rating in six out of twenty-two categories. (*See* Retail Banking Performance Review.) Defendants also point out that Plaintiff's memorandum to Black concedes that she agreed with the "needs improvement" rating in regard to two factors (pre-set sales and policy and procedure execution). (Defs.' Reply Br. at 5; *see* Pl.'s Internal Mem. at 1.) Defendants maintain that no part of the review was based on Plaintiff's use of FMLA leave. (*Id.* at 9.) Defendants also point out that the review "highlighted some of Plaintiff's positive attributes." (Defs.' Reply Br. at 6) (listing comments from factors on which Plaintiff met expectations). Accordingly, the court finds that Defendants have carried their burden of production [*62] by articulating a non-discriminatory reason for the negative performance review.

### 5. Plaintiff's Showing of Pretext and/or Motivating Factor

As Defendants have carried their burden to produce a "legitimate, non-discriminatory reason" for each adverse employment action, Plaintiff must now demonstrate that, despite Defendants' contentions otherwise, their true reasons for the performance review were discriminatory. *Gibson, 336 F.3d at 513-14*. Plaintiff can do this by showing either that Defendants' reason is a pretext or that discrimination was a motivating factor.

First, Plaintiff can show "that the articulated reason is in reality a pretext to mask discrimination." *Skrjanc, 272 F.3d at 315* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*). Direct evidence is not required to establish pretext. *Id.* (citing *Reeves v. Sanderson Plumbing Prods.,*

530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). Plaintiff can show pretext "in one of three ways: [1] by showing that the proffered reasons had no basis in fact; [2] by showing that the proffered reasons did not actually motivate [the adverse employment action]; or [3] by showing [*63] that the proffered reasons were insufficient to motivate [the adverse employment action]." *McConnell v. Swifty Transp., Inc.*, 198 Fed. Appx. 439 (6th Cir. 2006) (quotation omitted). It is not sufficient to simply allege that the relevant facts are disputed; Plaintiff must "demonstrate[] that the employer did not 'honestly believe' in the proffered non-discriminatory reason." *Id.* (quotations omitted).

Second, even if Defendants' non-discriminatory reasons partially explain the adverse actions, Plaintiff can succeed on her retaliation claim by showing that Defendants had mixed motives and that a discriminatory reason was a "motivating factor" in Defendants' decisions. *Gibson, 336 F.3d at 513.* To avoid liability, Defendants must then prove that they would have taken the actions even without the discriminatory reason. *Lampkin, 2005 U.S. Dist. LEXIS 5451 at *4.*

Plaintiff's evidence supports a showing of both the second and third methods of pretext as well as a showing of a "motivating factor" under the mixed-motive analysis. The record shows absences in the Fall of 2003 that Torres may have used in compiling Plaintiff's performance [*64] evaluation. These absences would have been improper to hold against Plaintiff, for if her FMLA paperwork had been processed earlier, these absences would have been approved. Moreover, of the twenty-one applicable categories in her review, Plaintiff received a rating of "needs improvement" in only six categories and a rating of "meets improvement" in fifteen categories. Consequently, Plaintiff has successfully raised a question as to whether Defendants' proffered reasons are either untrue or insufficient as a basis for her negative performance review, or whether instead Plaintiff's allegations of Torres' improper, harassing, and retaliatory behavior were the true reasons (or, alternatively, played a motivating factor in) Plaintiff's overall rating of "needs improvement."

Under the motivating factor analysis, Defendants can avoid liability if they can show that even without taking into account Plaintiff's absences in the Fall of 2003, Defendants would still have given her a poor performance review. Defendants do not expressly argue the motivating factor analysis on this issue, but they do emphasize that Plaintiff conceded that two of her poor ratings were fair. The court finds that [*65] this argument is not sufficient to overcome the potential role that the Fall of 2003 absences played in the performance review. Accordingly, the court finds that there is a genuine issue of material fact regarding whether Defendants retaliated

against Plaintiff by improperly counting certain FMLA-related absences against her on her performance review. Therefore, the court denies Defendants' motion for summary judgment as to Plaintiff's retaliation claim based on her performance review.

**E. Torres' Individual Liability**

Defendants put forth two arguments in support of their contention that Torres cannot be held individually liable in this action. The court shall discuss each in turn.

1. Availability of Individual Liability

First, Defendants correctly point out that the Sixth Circuit has not yet determined whether an individual employee in the private sector can be held liable as an employer under the FMLA. (Defs.' Mot. for Summ. J. at 19.) Although *Mitchell v. Chapman, 343 F.3d 811, 831 n.22 (6th Cir. 2003),* did not explicitly address liability for private employers, nevertheless it did refer, in a footnote, to the Sixth Circuit's "prior determination that [*66] the FMLA extends individual liability to private-sector employers." [16] In other words, *Mitchell's* holding that public agency employees *are not* individually liable under the FMLA relies on an unidentified Sixth Circuit holding that private sector employees *are* individually liable. The *Mitchell* court also states that the FMLA could impose individual liability on appropriate individuals, "such as corporate officers acting in the interest of an employer." *Id. at 832.* While *Mitchell* did not cite the case that made this prior determination, and no court since has been able to identify the case, *Mitchell* has been read by district courts in the Sixth Circuit as implicitly holding that individual liability exists. *See, e.g., Brown v. CBK, 2005 U.S. Dist. LEXIS 31960, *11 (W.D. Tenn. Nov. 28, 2005).*

16

The *Mitchell* court first points out that "[t]he FMLA expressly incorporates into its provisions the Fair Labor Standards Act's ("FLSA") . . . definition of 'employee'" and that the FMLA's definition of employer mirrors that of the FLSA. *Id. at 826-27.* The court then states that other Sixth Circuit decisions have "interpreted the FLSA's . . . language to impose individual liability on private-sector employers." *Id. at 827.* Finally, the *Mitchell* court lists a string of non-binding cases that hold that because the FLSA imposes individual liability on private-sector employers, and because the FMLA's language mirrors the FLSA, then the FMLA also imposes such individual liability. *Id. at 827-28.* At the same time, the *Mitchell* court also emphasizes that only

the question of public agency employers was squarely before the court. *Id. at 828.*

[*67] In addition, the relevant regulation, entitled, "What employers are covered by the Act?" expressly states that "[a]s under the FLSA, individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA." *29 C.F.R. § 825.104(d)*. Furthermore, cases from this district also support this conclusion. *See Carpenter v. Refrigeration Sales Corp., 49 F. Supp. 2d 1028, 1030 (N.D. Ohio 1999)* (human resources manager is "employer" under FMLA and therefore liable); *Rupnow v. TRC, Inc., 999 F. Supp. 1047, 1048 (N.D. Ohio 1998)* (company's president can be held liable under FMLA). Therefore, the court finds that both Sixth Circuit and Northern District of Ohio precedent establishes that individuals may be held liable under the FMLA.

2. Whether Torres Is an Employer under the FMLA

Defendants next argue that Torres does not constitute an employer under the FMLA because he had no responsibility, beyond ministerial tasks, to administer the FMLA, and he was not responsible for terminating Plaintiff. (Defs.' Mot. for Summ. J. at 20; Defs.' Reply Br. at 14-15.) [*68] Under the FMLA, an employer is "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *29 U.S.C. § 2611(4)(A)(ii)(I)*. Also, individual liability "arises under the FMLA when the supervisor 'exercise[s] sufficient control' over the employee's leave and employment status." *Phillips v. Leroy-Somer N. Am., 2003 U.S. Dist. LEXIS 5334 (E.D. Tenn. Mar. 31, 2003)* (denying summary judgment for three defendants who had conferred about terminating plaintiff). [17]

---

17 The *Phillips* court noted that the plaintiff "concedes" that summary judgment is proper for her supervisor. *2003 U.S. Dist. LEXIS 5334 at *2.* However, as this statement was made without discussion or explanation, this language cannot support summary judgment for Torres in the instant case.

Courts easily find individual liability where the individual employer was a member of the Human Resources department; was responsible for the employer's FMLA compliance; or actually [*69] terminated the plaintiff. *See, e.g., Carpenter, 49 F. Supp. 2d at 1031* (holding individually liable an employer who was head of the human resources department, was charged with FMLA compliance, and who made the decision to terminate the plaintiff); *Bryant v. Delbar Prods., Inc., 18 F. Supp. 2d 799, 809 (M.D. Tenn. 1998)* (holding manager individually liable on summary judgment where manager was in charge of all personnel responsibilities, including

sometimes handling FMLA paperwork; had the authority to grant personal leave and excuse employees from work; and was directed to, and did, terminate the plaintiff -- even though it was unclear whether he actually recommended termination). Such facts, however, are not necessary to determine that liability may attach.

In *Brown v. CBK*, the court denied an employer's motion to dismiss because "[s]o long as [the individual defendant] possesses control *over the aspect of employment alleged to have been violated,* the FMLA will apply to that individual." *2005 U.S. Dist. LEXIS 31960, *18 (W.D. Tenn. Nov. 28, 2005)* (quotation omitted). In *Brown,* the plaintiff alleged that she had been fired [*70] in part for taking FMLA leave, and the relevant defendant, Pardue, was the manager who actually terminated the plaintiff. *2005 U.S. Dist. LEXIS 31960 at *2-3.* Similarly, in the instant case, as her direct supervisor, Torres possessed control over initiating her FMLA paperwork and conducting her performance review. Thus, as in *Brown,* Torres possessed control over the aspects of Plaintiff's employment that she alleges have been violated.

In addition, the *Brown* court stated that

> Plaintiff has alleged a "set of facts" that might ultimately support a finding of individual liability against Defendant Pardue. . . . Although Plaintiff may ultimately fail to prove that Defendant Pardue's participation in the alleged violations was sufficient, that factual inquiry cannot be determined on a motion to dismiss for failure to state a claim.

*2005 U.S. Dist. LEXIS 31960 at *18.* In the instant case, the court finds that there is information from which a jury could reasonably conclude that Torres exercised control over the disputed aspects that survive summary judgment. First, the court finds that Torres' involvement with the FMLA process was more than "merely ministerial" because he was able to singlehandedly initiate [*71] or delay the FMLA paperwork process. Second, Torres was directly responsible for completing Plaintiff's performance review. For these reasons, the court finds that there is evidence from which a reasonable jury might conclude that Torres can properly be held individually liable for Plaintiff's remaining FMLA claims. Whether he *is* liable in the instant case is a question of fact inappropriate for determination at this time. Therefore, Defendants' motion for summary judgment is denied as to Torres' individual liability.

**IV. CONCLUSION**

2007 U.S. Dist. LEXIS 20828, *

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 67) is hereby granted in part and denied in part. Specifically, as to Plaintiff's interference claim, summary judgment is denied as to Torres' delay in processing Plaintiff's FMLA request and granted as to Torres' alleged harassment of Plaintiff. As to Plaintiff's retaliation claim, summary judgment is denied as to the negative performance review; granted as to Plaintiff's termination; granted as to Torres' alleged harassment of Plaintiff; and granted as to Defendants' failure to discipline Torres. In addition, summary judgment is denied as to Torres' individual liability.

[*72] A final pretrial conference will be held in the within case on May 2, 2007, at 2:00 p.m. Trial shall commence on June 25, 2007, at 9:00 a.m. A separate trial order shall issue.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.

UNITED STATES DISTRICT JUDGE

March 23, 2007



LEXSEE 2004 U.S. DIST. LEXIS 28073

**Daniel Palmer, Plaintiff, Vs. Ford Motor Company, et al., Defendants.**

**CASE NO. 1:03 CV 430**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 28073*

**April 22, 2004, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Palmer v. Ford Motor Co., 2004 U.S. Dist. LEXIS 28074 (N.D. Ohio, May 26, 2004)*
Affirmed by *Palmer v. Ford Motor Co., 134 Fed. Appx. 887, 2005 U.S. App. LEXIS 10480 (6th Cir. Ohio, June 6, 2005)*

**DISPOSITION:**    [*1] Motions for Summary Judgment filed by the Union and Ford granted.

**COUNSEL:** For Daniel Palmer, Plaintiff: Howard V. Mishler, Law Office of Howard V. Mishler, Westlake, OH.

For Ford Motor Company, Ford Motor Company Cleveland Foundry and Engine Plant, Casting Plant, Ford Motor Company Pension Plan, Scott Wilson, Supervisor, Individually, Keith Kleinsmith, Individually, Frank Kluck, Individually, Michelle Price, Individually, Betress Harris, Individually, Defendants: Ellen J. Garling, Baker & Hostetler, Columbus, OH.

For International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America-UAW Local 1250, Defendants: Andrea L. Whitaker, Emily A. Tidball, Joyce Goldstein, Bryan P. O'Connor, Goldstein & O'Connor, Cleveland, OH.

**JUDGES:** PATRICIA A. GAUGHAN, United States District Judge.

**OPINION BY:** PATRICIA A. GAUGHAN

**OPINION**

**Memorandum of Opinion and Order**

**Introduction**

This matter is before the Court upon defendant Union's Motion for Summary Judgment (Doc. 29) and defendants Ford Motor Company, Ford Motor Company Cleveland Foundry and Engine Plant, Casting [*2] Plant, Ford Motor Company Pension Plan, Scott Wilson, Keith Kleinsmith, Frank Kluk, Michelle Price and Betrese Harris's Motion for Summary Judgment (Doc. 30). This case arises out of plaintiff's employment with Ford Motor Company. For the following reasons, both Motions are GRANTED.

**Facts**

Plaintiff, Daniel Palmer, filed this Complaint against defendants, Ford Motor Company; Ford Motor Company Cleveland Foundry and Engine Plant, Casting Plant; Ford Motor Company Pension Plan; Scott Wilson; Keith Kleinsmith; Frank Kluk; Michelle Price; Betress (Betrese) Harris (collectively hereafter, Ford); International Union, United Automobile, Aerospace and Agricultural Implement Workers of America-UAW; and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America-UAW Local 1250 (collectively hereafter, the Union).

Ford and the Union are parties to national and local collective bargaining agreements. [1] Plaintiff, a Caucasian male, began working for Ford in 1973 and became a member of the local Union. He has been employed in several different Ford plants. Since the late 1980s he has remained continuously employed at Ford's Brook Park operations in [*3] a machine repair work classification.

1    Plaintiff does not submit any statement of facts. Therefore, the facts are taken from those provided by Ford and the Union.

In 1995, plaintiff began seeing Dr. Mark Pagano, a psychologist, because he believed his supervisor was abusing him and he wanted "to make sure there was not issues with me that I didn't know about." Plaintiff continued to see Dr. Pagano until March 2003 when he began seeing Alan Shubert, LISW, BCD. (pltf. depo. 32-34; Doc. 33 Ex. B) Also in 1995, Ford sent plaintiff to a psychologist due to an incident wherein plaintiff threatened to shoot a Union representative with a rifle and plaintiff's "long history of difficulties interacting with both hourly and salaried employees" and it was determined that plaintiff suffered from a personality disorder. (Doc. 33 Ex. C).

Since at least 1996, plaintiff has been granted leave from work on multiple occasions for his mental health issues. (pltf. depo. Ex. A, B, C). In 1998, Dr. James Fleming, the Chief Physician [*4] at Ford's Central Medical Department, stated that plaintiff has a "severe personality disorder with paranoid elements and narcissistic elements," has a "tendency toward explosive, inappropriate gesturing and at times looses [sic] self control" and Ford has "had ongoing and continuous difficulties with [his] inappropriate behavior." (*Id.* Ex. A).

In 1999, Ford sent plaintiff for a psychological fitness for duty examination. (pltf. depo. 37). By report of July 29, 1999, Dr. Jeffrey Hutzler diagnosed plaintiff with narcissistic personality disorder, paranoid personality disorder, a sense of anger towards others whom he believes are harassing him and serious impairment in social and occupational functioning. Dr. Hutzler also noted that while plaintiff was "generally able to return to work," he "will cause constant uproar because of his personality disorders" and he "is very vociferous and aggressive in his attack on others." He concluded, "I don't believe [plaintiff] is dangerous to others or to himself, but I believe that he would be a constant source of conflict in the workforce." (*Id.* Ex. 1).

In early 2002, it was reported that plaintiff made threats regarding the Labor [*5] Relations staff, wishing them dead. Also around this time, plaintiff made numerous calls to Ford's Harassment Hotline reporting various incidents which he claimed were harassing. Internal requests were made that he be scheduled for an independent fitness for duty examination. (Doc. 33 Exs. D-F). As a result, plaintiff was placed on leave and sent for another fitness for duty examination. In May 2002, Dr. Steven Zuchowski diagnosed plaintiff with adjustment disorder with mixed disturbance of emotions and conduct, paranoid personality disorder, narcissistic personality disorder and a history of alcohol dependence. (pltf.

depo. Ex. 2). Dr. Zuchowski concluded that plaintiff could return to work with extensive conditions but that he was at "moderate-to-high risk of lower level violence to others such as impulsively striking or slapping another individual." He found plaintiff to represent a low risk for serious violence. (*Id.*).

Plaintiff was brought back to work from medical leave and given full back pay for his time off. (Thomas Wood aff.).

Since 1995, plaintiff has filed over 60 grievances with the Union. He has also filed numerous "Statements of Complaint" with Ford and made more [*6] than 50 calls to Ford's safety and harassment hotlines during the course of 1 1/2 years. It has been reported that he has acted abusively and made threatening remarks to the hotlines' operators. Plaintiff has also filed multiple unfair labor practice charges with the National Labor Relations Board against the Union and Ford. (pltf. depo. Doc. 33 Exs. G and H).

This lawsuit was filed on March 10, 2003, asserting five causes of action. Count One alleges that Ford has incorrectly regarded plaintiff as mentally ill and retaliated against him for engaging in protected activity in violation of *Ohio Revised Code § 4112*. Count Two alleges that the Union has breached its duty of fair representation with regard to grievances plaintiff has filed and Ford has breached the Collective Bargaining Agreement. Count Three alleges that Ford has discriminated against plaintiff on the basis of his race in violation of Title VII and the Ohio Revised Code. Count Four alleges that defendants Wilson, Kluck, Kleinsmith, Harris and Price have inflicted metal distress on plaintiff and deprived him of certain job rights. Count Five alleges a violation of Ohio Revised Code based on the actions of defendants Wilson, [*7] Gluck and Kleinsmith.

This matter is before the Court upon the Motions for Summary Judgment filed by Ford and the Union. Because some of the claims are intertwined, the Motions will not be addressed separately.

**Discussion**

**(1) Counts One and Five**

Count One alleges that Ford incorrectly regarded plaintiff as mentally ill and retaliated against him for engaging in protected activity in violation of *Ohio Revised Code § 4112*. Count Five is based on plaintiff's allegation that the individual defendants perceived him as mentally ill.

**(a) "regarded as" claim**

The Sixth Circuit has stated that "there are two apparent ways" to determine whether an individual is "regarded as disabled:"

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. To run afoul of the act, then, a covered entity must hold a mistaken belief that a claimant is disabled within the meaning of the acts.

*Mahon v. Crowell, 295 F.3d 585, 592 (6th Cir. 2002).* [*8] [2]

> [2]    While plaintiff's Complaint refers only to the Ohio Revised Code, he seems to invoke the *Americans with Disabilities Act* (ADA) in his brief. Regardless, the analysis for disability discrimination claims is essentially the same under the ADA and *Ohio Rev.Code § 4112.02(A).* *Boerst v. General Mills Operations, Inc., 25 Fed. Appx. 403 (2002)* and *Brune v. BASF Corp., 2000 U.S. App. LEXIS 26772, 2000 WL 1597908 (6th Cir. Oct. 17, 2000).*

Ford asserts that plaintiff cannot satisfy this inquiry. The Court agrees. Plaintiff has not demonstrated that Ford held any mistaken belief. As discussed above, Ford sent plaintiff for fitness for duty examinations on at least two occasions as a result of his threats of severe violence in the workplace. Thomas Wood, Ford's Senior Labor Relations Representative, avers, "It is Ford's standard procedure to send an employee who threatens bodily harm or to kill another Ford employee for a psychological fitness for duty examination to [*9] determine whether the employee is a threat to himself or herself or others." (Wood aff.). While plaintiff was returned to work, he was diagnosed with several mental conditions. In addition, plaintiff began seeing his own psychologist in 1995. This doctor signed several requests for leave of absence on plaintiff's behalf for his chronic mental health condition and personality disorder.

Plaintiff contends that he is not disabled within the meaning of the Americans with Disabilities Act (ADA) but that he is regarded as such by Ford. His only assertion in this regard is as follows:

> It is the Plaintiff's position that due to the fact that the Defendants regarded him

as mentally ill or a danger to himself and/or others, that when he would present an opinion or demonstrate zeal and/or initiative it would be perceived as a flagrant insultation [sic] or exacerbated mental illness.

(Doc. 42 at 11). Plaintiff points to no evidence that he was actually treated differently because Ford mistakenly believed that plaintiff was substantially limited in a major life activity due to his mental illness. In fact, there is no evidence that Ford regarded plaintiff as significantly impaired [*10] in any major life activity such as sitting, walking, etc. Plaintiff may be claiming that Ford incorrectly regarded him as disabled in the major life activity of working. However, the evidence only shows that Ford sent plaintiff for fitness for duty examinations in accordance with its standard procedure due to plaintiff's behavior.

Plaintiff submits his affidavit [3] which states that "he has been incorrectly perceived or regarded as having mental illness. He does not have mental illness." (pltf. aff. 1 at 4). This self-serving conclusion does not create an issue of fact where, as discussed above, Ford had documentation from plaintiff's own doctor that plaintiff had a mental illness and in accordance with its standard procedure, Ford sent plaintiff for psychological fitness for duty examinations after he threatened serious physical harm to others. Ford received further documentation that plaintiff was mentally ill. Thus, there is no evidence that plaintiff was treated differently because Ford mistakenly regarded him as disabled.

> [3]    Plaintiff actually submits three different affidavits which are referred to hereafter as follows: Ex. A to Doc. 41 referred to as pltf. aff. 1; Ex. B to Doc. 41 and Doc. 42 referred to as pltf. aff. 2; Ex. A to Doc. 42 referred to as pltf. aff. 3.

[*11] In *Mahon, supra,* the employer was entitled to summary judgment where there was no evidence that plaintiff was treated differently because the employer mistakenly regarded him as disabled. Plaintiff had asserted that he was separated from other employees because he was a workers' compensation recipient. However, the court stated that the employer "did not treat [plaintiff] differently because [the employer] mistakenly regarded him as disabled. Rather, under [plaintiff's] own theory[, the employer] treated him differently because it correctly regarded him as a recipient of workers' compensation. Thus, [the employer] held no mistaken views of [plaintiff.]" *Mahon, 295 F.3d at 593.* Likewise, herein, Ford only treated plaintiff differently from other employees by sending him to a fitness examination because he

threatened harm to others. Moreover, Ford had knowledge through plaintiff's own doctor, as well as the independent examiners, that plaintiff suffered from a mental health condition. Plaintiff has not demonstrated that his opinions were disregarded because Ford mistakenly believed he was mentally ill.

Finally, plaintiff's affidavit also [*12] states in relevant part that he "has never been told by any psychiatrist or psychologist that he had a paranoid disorder or that he was a risk to himself or others ... [and] that the only personality trait that was associated with him was narcissism." (pltf. aff. 1 at 2). Whether or not he was so informed is irrelevant to Ford's knowledge of his mental illness. Notwithstanding, plaintiff's own doctor did state that plaintiff had a personality disorder.

For these reasons, summary judgment is granted in Ford's favor as to that portion of Count One alleging a violation of Ohio's disability statute and on Count Five.

### (b) retaliation claim

Plaintiff alleges that Ford retaliated against him in violation of the Ohio Revised Code "for filing safety violations, EEOC charges and inter-corporate statements of complaints as well as harassment reports." (Compl. P7).

In the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework. *Weigel v. Baptist Hosp.*, 302 F.3d 367, 381 (6th Cir.2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)). In order to survive summary judgment on [*13] a retaliation claim a plaintiff must demonstrate that: (1) he engaged in protected activity; (2) the exercise of his protected rights was known to the defendant; (3) the defendant consequently took an employment action adverse to plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Delisle v. Brimfield Township Police Department*, 94 Fed. Appx. 247, 2004 WL 445181 (6th Cir. March 8, 2004) (citing *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir.1999)). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action and the plaintiff may rebut the defendant by demonstrating that the articulated reason was a mere pretext for discrimination. *Id.* (citations omitted). [4]

> 4 Claims of retaliation are analyzed in the same manner whether brought under federal or state law. *Delisle v. Brimfield Township Police Department*, 94 Fed. Appx. 247, 2004 WL 445181 (6th Cir. March 8, 2004)

[*14] Ford asserts that plaintiff fails to establish a prima facie case because he cannot show that he suffered an adverse employment action. The Court agrees. Plaintiff's only argument as to this claim is that he "was retaliated against after participating in protected activity in the form of excessive discipline and the loss of economic opportunities and advancement." (Doc. 42 at 11). While there are no references to supporting evidence, plaintiff's affidavit testimony asserts, (1) Ford has "attempted to silence him by allowing his toolbox to be stolen twice" without compensation, (2) "retaliation took the form of stereotyping or stigmatizing him as a mentally ill individual whose opinion was worthless when he would begin to opine on a particular subject" and (3) he was suspended for 30 days for an alleged disparaging remark to safety personnel.

In order for plaintiff to show that he suffered an adverse employment action, he must demonstrate a materially adverse change in the terms and conditions of his employment. *Douglas v. Caldera*, 29 Fed.Appx. 257 (6th Cir. 2002). The first and second averments, stated immediately above, do not satisfy this criterion. Plaintiff does [*15] aver that he was given a 30 day suspension. However, this is only a conclusory and self-serving averment unsupported by documentation and does not raise an issue of fact. *See Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69-70 (6th Cir.1982) (holding that to defeat an otherwise supported motion for summary judgment, affidavits must contain more than conclusory allegations) and *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 171 (6th Cir.1996) (holding that the plaintiffs failed to create an issue of fact by alleging numerous instances of disparate treatment and hostile work environment in conclusory terms with no reference to names, times, occasions).

Even assuming plaintiff has shown an adverse employment action, he presents no evidence of a causal connection between the protected activity and the adverse employment action. Because plaintiff fails to establish a prima facie case, his retaliation claim fails.

For these reasons, summary judgment is granted to Ford on Counts One and Five.

### (2) Count Two

Count Two alleges that the Union has breached its duty of fair representation with regard to grievances plaintiff has filed and Ford has breached [*16] the Collective Bargaining Agreement. This is a claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), otherwise known as a "hybrid" action. The Sixth Circuit has recently restated the elements of such a cause of action:

A hybrid *section 301* action involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union. *Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir.1994).* The two claims are 'inextricably interdependent.' *DelCostello v. Teamsters, 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).* Unless a plaintiff 'demonstrates both violations, he cannot succeed against either party.' *Bagsby v. Lewis Bros. Inc. of Tenn., 820 F.2d 799, 801 (6th Cir.1987).* In order to prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).* Each of these wrongs is mutually [*17] independent, meaning, that 'the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty.' *Black, 15 F.3d at 584.* 'Actions for a union's breach of its otherwise-complete control over the handling of an employee's grievance.' *Id.*

*Garrison v. Cassens Transport Co., 334 F.3d 528, 538 (6th Cir. 2003).*

### (a) statute of limitations

Ford and the Union argue that plaintiff's hybrid claim is barred by the applicable six month statute of limitations.

It is well-established that a "hybrid breach of contract/breach of the duty of fair representation action is subject to the six-month statute of limitations period as set forth in *29 U.S.C. § 160(b).*" *Hanely v. Int'l Bhd. of Locomotive Eng'rs, 69 Fed. Appx. 292, 298 (6th Cir.2003)* (citing *DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 164-65, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983)*). "A hybrid cause of action accrues and the six-month limitations period begins to run when the plaintiff knew or should have [*18] known of the union's alleged breach of its duty of fair representation." *Id.* (citing *Ryan v. Gen. Motors Corp., 929 F.2d 1105, 1111 (6th Cir.1989)*). When the claim against the union concerns its failure to pursue or process a grievance, the claim accrues when the period for pursuing a

grievance under the collective bargaining agreement has expired. *Id.* (citing *Shapiro v. Cook United, Inc., 762 F.2d 49, 51 (6th Cir.1985)*).

Pursuant to this Court's instruction at a previous status conference, the Union memorialized by letter the four grievances at issue in this litigation: 1) Grievances P5553/GP5569, 2) Grievance CC186309, 3) Grievance P6605 and 4) Grievance P6596. (Doc. 33 Ex. J). Plaintiff did not counter this assertion.

Plaintiff does not dispute that Grievances P5553/GP 5569 and CC86309 are time-barred. He asserts that Grievances P6605 and P6596 are timely. Therefore, only the latter are at issue herein.

**Grievance P6605:** On June 5, 2002, plaintiff was disciplined for failing to follow instructions given by a member of management. (pltf. depo. Ex. 27). On June 7, 2002, the Union filed a grievance concerning the discipline. (*Id.* [*19] Ex. 28). On April 11, 2003, the grievance was withdrawn. (*Id.* Ex. 29). This Complaint was filed on March 10, 2003.

The Union asserts that the claim regarding this grievance is time-barred because the statute of limitations began to accrue no later than the date the grievance was filed- June 7, 2002. This is so because plaintiff testified that as of the date the grievance was filed he was not happy with the Union's handling of it and he was dissatisfied with the Union's representation on the grievance. (pltf. depo. 250). Because the Complaint herein was filed on March 10, 2003- more than six months after June 7, 2002- the Union contends that the claim is untimely. Plaintiff argues that the claim regarding this grievance is not time-barred because the grievance was withdrawn on November 23, 2002 and, thus, the Complaint was filed less than six months later.

The Court finds the claim based on this grievance to be time-barred. Plaintiff does not point to evidence showing that the grievance was withdrawn on November 23, 2002. Rather, the evidence shows that it was withdrawn on April 11, 2003- one month after the Complaint herein was filed. Nonetheless, the limitations period begins [*20] to run when the plaintiff knew or should have known of the union's alleged breach of its duty of fair representation. Plaintiff testified that he was dissatisfied with the Union's representation from the date the grievance was filed. Because plaintiff did not file this lawsuit within six months of June 7, 2002 (the date the grievance was filed) it is untimely.

**Grievance P6596:** On January 28, 2002, plaintiff was disciplined for being "off the job w/o permission." (Doc. 33 Ex. N). On February 13, 2002, the Union filed a grievance. (*Id.* Ex. O). On December 9, 2002, the griev-

ance was resolved when Ford agreed to pay plaintiff the full amount of lost pay. (*Id.*).

Again, the Union argues that the cause of action accrued when the grievance was filed because plaintiff testified that he was dissatisfied with the Union's representation as of that date. Plaintiff asserts that the statute of limitations should begin to run on December 9, 2002 when the grievance was resolved.

The Court finds the claim to be untimely. The grievance was resolved fully in *plaintiff's* favor on December 9, 2002. Therefore, it is nonsensical to find that plaintiff knew of the Union's breach of duty **[*21]** at that time. Plaintiff now states that it was settled on that date "without any input from the plaintiff and without protecting [his] right to overtime and/or benefits within said grievance." (Doc. 41 at 7). However, the grievance only sought full pay for the six hours that plaintiff lost as a result of the discipline. Plaintiff signed the grievance. (Doc. 33 Ex. O). He cannot now state that he was dissatisfied that the Union did not seek more in resolving the grievance. Thus, the statute of limitations began to run on the date the grievance was filed (February 13, 2002) and is, therefore, time-barred because the Complaint herein was filed more than six months later.

For these reasons, plaintiff's hybrid claim is barred by the statute of limitations.

### (b) failure to exhaust

Assuming plaintiff's claim is not barred by the statute of limitations, it is barred by his failure to exhaust internal Union remedies.

The Sixth Circuit recognizes that "a union member must exhaust internal union remedies before [he] can sue the union for the breach of the duty of fair representation, unless the member can demonstrate the futility of exhaustion." *LaPerriere v. International Union, United Auto., Aerospace and Agr. Imp. Workers of America, 348 F.3d 127, 131 (6th Cir. 2003)* **[*22]** (citation omitted). However, if any of the following factors are found to exist, the court may properly excuse the employee's failure to exhaust: (1) where union officials have shown hostility toward the member; (2) where the appeals procedures inadequately reactivated the grievance or did not award the full relief sought; and (3) where delay would occur if the procedures were followed. *Id.*

Article 33 of the Union Constitution at issue here provides an appeals process with regard to grievances. Plaintiff did not file an Article 33 appeal over either of the grievances at issue. (Barbara Klein aff., Eunice Stokes-Wilson aff.).

Plaintiff appears to argue that his failure to exhaust should be excused because of union officials' hostility

and his unfamiliarity with Article 33. For the following reasons, neither argument is persuasive.

Plaintiff avers that the Union was biased against him because he created a web site to keep his fellow workers abreast of Union developments, he demanded refund of politically based Union dues, he had a "generally conspicuous demeanor which [the Union] reported to him on several occasions" and Union president Willie Hubbard and his representative **[*23]** Randy Payne "indicated that he would not get any adequate type of representation due to his 'Beck stand.'" (pltf. aff. 1).

Plaintiff fails to demonstrate the required hostility. The Sixth Circuit has clearly stated, "In order for hostility to excuse exhaustion, hostility must exist at every level of the appeals process. An employee has a duty to pursue an appeal..." *LaPerriere, 348 F.3d at 131*. Here, plaintiff presents no evidence that International Union officials or Public Review Board members are hostile toward him. Rather, he only specifically identifies local president Hubbard as biased. Therefore, plaintiff does not demonstrate hostility at every level of the appeals process.

Additionally, plaintiff avers that although "he has heard the expression Article 33 Appeal prior to December, 2002, he was not familiar with the precise procedure associated with the same..." and that no Union representative advised him with regard to an Article 33 Appeal. (pltf. aff. 1). Plaintiff also testified at deposition that he was unaware of Article 33.

However, evidence submitted as Exhibits to plaintiff's deposition clearly shows that plaintiff has filed Article 33 complaints **[*24]** on other issues (Doc. 33 Exs. 7-11). Therefore, he was familiar with the Article 33 procedures.

For these reasons, the Court finds no basis to excuse the exhaustion requirements and plaintiff's hybrid claim is dismissed for failure to exhaust.

### (c) Union's duty of fair representation

Assuming the statute of limitations has not expired and that plaintiff has exhausted his claim with regard to the grievances at issue, the Union argues that there has been no breach of the duty of fair representation. This Court agrees.

As stated above, "In order to prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." *Garrison, 334 F.3d at 538* (citing *Vaca v. Sipes*). The Union asserts that plaintiff has no evidence of such bad faith or discriminatory conduct.

Grievance P6605 was ultimately withdrawn by the Union. (Doc. 33 Ex. 29). There is no evidence of arbitrary, discriminatory, or bad faith conduct in doing so. Plaintiff had been disciplined for failing to return to work when instructed to do so after he was found [*25] in the administration building. Plaintiff's discipline had been enhanced because of his previous similar conduct. The grievance had requested that plaintiff "be paid all lost monies and his record cleared." (Doc. 33 Exs. 27-29). However, the Union points out that plaintiff's own deposition testimony does not present a consistent version of what happened on the day plaintiff received the discipline. (pltf. depo. 233-246). And, the evidence shows that the Union investigated the facts underlying the Grievance and even noted plaintiff's uncooperative and disrespectful manner at the time of the incident. Thus, the Union apparently decided to not proceed with the grievance. Plaintiff fails to present any evidence raising an issue of fact as to whether this decision by the Union was arbitrary.

With regard to Grievance P6596, plaintiff was disciplined for being "off the job w/o permission." The Union filed a grievance, signed by plaintiff, requesting reimbursement for the "six hours straight time" plaintiff lost. The Grievance was subsequently resolved when Ford agreed to pay plaintiff the full amount of lost pay. (Doc. 33 Exs. N and O). Therefore, the Union obtained for plaintiff the exact [*26] relief that he had requested. While plaintiff now asserts that he wanted more, he signed the grievance. Therefore, plaintiff fails to refute the evidence that the Union did not act in bad faith.

For these reasons, plaintiff has not demonstrated that the Union breached its duty of fair representation. Without such a showing, plaintiff's § 301 hybrid claim fails. *Garrison, 334 F.3d at 538* ("A hybrid *section 301* action involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union. The two claims are 'inextricably interdependent.' Unless a plaintiff demonstrates both violations, he cannot succeed against either party.") Thus, because plaintiff fails to demonstrate that the Union breached the duty of fair representation, the Court need not proceed to whether Ford breached the collective bargaining agreement.

For these reasons, summary judgment is granted to Ford and the Union on Count Two.

**(3) Count Three**

Count Three alleges that Ford has discriminated against plaintiff, a Caucasian male, on the basis of his race in violation of Title VII and the Ohio Revised Code. Claims [*27] brought under the two statutes are analyzed in the same manner. *Koval v. Dow Jones & Co., 86 Fed. Appx. 61 (6th Cir. 2004).*

The Sixth Circuit has set forth the standard in analyzing disparate treatment claims of reverse racial discrimination. In the absence of direct evidence, the plaintiff can meet his evidentiary burden through indirect evidence under the *McDonnell Douglas* framework. The plaintiff bears the initial burden of establishing a prima facie case by showing: (1) that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority, and (2) that the employer treated differently employees who were similarly situated but not members of the protected class. *Weberg v. Franks, 229 F.3d 514, 522-523, footnote 8 (6th Cir. 2000), Zambetti v. Cuyahoga Community College, 314 F.3d 249 (6th Cir. 2002)* and *Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603 (6th Cir. 2003).*

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to proffer a nondiscriminatory reason for its employment decision and plaintiff must [*28] then show that this was merely a pretext for discrimination.

The Sixth Circuit has stated with regard to the first prong of plaintiff's initial showing:

> To satisfy the burden of demonstrating background circumstances that give rise to a suspicion of discrimination against the majority in employment, the plaintiff may present evidence of the defendants' unlawful consideration of race in employment decisions in the past.

*Sutherland, 344 F.3d at 615.* With regard to the second prong, plaintiff must demonstrate that employees with whom he wishes to compare himself are "similarly-situated in all respects, absent other circumstantial or statistical evidence supporting an inference of discrimination." *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir.1998)* (quoting *Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992)*). "This means a plaintiff must prove that all of the relevant aspects of his employment situation were nearly identical to those of the non-minority's employment situation." *Seay v. TVA, 339 F.3d 454, 479 (6th Cir. 2003)* (citations omitted) and [*29] *Strong v. Orkand Corporation, 83 Fed. Appx. 751, 2003 WL 22976654 (6th Cir. Dec. 8, 2003).* Additionally, "as *Mitchell* instructs, a plaintiff must identify a person who has the same supervisor, who was subject to the same standards of conduct, and who engaged in the same conduct without differentiating or mitigating circumstances." *Mallory v. Noble Correctional Institute, 45 Fed.Appx. 463, 472 (6th Cir. Sept. 3, 2002).*

Plaintiff makes no attempt to satisfy these require-
ments. Instead, he meshes the two inquiries and points to
three instances wherein he claims he was treated differ-
ently than black employees.

First, plaintiff asserts that he was discriminated
against "concerning a black security guard and a parking
position." (Doc. 42 at 6). While offering no other expla-
nation, plaintiff cites to his deposition testimony wherein
he testified:

> When I was parking my car, like I done
> for 30 years or so, I had a black security
> guard approach me and start cussing at me
> and swearing at me and telling me to
> move my car, that I was parked illegally. I
> told him I wasn't. He started getting very
> vulgar with me. He never went once for-
> ward to the three cars that were parked
> [*30] in front of me illegally in front of
> signs saying no parking, he never con-
> fronted them due to the observation that
> they were black.

(pltf. depo. 449). While not citing to it, plaintiff's affida-
vit testimony states, "a black Security Guard's view was
preferred over [plaintiff's] version of a parking incident."
(pltf. aff. 3 at 6).

Plaintiff makes no attempt to show that the two em-
ployees were similarly situated. In fact, Ford asserts that
plaintiff and the security guard worked different jobs and
had different supervisors.

Moreover, Ford presents evidence that plaintiff was
not treated differently. Thomas Wood, Ford's Senior La-
bor Relations Representative, avers that in November
2002, he received a statement from Officer Mark Bailey
reporting that plaintiff was verbally abusive toward him
when Bailey informed plaintiff that he was double-
parked in the Ford parking lot. Wood attempted to inves-
tigate the event but was unable to substantiate either ver-
sion because Bailey did not have a witness to corroborate
his version and plaintiff, while claiming that he had a
witness, refused to disclose the name of the witness.
Therefore, neither Bailey nor plaintiff received any dis-
cipline. [*31] (Thomas Wood aff.).

Second, plaintiff asserts that he was treated differ-
ently than black employee Keith Tucker regarding breaks
and conditions of employment. However, the deposition
testimony plaintiff points to does not support that the two
were treated differently other than asserting so in a
merely conclusory manner. (pltf. depo. 372, 448). Addi-
tionally, plaintiff's affidavit simply states that plaintiff's
"co-employee was not disciplined for taking a long break

nor docked for leaving early." (pltf. aff. 3 at 6). Again,
this is a conclusory averment insufficient to create an
issue of fact. Conversely, Ford points to plaintiff's depo-
sition testimony wherein he acknowledges that he has no
"firsthand knowledge" that Tucker was not docked while
plaintiff was. (pltf. depo. 508).

Third, plaintiff asserts that he was ejected from a di-
versity class by black instructors, Betrese Harris and
Michelle Price. Plaintiff filed a grievance, statement of
complaint and EEOC charge of discrimination resulting
from the incident wherein he claims to have been un-
fairly removed from the diversity class in December
2002. [5] Plaintiff fails to present evidence that he was
treated differently than black [*32] employees. While he
avers that his "black counterpart Jimmy Tabb" was al-
lowed to remain in the class, he makes no showing that
this individual is a similarly situated employee. Nor does
plaintiff show that Tabb engaged in the same conduct
which plaintiff engaged in. In fact, plaintiff testified at
deposition that Tabb did not make any comments to the
instructors while he does not deny that he did so. (pltf.
depo. 413-414, 426). Additionally, the instructor testified
that while Tabb was cooperative after initially question-
ing the purpose of the class, plaintiff remained disruptive
and argumentative. (Michelle Price depo. 21-22, 28).

> 5  Thomas Wood avers that Ford fully investi-
> gated plaintiff's statement of complaint regarding
> the incident and found that it lacked merit. (Wood
> aff.). The EEOC charge was dismissed by admin-
> istrative decision.

For these reasons, plaintiff fails to show that he was
treated differently than similarly situated non-White em-
ployees. Even if he did, plaintiff fails to show that back-
ground [*33] circumstances support the suspicion that
Ford is that unusual employer who discriminates against
the majority. Thus, plaintiff fails to establish a prima
facie case of reverse race discrimination and the Court
need not proceed with the remainder of the burden shift-
ing analysis.

Summary judgment is warranted as to Count Three.

### (4) Count Four

Count Four alleges that defendants Wilson, Kluck,
Kleinsmith, Harris and Price have inflicted metal distress
on plaintiff and deprived him of certain job rights. To the
extent this claim is based on plaintiff's earlier allegations,
this claim fails for the same reasons stated above. Oth-
erwise, plaintiff presents no other argument supporting
this claim.

Therefore, summary judgment is appropriate.

### (5) Claims against Ford Motor Company Pension Plan

Ford argues that defendant Ford Motor Company Pension Plan must be dismissed because plaintiff fails to state a cause of action or present any evidence against this defendant. Plaintiff summarily asserts that he has lost a portion of his pension as a result of Ford's and/or the Union's conduct. However, plaintiff fails to allege that the Pension Plan took any action against him. The Court [*34] agrees that summary judgment is warranted in favor of this defendant for the reasons stated by Ford.

**Conclusion**

For the foregoing reasons, the Motions for Summary Judgment filed by the Union and Ford are granted.

IT IS SO ORDERED.

PATRICIA A. GAUGHAN

United States District Judge



LexisNexis

LEXSEE

**Britta Sundberg v. High-Tech Institute, Inc.**

**03-CV-3270(JMR/FLN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2005 U.S. Dist. LEXIS 1139; 95 Fair Empl. Prac. Cas. (BNA) 497*

**January 26, 2005, Decided**

**DISPOSITION:**   Complaint dismissed.

**COUNSEL:**   [*1]   For Britta Y Sundberg, Plaintiff: Sonja Dunnwald Peterson, Dunnwald & Peterson, Mpls, MN

For High-Tech Institute, Inc., an Arizona corporation, Defendant: Joseph M Sokolowski, Parsinen Kaplan Rosberg & Gotlieb, Mpls, MN; Lindsay J Zamzow, Parsinen Kaplan Rosberg & Gotlieb, Mpls, MN

**JUDGES:**  JAMES M. ROSENBAUM, United States District Judge

**OPINION BY:** JAMES M. ROSENBAUM

**OPINION**

ORDER

Plaintiff claims her employer discriminated against her on the basis of her gender, within the contemplation of the *Minnesota Human Rights Act* ("MHRA"). [1] This Court has jurisdiction pursuant to *28 U.S.C. §§ 1332* and *1441*. Defendant moves for summary judgment. For the following reasons, defendant's motion is granted.

> 1   Plaintiff has voluntarily dismissed her claim of intentional infliction of emotional distress.

*I. Background*

The facts are viewed in the light most favorable to plaintiff Defendant is a national multi-occupational career college. Plaintiff began her employment with the college as an admissions [*2] representative on June 24, 2002. Admissions representatives solicit and follow-up

on leads for potential student enrollment. Plaintiff was interviewed, hired, and supervised by Elizabeth Beseke.

Once plaintiff's employment began, the two women spoke as co-workers do. As occurs in the real world, they occasionally spoke about matters not wholly employment-related. During one conversation, Ms. Beseke told plaintiff she was dating a coworker, and invited plaintiff on double dates. On four or five other occasions early in plaintiff's employment, Ms. Beseke offered to arrange blind dates for her. Plaintiff declined these invitations, but never indicated these offers and suggestions made her uncomfortable.

Plaintiff and Ms. Beseke maintained a friendly workplace relationship, which included discussions about their personal lives. On November 27, 2002, Ms. Beseke called plaintiff into her office and asked her, "So what's up, do you like guys or girls?" Plaintiff responded, "Why are you asking me that?" Ms. Beseke replied, "You never talk about guys."

Plaintiff stated she preferred to separate her personal and professional lives. Nonetheless, Ms. Beseke continued asking questions such as,  [*3]  "Do you have plans? Do you want to get married? Do you want to have kids? What do you want to do?" According to plaintiff, she felt pressured and compelled to mention her college boyfriend even though she was not dating anyone at the time. Ms. Beseke responded, "It's okay if you're gay. I've got friends that are gay and bisexual. That's fine." (Sundberg Dep. at 91-92).

While plaintiff acknowledges she did not believe this questioning was motivated by a sexual interest, she considered it intrusive and inappropriate. Although plaintiff did not tell Ms. Beseke she was offended, she believed her supervisor "caught the gist" of how she was feeling. (Sundberg Dep. at 93). According to plaintiff, Ms. Beseke's statement that it was "okay" to be gay was

Case: 08-4435    Document: 30-2    Filed: 05/07/2009    Page: 58

Page 2

2005 U.S. Dist. LEXIS 1139, *; 95 Fair Empl. Prac. Cas. (BNA) 497

neither an apology nor an attempt to placate her. Instead, she considered it to be "needling" her to admit she was gay. (*Id.*)

The parties dispute the length of this conversation, but the Court will assume it lasted at most 45 minutes as plaintiff claims. The discussion ended with the arrival of Bill Schulte, the co-worker Ms. Beseke was dating. According to plaintiff's unsworn notes, Mr. Schulte sat next to plaintiff, took her hand, said [*4] he had her home phone number, and asked if they were "going out this weekend." Ms. Beseke said "that's fine." Plaintiff responded, "[you] will need to wait in. line," and then left the room. (Sundberg Aff. Ex. 1.)

Several days later, a female co-worker told plaintiff that Mr. Schulte had come by and asked, "Are you jealous that your girl friend is in there with the boss?" (Sundberg Dep. at 99.) Concerned that her supervisor was repeating their conversation, plaintiff met with Ms. Beseke privately on December 3, 2002, and told her she was uncomfortable with their earlier discussion. Ms. Beseke apologized and reiterated that it was all right if plaintiff was gay. Plaintiff said she did not want to discuss her sexuality, and accused Ms. Beseke of telling others about their conversation. When Ms. Beseke denied this, plaintiff told her about Mr. Schulte's alleged comment. Ms. Beseke replied that he "says dumb things all the time." (Sundberg Dep. at 101.)

Plaintiff informed Ms. Beseke that her concerns were serious, and warned that her comments amounted to "a lawyer's dream case." (Sundberg Dep. at 104.) Ms. Beseke then became angry, and the two women agreed they would never again discuss [*5] their personal lives. Plaintiff concedes they never did.

After this conversation, plaintiff perceived a change in Ms. Beseke's attitude toward her that she described as a "cold shoulder." (Sundberg Dep. at 120.) Plaintiff claims Ms. Beseke ignored her, avoided her, spoke to her impatiently, and gave short answers to her questions. She contrasts this to Ms. Beseke's relations with other employees to whom the supervisor was more friendly and generous with her time. Plaintiff claims Ms. Beseke also stopped praising her in front of other employees, stole one of her ideas without giving her credit, and rated plaintiff's work merely "good," when plaintiff felt she deserved better. Notwithstanding these issues, there were no further discussions of plaintiff's social relationships.

The entire office performed below expectations early in 2003. Defendant's company-wide weekly performance reports, generated in February and March 2003, consistently ranked plaintiff last among the Minneapolis office representatives, and among the last nationwide. (Sokolowski Aff. Ex. B.). Plaintiff admits she

was ranked "among the lowest" performing representatives during this time. (Sundberg Dep. at 68.)

Around [*6] the same time, Ms. Beseke's log indicated plaintiff was to receive no new leads. Defendant maintains, and plaintiff does not dispute, that she had requested fewer leads so that she might follow up on those she had already received. (Affidavit of Todd Brown at P 2; Beseke Dep. at 155.)

On March 14, 2003, Ms. Beseke gave plaintiff a two-week performance plan under which she was required to develop leads and generate new enrollments more aggressively. The plan called for a 17% return of her leads into enrollments, while the company's performance standards described a 14% return as "fair," and a 16% return as "good." [2] No other employee was put on a performance plan. Plaintiff thereafter sought a meeting with Todd Brown, Ms. Beseke's supervisor.

> 2 Defendant presented unrebutted evidence that at the time of the performance plan, the other employees in the office were performing at the 17% level, and that this was how plaintiff's standard was set. (Brown Aff. P 3.)

The meeting between Mr. Brown, Ms. Beseke, and [*7] plaintiff was held on March 17, 2003, approximately 3 1/2 months after the discussions of plaintiff's social life. Plaintiff told Mr. Brown her performance problems arose from Ms. Beseke's November inquiry into her sexuality, and then requested to be transferred to the Denver office. This was the first time plaintiff raised any of her concerns to anyone other than Ms. Beseke.

Mr. Brown denied the requested transfer due to plaintiff's poor performance, and directed plaintiff to report directly to him rather than to Ms. Beseke. This change made plaintiff the only admissions representative reporting directly to Mr. Brown. According to defendant, the reassignment was made to assure plaintiff that she did not have to report to Ms. Beseke. Because plaintiff claims she felt intimidated by Mr. Brown, she now claims this reassignment was a reprisal for her complaint. Plaintiff claims she would have preferred to report to Ms. Beseke, but made no such request to Mr. Brown.

During the last few weeks of her employment, plaintiff reported directly to Mr. Brown. She considered him to be critical of her work, and felt he held her to unfairly high standards, unfairly challenging her use of break [*8] time, leave time, and vacation time. Plaintiff further felt he was rude, brusque, sarcastic, and impatient without justification. She states in her unsworn notes that, on two occasions, he looked into her office to check on her and "shook his head in disgust" as he walked by. Once, he "sighed and groaned" in connection with her request for overtime. (Sundberg Aff. Ex. 1.) However, plaintiff ac-

Case: 08-4435    Document: 30-2    Filed: 05/07/2009    Page: 59

Page 3

2005 U.S. Dist. LEXIS 1139, *; 95 Fair Empl. Prac. Cas. (BNA) 497

knowledges that throughout her employment she was able to take all leave time for which she was eligible, and all of her overtime requests were approved. (Sundberg Dep. at 126-131, 135). Plaintiff further acknowledges she was never disciplined regarding the issues reflected in her March, 2003, performance plan. (Sundberg Dep. at 79.)

While on vacation in early May, 2003, plaintiff decided to resign. She submitted her resignation letter on May 13, 2003. Ten days later, she filed this action in Minnesota's Fourth Judicial District. Defendant timely removed the action to this Court.

II. *Analysis*

A. *Summary Judgment*

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. *Rule 56 of the* [*9] *Federal Rules of Civil Procedure* ("Fed. R. Civ. P."); *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. *See Anderson, 477 U.S. at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992).* "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson, 477 U.S. at 247-48.* If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. *See Celotex, 477 U.S. at 322.*

Here, plaintiff's claim is premised on the MHRA, which prohibits an employer from discriminating on the basis of sex and sexual orientation [*10] with respect to termination and "hiring, tenure, compensation, terms, upgrading, conditions, facilities or privileges of employment." *Minn. Stat. § 363.03, subd. 1(2)(c) (2002).* [3] Reprisal against those who "oppose[] a practice forbidden" under the Act is likewise prohibited. *Minn. Stat. § 363.03, subd. 7 (2002).*

> 3    The relevant portions of the MHRA were repealed and renumbered in 2003, and now appear at *Minn. Stat. § 363A.01 et seq* (2004).

A. *Harassment*

Not every workplace sexual comment becomes actionable sexual harassment. *Cummings v. Koehnen, 568 N.W.2d 418, 424 (Minn. 1997).* To establish employer MHRA liability, an employee must prove that the conduct she experienced (1) was unwelcome; (2) consisted of "sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature"; was (3) "sufficiently pervasive so as to substantially interfere with the plaintiff's employment or to create a hostile, intimidating [*11] or offensive work environment"; and (4) was known or should have been known to the employer, who failed to take "timely and appropriate action." *Id.; Minn. Stat. § 363.01, subd. 41 (2002).*

The Court finds plaintiff has failed to present a genuine issue of fact to be presented to a jury on the third element. As a result, her harassment claim must be dismissed. All parties acknowledge that a conversation occurred between plaintiff and Ms. Beseke in late November, 2002. It is also a fact that, from the moment plaintiff told Ms. Beseke she did not want to discuss her sexuality or social life, Ms. Beseke never referred to it again. While the behavior of Ms. Beseke and Mr. Schulte may have been clumsy and insensitive, no reasonable jury could find on this evidence that it rose to a level which constituted a "hostile, intimidating or offensive" workplace.

Neither the law, nor logic, demands that an employer maintain a "pristine working environment." *Klink v. Ramsey County, 397 N.W.2d 894, 900 (Minn. Ct. App. 1986), review denied* (Minn. 1987), abrogated in part on other grounds in *Cummings, 568 N.W.2d at 420, n.8.* "Carelessness and insensitivity [are] [*12] not tantamount to purposeful sexual harassment." *Klink, 397 N.W.2d at 902.* Actionable conduct must be so "severe or pervasive" that it alters the conditions of plaintiff's employment, *id. at 901,* and be both subjectively and objectively offensive. *Goins v. West Group, 635 N.W.2d 717, 725 (Minn. 2001); Johns v. Harborage I, Ltd., 585 N.W.2d 853, 861 (Minn. Ct. App. 1998).* In making this determination, a court must consider the conduct's "nature, frequency, intensity, location, context, duration, and object or target." *Klink, 397 N.W.2d at 901.*

Beseke's and Schulte's behavior may well have offended plaintiff. Yet this alone cannot sustain a claim under the MHRA. *See Bilal v. Northwest Airlines, Inc., 537 N.W.2d 614, 619 (Minn. 1995); see also Soukup v. Graco, Inc., 2003 Minn. App. LEXIS 585, 2003 WL 21058572, *4 (Minn. Ct. App. 2003)* (plaintiff's subjective perception that sexual harassment occurred, without more, does not establish an issue of fact). Plaintiff has entirely failed to show that after a brief unpleasantness, a reasonable person would have found the workplace so

altered they would [*13] have found further service impossible.

The MHRA cases upon which plaintiff relies provide little support for her argument. Each involves conduct far more frequent and egregious. *See, e.g., Cummings, 568 N.W.2d at 420* (harasser pinched plaintiff's buttocks and inner thigh, grabbed plaintiff's hips to simulate anal sex, and repeatedly subjected plaintiff to sexually explicit and derogatory taunts); *Costilla v. State, 571 N.W.2d 587, 589-90 (Minn. Ct. App. 1997)* (a longer-than-two year period when harasser touched, grabbed, propositioned, and threatened plaintiff, and made offensive phone calls to her at home); *Bersie v. Zycad Corp., 399 N.W.2d 141, 142-43 (Minn. Ct. App. 1987)* (harassers compared plaintiff to a prostitute, massaged her neck and shoulders, and intimidated her physically by blocking her path and invading her personal space). Plaintiff correctly notes that a single severe incident may be actionable under the MHRA, but she alleges nothing rising to this level. *See Johns, 585 N.W.2d at 861* (co-worker who had previously harassed other women, lured plaintiff into storeroom, exposed himself to her, and [*14] pulled down her shorts).

When the Court compares the relatively banal circumstances of this case with the pervasive and obtrusive situations in the cited cases, the weakness of plaintiff's case is clear. Plaintiff's supervisor may have offended her, but the supervisor used no derogatory, abusive, or judgmental language; indeed, she repeatedly assured plaintiff there would be no employment consequence regardless of plaintiff's sexual orientation. Nor does the perhaps unseemly conduct of Mr. Schulte elevate her claim. Even accepting plaintiff's claim that his actions were offensive, it remains an isolated incident. As a matter of law, these incidents are neither severe nor pervasive; they cannot sustain a claim of sex or sexual orientation harassment as contemplated by the MHRA. Accordingly, these claims are dismissed.

## C. *Reprisal*

Under the MHRA, reprisal consists of "any form of intimidation, retaliation or harassment." *Minn. Stat. § 363.03, subd. 7. (2002)*. Minnesota analyzes MHRA reprisal claims under the burden-shifting formula used in federal Title VII actions. *Fletcher v. St. Paul Pioneer-Press, 589 N.W.2d 96, 101 (Minn. 1999), citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)* [*15] and *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. As a result, plaintiff must first establish a prima facie case of retaliation, defined as (1) statutorily-protected conduct; (2) adverse employment action; and (3) a causal connection between the two. *Fletcher, 589 N.W.2d at 102.* The employer must then articulate a legitimate, non-

retaliatory reason for its action. *Id.* If the employer does so, the burden shifts back to plaintiff to demonstrate that the employer's reasons are not the real reasons, but instead, a pretext for retaliation. *Id.*

Here, the Court will assume plaintiff has established the first element. Two complaints were made regarding what plaintiff perceived to be harassment: once informally to Ms. Beseke, her immediate supervisor in December, 2002, when she described their earlier conversation as a "lawyer's dream case"; and later, in March, 2003, when plaintiff directly complained to Mr. Brown and requested a transfer. There is no suggestion that her complaints were made in bad faith.

The second element is more problematic. "Not everything that makes an employee unhappy is an actionable adverse employment action." *LaCroix v. Sears, Roebuck & Co., 240 F.3d 688, 691 (8th Cir. 2001).* [*16] Instead, the Court considers whether plaintiff experienced a "material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Id.; see also Minneapolis Police Dep't v. Minneapolis Comm'n on Civil Rights, 425 N.W.2d 235, 240 (Minn. 1988)* (reassignment to different shift not adverse action where wages, benefits, workload, and duties remained the same).

Plaintiff asks the Court to conclude that the MHRA's language prohibiting "any form" of "intimidation, retaliation or harassment" encompasses the "cold shoulder" she claims she experienced. But plaintiff cites, and the Court finds, no case affording the MHRA such a broad reading. Rather, Minnesota requires plaintiff to establish an adverse employment action. *See Minneapolis Police Dep't, 425 N.W.2d at 240.* A supervisor's failure to be nice, even in Minnesota, will not suffice. *See Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997)* (supervisors' "hostility and personal animus" not adverse employment action under Title VII).

Plaintiff next claims she received fewer leads in early 2003 and was placed on probation. Her co-workers were not [*17] similarly treated. She claims she was required to meet higher standards than outlined in the company's performance standards reports. Her request for a transfer was denied, and instead, she was reassigned to a different supervisor. The Court does not consider these incidents to be adverse employment actions under the MHRA, for they resulted in no difference in compensation, benefits, workload, or duties. *See Minneapolis Police Dep't, 425 N.W.2d at 240.* Plaintiff was not denied any benefit to which she was entitled. Nor was she fired or disciplined as a result of failing to meet the higher standards.

Even if the Court concluded these incidents amounted to adverse employment actions, plaintiff has failed to show discriminatory or retaliatory animus. De-

Case: 08-4435    Document: 30-2    Filed: 05/07/2009    Page: 61

Page 5

2005 U.S. Dist. LEXIS 1139, *; 95 Fair Empl. Prac. Cas. (BNA) 497

fendant has responded to these claims by offering legitimate, nonretaliatory reasons for each action. Plaintiff received fewer leads because she requested fewer leads. Her probation and the denial of her request for a transfer arose out her objective failure to produce and close on lead prospects. Her workplace performance was not only the worst in her home office, she was among the very lowest producers in the company [*18] on a national scale. She was asked to meet the enrollment level the rest of the office was meeting, and even though she failed to do so, she was not fired. In light of her failure as a productive worker, the Court cannot find a retaliation case to be presented to a jury on these facts.

It is hardly surprising that a non-productive worker such as plaintiff would be given a performance plan and denied a transfer to another similar position in another office. Rather than transferring her to another office, defendant tried to address her concerns by arranging for her to report to a different supervisor. This is a reasonable action in light of her former unpleasant experiences.

Plaintiff has failed to demonstrate that management's proffered reasons are pretextual. "The proper scope of inquiry on the issue of pretext is limited to whether the employer gave an honest explanation of its behavior." *Cierzan v. Hamline Univ., 2002 Minn. App. LEXIS 1265, 2002 WL 31553931, *3 (Minn. Ct. App. 2002)* (unpublished). Plaintiff does not deny that she, herself, requested fewer leads; in fact, she acknowledges her weak

performance. Plaintiff claims she out-performed other representatives, but this conclusion rests [*19] on her own definitions of good performance, not the company's. This cannot create a fact issue on pretext. *Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534, 546 (Minn. 2001)* (en banc) (plaintiff created fact issue on pretext by introducing evidence of prior outstanding performance as well as evidence that co-workers who made similar mistakes were not disciplined or terminated). Plaintiff has failed to meet her burden of showing that the employer's actions were motivated by a desire to retaliate.

Accordingly, plaintiff's reprisal claim cannot survive summary judgment.

III. *Conclusion*

For the reasons set forth above, plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: January 26, 2005

JAMES M. ROSENBAUM

United States District Judge